Ted A. Troutman
Troutman Law Firm, P.C.
5075 Griffith Drive, Suite 220
Beaverton, OR 97006
Telephone: (503) 292-6788
Facsimile: (503) 596-2371
tedtroutman@sbcglobal.net

Attorneys for Debtor

Brandy A. Sargent, OSB No. 045713
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Telephone: (503) 224-3380
Facsimile: (503) 220-2480
brandy.sargent@stoel.com

Attorneys for R&R Property Holdings, Inc.

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>Laura Lee Hagenauer,<br><br>          Debtor in Possession. | Case No. 14-63530-fra11<br><br>**JOINT MOTION BY DEBTOR AND R&R PROPERTY HOLDINGS, INC. TO APPROVE: (A) SALE OF REAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND DEBTOR'S ENTRY INTO REAL PROPERTY LEASE; AND (C) COMPENSATION TO REAL ESTATE BROKER** |

Laura Lee Hagenauer, the above-captioned debtor and debtor in possession (the "***Debtor***"),

and R&R Property Holdings, Inc. ("***R&R***" and, together with the Debtor, the "***Movants***")

respectfully submit this joint motion (this "***Motion***") seeking entry of an order (a) authorizing the

sale (the "***Sale***") of Debtor's commercial real property and certain fixtures located at 3071 Schmidt

80247414.4 0052781-00013

Lane, Hubbard, Oregon (the "***Property***") free and clear of liens, claims, encumbrances, and interests pursuant to the terms of this Motion and Section 363(b), (f) and (m) of Title 11 of the United States Code (the "***Bankruptcy Code***") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"); (b) authorizing the Debtor to enter into a lease of portions of the Property pursuant to Section 363(b) of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules; and (c) approving compensation to Debtor's real estate broker under Section 328 of the Bankruptcy Code and Rule 2016 of the Bankruptcy Rules.   In support of this Motion, the Movants respectfully represent as follows:

## I.  JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 28, 2014 (the "***Petition Date***").  No trustee or examiner has been appointed in this case.

3.      The Debtor continues to operate her business and manage her assets as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  An official committee of unsecured creditors (the "***Committee***") was appointed in this case by the United States Trustee on October 30, 2014.

## II.  Background

4.      Through her business located at the Property, the Debtor manufactures steel roofing and siding for use in agricultural and commercial buildings and sells trim products, accessories, and hardware.

80247414.4 0052781-00013

5.     Based on filed proofs of claim, the following creditors (collectively, the "***Lien Creditors***") claim liens on the Property (including security interests in fixtures, collectively, the "***Liens***"), in the following amounts and order of priority[, based on a preliminary title report]:

| Creditor | Lien Claim | Total Liens |
| --- | --- | --- |
| Marion County Assessor's Office (Prop. Taxes) | $   131,680.15 | $   131,680.15 |
| KeyBank National Association | $1,622,645.00 | $1,754,325.15 |
| US Small Business Administration | $   860,448.55 | $2,614,773.70 |
| Oregon Business Development Corporation | $   706,588.97 | $3,321,362.67 |
| Cascadia Metals Inc. | $   634,357.58 | $3,955,720.25 |
| Internal Revenue Service – tax lien | $   514,014.53 | $4,469,734.78 |

6.     On February 6, 2015, Key Bank National Association ("***KeyBank***") filed a motion for relief from stay to begin foreclosure proceedings against the Property, alleging that there was no equity in the Property and it was not necessary for an effective reorganization (the "***Stay Relief Motion***") and a motion to convert the case to Chapter 7 (the "***Conversion Motion***").  Cascadia Metals Inc. ("***Cascadia***") filed a response to the Stay Relief Motion, and the Debtor and the Committee objected to both the Stay Relief Motion and the Conversion Motion.

7.     Thereafter, the Debtor, KeyBank, Cascadia, and the Committee entered into a Stipulated Order on Various Motions (Docket No. 146, the "***Stay Relief Order***") resolving the Stay Relief Motion, the Conversion Motion, and certain other pending matters.  The Stay Relief Order provided that the Debtor would engage a real estate broker acceptable to KeyBank and Cascadia and cause the Property to be listed for sale at a price agreed upon by the parties.  Any sale was to be an "all cash" transaction, with full payment to be made at closing.  Bona fide offers were to be transmitted to the parties and if approved by Cascadia (the party to the Stay Relief Order holding the lowest priority Lien), the Debtor was to file a motion pursuant to Sections 363(b) and (f) to sell the Property.  In the event that a sale of the Property had not closed and the Debtor had not

confirmed a Plan of Reorganization by October 1, 2015, the stay was to terminate and KeyBank was to be granted relief from the automatic stay to proceed with foreclosure.

8.      Debtor filed an application to employ Coldwell Banker Commercial of Salem, Oregon (the "***Broker***") as the real estate broker for the Property, with compensation to be four percent (4%) of the sale price, subject to the Court's final approval.  (Docket No. 161.)  The application was granted by order entered on May 6, 2015 (the "***Broker Order***").

9.      The Property was listed for sale on April 30, 2015 for $3,775,000.  The Broker listed the Property on numerous commercial real estate services; was contacted by or contacted approximately 18 parties interested in the Property, and showed the Property three times, but only received one formal offers for the Property.[1]  On September 12, 2015, the Debtor received an offer from Johnco Inv. LLC  ("***Johnco***") to purchase the Property for $2,300,000, contingent on the buyer's completion of due diligence, negotiation of a lease back to the Debtor, and bankruptcy approval, to close before December 31, 2015 (the "***Johnco Offer***").

10.      On September 16, 2015, Cascadia advised the Debtor that it did not approve the Johnco Offer.  At the same time, Cascadia's affiliate, R&R, submitted an offer to purchase the Property for $2,600,000, contingent on the completion of due diligence and bankruptcy approval, to close within fifteen days of satisfaction of the contingencies (the "***R&R Offer***").

11.      The Debtor countered both the Johnco Offer and the R&R Offer with a proposed price of $3,175,000.  Thereafter, Johnco raised its offer to $2,400,000; R&R did not increase its offer, which still was the highest offer for the Property.

---

[1]      The Debtor also received an informal offer of $2,000,000, but the party making the informal offer never wrote-up a formal offer.

80247414.4 0052781-00013

12.     On September 29, 2015, Debtor accepted the R&R Offer.  A copy of the executed Standard Commercial Sale Agreement between the Debtor and R&R (the "***Sale Agreement***") is attached hereto as **Exhibit A**.  In summary, the Sale Agreement provides for: (i) an earnest money deposit ("Deposit") that R&R has already made into escrow at Ticor Title Insurance Company ("Title Company"); (ii) a contingency period of up to 45 days after the Opening of Escrow (which occurred on September 29, 2015), during which R&R will proceed to satisfy itself as to the condition of the Property, environmental matters, and other matters (Section 3 of Sale Agreement); (iii) a title review period of 15 days after receipt of a title report (Section 4 of Sale Agreement); (iv) a contingency for Court approval (Section 5 of Sale Agreement); and (v) a period of 15 days after satisfaction of contingencies for R&R to close the Sale.  In the event that R&R is not the successful purchaser of the Property, the costs of any environmental assessment will be borne by the Debtor.

13.     Thereafter, R&R and the Debtor reached an agreement that, if R&R was the purchaser of the Property, it would lease a portion of the Property back to the Debtor (the "***Lease***") to allow her to continue her business operations there and avoid the cost and loss of productivity entailed in moving.  A copy of the Lease is attached hereto as **Exhibit B**.  In summary, the Lease would commence at the closing of the Sale and continue for an initial period of 12 full calendar months, and thereafter be a year-to-year lease.  Either party can terminate the Lease on 90 days' notice at the end of the initial term or any renewal term.  For the initial term, the monthly rent would be a "gross rental" of $15,000 per month, inclusive of monthly base rent of $12,650 and Debtor's proportionate share of property taxes (estimated at $1,916.67 per month) and property insurance costs (estimated at $433.34 per month).  After the first year, unless the Lease is terminated, the rent becomes "triple net," and Debtor would pay her proportionate share of

80247414.4 0052781-00013

property taxes, property insurance and maintenance costs. Debtor is responsible for utilities that she uses. At the start of the Lease, Debtor would pay the first month's rent ($15,000) and a security deposit equal to $15,000 (which would be refundable at the end of the Lease, unless applied to cure a breach of the Lease).

14.     At a hearing held before the Court on October 1, 2015, the Court ordered the Debtor to file a motion to approve the Cascadia Offer and the Lease on or before October 7, 2015. This Motion is in response to such order.

### III.     RELIEF REQUESTED AND SUPPORT THEREFOR

15.     Movants hereby request entry of an order approving the Sale of the Property pursuant to the Sale Agreement and entry into the Lease, and making appropriate findings regarding R&R's good faith in connection with the Sale.

16.     In connection with approval of the Sale Agreement, Movants further request authority to pay the Broker the compensation to which it is entitled under the terms of its engagement agreement and the Broker Order.

### A.     The Proposed Sale Satisfies the Requirements of Section 363(b) of the Bankruptcy Code for a Sale Outside the Ordinary Course of Business.

17.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). To approve the use, sale or lease of property outside of the ordinary course of business, a debtor must demonstrate (1) a valid business justification; and (2) fair value. *See*, *Debilio v. Golden (In re Debilio),* Case No. CC-13-1441-TaPaKi, 2014 Bankr. Lexis 3886, *15 (B.A.P. 9th Cir. Sept. 11, 2014).

18.     Bankruptcy courts generally defer to a debtor's reasonable business judgment regarding the sale of estate assets. *Id.*; *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr.

D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew*, 14 B.R. at 513-14 (footnotes omitted).

19.     In this case, the Debtor has sound business reasons for the proposed Sale. First and foremost, the Debtor is obligated to proceed with the Sale under the terms of the Stay Relief Order. The stipulation embodied by the Stay Relief Order afforded the Debtor a reasonable opportunity to sell the Property, and the Sale Agreement was the highest and best offer received as part of that process.

20.     The Debtor also has determined that a prompt sale of the Property is appropriate given the Debtor's need to reduce costs associated with the Property. Debtor's regular debt service obligations related to the Property exceed $20,008.68 per month. After the Sale and upon commencement of the Lease, Debtor's base rent obligations will be $15,000 per month, a reduction of more than $7,500 per month.

21.     With respect to the value received by the estate, Debtor submits that the Sale Agreement represents the highest and best offer received by the Debtor after a reasonable marketing period and is a fair consideration for the Property. Based on a November 2014 appraisal of the Property for $3,800,000, the Property was initially listed for $3,775,000. Although the Property was aggressively marketed by the Broker, both locally and nationally, the Debtor received only one formal offer for the Property (the Johnco Offer of $2,300,000), other than the R&R Offer.

22.     The terms of the R&R Offer are favorable to the Debtor in that it is an all-cash and effectively noncontingent offer that will pay significant secured claims against the Property. Additionally, because the Sale Offer is coupled with the Lease, the Debtor will save approximately $83,000 in moving costs, will pay approximately half the amount of rent Debtor projected she

80247414.4 0052781-00013

would have to pay in a new facility, and will avoid the disruption to her business that would result from moving to a new location.

23. Additionally, the Notice of Intent and Hearing regarding this Motion advises parties in interest that competing bids may be submitted, provided they exceed the R&R Offer by $100,000 and are on the same or more favorable terms, including, without limitation, the Lease; and R&R has not requested or received any compensation or additional bid protections from the Debtor for its role as the proposed purchaser of the Property.

B. **The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, Encumbrances and Interests.**

24. Pursuant to Section 363(f) of the Bankruptcy Code, a debtor may sell property free and clear of any lien, claim, or interest in such property of an entity other than the estate, if, among other things—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

25. Because Section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of the five requirements is sufficient to permit the Debtor to sell the Property free and clear of the Lien Creditors' Liens on the Property.

26. The Debtor anticipates providing evidence at the hearing on this Motion that most, if not all, of the six Lien Creditors identified above have affirmatively consented to the Sale

8

pursuant to the terms of this Motion, including payment of the Broker's commission and the other ordinary costs of the Sale. *See In re Smith*, Case No. 13-61627, 2014 Bankr. Lexis 779, *3-4 (Bankr. D. Or. Feb. 26, 2014) (affirmative consent required under Section 363(f)(2); non-objection does not constitute consent).

27.     If any of the six Lien Creditors does not consent, the Debtor believes such non-consenting Lien Creditor could be compelled to accept a money satisfaction of its Lien in a legal or equitable proceeding, thereby satisfying the alternative provision of Section 365(f)(5) of the Bankruptcy Code.[2]  In order to sell property free and clear under Section 363(f)(5), the Debtor must demonstrate that there is "at least the possibility of an available 'legal or equitable proceeding in which a court could compel [a claimant] to release its lien for payment of an amount that [is] less than full value of [its] claim." *Id.* at *9 (*citing Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 45-46 (B.A.P. 9th Cir. 2008)).

28.     Based on a purchase price of $2,600,000, the Sale will fully satisfy, at the very least, the Liens of Marion County and KeyBank.  In Oregon, a real estate tax lien will be released upon payment in full of the underlying tax obligation, and a debtor may bring a quiet title action to remove the satisfied lien if necessary.  ORS 105.605.  The situation is no different with respect to KeyBank.  KeyBank's deed of trust on the Property requires it to execute a request for full reconveyance once the indebtedness if fully satisfied.  [*See Claim No. 21-1.*]  Oregon law further provides that a grantor may force reconveyance upon payment.  ORS 86.720.

29.     With respect to the Liens on the Property that are junior to the Liens of Marion County and KeyBank, each such junior Lien could be foreclosed in connection with a sale by

---

[2] Alternatively, to the extent that the authorities cited herein constitute applicable nonbankruptcy law that would authorize the Sale free and clear of Interests, Section 363(f)(1) would also apply to the Sale.

KeyBank pursuant to the trust deed statute, ORS 86.797. In such a case, if there were sufficient proceeds from the foreclosure sale, the proceeds would be paid to the junior lien holders in their order of priority, and their Liens on the Property would be extinguished. ORS 86.794.

30. Not only are these methods of compelling release of the Lien Creditors' Liens on the Property "possible", they are already a practical reality. KeyBank instituted a foreclosure of the Property in August 2014, (Case No. 14C19185, Marion County Oregon) [Claim No. 21-1], just before this bankruptcy case was filed. Further, KeyBank has been granted relief from stay [Docket No. 146] and has advised this Court, including at the hearing held on October 1, 2015, that it intends to pursue its recovery through foreclosure of the Property if it is not sold.

31. Debtor proposes that any Lien would attach to the net proceeds of the Sale. Accordingly, the requirements of Section 363(f) of the Bankruptcy Code will be satisfied pursuant to both Section 363(f)(2) and (5), and the Property may be sold free and clear of the Liens on the Property held by the Lien Claimants.

C. **The Court Should Find R&R's Purchase of the Property is in Good Faith.**

32. Pursuant to Section 363(m) of the Bankruptcy Code, if an order approving a sale under Section 363(b) is reversed on appeal, such reversal does not affect the validity of the sale to a party that purchased the property in good faith. 11 U.S.C. § 363(m). Accordingly, if an appellant fails to obtain a stay of a sale order, any appeal of the order will be rendered moot. *In re Southwest Products, Inc.*, 144 B.R. 100, 103 (B.A.P. 9th Cir. 1992). Good faith involves a showing of the absence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.*

33. In this case, R&R has engaged in good faith, arm's-length negotiations with the Debtor, and there has been no fraud or collusion, or action prejudicial to other bidders. At the hearing on the Motion, the Debtor and R&R will provide testimony in support of the fact that: both

parties were represented in the negotiations resulting in the Sale Agreement by their respective independent professionals; the identity and role of R&R, including its affiliation with Cascadia, a creditor and vendor to Debtor, was fully disclosed at all times (*See Medical Software Solutions*, 286 B.R. 431, 445-446 (Bankr. D. Utah 2002) (finding that debtor acted in good faith where the debtor "disclosed all elements of the transaction, including the insider status of the proposed purchaser")); R&R has a legitimate business purpose for purchasing the Property, and that the Sale is not intended or expected to prejudice any other party; the marketing and sale process was open to all interested bidders, without unfair advantage to R&R or prejudice to any competing bidder; and the terms of the Sale are $200,000 better than the next highest offer and, coupled with the Lease, contain all of the benefits the next highest offer would have provided.

34.     Accordingly, Debtor submits that the Court can and should make a finding of good faith pursuant to Section 363(m).

>       **D.     Entry into the Lease is a Sound Exercise of the Debtor's Business Judgment.**

35.     The same standard that applies to property sales under Section 363(b) applies to a debtor's entry into a real estate lease. *See In re Caldor, Inc.*, 193 B.R. 182, 187 (Bankr. S.D.N.Y. 1996). Debtor has exercised her business judgment in negotiating and agreeing to the terms of the Lease. As previously noted, the base rent under the Lease is more than $7,000 per month lower than the debt service the Debtor has paid on the Property. Further, the monthly rent is approximately half of what the Debtor estimates she would have to pay each month in debt service for a new building (if she could finance one). Finally, by entering into the Lease, the Debtor will save more than $80,000 in estimated moving costs and avoid the lost productivity and business interruption that inevitably would occur if the Debtor were required to move.

E.    **Payment of the Broker's Commission Should Be Approved.**

36.    The Court has already approved the Broker's retention and compensation, subject to entry of a final order.  Pursuant to Bankruptcy Rule 2016(a), an entity seeking compensation must "file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested."  Pursuant to Local Rule 2016-1(c)(2)(A) & (B), chapter 11 real estate brokers are permitted to request compensation without the use of a local form, but are required to file a fee application as a proof of claim.  The Broker has filed or will timely file a proof of claim prior to the hearing on this Motion.  Additionally, in order to provide appropriate notice under Bankruptcy Rule 2002(a)(6), the Debtor has included in its notice of this Motion information regarding the Broker's requested commission.  The Debtor requests that a commission in the amount of $104,000, which is four percent (4%) of the gross sale price under the Sale Agreement, be approved.   The Debtor submits that, pursuant to Section 330(a)(1), this amount is reasonable compensation for actual, necessary services rendered by the Broker.

## IV.    NOTICE

37.    In accordance with Local Rule 2002-1(b), notice of this Motion, including all of the information required under Local Rule 2002-1(b)(2) and (b)(3), has been provided to all creditors and parties in interest as identified on the Certificate of Service accompanying this Motion.

38.    The Debtor submits that this Motion will provide adequate notice to all parties in interest of the proposed Sale, including sufficient time for parties in interest to submit objections and for any party that desires to submit a competing bid for the Property to do so.

80247414.4 0052781-00013

## V.    CONCLUSION

For the reasons stated herein, the Movants respectfully requests entry of an order (i) authorizing Debtor's consummation of the Sale of the Property pursuant to the terms of the Sale Agreement and Section 363(b) of the Bankruptcy Code; (ii) approving the Sale of the Property free and clear of the Lien Creditors liens, claims, encumbrances and interests pursuant to Section 363(f); (iii) finding that R&R is a good faith purchaser for purposes of Section 363(m); (iv) authorizing the Debtor to enter into the Lease pursuant to Section 363(b); (v) approving the Debtor's payment of a 4% commission to the Broker following the closing of the Sale; and (vi) granting the Movants such other and further relief as the Court deems just and proper.

DATED:  October 7, 2015.                     TROUTMAN LAW FIRM, P.C.

/s/ Ted A. Troutman
Ted A. Troutman, OSB No. 844470
5075 Griffith Drive, Suite 220
Beaverton, OR 97006
Telephone:  (503) 292-6788
Facsimile:  (503) 596-2371


STOEL RIVES LLP


/s/ Brandy A. Sargent
Brandy A. Sargent, OSB No. 045713
900 S.W. Fifth Avenue, Suite 2600
Portland, OR 97204
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

80247414.4 0052781-00013

STANDARD COMMERCIAL
SALE AGREEMENT

THIS IS A LEGALLY BINDING CONTRACT. IF NOT UNDERSTOOD, SEEK COMPETENT ADVICE.

_____September 16___, 2015

FOR VALUE RECEIVED, and in consideration of the mutual promises contained in this SALE AGREEMENT (the "Agreement"), the undersigned __LAURA LEE HAGENAUER___ ("Seller") agrees to sell, and the undersigned __R &. R PROPERTY HOLDINGS, INC., a Washington corporation__ ("Purchaser") agrees to purchase, subject to the conditions stated in this Agreement, the following property, situated in the State of Oregon, to-wit: __the buildings, the cranes and other improvements on the property that are used in connection with the building, and land located at 3071 Schmidt Lane NE, Hubbard, OR 97032, as more particularly described in the attached Exhibit A__ (collectively, the "Property"), on the following terms and conditions:

1. **PURCHASE PRICE.** The purchase price ("Purchase Price") for the Property shall be TWO MILLION SIX HUNDRED THOUSAND AND 00/100THS Dollars ($2,600,000.00 ). The terms of such purchase shall be: __all cash at Closing__. **This** Agreement is not subject to (or conditioned upon) the need for Purchaser to obtain any financing on the Property.

2. **DEPOSIT AND ESCROW.** Purchaser will deposit in escrow an earnest money deposit in the amount of __TWENTY-FIVE THOUSAND DOLLARS ($25,000.00)__ (the "Deposit"), within three business days after the Opening of Escrow . The escrow agent ("Escrow Agent") will be a branch office of a title company in Oregon ("Title Company") mutually acceptable to Seller and Purchaser. The earnest money deposit (the "Deposit") will be refunded to Purchaser if Purchaser terminates this Agreement during the Contingency Period described below. If this Agreement is not so terminated, the Deposit will become a forfeitable earnest money deposit and will be applied to the Purchase Price due at closing. This Agreement will constitute the parties' instructions to Escrow Agent; *provided*, that if Escrow Agent requires separate or additional instructions or information from the parties, the parties will reasonably and promptly execute such instructions and/or provide such information. The date on which Escrow Agent notifies the parties that it has received an executed copy or counterpart copy of this Agreement is the "Opening of Escrow."

3. **CONTINGENCY PERIOD AND APPROVAL BY PURCHASER.** The review and contingency period ("Contingency Period") for Purchaser to satisfy itself concerning inspections, investigations or other "due diligence" reviews of the Property will be as follows:  __the Contingency Period will start on the date of this Agreement and  will expire and terminate upon the date that is forty-five (45) days after the date of Opening of Escrow, within which Purchaser shall satisfy itself as to the following: (1) the physical condition of the Property including physical condition, zoning and use, (2) the environmental condition of the Property, including receipt of a "phase 1" environmental assessment of the Property (as provided below), (3) all relevant business documents pertaining to the Property, including (without limitation) any existing reports or information in Seller's possession concerning the environmental condition of the Property, any surveys, any notices of violation in Seller's possession that pertain to the Property, any other studies or notices pertaining to the Property, and copies of any other written information in Seller's possession pertaining to the condition, use, operation or ownership of the Property that Purchaser may reasonably require, and (4) any other studies or matters that Purchaser chooses to review and that are pertinent to the Property.__ During the Contingency Period, Purchaser may terminate the Agreement in its discretion, if Purchase determines that the contingencies are not satisfied. If it does so, any deposit made by Purchaser shall be refunded.

After mutual execution of this Agreement, the parties will order a "phase 1" environmental assessment (the "Phase I Assessment") of the Property from an environmental consulting firm acceptable to Purchaser, which will be addressed jointly to Seller and Purchaser. Purchaser will pay for the cost of the Phase I Assessment at Closing (as provided below) or if the transaction fails to close solely because of Purchaser's default or refusal to close the purchase of the Property after removal of contingencies (and, otherwise, the cost of the Phase I Assessment will be paid by Seller or any overbidder who becomes the final purchaser of the Property pursuant to a Final Order, as defined and described below).

4. **TITLE REVIEW AND APPROVAL.** Upon mutual execution of this Agreement, Seller will furnish to Purchaser a preliminary title report showing the status of title to the Property, along with a legible copy of the exceptions to title shown in the title report. Purchaser will have fifteen (15) days after receipt of the title report to notify Seller as to any matter shown on the title report to which Purchaser objects. Any matter shown on the title report that Purchaser does not disapprove within such 15-day period will be deemed conclusively approved by Purchaser ("Permitted Exceptions"). Seller may, but will not be required to, elect to cure any disapproved title matter or notify Purchaser that Seller elects not to cure. If Seller elects to cure a disapproved title matter, Seller will have until Closing to cure the matter. If Seller elects not to cure or is unable to cure a disapproved title matter, Seller may so notify Purchaser, and Purchaser will have five (5) days after receipt of such notice to elect to waive any objection to the previously disapproved title matter, and if not so waived, this Agreement shall terminate. At Closing, an owner's title insurance policy will be issued to Purchaser, in form reasonably acceptable to Purchaser, insuring that Purchaser holds good and merchantable fee title to the Property, subject only to the Permitted Exceptions and any other exception specifically approved by Purchaser.

5. **BANKRUPTCY COURT APPROVAL.** The parties acknowledge that Seller is the subject of that certain bankruptcy case, Case No. 14-63530-FRA11 (the "Bankruptcy Case"), which is pending in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court"). The parties further acknowledge that the transactions described in this Agreement are subject to the approval of the Bankruptcy Court and cannot be consummated without such approval. Seller shall file a motion with the Bankruptcy Court seeking the entry of an order (the "Approval Order") authorizing Seller to enter into this Agreement and consummate the transactions described herein. Purchaser shall use commercially reasonable efforts to cooperate with Seller in the filing of the motion for the Approval Order. The parties' obligations under this Agreement are conditioned upon the Approval Order becomes a Final Order. "Final Order" means that (i) the Approval Order has been entered in the Bankruptcy Case, and (ii) the period in which the Approval Order is subject to any rights of appeal, certiorari proceeding, or other proceeding for review or rehearing has ended, or if any appeal, certiorari proceeding or other review or rehearing occurs), it has ended and the Approval Order is not subject to further rights of legal challenge.

6. **CLOSING.** The escrow shall be closed (the "Closing") on a date mutually acceptable to the parties ("Closing Date"), within fifteen (15) days after the date on which the conditions to Closing set forth above are satisfied. At Closing, the following will take place: (a) Seller will convey the Property to Purchaser pursuant to a good and sufficient, statutory warranty deed ("Deed") and bill of sale (the form of which will be approved by the parties within the Contingency Period); (b) the Title Company will commit to issue to Purchaser an owner's policy of title insurance, in the amount of the Purchase Price and subject to no liens or encumbrances, other than the Permitted Exceptions and any other exception specifically approved by Purchaser in its review of title; and (c) Purchaser will pay the Purchase Price to Seller.

FORM - Purchase and Sale Agreement (Oregon)
79982533.1 0200079-00001

Current property taxes shall be prorated as of the Closing Date (such property taxes, if not yet assessed, to be deemed equal to those for the last preceding year, subject to a post-Closing adjustment when the actual amount of property taxes becomes known). Seller and Purchaser shall equally divide the escrow fee, if the parties choose to close this transaction in escrow with the title company. The cost of the owner's policy of title insurance to be issued to Purchaser in the amount of the Purchase Price will be paid by Seller. Seller will be responsible for causing the Property to be released from the Bankruptcy Case and any liens on the Property, other than current property taxes. Purchaser will pay the recording fee for the Deed and the cost of its "due diligence" investigations. Each party will pay its own legal and consulting fees.

If any post-Closing reconciliation or adjustment is required between the parties pursuant to this Agreement (because of an adjustment or prorate that is done on an estimated basis, or otherwise), the parties will reasonably co-operate with each other to provide the information needed for such reconciliation and adjustment, and will promptly do the reconciliation and adjustment when the information is available to do so. If any other closing costs not specifically provided for herein are due at closing of this transaction, each party shall pay such closing costs as are normally and customarily the responsibility of such party. This paragraph 6 shall survive the Closing for all purposes.

**7. UNTIL CLOSING; SELLER'S COOPERATION.** From the date of this Agreement until the Closing Date, Seller will continue to cause the Property to be maintained in substantially the same manner and condition which now exists, and will not further mortgage or further encumber its interest in the Property. Seller will cooperate in executing any documents and doing such other things as Purchaser may reasonably request in connection with Purchaser's due diligence activities; provided, that such actions will be at no out-of-pocket expense to Seller, and neither Seller nor the Property will be bound if Purchaser does not close the purchase of the Property.

**8. CONDEMNATION.** If, prior to Closing, any part of the Property is condemned or appropriated by public authority or any party exercising the right of eminent domain, or is threatened thereby, then this Agreement shall, at the election of Purchaser, become null and void. In the event Purchaser elects not to terminate this Agreement, the purchase price shall be reduced by the amount of the Seller's award pertaining to the Property. Seller will promptly notify Purchaser as to the commencement of any such action known to Seller or any communication from a condemning authority that a condemnation or appropriation is contemplated, and will cooperate with Purchaser prior to Closing in the response to or defense of such actions in order to maximize the award.

**9. NOTICES.** All notices given pursuant to this Agreement shall be in writing and shall either be (i) mailed by first class mail, postage prepaid, certified or registered with return receipt requested, (ii) delivered in person or by nationally recognized overnight courier, or (iii) sent by facsimile or as a PDF attachment to an email, if the party has specified a facsimile number or email address to use for notice purposes. Notices shall be effective when received (or deemed received by the party). Any notice transmitted by overnight courier service or by certified mail shall be deemed received as of the date of delivery to the address of the party, as confirmed by the overnight courier or as shown on the certified mail return receipt. Any such notice transmitted by facsimile shall be deemed received 12 hours after being telecopied and receipt has been confirmed either electronically or otherwise. Notice given to a party in any manner not specified above shall be effective only if and when received by the addressee as demonstrated by objective evidence in the possession of the sender. The address of each party to this Agreement for purposes of notice are as set forth below their signatures. A copy of any notice to either party will be sent to the party's legal counsel, as the party may designate. Each party may change its address for notice by giving not less than ten (10) days' prior notice of such change to the other party in the manner set forth above. Delivery of the copy of any notice to the places to which copies are to be sent is not a precondition to the effectiveness of the notice between the parties themselves.

For the purpose of this Agreement, the term "receipt" shall include the earlier of any of the following: (i) the date of actual receipt of the notice by the office of the person or entity pursuant to this Agreement, whether or not any named individual at such address receives the notice, or (ii) in the case of refusal to accept delivery or inability to deliver the notice because of the recipient's failure to maintain an address at which notices can be delivered, then the earlier of (A) the date of the attempted delivery or refusal to accept delivery, or (B) the date of receipt of notice of refusal or notice of non-delivery by the sending party.

**10. REPRESENTATIONS AND WARRANTIES.** Seller warrants and represents to Purchaser as follows: (1) to Seller's knowledge, the Property is not in violation of any zoning, land-use, environmental, public health, or safety laws; (2) to Seller's knowledge, the Property, buildings and improvements (including any HVAC, plumbing, life-safety and other installed building systems and cranes) are in good and working condition and free of any known defects; (3) Seller is not aware of any pending or threatened litigation affecting the Property; (4) Seller is not aware of any pending or threatened condemnation proceedings or change in zoning affecting the Property; and (5) this Agreement has been, and all the documents to be delivered by Seller to Purchaser at Closing will be, duly authorized, executed and delivered by Seller, are or will be legal, valid, and binding obligations of Seller, will be sufficient to convey title to the Property, are or will be enforceable in accordance with their respective terms, and do not and will not at Closing violate any provisions of any agreement to which Seller is a party or by which the Property is bound.

Seller represents that, to Seller's knowledge, (a) there are no known hazardous substances on, under, in or about the Property in violation of any applicable environmental laws; (b) there have been no known spills, releases, discharges or disposal of any hazardous substances that have occurred or are presently occurring on or onto the Property or off the Property as a result of any construction on or operation and use of the Property; (c) there are no known underground storage tanks located on or immediately adjacent to the Property; or (d) there is no known contamination in the ground water on, under or about the Property. The term "hazardous substances" does not include cleaning materials, landscape fertilizer and other products and materials ("Permitted Materials") typically used in the ordinary course of maintaining and operating a commercial property similar to the Property (provided such Permitted Materials are in ordinary quantities and have been used in accordance with applicable environmental laws).

As used in the Agreement, the terms "known" or "knowledge" (or similar terms) means the actual, conscious knowledge of facts by Seller (and does not include "constructive" knowledge or imply any particular duty of investigation of facts not actually known by Seller). Seller's representations and warranties are made as of the Effective Date and will be deemed to be re-made as of the Closing Date. This paragraph 10 will survive the Closing Date and be fully enforceable thereafter; provided, that Seller will not be deemed in breach of the representations or warranties in this Agreement or be liable to Purchaser for any claimed misrepresentation in this Agreement after the Closing Date on a representation made to Seller's knowledge unless Seller had actual knowledge on the Closing Date that the representation or warranty was false and failed to provide promptly the Discovery Notice (as defined and set forth

below) to disclose to Purchaser the matter, occurrence or condition that was discovered by or made known to Seller which made the representation or warranty false.

If, prior to the Closing, Seller obtains actual knowledge of a matter, occurrence or condition that would cause any representation made by Seller in this Agreement to be misleading or inaccurate, then (i) Seller will promptly notify Purchaser ("Discovery Notice") of the fact discovered by or made known to that would cause such any such representation to be misleading or inaccurate, and (ii) Purchaser will have the option to terminate this Agreement within five (5) days after receipt of such Discovery Notice if the matter, occurrence or event that was disclosed might adversely affect the value of the Property or Purchaser's ability to use the Property after the Closing Date. If Purchaser terminates this Agreement pursuant to this paragraph, the Deposit will be refunded to Purchaser, and neither party will have any further obligation to the other party under this Agreement (whether or not such events occur during or after the end of any contingency period provided in this Agreement).

## 11. REMEDIES; COSTS AND ATTORNEYS' FEES.

**11.1** **Seller's Default.** Seller shall be deemed to be in default under this Agreement if Seller fails, for any reason other than Purchaser's default under this Agreement, to meet, comply with, or perform any covenant, agreement, or obligation required on its part within the time limits and in the manner required in this Agreement, or a material breach shall have occurred of any representation or warranty made by Seller ("Seller's Default"). In the event of Seller's Default, Purchaser shall be entitled to exercise all remedies available under applicable law for breach of contract, including (without limitation) specific performance, and collection of damages and costs and attorneys' fees in connection with enforcement of this Agreement, and other sums allowed by law.

**11.2** **Purchaser's Default and Failure to Close.** If Purchaser defaults and fails to close the purchase, and neither party has exercised any right to terminate or rescind this Agreement as provided herein, the Deposit shall be retained by Seller as liquidated damages. PURCHASER AND SELLER ACKNOWLEDGE AND AGREE THAT SELLER'S DAMAGES IN THE EVENT OF BREACH BY PURCHASER WOULD BE EXTREMELY DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT THE DEPOSIT AMOUNT IS THE PARTIES' BEST ESTIMATE OF THE DAMAGES SELLER WOULD SUFFER IN THE EVENT THIS TRANSACTION FAILS TO CLOSE BY REASON OF PURCHASER'S BREACH OF THIS AGREEMENT, AND THAT SUCH ESTIMATE IS REASONABLE COMPENSATION UNDER THE CIRCUMSTANCES EXISTING ON THE EFFECTIVE DATE OF THIS AGREEMENT AND THE EXCLUSIVE REMEDY FOR PURCHASER'S DEFAULT, SINCE THE PRECISE AMOUNT OF SUCH COMPENSATION WOULD BE DIFFICULT TO DETERMINE. In addition, Purchaser will pay the cost of the Phase I Assessment, as provided in Section 3.

The foregoing is accepted and agreed to:

Initials of: _____  _____
             Seller   Purchaser

If this transaction fails to close for any reason other than Purchaser's default, Purchaser will be entitled to a refund of the Deposit upon demand.

12. **GENERAL PROVISIONS.** (a) Time of Essence. TIME IS OF THE ESSENCE of each and every provision of this Agreement.

   (a) Brokers. Each party will defend, indemnify and hold the other party harmless from any claim, loss or liability made or imposed by any party claiming a commission or fee in connection with this transaction and arising out of its own conduct. Seller has used ALEX RHOTEN/TIFFANY JONES of COLDWELL BANKER COMMERCIAL MWRE, LLC on this transaction.

   (b) Prior Agreements. This document is the entire, final and complete agreement of the parties with respect to this transaction, and supersedes and replaces all written and oral agreements previously made or existing between the parties or their representatives with respect to the Option.

   (c) Counterparts; PDF and Facsimile Transmissions. This Agreement may be executed simultaneously or in separate counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties to this Agreement may execute the Agreement by signing counterpart signature pages. Signatures transmitted by telecopy or as emailed PDF copies shall be binding as originals, and each party hereby waive any defenses to the enforcement of the terms of this Agreement or any document sent by emailed PDF, based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").

   (d) Invalidity of Provisions. In the event any provision of this Agreement is declared invalid or is unenforceable for any reason, such provision shall be deleted from the Agreement and shall not invalidate any other provision contained in the Agreement.

   (e) Governing Law. This Agreement affects property located in the State of OREGON, and this Agreement will be interpreted and enforced in accordance with the laws of the State of Oregon.

   (f) Waiver. Failure of either party at any time to require performance of any provision of this Agreement shall not limit the party's right to enforce the provision. Waiver of any breach of any provision shall not be a waiver of any succeeding breach of the provision or a waiver of the provision itself or any other provision.

   (g) Legal Effect. THIS IS A LEGALLY BINDING CONTRACT. ALL PARTIES SHOULD SEEK ADVICE OF COUNSEL BEFORE SIGNING.

   (h) Saturday, Sunday and Legal Holidays. If the time for performance of any of the terms, conditions and provisions of this Agreement shall fall on a Saturday, Sunday or legal holiday, then the time of such performance shall be extended to the next business day thereafter. As used in this Agreement, the expression (i) "business day" means every day other than a nonbusiness day, and (ii) "nonbusiness day" means a Saturday, Sunday or legal holiday in the State of Oregon. In any case where a payment is due, an act is to be performed, a notice is to be delivered or a period expires under this Agreement on a non-business day, such occurrence shall be deferred until the next succeeding business day.

   (i) Assignment and Succession. This Agreement shall be binding upon and inure to the benefit of the parties, and their respective heirs, personal representatives, successors, and assigns, but Purchaser shall not assign or otherwise transfer any interest without the prior written consent of Seller, which may be given (or withheld) in Seller's commercially reasonable judgment. Without the need for such consent, Purchaser may assign its rights under this Agreement at any time to any person or entity that is affiliated with or under common control with Purchaser or Purchaser's principals or affiliates and may cause the title to be taken in the name of a nominee or third party at Closing, but no such action will constitute a release of Purchaser's liability under this Agreement..

   (j) Oregon Statutory Notice. THE PROPERTY DESCRIBED IN THIS INSTRUMENT MAY NOT BE WITHIN A FIRE PROTECTION DISTRICT PROTECTING STRUCTURES. THE PROPERTY IS SUBJECT TO LAND USE LAWS AND REGULATIONS THAT, IN FARM OR FOREST ZONES, MAY NOT AUTHORIZE CONSTRUCTION OR SITING OF A RESIDENCE AND THAT LIMIT LAWSUITS AGAINST FARMING OR FOREST PRACTICES AS DEFINED IN ORS 30.930 IN ALL ZONES. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER ORS 195.300, 195.301, AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON

LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY THAT THE UNIT OF LAND BEING TRANSFERRED IS A LAWFULLY ESTABLISHED LOT OR PARCEL, AS DEFINED IN ORS 92.010 OR 215.010, TO VERIFY THE APPROVED USES OF THE LOT OR PARCEL, TO VERIFY THE EXISTENCE OF FIRE PROTECTION FOR STRUCTURES AND THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the dates shown below.

Dated: 9-29-15, 2015

SELLER: LAURA LEE HAGENAUER

By _____
Name:

Address for Notices to Seller:
To be provided by Seller

Dated: Sept 16, 2015

PURCHASER: R & R PROPERTY HOLDINGS, INC.,
a Washington corporation

By _____
Name: Dwaine Odinson, CA
Title: Controller

Address for Notices to Purchaser:
R & R PROPERTY HOLDINGS, INC.
Attention: Dwaine Odinson, CA
Controller
7449 River Rd.
Delta, British Columbia
CANADA V4G1B9

Telephone: (604) 946-0916
Facsimile: (604) 946-0783
Email: dwaineo@napsteel.com

EXHIBIT A

DESCRIPTION OF PROPERTY

The Property is known also known as: 041W33DC, Tax Lot 400, Marion County, Oregon; Tax Assessor's Parcel No. R11578. The legal description of the Property is set forth below or attached to this Exhibit A (or, if not, then the parties will use the legal description as it appears in the preliminary title commitment referred to in this Agreement, and will reasonably approve and attach it as soon as available).

The Property includes, without limitation, the land, the manufacturing building and coil storage building located thereon ("Building(s)"), the cranes used in connection with the operation of the Building(s), and the chain link fence at the perimeter of the Property boundary lines, and other improvements that are located on the land and/or that are in or a part of the Building(s).

*THIS INDENTURE OF LEASE*, entered into this ........................................ day of ........................................, ........,
between ........................................ R & R PROPERTY HOLDINGS, INC., a Washington corporation ........................................
........................................................................................................................................................................,
*hereinafter called the lessor, and* ........................................ LAURA LEE HAGENAUER ........................................
........................................................................................................................................................................
........................................................................................................................, *hereinafter called the lessee,*

*WITNESSETH: In consideration of the covenants herein, the lessor hereby leases unto the lessee those certain premises, as is, situated in the City of* .... Hubbard ........................................, *County of* ... Marion ........................................ *and State of* ........................................, *hereinafter called the premises, described as follows:*

See attached ADDENDUM, incorporated into this Lease by this reference.

*To Have and to Hold the premises commencing with the* ................ *day of* See attached Addendum ........,
*and ending at midnight on the* ................ *day of* ........................................, ........, *for a rental of $........................................
for the whole term, which lessee agrees to pay, at* Landlord's address under this Lease ........................................,
*City of* ........................................, *State of* ........................................, *at the following times and in the following amounts, to-wit:*

SEE ATTACHED ADDENDUM

*In consideration of the leasing of the premises and of the mutual agreements herein contained, the parties agree as follows:*

**LESSEE'S ACCEPTANCE OF LEASE** *(1) The lessee accepts this letting and agrees to pay to the order of the lessor the monthly rentals above stated for the full term of this lease, in advance, at the times and in the manner aforesaid.*

**USE OF PREMISES** *(2a) The lessee shall use the premises during the term of this lease for the conduct of the following business:*

.................................................................................................................................................................

See Addendum

.............................................................................. *and for no other purpose whatsoever without lessor's written consent.*

*(2b) The lessee will not make any unlawful, improper or offensive use of the premises; the lessee will not suffer any strip or waste thereof; the lessee will not permit any objectionable noise or odor to escape or to be emitted from the premises or do anything or permit anything to be done upon or about the premises in any way tending to create a nuisance; the lessee will not sell or permit to be sold any product, substance or service upon or about the premises, excepting such as lessee may be licensed by law to sell and as may be herein expressly permitted.*

*(2c) The lessee will not allow the premises at any time to fall into such a state of repair or disorder as to increase the fire hazard thereon; the lessee will not install any power machinery on the premises except under the supervision and with written consent of the lessor; the lessee will not store gasoline or other highly combustible materials on the premises at any time; the lessee will not use the premises in such a way or for such a purpose that the fire insurance rate on the improvements on the premises is thereby increased or that would prevent the lessor from taking advantage of any rulings of any agency of the state in which the premises are situated, or which would allow the lessor to obtain reduced premium rates for long term fire insurance policies.*

*(2d) The lessee shall comply at lessee's own expense with all laws and regulations of any municipal, county, state, federal or other public authority respecting the use of the premises. These include, without limitation, all laws, regulations and ordinances pertaining to air and water quality, Hazardous Materials as herein defined, waste disposal, air emissions, and other environmental matters. As used herein, Hazardous Material means any hazardous or toxic substance, material, or waste, including but not limited to those substances, materials, and waste listed in the U.S. Department of Transportation Hazardous Materials Table or by the U.S. Environmental Protection Agency as hazardous substances and amendments thereto, petroleum products, or such other substances, materials, and waste that are or become regulated under any applicable local, state, or federal law.*

*(2e) The lessee shall regularly occupy and use the premises for the conduct of lessee's business, and shall not abandon or vacate the premises for more than ten days without written approval of lessor.*

*(2f) Lessee shall not cause or permit any Hazardous Material to be brought upon, kept or used in or about the premises by lessee, its agents, employees, contractors, or invitees without the prior written consent of lessor, which consent will not be unreasonably withheld so long as lessee demonstrates to lessor's reasonable satisfaction that such Hazardous Material is necessary or useful to lessee's business and will be used, kept, and stored in a manner that will comply at all times with all laws regulating any such Hazardous Material so brought upon or used or kept on or about the premises.*

**UTILITIES** *(3) The lessee shall pay for all heat, light, water, power, and other services or utilities used in the premises during the term of this lease.*

**REPAIRS AND IMPROVEMENTS** *(4a) The lessor shall not be required to make any repairs, alterations, additions or improvements to or upon the premises during the term of this lease, except only those hereinafter specifically provided for; the lessee hereby agrees to maintain and keep the premises, including all interior and exterior walls and doors, heating, ventilating and cooling systems, interior wiring, plumbing and drain pipes to sewers or septic tank, in good order and repair during the entire term of this lease, at lessee's own cost and expense, and to replace all glass which may be broken or damaged during the term hereof in the windows and doors of the premises with glass of as good or better quality as that now in use; it is further agreed that the lessee will make no alterations, additions or improvements to or upon the premises without the written consent of the lessor first being obtained.*

*(4b) The lessor agrees to make all necessary structural repairs to the building, including exterior walls, foundation, roof, gutters and downspouts, and the abutting sidewalks. The lessor reserves and at any and all times shall have the right to alter, repair or improve the building of which the premises are a part, or to add thereto, and for that purpose at any time may erect scaffolding and all other necessary structures about and upon the premises and lessor and lessor's representatives, contractors and workers for that purpose may enter in or about the premises with such materials as lessor may deem necessary therefor, and lessee waives any claim to damages, including loss of business resulting therefrom.*

**LESSOR'S RIGHT OF ENTRY** *(5) It shall be lawful for the lessor, the lessor's agents and representatives, at any reasonable time to enter into or upon the premises for the purpose of examining into the condition thereof, or for any other lawful purpose.*

**RIGHT OF ASSIGNMENT** *(6) The lessee will not assign, transfer, pledge, hypothecate, surrender or dispose of this lease, or any interest herein, sublet, or permit any other person or persons whomsoever to occupy the premises without the written consent of the lessor being first obtained in writing; this lease is personal to lessee; lessee's interests, in whole or in part, cannot be sold, assigned, transferred, seized or taken by operation at law, or under or by virtue of any execution or legal process, attachment or proceedings instituted against the lessee, or under or by virtue of any bankruptcy or insolvency proceedings had in regard to the lessee, or in any other manner, except as above mentioned.*

**LIENS** *(7) The lessee will not permit any lien of any kind, type or description to be placed or imposed upon the improvements in which the premises are situated, or any part thereof, or the land on which they stand.*

**ICE, SNOW, DEBRIS** *(8) If the premises are located at street level, then at all times lessee shall keep the sidewalks in front of the premises free and clear of ice, snow, rubbish, debris and obstruction; and if the lessee occupies the entire building, the lessee will not permit rubbish, debris, ice or snow to accumulate on the roof of the building so as to stop up or obstruct gutters or downspouts or cause damage to the roof, and will save harmless and protect the lessor against any injury whether to lessor or to lessor's property or to any other person or property caused by lessee's failure in that regard.*

**OVERLOADING OF FLOORS** *(9) The lessee will not overload the floors of the premises in such a way as to cause any undue or serious stress or strain upon the building in which the premises are located, or any part thereof, and the lessor shall have the right, at any time, to call upon any competent engineer or architect whom the lessor may choose, to decide whether or not the floors of the premises, or any part thereof, are being overloaded so as to cause any undue or serious stress or strain on the building, or any part thereof, and the decision of the engineer or architect shall be final and binding upon the lessee; and in the event that it is the opinion of the engineer or architect that the stress or strain is such as to endanger or injure the building, or any part thereof, then and in that event the lessee agrees immediately to relieve the stress or strain, either by reinforcing the building or by lightening the load which causes such stress or strain, in a manner satisfactory to the lessor.*

**ADVERTISING SIGNS** *(10) The lessee will not use the outside walls of the premises, or allow signs or devices of any kind to be attached thereto or suspended therefrom, for advertising or displaying the name or business of the lessee or for any purpose whatsoever without the written consent of the lessor; however, the lessee may make use of the windows of the premises to display lessee's name and business when the workmanship of such signs shall be of good quality and permanent nature; provided further that the lessee may not suspend or place within said windows or paint thereon any banners, signs, sign-boards or other devices in violation of the intent and meaning of this section.*

**LIABILITY INSURANCE** *(11) At all times during the term hereof, the lessee will, at the lessee's own expense, keep in effect and deliver to the lessor liability insurance policies in form, and with an insurer, satisfactory to the lessor. Such policies shall insure both the lessor and the lessee against all liability for damage to persons or property in, upon, or about the premises. The amount of such insurance shall be not less than $........................ for injury to one person, not less than $........................ for injuries to all persons arising out of any single incident, and not less than $........................ for damage to property, or a combined single limit of not less than $1,000,000.00........................ It shall be the responsibility of lessor to purchase casualty insurance with extended coverage so as to insure any structure on the premises against damage caused by fire or the effects of fire (smoke, heat, means of extinguishment, etc.), or any other means of loss. It shall be the responsibility of the lessee to insure all of the lessee's belongings upon the premises, of whatsoever nature, against the same. With respect to these policies, lessee shall cause the lessor to be named as an additional insured party. Lessee agrees to and shall indemnify and hold lessor harmless against any and all claims and demands arising from the negligence of the lessee, lessee's officers, agents, invitees and/or employees, as well as those arising from lessee's failure to comply with any covenant of this lease on lessee's part to be performed, and shall at lessee's own expense defend the lessor against any and all suits or actions arising out of such negligence, actual or alleged, and all appeals therefrom and shall satisfy and discharge any judgment which may be awarded against lessor in any such suit or action.*

**FIXTURES** *(12) All partitions, plumbing, electrical wiring, additions to or improvements upon the premises, whether installed by the lessor or lessee, shall be and become a part of the building in which the premises are located as soon as installed and the property of the lessor unless otherwise herein provided.*

**LIGHT AND AIR** *(13) This lease does not grant any rights of access to light and air over the premises or any adjacent property.*

**DAMAGE BY CASUALTY, FIRE AND DUTY TO REPAIR** *(14) In the event of the destruction of the improvements in which the premises are located by fire or other casualty, either party hereto may terminate this lease as of the date of fire or casualty, provided, however, that in the event of damage to the improvements by fire or other casualty to the extent of ...........30......... per cent or more of the sound value thereof, the lessor may or may not elect to repair the same; written notice of lessor's election shall be given lessee within fifteen days after the occurrence of the damage; if notice is not so given, lessor conclusively shall be deemed to have elected not to repair; in the event lessor elects not to repair, then and in that event this lease shall terminate with the date of the damage; but if the improvements in which the premises are located be but partially destroyed and the damage so occasioned shall not amount to the extent indicated above, or if greater than said extent and lessor elects to repair, as aforesaid, then the lessor shall repair the same with all convenient speed and shall have the right to take possession of and occupy, to the exclusion of the lessee, all or any part thereof in order to make the necessary repairs, and the lessee hereby agrees to vacate upon request, all or any part thereof which the lessor may require for the purpose of making necessary repairs, and for the period of time between the day of such damage and until such repairs have been substantially completed there shall be such an abatement of rent as the nature of the injury or damage and its interference with the occupancy of the premises by the lessee shall warrant; however, if the premises be but slightly injured and the damage so occasioned shall not cause any material interference with the occupation of the premises by lessee, then there shall be no abatement of rent and the lessor shall repair the damage with all convenient speed.*

**WAIVER OF SUBROGATION RIGHTS** *(15) Neither the lessor nor the lessee shall be liable to the other for loss arising out of damage to or destruction of the premises, or the building or improvement of which the premises are a part or with which they are connected, or the contents of any thereof, when such loss is caused by any of the perils which are or could be included within or insured against by a standard form of fire insurance with extended coverage, including sprinkler leakage insurance, if any. All such claims for any and all loss, however caused, hereby are waived. Such absence of liability shall exist whether or not the damage or destruction is caused by the negligence of either lessor or lessee or by any of their respective agents, servants or employees. It is the intention and agreement of the lessor and the lessee that the rentals reserved by this lease have been fixed in contemplation that both parties shall fully provide their own insurance protection at their own expense, and that both parties shall look to their respective insurance carriers for reimbursement of any such loss, and further, that the insurance carriers involved shall not be entitled to subrogation under any circumstances against any party to this lease. Neither the lessor nor the lessee shall have any interest or claim in the other's insurance policy or policies, or the proceeds thereof, unless specifically covered therein as a joint assured.*

**EMINENT DOMAIN** *(16) In case of the condemnation or purchase of all or any substantial part of the premises by any public or private corporation with the power of condemnation this lease may be terminated, effective on the date possession is taken, by either party hereto on written notice to the other and in that case the lessee shall not be liable for any rent after the termination date. Lessee shall not be entitled to and hereby expressly waives any right to any part of the condemnation award or purchase price.*

**FOR SALE AND FOR RENT SIGNS** *(17) During the period of ......30...... days prior to the date above fixed for the termination of this lease, the lessor herein may post on the premises or in the windows thereof signs of moderate size notifying the public that the premises are "for sale" or "for lease."*

**DELIVERING UP PREMISES ON TERMINATION** *(18) At the expiration of the lease term or upon any sooner termination thereof, the lessee will quit and deliver up the premises and all future erections or additions to or upon the same, broom-clean, to the lessor or those having lessee's estate in the premises, peaceably, quietly, and in as good order and condition, reasonable use and wear thereof, damage by fire, unavoidable casualty and the elements alone excepted, as the same are now in or hereafter may be put in by the lessor.*

**ADDITIONAL COVENANTS OR EXCEPTIONS** *(19)*

SEE ATTACHED ADDENDUM

**ATTACHMENT BANKRUPT DEFAULT**

*PROVIDED, ALWAYS, and these presents are upon these conditions, that (1) if the lessee shall be in arrears in the payment of rent for a period of ten days after the same becomes due, or (2) if the lessee shall fail or neglect to perform or observe any of the covenants and agreements contained herein on lessee's part to be done, kept, performed and observed and such default shall continue for ten days or more after written notice of such failure or neglect shall be given to lessee, or (3) if the lessee shall be declared bankrupt or insolvent according to law, or (4) if any assignment of lessee's property shall be made for the benefit of creditors, or (5) if on the expiration of this lease lessee fails to surrender possession of the premises, the lessor or those having lessor's estate in the premises, may terminate this lease and, lawfully, at lessor's option immediately or at any time thereafter, without demand or notice, enter into and upon the premises and every part thereof and reposses the same, and expel lessee and those claiming by, through and under lessee and remove lessee's effects at lessee's expense, forcibly if necessary and store the same, all without being deemed guilty of trespass and without prejudice to any remedy which otherwise might be used for arrears of rent or preceding breach of covenant.*

*Neither the termination of this lease by forfeiture nor the taking or recovery of possession of the premises shall deprive lessor of any other action, right, or remedy against lessee for possession, rent or damages, nor shall any omission by lessor to enforce any forfeiture, right or remedy to which lessor may be entitled be deemed a waiver by lessor of the right to enforce the performance of all terms and conditions of this lease by lessee.*

*In the event of any re-entry by lessor, lessor may lease or relet the premises in whole or in part to any tenant or tenants who may be satisfactory to lessor, for any duration, and for the best rent, terms and conditions as lessor may reasonably obtain. Lessor shall apply the rent received from any such tenant first to the cost of retaking and reletting the premises, including remodeling required to obtain any such tenant, and then to any arrears of rent and future rent payable under this lease and any other damages to which lessor may be entitled hereunder.*

*Any property which lessee leaves on the premises after abandonment or expiration of the lease, or for more than ten days after any termination of the lease by landlord, shall be deemed to have been abandoned, and lessor may remove and sell the property at public or private sale as lessor sees fit, without being liable for any prosecution therefor or for damages by reason thereof, and the net proceeds of any such sale shall be applied toward the expenses of landlord and rent as aforesaid, and the balance of such amounts, if any, shall be held for and paid to the lessee.*

**HOLDING OVER**

*In the event the lessee for any reason shall hold over after the expiration of this lease, such holding over shall not be deemed to operate as a renewal or extension of this lease, but shall only create a tenancy at sufferance which may be terminated at will at any time by the lessor.*

**ATTORNEY FEES AND COURT COSTS**

*In case suit or action is instituted to enforce compliance with any of the terms, covenants or conditions of this lease, or to collect the rental which may become due hereunder, or any portion thereof, the losing party agrees to pay the prevailing party's reasonable attorney fees incurred throughout such proceeding, including at trial, on appeal, and for post-judgment collection. The lessee agrees to pay and discharge all lessor's costs and expenses, including lessor's reasonable attorney's fees that shall arise from enforcing any provision or covenants of this lease even though no suit or action is instituted.*

*Should the lessee be or become the debtor in any bankruptcy proceeding, voluntarily, involuntarily or otherwise, either during the period this lease is in effect or while there exists any outstanding obligation of the lessee created by this lease in favor of the lessor, the lessee agrees to pay the lessor's reasonable attorney fees and costs which the lessor may incur as the result of lessor's participation in such bankruptcy proceedings. It is understood and agreed by both parties that applicable federal bankruptcy law or rules of procedure may affect, alter, reduce or nullify the attorney fee and cost awards mentioned in the preceding sentence.*

**WAIVER**

*Any waiver by the lessor of any breach of any covenant herein contained to be kept and performed by the lessee shall not be deemed or considered as a continuing waiver, and shall not operate to bar or prevent the lessor from declaring a forfeiture for any succeeding breach, either of the same condition or covenant or otherwise.*

**NOTICES**

*Any notice required by the terms of this lease to be given by one party hereto to the other or desired so to be given, shall be sufficient if in writing, contained in a sealed envelope, and sent first class mail, with postage fully prepaid, and if intended for the lessor herein, then if addressed to the lessor at* .................... SEE ADDENDUM

.................................................................. *and if intended for the lessee, then if addressed to the lessee at* ....... Tenant's address or the leased premises ............................................ *Any such notice shall be deemed conclusively to have been delivered to the addressee forty-eight hours after the deposit thereof in the U.S. Mail.*

**HEIRS AND ASSIGNS**

*All rights, remedies and liabilities herein given to or imposed upon either of the parties hereto shall extend to, inure to the benefit of and bind, as the circumstances may require, the heirs, successors, personal representatives and so far as this lease is assignable by the terms hereof, to the assigns of such parties.*

*In construing this lease, it is understood that the lessor or the lessee may be more than one person; that if the context so requires, the singular pronoun shall be taken to mean and include the plural, and that generally all grammatical changes shall be made, assumed and implied to make the provisions hereof apply equally to corporations and to individuals.*

*IN WITNESS WHEREOF, the parties have executed this lease on the day and year first hereinabove written, any corporation signature being by authority of its Board of Directors.*

LANDLORD: ....................................................

R & R PROPERTY HOLDINGS, INC.,

a Washington corporation

- Signature on attached ADDENDUM

TENANT: ....................................................

LAURA LEE HAGENAUER

Signature on attached ADDENDUM

**The publisher strongly recommends that both the lessor and the lessee become familiar with the Americans with Disabilities Act of 1990, Public Laws 101-336. The Act may impose certain duties and responsibilities upon either or both parties to this lease. These duties and responsibilities may include but not be limited to the removal of certain architectural barriers and ensuring that disabled persons are not denied the opportunity to benefit from the same goods and services as those available to persons without disabilities. Under the Act, prohibition against discrimination applies to any person who is the owner, operator, lessor, or lessee of a place of public accommodation.**

# ADDENDUM TO LEASE

DATED:      As of **October \_\_\_, 2015**

BETWEEN:   **R & R PROPERTY HOLDINGS, INC.,**
              **a Washington corporation**                  **"Lessor" or "Landlord"**

AND:          **LAURA LEE HAGENAUER (successor-in-interest to, and**
              **formerly doing business as, "VALLEY ROLLING LLC")**     **"Lessee" or "Tenant"**

This Addendum to Lease ("**Addendum**") and the attached Business Lease [Stevens Ness Form No. 812] by Landlord (with this Addendum, the "**Lease**") are executed to document the terms of the lease between the parties for the following premises ("**Premises**"): approximately **27,500 square feet of space, including office space,** in the building ("**Building**") located at **3071 Schmidt Lane NE, Hubbard, Oregon 97032,** as more particularly described on the attachments to this Lease, subject to the provisions of this Addendum. The Building is located on a larger parcel of property shown on the drawing attached to this Lease as the **"Valley Rolling"** property, known as **Tax Lot 400, Marion County, Oregon** (the "**Property**").

This Addendum hereby amends, supplements and is incorporated into the Lease, as follows:

    **1.**     **Bankruptcy Case; Closing of Purchase.** The parties acknowledge that the Property is the subject of the bankruptcy case, Case No. 14-63530-FRA11 (the "**Bankruptcy Case**"), which is pending in the United States Bankruptcy Court for the District of Oregon (the "**Bankruptcy Court**") and an executory Sale Agreement, dated as of September 16, 2015 ("**Sale Agreement**"), under which Landlord would purchase the Property and lease the Premises back to Tenant. This Lease is subject to the closing of the purchase of the Property pursuant to the Sale Agreement (the "**Closing**").

    **2.**     **Commencement Date.** Possession will be deemed delivered to Tenant at Closing, which will be the commencement of the Lease term ("**Commencement Date**"). Rent will commence as of the Commencement Date.

    **3.**     **Future Demising of Office Space into Two Spaces.** Initially, the Premises includes use of the entire office space within the Building, which contains approximately 4,276 square feet. However, Landlord will have the right and option to demise separately (and lease or occupy for any office-warehouse purpose) up to one-half of such office space (the "**Separate Office Space**"), so long as Landlord provides to Tenant additional warehouse space in the Building with a gross square footage equal to the area of the Separate Office Space taken from the Premises.

    **4.**     **Year-to-Year Lease Term.** The initial Lease term (the "**Term**") will commence on the Commencement Date and continue until the last day of the calendar month in which the first anniversary of the Commencement Date occurs (the "**Renewal Date**"), at which time this Lease will be automatically renewed for an additional period of twelve (12) calendar months (a "**Renewal Term**"), and thereafter on each anniversary of the first Renewal Date will be automatically renewed for additional period(s) of twelve (12) calendar months each, <u>unless and until</u> either party notifies the other party at least ninety (90) days before a Renewal Date that the party is electing to terminate this Lease at the end of the current Term, immediately before such renewal.

    **5.**     **Base Rent.** The regular monthly base rent amount will be <u>**$12,650.00**</u>. The monthly base rent will be due as of the fifteenth (15th) day of each month. Rent for any partial month will be prorated on the basis of a 30-day month. Rent is payable in advance. During the initial term of this Lease (ending on the first Renewal Date), the monthly base rent is included in the gross rent amount of $15,000 per month, and thereafter will be paid as part of the "triple net" Lease rental, as provided in Section 6.

    **6.**     **Gross Lease for First Year; Triple Net Lease Thereafter.** For the initial Term of this Lease ending on the first Renewal Date, Tenant will pay a "gross" rent of $15,000 per month, including the monthly base rent amount and all other amounts to be reimbursed to Landlord for property taxes, insurance and maintenance. Thereafter,

if the Lease is renewed and extended, this Lease is a so-called "triple net" lease, pursuant to which Tenant will be responsible for its proportionate and allocated share of taxes, maintenance, insurance and other costs in operating the Premises during the Term. Tenant's share of such costs is referred to as **"Additional Rent."** The term **"Rent"** means the monthly base rent and all Additional Rent.

7. **Security Deposit; Payment.** As a condition to the commencement of the Term, Tenant will pay to Landlord (i) the monthly "gross" rent of $15,000 for the first month of the Term, and (ii) a Security Deposit of $15,000. All payments by Tenant to Landlord under the Lease will be made by wire transfer to a bank account of Landlord to be designated by written notice to Tenant.

8. **Property Taxes and Assessments.** Landlord is responsible for paying the property taxes and assessments (**"taxes"**) against the Building and land area being used by Tenant, as they become due, subject to Landlord's right to collect back from Tenant during the Term Tenant's proportionate share of such amounts, as Additional Rent, commencing with the first Renewal Term. Taxes for the year in which the Lease terminates will be prorated and adjusted for any partial year. As used in this Lease, the term **"proportionate share"** of Additional Rent items that are attributable to the Building will be fixed at fifty percent (50%). The initial estimated amount payable by Tenant is: <u>50% of $3,833.33, equaling $1,916.67 per month</u> (which is included in the "gross" rent amount under this Lease for the initial Term). Tenant's proportionate share of property taxes will be due on November 1st of each year, unless Tenant is paying monthly installments as referenced below.

Commencing with the first Renewal Term, Landlord may elect to require that Tenant shall pay to Landlord, on the fifteenth (15th) day of each month in advance, an amount equal to one twelfth (1/12) of Tenant's proportionate share of taxes to be paid for the year. The monthly payment for taxes may be adjusted by Landlord during the Term, based on Landlord's reasonable estimate of changes in the amount of annual property taxes and assessments to be paid. There will be an annual reconciliation and adjustment between the parties when the actual amount of taxes is determined. If the monthly estimated payments were less than Tenant's proportionate share of the actual taxes, Tenant will pay the deficiency to Landlord at the time Landlord submits an invoice therefor. If the monthly estimated payments were greater than the actual amount due, Landlord will credit the difference against the next monthly payments due from Tenant.

Tenant will pay any personal property taxes on Tenant's trade fixtures and personal property.

9. **Maintenance and Repair.** Tenant will maintain the Premises, and Landlord will maintain the Building, parking areas, accessways, landscaping and other common area portions of the Property (**"Common Areas"**), and the parties will otherwise perform their respective obligations in **Sections 2 and 4(a)** of the Lease. If any maintenance expenses are incurred by Landlord for the Building or Common Areas, and the work performed is not specific to the correction of a maintenance problem caused by a tenant within its tenant space, such maintenance expenses will be allocated proportionately to the tenant space in the Building as a whole, and Tenant will pay its proportionate share (i.e., 50%, if it is leasing one-half of the Building) of such maintenance expenses, as Additional Rent, commencing with the first Renewal Term. Maintenance charges for the Building and Common Areas are included in the "gross" rent amount under this Lease for the initial Term.

10. **Property Insurance.** Landlord will maintain property casualty insurance on the Building (but not any of Tenant's own trade fixtures, inventory and personal property), as Landlord determines to be appropriate. Tenant will reimburse Landlord for Tenant's allocated and proportionate share of the cost of Landlord's property insurance, as Additional Rent, commencing with the first Renewal Term. The initial estimated amount payable by Tenant is: <u>$433.34 per month</u> (which is included in the "gross" rent amount under this Lease for the initial Term). Tenant will maintain such casualty insurance on Tenant's own trade fixtures, inventory and personal property, as Tenant determines to be appropriate.

11. **Liability Insurance; Indemnity** Tenant must provide Landlord with a certificate of commercial general liability insurance in the amount of at least $1,000,000 (combined single limit), as provided in **Section 11** of the Lease, naming Landlord as additional named insured and with a contractual liability endorsement covering the

indemnification obligations referenced in this Lease. The certificate must have a minimum 10-day written cancellation notice clause in favor of Landlord. <u>Failure to provide such insurance certificate may result in termination of this Lease by Landlord and/or Tenant's not being entitled to enter and continue to use the Premises.</u>

Tenant will defend, indemnify, and hold Landlord, and its agents and representatives, harmless from any claim, loss, or liability (including attorneys' fees incurred) arising out of or in connection with any use, entry or activity on the Premises or any injury or damage to the Premises or Building or to any person or property therein or thereon during the term of this Lease, whether or not caused or contributed to by any act or omission of Landlord, its agents or representatives.

**12.** **Utilities; Telephone.** Except as otherwise provided below, Tenant will pay for all utilities used by Tenant in the Premises. For utilities provided to the Building that are not separately metered, Tenant will pay 100% of such utilities until the other portion of the Building is leased, and thereafter will pay its proportionate share (50%), unless otherwise reasonably allocated by Landlord, of such utilities. Tenant will arrange for its own trash removal and arrange for its own janitorial service, if any. Water and sewer and natural gas charges will be paid by Landlord unless and until the costs are separately metered or submetered.

The telephone service for the Building will be initially in the name of Tenant and paid by Tenant. If an additional tenant is added by Landlord to the Building, the added tenant will arrange for its own telephone line.

**13.** **Alterations.** Any proposed alterations by Tenant to the Premises or Building will be subject to Landlord's prior written consent, as required by this Lease.

**14.** **Tenant's Use.** Under **Section 2(a)** of the Lease, Tenant's intended and permitted use of the Premises is for the following: **office and warehouse use**, and no other use without Landlord's prior written consent. Tenant keep its hours of operation posted at the Premises. Tenant will have the right to use a reasonable number of parking spaces, which will be equitably allocated by Landlord to Tenant and other tenants of the Building from time to time, but will not occupy any parking spaces designated for customers.

**15.** **Tenant's Work.** There is no work required to be performed by Landlord to ready the Premises for use by Tenant. Tenant will be responsible for moving to the Premises any of Tenant's furniture, fixtures and equipment ("**FF&E**") that Tenant wants to use within the Premises. The Premises will be modified by Tenant to accommodate its intended use, in accordance with this Lease, but any such work must meet Code requirements.

**16.** **Rent Not Paid When Due; NSF Checks.** Rent will be received by Landlord without set-off, offset, abatement or deduction of any kind. Such payments will be made in advance to Landlord's address as stated below (or as Landlord may subsequently specify by written notice to Tenant). Any rent not paid within ten (10) days after it is due will be assessed a late charge equal to **Five percent (5%) of the overdue amount**. Tenant shall pay the late charge without the need for demand by Landlord, and will reimburse Landlord for reasonable attorneys' fees incurred by Landlord in connection with any overdue payment (if Landlord consults an attorney or takes other action to collect the amounts owed). Landlord may levy and collect a late charge and/or interest in addition to all other remedies available for Tenant's default. If any check is returned by Tenant's bank for insufficient funds ("NSF"), then the bank service charges resulting from the NSF check will be promptly paid by Tenant, in addition to the late charge.

**17.** **Rights of Use; Rules.** Tenant will (a) reasonably co-operate on any security measures that Landlord may take from time to time, and (b) promptly comply with reasonable rules and regulations that Landlord may adopt from time to time in order to promote safety, order, cleanliness, operation of business, and good service to the Building and its tenants, so long as they are required of all tenants at Landlord's Property. Such rules will include (without limitation) the following: (i) there is NO SMOKING allowed in the Premises, Building or restrooms; and (ii) no portion of the Premises may be used for overnight sleeping.

**18.** **Transfers.** Tenant shall not assign, mortgage, lien or encumber the Premises or Tenant's leasehold estate, or sublet any portion of the Premises, or license the use of any portion of the Premises, or otherwise transfer any

interest in the Premises (whether voluntary, involuntary, by operation of law or otherwise) (collectively, a "**transfer**"), without the prior written consent of Landlord pursuant to **Section 6** of the body of this Lease. Any attempted transfer without consent shall be null and void and, at the option of Landlord, will cause termination of this Lease. The giving of such consent in one instance shall not preclude the need for Tenant to obtain Landlord's consent to further transfers. If Tenant is permitted to make any transfer, Tenant shall not be relieved of its obligations, but shall remain primarily liable to Landlord for performance of all obligations.

19. **Methods for Notices**. Notices may be given by utilization of the method(s) in the Lease, or by registered mail, or by facsimile or other telecommunication device capable of transmitting or creating a written record, or personally. Notices are effective on receipt. A notice will also be deemed received if posted at or delivered to the Premises.

20. **Conduct of Business; Maintenance; Signage**. Tenant will cause its employees, customers and invitees on the Premises to conduct themselves in a good and orderly manner. Tenant will keep the interior of the Premises in good condition, repair and appearance. To identify Tenant's business, Tenant may maintain signage appropriate for the conduct of its business, subject to compliance with applicable sign codes and Landlord's prior written approval of the size, design, placement and other details of such signage.

21. **Default**. Tenant will not be in default under the Lease unless Tenant fails to pay rent or other charges within **FIVE (5) days** after receipt of written notice of nonpayment when due (which notice can be given within the 10-day grace period in the Lease and need not wait until the end of the 10-day period) or fails to perform other obligations under the Lease within **twenty (20) days** after receipt of written notice of nonperformance by Landlord, specifying in reasonable detail the nature of Tenant's default.

22. **General Provisions**. The following are added as Miscellaneous Provisions of the Lease:

(a) **Surrender of Premises**. Upon expiration of the Term or earlier termination of this Lease, Tenant shall deliver all keys to Landlord and surrender the Premises in good condition, subject to reasonable wear and tear. Tenant shall remove all of its furnishings, furniture, and trade fixtures that remain the property of Tenant (and if Tenant has made any alterations, Landlord may require that Tenant remove them. **Tenant will restore any physical damage caused by such removal (including, without limitation, resurfacing or covering holes in the walls, floors or other parts of the Premises and any necessary repainting to put the Premises in the condition required by this Lease)**. If Tenant fails to do so, such failure shall, at Landlord's option, be deemed an abandonment of the property and Landlord may retain the property and all rights of Tenant with respect to it shall cease or, by notice in writing given to Tenant within 20 days after removal was required, Landlord may elect to hold Tenant to its obligation of removal. If Landlord elects to require Tenant to remove, Landlord may effect a removal and place the property in public storage for Tenant's account. Tenant shall be liable to Landlord for the cost of removal, restoration, transportation to storage, and storage, with interest on all such expenses as provided in this Lease.

(b) **Holdover**. If Tenant does not vacate the Premises at the time required, Landlord shall have the option to treat Tenant as a tenant from month to month, subject to all of the provisions of this Lease (except that the term will be month to month and the initial base rent will be 150 percent of the base rent then being paid by Tenant), or to eject Tenant from the Building and Premises and recover damages caused by wrongful holdover. Failure of Tenant to remove property or installations which Tenant is required to remove under **paragraph 20 (b)** above shall constitute a failure to vacate to which this paragraph shall apply.

(c) **Security Deposit**. Tenant shall maintain with Landlord the security deposit as listed above. The deposit shall be held by Landlord to secure all payments and performances due from Tenant under this Lease. Landlord may commingle the deposit with its funds and will owe no interest on the deposit. Landlord may apply the deposit to the cost of performing any obligation which Tenant fails to perform within the time required by this Lease, but application by Landlord will not be the exclusive remedy for Tenant's default. If the deposit is applied by Landlord, Tenant shall pay the sum necessary to restore the deposit to its original amount on Landlord's demand. To the extent not applied by Landlord, the deposit shall be refunded to Tenant within 30 days after expiration of the Term.

(d)        **Addresses**. Tenant's addresses for notice purposes are: **Business Address: 3071 Schmidt Lane, Hubbard, OR 97032; and Personal Address: 1129 Belle Passi Rd., Woodburn, OR 97071**. Landlord's address for notice purposes and for payment of rent is: **R & R PROPERTY HOLDINGS, INC., Attention: Dwaine Odinson, CA, Controller, 7449 River Rd., Delta, British Columbia, CANADA V4G1B9**. Landlord's representative: **Dwaine Odinson. Telephone: (604) 946-0916, Facsimile: (604) 946-0783. Email: dwaineo@napsteel.com** .

(e)        **Counterparts; Fax or PDF Transmission**. This Lease (Addendum) may be executed in separate counterpart signature pages with the same effect as if both parties had signed the same document. All counterparts shall be taken together and shall constitute a single Lease. Any counterparts that are signed and transmitted by facsimile machine or as an emailed PDF copy shall be treated as an original document. Each party hereby waives any defenses to the enforcement of the terms of this document if sent by facsimile or as an emailed PDF, based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").

IN WITNESS WHEREOF, the parties have executed this instrument as of the date first above written.

Tenant:                                                        Landlord:

**LAURA LEE HAGENAUER** (successor-in-interest to, and          **R & R PROPERTY HOLDINGS, INC.,**
formerly doing business as "VALLEY ROLLING LLC")               **a Washington corporation**

By _____                         By: _____
                                                               Name: **Dwaine Odinson, CA**
                                                               Title: **Controller**

## DRAWING OF PREMISES
## AND BUILDING





DRAWING OF PROPERTY

RECORD OF

For: PBSL, LLC

Ted A. Troutman, OSB #844470
Troutman Law Firm, PC
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788
tedtroutman@sbcglobal.net

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF OREGON

In Re                       )

                           ) Case No.  14-63530-fra11

**Laura L. Hagenauer,**      )

                           )

                           ) **CERTIFICATE OF SERVICE**

                           )

I, Lisette Barajas, Declare as follow:

      I certify that on **October 7, 2015** I served, by **first class mail**, a full and true copy of the foregoing **Joint Motion by Debtor and R&R Property Holdings, Inc. to Approve: (A) Sale of Real Property Free and Clear of Liens, Claims, Encumbrances and Interests; and Debtor's Entry Into Real Property Lease; and (C) Compensation to Real Estate Broker and Certificate of Service** on the following by causing a copy thereof to be placed in a sealed envelope, postage prepaid, addressed as shown below, in the U.S. Mail at Beaverton, Oregon on the date indicated below:

### "See Attached Matrix"

| | |
|---|---|
| **Tom Rohlfing**<br>**Marion County Tax Assessor**<br>**555 Court St. NE, Suite 2233**<br>**Salem OR 97301** | **State of Oregon**<br>**Business Development Department**<br>**Attn: Terry Hegle, Business Finance**<br>**Officer**<br>**775 Summer St. NE Suite 200**<br>**Salem OR 97301-1280** |
| **SBA – Portland District Office**<br>**Attn: Caron Doss, District Director**<br>**601 SW 2nd Ave., Suite 950**<br>**Portland OR 97204-3154** | |
| | **State of Oregon**<br>**Business Development Department**<br>**Attn: Tim McCabe, Director**<br>**775 Summer St. NE Suite 200**<br>**Salem OR 97301-1280** |
| **Suzanne C. Pickgrobe**<br>**US Small Business Administration**<br>**601 SW 2nd Ave., Suite 950**<br>**Portland OR 97204-3154** | |

Page 1 Certificate of Service

| | |
|---|---|
| State of Oregon<br>Business Development Department<br>Attn: Carolyn G. Wade<br>DOJ Civil Enf. Civil Recovery<br>1162 Court St. NE<br>Salem OR 97301 | Attorney General of the US<br>c/o Loretta Lynch, Department of<br>Justice<br>10th & Constitution NW<br>Washington DC 20530 |
| Cascadia Metals, Inc.<br>Attn: Michael Linn, RA<br>9525 SW Commerce Circle<br>Wilsonville OR 97070 | US Attorney for the District of Oregon<br>c/o Billy J. Williams, US Attorney<br>1000 SW 3rd Ave., Suite 600<br>Portland OR 97204 |
| Brandy A. Sargent<br>Stoel Rives LLP<br>900 SW Fifth Ave., Suite 2600<br>Portland OR 97204 | Oregon Department of Justice<br>c/o Ellen Rosenblum, Attorney<br>General<br>1162 Court Street NE<br>Salem OR 97301 |

I certify that on **October 7, 2015** I served, by **Certified Mail**, a full and true copy of the foregoing **Joint Motion by Debtor and R&R Property Holdings, Inc. to Approve: (A) Sale of Real Property Free and Clear of Liens, Claims, Encumbrances and Interests; and Debtor's Entry Into Real Property Lease; and (C) Compensation to Real Estate Broker and Certificate of Service** on the following by causing a copy thereof to be placed in a sealed envelope, postage prepaid, addressed as shown below, in the U.S. Mail at Beaverton, Oregon on the date indicated below:

KeyBank National Association<br>
Attn: Ronald W. Goss, Corporate Council<br>
1101 Pacific Avenue, Lower Level<br>
Tacoma WA 98402

Dated: **October 7, 2015**

/s/ Lisette Barajas
Lisette Barajas, Legal Assistant to
Ted A. Troutman

Label Matrix for local noticing
0979-6
Case 14-63530-fra11
District of Oregon
Eugene
Wed Oct  7 21:06:51 PDT 2015

JOHN D ALBERT
Sherman Sherman Johnnie & Hoyt
PO BOX 2247
Salem, OR 97308-2247

AMCI
POB 8205
Spokane, WA 99203-0205

DAVID ANDERSON
Schwabe, Williamson & Wyatt, PC
1211 SW Fifth Avenue, Suite 1500-1900
Portland, OR 97204-3795

Agnes Hagenauer
1910 E. Hardcastle
Woodburn, OR 97071-3741

Aramark
POB 101179
Pasadena, CA 91109

Artis
3323 Chinden Blvd.
Boise, ID 83714-6638

Associated Management Consultants, Inc. (AMC
P.O. Box 8205
Spokane, WA 99203-0205

Associated Manangement Consultants, Inc. dba
C/O Keith A. Trefry
Paine Hamblen LLP
717 W Sprague Ave
Ste 1200
Spokane, WA 99201-3905

Atlas Bolt & Screw
POB 96113
Chicago, IL 60693-6113

Atlas Bolt & Screw Co., LLC
1628 Troy Road
Ashland, OH 44805-1398

KATHLEEN LOUISE BICKERS
United States Attorneys Office
1000 SW 3rd Avenue, Suite 600
Portland, OR 97204-2936

(p)BANK OF AMERICA
PO BOX 982238
EL PASO TX 79998-2238

Bruce Kahler
921 Chemawa Rd NE
Keizer OR 97303-3715

Cannonball HNP, LLC
555 Lawton Ave.
Beloit, WI 53511-5441

Cascadia Metals
C/O Michael Linn, RA
9525 SW Commerce Circle
Wilsonville, OR 97070-8407

Cascadia Metals, Inc
7 International Way
Longview, WA 98632-1020

Cascadia Metals, Inc.
c/o Brandy Sargent
900 SW 5th Avenue
Suite 2600
Portland, OR 97204-1229

Cascadia Metals, Inc.
c/o Stoel Rives LLP Attn: Brandy A Sarge
900 SW 5th Ave #2600
Portland, OR 97204-1229

Champion
POB 1624
Woodinville, WA 98072-1624

Champion Metal of Washington Inc.
PO Box 1624
Woodinville, WA 98072-1624

Champion Metal of Washington, Inc.
c/o John DeVore
P. O. Box 1624
Woodinville, WA 98072-1624

Chase
POB 94014
Palatine, IL  60094-4014

CitiBank
POB 6235
Sioux Falls, SD 57117-6235

DeLAMMC, LLC
1129 Belle Passi Rd. NE
Woodburn, OR 97071-5709

Dennis Hagenauer
1129 Belle Passi Rd.
Woodburn, OR 97071-5709

Dennis J. Hagenauer
1129 Belle Passi Rd.
Woodburn, OR 97071-5709

Discover Bank
DB Servicing Corporation
PO Box 3025
New Albany, OH  43054-3025

(p)DISCOVER FINANCIAL SERVICES LLC
PO BOX 3025
NEW ALBANY OH 43054-3025

SCOTT D FINK
Weltman Weinberg & Reis Co
323 W Lakeside Ave #200
Cleveland, OH 44113-1009

Fora Financial Business Loans, LLC
C/O Dan Smith, President
242 W. 36th Street, 14th Floor
New York, NY 10018-7542

Ford Motor Credit Company, LLC
C/O CT Corporation System, RA
388 State Street, Suite 420
Salem, OR 97301-3581

RONALD W GOSS
1101 Pacific Ave
Tacoma, WA 98402-4392

Green Tree Servicing LLC
C/O Malcolm Cisneros
2112 Business Center Drive
Irvine, CA 92612-7135

Green Tree Servicing, LLC
C/O CT Corporation System, RA
388 State St. Suite 420
Salem, OR 97301-3581

HOME 123 CORPORATION
Green Tree Servicing LLC
PO BOX 6154
Rapid City, SD 57709-6154

Laura Lee Hagenauer
3071 Schmidt Ln NE
Hubbard, OR 97032-9806

Paul Harrison
Harrison Management Company
POB 80096
Portland, OR 97280-1096

ISS West
801 Second Ave., Suite 1108
Seattle, WA 98104-1524

ISS West, Inc.
Yoshio Nakamura
801 2nd Ave # 1108
Seattle, WA 98104-1524

Internal Revenue Service
Centralized Insolvency Operations
POB 7346
Philadelphia, PA 19101-7346

Tiffany Jones
Coldwell Banker Commercial
960 Liberty St SE #250
Salem, OR 97302-4197

Joseph N. Argentina, Jr.
Drinker Biddle & Reath LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996

Keith A. Trefry
PAINE HAMBLEN
717 W. Sprague Avenue
Suite 1200
Spokane, WA 99201-3505

Key Bank
POB 94932
Cleveland, OH 44101-4932

Key Bank National Association
C/O Christopher Gorman, CEO
127 Public Square
Cleveland, OH 44114-1226

KeyBank
1101 Pacific Avenue
Tacoma, wa 98402-4392

KeyBank N.A.
Weltman Weinberg & Reis Co LPA
323 W Lakeside Ave #200
Cleveland, OH 44113-1009

KeyBank National Association
Attention: Ronald Goss
1101 Pacific Avenue
Tacoma, WA 98402-4392

GARRETT SHEA LEDGERWOOD
Hershner Hunter LLP
180 East 11th Avenue
Eugene, OR 97401-3584

Liberty Mutual Insurance
POB 9502
Dover NH 03821-9502

MARION COUNTY TAX COLLECTOR
PO BOX 2511
SALEM, OR 97308-2511

Mackey Porth & Unrein
864 Promontory Pl SE/ PO 3200
Salem, OR 97302-0200

Marc Nelson Oil Products
POB 7135
Salem, OR 97303-0024

Marion County Assessor's Office
C/O Tom Rohlfing
POB 14500
Salem, OR 97309-5036

Marion County Circuit Court
100 High Street NE
Salem, OR 97301-3640

McMinnville Gas
1384 NE Hwy 99W
McMinnville, OR 97128-2797

Metal Works, Inc.
POB 939
Spencer, IA 51301-0939

Mt Angel Telephone Company
PO Box 200
Mt Angel, OR 97362-0200

ODR Bkcy
955 Center St NE
Salem OR 97301-2555

Optima Steel Holdings C/O Eulerhermes
1a Rockland Park Ave
Tappan, NY 10983

Oregon Business Development Corporation
775 Summer St NE #200
Salem, OR 97301-1280

Oxbow
600 S. 7th Street
Louisville, KY 40203-1968

PGE
POB 4438
Portland, OR 97208-4438

SUZANNE C PICKGROBE
620 SW Main St., Suite 313
Portland, OR 97205-3026

Penske
POB 7429
Pasadena, CA 91109-7429

Penske Truck Leasing Co., L.P.
Andrew J. Flame
Drinker Biddle & Reath LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996

Pitney Bowes Global Financial Services LLC
27 Waterview Drive
Shelton, CT 06484-4301

Protec
720 NE Flanders
Portland, OR 97232-2763

RF Factor
APEC & Service Partner
8904 Kimmie Rd SW
Tumwater, WA 98512-7641

CRAIG G RUSSILLO
1211 SW 5th Ave #1600-1900
Portland, OR 97204-3795

Recovery Management Systems Corporation
25 SE 2nd Ave #1120
Miami, FL 33131-1605

Recovery Management Systems Corporation
25 S.E. 2nd Avenue, Suite 1120
Miami, FL 33131-1605

Alex Rhoten
Coldwell Banker Commercial
960 Liberty St SE #250
Salem, OR 97302-4197

BRANDY A SARGENT
900 SW 5th Ave #2600
Portland, OR 97204-1229

SBA - Portland District Office
620 SW Main St #313
Portland, OR 97205-3026

TARA J SCHLEICHER
121 SW Morrison St #600
Portland, OR 97204-3136

NATHAN FREDERICK JONES SMITH
Malcolm & Cisneros, A Law Corporation
2112 Business Center Drive
Irvine, CA 92612-7137

Schwabe Williamson & Wyatt PC
Attorneys At Law
360 SW Bond St., Suite 400
Bend, OR 97702-3540

Service Partners LLC
c/o John C. Baker
P. O. Box 467
Marysville, WA 98270-0467

Service Partners LLC
P.O. Box 467
Marysville, WA 98270-0467

State Board of Equalization
Special Ops Branch, MIC:55
POB 942879
Sacramento, CA 94279-0055

State of Oregon, Business Development Deptme
775 Summer St. NE Suite 200
Salem, OR 97301-1280

Superior Plus
4225 W Glenrosa Ave
Phoenix, AZ 85019-3308

TED A TROUTMAN
5075 SW Griffith Dr.
STE 220
Beaverton, OR 97005-3045

Thomas E. Perez, US Secretary of Labor,
US Dept of Labor ATTN Judy Owen
Employee Benefits Security Admin.
300 5th Ave #1110
Seattle, WA 98104-0002

Toyota Lift Northwest
POB 4100
Portland, OR 97208-4100

U.S. Small Business Administration
801 Tom Martin Drive, Ste 120
Birmingham, AL 35211-6424

US Trustee, Eugene
405 E 8th Ave #1100
Eugene, OR 97401-2728

Valley Development Initiatives
C/O Truman A. Stone, RA
100 High Street SE, Suite 200
Salem, OR 97301-3636

Valley Development Initiatives
c/o John D. Albert
PO Box 2247
Salem, OR 97308-2247

Valley Rolling Corporation
3071 Schmidt Ln. NE
Hubbard, OR 97032-9806

CAROLYN G WADE
Dept of Justice/Civil Enforce/Recovery
1162 Court St NE
Salem, OR 97301-4096

PATRICK W WADE
POB 1475
Eugene, OR 97440-1475

West Coast Metals
c/o Erik Hallenbeck
27292 Calle Arroyo, Suite A
San Juan Capistrano, CA 92675-6759

West Coast Metals
c/o Erik Hallenbeck
27292 Calley Arroyo, Suite A
San Juan Capistrano, CA 92675-6759

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Bank Of America
POB 982235
El Paso, TX  79998-2235

Discover Financial Services
PO Box 15316
Wilmington, DE  19850

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)KeyBank National Association

(u)KeyBank,N.A.

(d)Mt. Angel Telephone Company
POB 200
Mt. Angel, OR 97362-0200

(u)Oregon Business Development Department

(u)Penske Truck Leasing Co., L.P.

(d)SBA - Portland District Office
620 SW Main St #313
Portland OR 97205-3026

(d)KEITH A TREFRY
Paine Hamblen LLP
717 W Sprague Ave Ste 1200
Spokane, WA 99201-3905

(u)United States of America/ IRS

(u)Valley Development Initiatives

End of Label Matrix
Mailable recipients    95
Bypassed recipients     9
Total                 104