Ted A. Troutman
Troutman Law Firm, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97006
Tel:     503-292-6788
Fax:     503-596-2371
E-mail: tedtroutman@sbcglobal.net

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

In Re:                                    )
                                          )     Bankruptcy Case No.: 14-63530-fra11
LAURA LEE HAGENAUER,                      )
                                          )     DEBTOR'S ~~SECOND~~ THIRD AMENDED
PLAN
                        Debtor.           )     OF REORGANIZATION

TABLE OF CONTENTS

1.     Treatment of Unclassified Claims

2.     Treatment of Classes of Claims and Equity Interests

       Class 1:        Impaired Secured Claim of KeyBank

       Class 2:        Impaired Secured Claim of KeyBank

       Class 3:        Impaired Secured Claim of Valley Development Initiatives

       Class 4:        Impaired Claim of Oregon Business Development Initiatives

       Class 5:        Impaired Secured Claim of US Small Business Administration

       Class 6:        Impaired Unsecured Inventory Related Claims of Current Suppliers

       Class 7:        Impaired Unsecured Claim of Cascadia Metals

       Class ~~7~~8:        Unimpaired Secured Claim of GreenTree Home Mortgage

       Class ~~8~~9:        Impaired Secured Claim of Marion County

Page 1 – DEBTOR'S ~~SECOND~~THIRD AMENDED PLAN OF REORGANIZATION          Ted A. Troutman
                                                                          TROUTMAN LAW FIRM, P.C.
                                                                          5075 SW Griffith Dr., Ste 220
                                                                          Beaverton, OR 97005
                                                                          (503) 292-6788 TEL (503) 596-2371
                                                                          tedtroutman@sbcglobal.net

Class 9:      Impaired Secured Claim of Cascadia Metals, Inc.

Class 10:      Impaired Unsecured Claim of Chase Bank

Class 1110:      Impaired Claim of Unsecured Claim Under $1,000

Class 1211:      Impaired Claim of Unsecured Creditors with Claims Over $1,000 that are

not Current Inventory Suppliers.

Class 1312:      Impaired Unsecured Claim of Agnes Hagenauer

Class 1413:      Impaired Unsecured Claim of Dennis Hagenauer

Class 1514:      Impaired Unsecured Claim of Employee Bruce Kahler

Class 1615:      Impaired Claim for Unfunded 401(k) Plan

Class 1716:      Impaired Secured Claim of KeyBank

Class 1817:      Disputed Secured Claim of AMCI (Associated Management Consultants

Inc.)

3.      Implementation of Second Third Amended Plan

4.   Conditions Precedent

5.   Effects of Confirmation

6.   Treatment of Executory Contract and Unexpired Leases

6. 7. Avoidance Claims

7. 8. Miscellaneous Provisions

8. 9. Definitions

1.      **Treatment of Unclassified Claims.**

**Administrative Claims** allowed by the Court for professional fees of Debtor's

counsel, Debtor's financial consultant and Committee's Counsel shall be paid as follows: (1) a

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

pro rata share of the account established pursuant to the Stipulated Final Order For Use of Cash

Collateral (Doc. No. 153) at paragraph 10, (the "Accumulated Administrative Account") along

with the Allowed 503(b)(9) Claims as set forth below, upon the Effective Date; (2) a pro rata

share of any Avoidance Claims recoveries; (3) a pro rata share of monthly payments of

$~~3,000~~4,000 per month ~~from~~ starting 30 days after the Effective Date ~~for 12 months; (4) a pro~~

~~rata share of monthly payments of $3,500 per month for the next 12 months; and (5) a pro rata~~

~~share of monthly payments of $4,000 per month thereafter~~ until paid in full.

~~**IRS Secured Claim** in the amount of $311,973.83 will be paid starting on~~

~~November 20, 2015 with monthly payments of $7,043.63 and interest at the rate of 3% per~~

~~annum until paid in full.~~

**IRS Secured Claim for Amounts Due that Would Otherwise be General**

**Unsecured Claim pursuant to Bankruptcy Code.** The IRS secured claims that, but for the

security would otherwise be general unsecured claims can be paid over a longer period than sixty

(60) months. ~~This~~ The claim ~~is~~ for penalty ~~in the amount of $136,423.00~~ is secured by Debtor's

personal property valued at $109,745.00. It will be paid over 84 months with equal payments of

$1,288 starting 30 days after the Effective Date. ~~$500 per month starting November 2015 through~~

~~September 2017.  Starting October 2017 the payments will increase to $1,000 per month through~~

~~September 2018.  Starting October of 2018 the payments will increase to $1,250 through~~

~~September of 2019.  Starting October 2019 the payments will increase to $1,500 per month~~

~~through September of 2020.  Starting October of 2020 the payments will increase to $2,500 per~~

~~month and continue until paid in full.~~ Interest will accrue on the unpaid balance at 3% per

annum.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

**IRS Priority Claim** in the amount of $~~51,363.78~~363,337.83 will be paid starting ~~November~~January 20, ~~2015~~2016 with monthly payments of $~~1,136.90~~8,730.48 and interest at three percent (3%) until paid in full.

**Oregon Department of Revenue Priority Claim**. Upon the Effective Date of the ~~Second~~Third Amended Plan, the unpaid balance of $~~47,287~~56,690 will be paid over ~~48~~45 months with monthly payments of $~~1,154.41~~1,462.34. The claim will be paid with interest of 8% per annum as required under § 511 of the bankruptcy code.

**Priority Tax Claim of California Board of Equalization** in the amount of $9,838.97 will be paid over ~~48~~45 months with interest at the statutory rate of 9% per annum. Monthly payments starting on the Effective Date of the ~~Second~~Third Amended Plan will be $~~244.84~~258.42.

**Priority Claim of the Oregon Employment Division** in the amount of $50,902.49 will be paid over ~~48~~45 months with the statutory interest rate of 8% per annum and monthly payments starting on the Effective Date of the ~~Second~~Third Amended Plan in the amount of $~~1,242.68~~1,313.05.

**503(b)(9) Claims.** There are filed 503(b)(9) administrative claims of $332,068.28. These claims are all from current suppliers including Cascadia Metals, Inc, which has filed a 503(b)(9) claim for $137,544.18, West Coast Metals for $174,456.90 and Atlas Bolt for $20,067.20. These claims will be paid ~~1.8%~~1.5% additional funds for each invoice for goods sold to Debtor. If the creditor ships goods invoiced at $100,000 they will be paid $100,000 plus ~~1.8%~~1.5% toward the 503(b)(3) claim which would equal an additional $1,800. This will continue until the claim, plus 3.25% interest, is paid in full. It is estimated that the amount of

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

time required to pay the 503(b)(9) claims in full is 36 months from the Date of Confirmation as set forth on Attached Exhibit B.  Cascadia Metals and West Coast Metals have verbally agreed to the proposed treatment.

**Penske Administrative Claim** for post-petition charges incurred between September 29, 2014 and November 4, 2014 in the amount of $25,976.75.  ~~Debtor has filed a claim dispute on this claim alleging the claim should be reduced to $4,607.37.  Debtor will be required to pay on the Effective Date of the Second Amended Plan, the full allowed claim of Penske, u8nless Penske agrees in writing to be treated the same as the other administrative claims.~~ Debtor and Penske have agreed this claim will be paid $12,988.38 on the Effective Date, plus 9 monthly payments of $1,443.15 starting 30 days after the Effective Date.

**2.    Treatment of Claims.**

   **2.1    Class 1 – Impaired Secured Claim of KeyBank** secured by 3071 Schmidt Lane NE, Hubbard, OR 97032 in the approximate amount of $~~1,605,401.05~~1,787,432.28.  The ~~interest rate will be reduced to 6.5%.  The payments on the loan will be $14,730.00 per month until~~claim will be paid from the sale of the property at 3071 Schmidt Lane NE, Hubbard, OR 97032.  ~~The property will be immediately listed and will be sold on or before February 1, 2016.  If not sold by that date, the automatic stay or discharge injunction shall terminate with respect to KeyBank and KeyBank shall be relieved from the effect of any stay under the Bankruptcy Code and any other restriction on the enforcement of its lien against the property.  The Debtor shall make regular payments to KeyBank in the amount of $14,730 until the earlier of the sale of the property or February 1, 2016.~~Debtor expects the sale of the property for $2,600,000 will be approved at a hearing for approval to sell the property free of liens scheduled for November 4,

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

2015.  The additional approximately $55,333.74 owed to KeyBank for default interest will be subordinated to the claim of SBA and will become a Class 11 unsecured debt.

**2.2** ~~Class 2 – Impaired Secured Claim of KeyBank~~ secured by the accounts receivable, equipment and accounts of Debtor in the approximate balance of $~~562,363.00~~430.932.11.  The loan documents will be modified to reduce the interest rate to 6.5% per annum.  The loan will be modified to require monthly payments of $~~11,003.28~~8,431.68 for 60 months ~~upon~~ starting 30 days after the Effective Date of the ~~Second~~Third Amended Plan. Any pre-petition default on the loan will be waived.

**2.3** ~~Class 3 – Impaired Secured Claim of Valley Development Initiatives~~ secured by the equipment formerly owned by Valley Rolling, Inc. and DeLaMCC, LLC.  The balance of the loan is approximately $229,028.88.  The loan documents will be modified to require monthly payments of $~~1,129.00~~2,542.69 ~~which represents~~with interest ~~only~~ at 6% per annum.  These payments will start ~~on~~ 30 days after the Effective Date and continue for a period of ~~18~~ 120 months~~, at which time the loan will require monthly payments of $1,791.00 for a period of 42 months.  At the end of 42 months the entire unpaid balance of principal and interest will be due. The balance due at the end of the 42 months will be $198,926.70 and can be paid out of Debtor's cash flow as set forth on attached Exhibit B.~~

**2.4** ~~Class 4 – Impaired Claim of Oregon Business Development Initiatives~~ secured by a second lien on Debtor's residence, a third lien on Debtor's building at 3071 Schmidt Lane NE, Hubbard, OR 97032, and a third lien on the personal property of Valley Rolling.  Any pre-petition default on the loan will be waived.  The loan is in the approximate amount of $~~660,000~~706,588.00.  ~~The loan will be paid at $4,250 per month until the business property~~There

Page 6 – DEBTOR'S ~~SECOND~~THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

Case 14-63530-fra11   Doc 260   Filed 10/23/15

is no equity in the building at 3071 Schmidt Lane NE, Hubbard OR 97032 is sold, at which time the loan will be paid in full to support the secured claim on the building. There is no equity in the personal property to support the secured claim. There is $350,000 in equity in Debtor's residence to support the lien. The balance of the lien in the amount of $356,588 will be paid as an unsecured claim pursuant to Class 11. The secured claim in the amount of $350,000 will be paid interest only at 4% with monthly payments of $1,166.67 for 45 months. The balance of $350,000 will then be re-amortized over 240 months at 4% interest and monthly payments of $2,120.93. The first payment will be due 30 days after the Effective Date.

 **2.5** <u>Class 5 – Impaired Secured Claim of US Small Business Administration</u> of $860,448.55 secured by a third lien on the property at 3071 Schmidt Lane NE, Hubbard, OR 97032. For a period of 12 months following the Effective Date of the Second Amended Plan, the monthly payments will be interest only with payments in the amount of $1,980.00. The loan will be paid in full approximately $581,097.24 upon the sale of the business property at 3071 Schmidt Lane NE, Hubbard, OR 97032. The balance of the loan will be paid as a Class 11 unsecured claim.

 **2.6** <u>Class 6 – Impaired Unsecured Inventory Related Claims of Current Suppliers.</u> These claimants are:

| | |
|---|---|
| Cascadia Metals, Inc. (approximate) | $300,000.00 |
| RF Factor | 61,107.25 |
| Winrock – Superior Plus | 42,922.41 |
| Atlas Bolt & Screw | 8,109.88 |
| Champion Metal of Washington | 12,167.97 |

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

TOTAL                        $~~424,307.51~~124,307.51

These creditors will be paid the amount of any current invoice shipped after confirmation of the ~~Second~~Third Amended Plan plus an additional 1.5% of the invoice to apply toward the unpaid claim.  These payments will continue until the claim is paid in full plus 3.25% interest.  The payments will start 30 days after the Effective Date.  If any of the claimants cease to be suppliers of Debtor, the balance left owing on the claim will be amortized with monthly payments for ~~72~~120 months with 3.25% interest.

**2.7** Class 7 – Impaired Unsecured Claim of Cascadia for balance of $634,357.58. This balance will be paid after the 503(b)(5) Claim of Cascadia has been paid in full.  The balance will be paid the amount of any current invoice shipped after confirmation of the Third Amended Plan plus 1.5% of the invoice.

~~2.7~~**2.8** Class 8 – Unimpaired Secured Claim of GreenTree Home Mortgage in the amount of $159,004.44 secured by Debtor's personal residence at 1129 Belle Passi Rd., Woodburn, OR 97071.  Debtor will continue to make the payments according to the terms of the mortgage.  At the time the case was filed, there was no arrearage on the GreenTree Home Mortgage.  Since the filing of the case, Debtor did become delinquent on the mortgage, however that delinquency has been cured.  Debtor will stay current on the GreenTree Home Mortgage loan.

~~2.8~~**2.9** Class ~~8~~9 – Impaired Secured Claim of Marion County secured by Debtor's real property at 3071 Schmidt Lane NE, Hubbard, OR 97032 in the approximate amount of $124,167.  ~~Debtor will pay $4,000 for the past due property tax each month and pay the current taxes as~~

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

they come due in 3 monthly installments as allowed by the County.  The taxes will accrue interest at the statutory rate of 16%.The claim will be paid in full upon sale of the property.

  2.9    Class 9 – Impaired Secured Claim of Cascadia Metals Inc. in the amount of $350,000 secured by a fourth lien on Debtor's real property at 3071 Schmidt Lane NE, Hubbard, OR 97032.  Debtor will make no payments on this claim until the sale of the property.  Cascadia will receive all funds left after payment of the prior liens.  The balance left owing, estimated at $350,000, constitutes a general unsecured claim, a class 6 claim.

  2.10    Class 10 – Impaired Unsecured Claim of Chase Bank in the amount of $110,496.64.  This claim is for Debtor's use of a personal credit card to fund the Valley Rolling operation.  The claim will be amortized over 120 months with interest at the rate of 3.25% per annum.  The first payment will be due on the Effective Date in the amount of $1,079.76 with an equal monthly payment thereafter for a total of 120 months.

  2.112.10    Class 11 10 – Impaired Claim of Unsecured Claims Under $1,000 will be paid 60 days after the Effective Date of the SecondThird Amended Plan without interest.  These claims are as follows:

| | |
|---|---|
| Primesource Building Products | $935.20 |
| Wells Fargo | 870.00 |
| Century Link | 773.29 |
| Pitney Bowes Purchase Power | 730.14 |
| Long Brothers Building Supply Inc. | 630.15 |
| AT&T | 610.74 |
| Pacific Marketing | 583.68 |

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

| | |
|---|---|
| J.J. Thayer Company | 569.73 |
| Pitney Bowes | 432.40 |
| Davison Auto Parts | 384.39 |
| Teletrac | 337.00 |
| Commercial Business Machines | 250.00 |
| Amerititle | 200.00 |
| G.W. Hardware | 199.19 |
| Industrial Welding Supply, Inc. | 165.69 |
| Oak Harbor Freight Lines, Inc. | 69.84 |
| Marion County Tax Collector | 42.99 |
| Northwest Natural Gas | 13.16 |
| Fastenal | 8.89 |
| TOTAL | $7,806.48 |

2.122.11    Class 12 11 – Impaired Claim of Unsecured Creditors with claims over $1,000 that are not Current Inventory Suppliers.  These claims total $467,559.71 1,345,139.30 and will be amortized over 84 months with 3.25% interest paid interest only payments for the first 45 months starting 30 days after the Effective Date.  The total monthly payment amount will be $6,230.83 3,643.09.  After 45 months the payments will increase to amortize the debt over 120 months with total monthly payments of $14,243.08.  These creditors and monthly payments are as follows:

| | Balance Owed | Interest Only Payment | After 45 Months |
|---|---|---|---|
| Marc Nelson Oil Products | $17,985.35 | $239.68 48.71 | $ 190.44 |

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

| | | | |
|---|---|---|---|
| Discover | 17,175.84 | ~~228.89~~ 46.52 | 181.87 |
| Mackey Porth & Unrein | 9,838.97 | ~~84.96~~ 26.65 | 104.18 |
| Toyota Lift Northwest | ~~6,375.00~~5,078.80 | ~~67.68~~ 13.76 | 53.78 |
| KeyBank (default interest) | 55,333.74 | 149.86 | 585.90 |
| SBA | 279,351.31 | 756.58 | 2,957.93 |
| FORA Financial [1] | 45,576.20 | 123.44 | 482.59 |
| Chase Bank | 110,496.69 | 299.26 | 1,170.00 |
| Oregon Business Development | 356,588.97 | 965.76 | 3,775.76 |
| Les Schwab | 2,901.89 | ~~38.67~~ 7.86 | 30.73 |
| MWI Components | 2,950.74 | ~~38.11~~ 7.99 | 31.24 |
| Mt. Angel Telephone | 2,492.44 | ~~33.22~~ 6.75 | 26.39 |
| National Manufacturing Co. | 2,014.98 | ~~26.85~~ 5.46 | 21.34 |
| Aramark Uniform Services | 1,927.19 | ~~25.68~~ 5.22 | 20.41 |
| Artis Metals Company, Inc. | 1,455.31 | ~~19.39~~ 3.94 | 15.41 |
| McMinnville Gas Inc. | 1,406.36 | ~~18.74~~ 3.81 | 14.89 |
| Portland General Electric | 1,332.90 | ~~17.76~~ 3.61 | 14.11 |
| Protec, Inc. Security, Fire & Video | 1,295.00 | ~~17.26~~ 3.51 | 13.71 |
| Cannonball [2] | 29,134.12 | 78.90 | 308.49 |
| ISS West | 224,493.64 | ~~2,991.66~~608.00 | 2,377.06 |
| Euler Hermes | 48,414.04 | ~~645.18~~131.12 | 512.63 |

[1] But see Section 7.3 below. Before FORA Financial can receive any distribution, it must pay back the preference payments.
[2] But see Section 7.4 below. Before Cannonball receives any distributions, it must pay back the preference amounts.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

| | | | |
|---|---|---|---|
| Penske (Disputed) | 60,949.29 | ~~346.66~~165.07 | 645.36 |
| IRS General Unsecured | ~~14,254.31~~40,931.92 | ~~189.96~~110.86 | 433.41 |
| Associated Management Consultants(A~~C~~MCI)_ 26,013.61 | | ~~346.66~~ 770.45 | 275.45 |
| TOTAL | $~~467,559.71~~1,462,406.07 | $~~6,230.83~~3,643.09 | $14,243.08 |

~~2.13~~2.12     Class ~~13~~12 – Impaired Unsecured Claim of Agnes Hagenauer in the amount of $259,000.  This claim will be paid starting in the 60th month after confirmation with 3.25% interest only if she has repaid to the Creditors' Committee, pursuant to Section 7 of the Third Amended Plan, the preference payment of $21,189.58 she received.  Monthly payments starting the 60th month after confirmation will be $4,682.72 per month until paid in full.  The claim of Agnes Hagenauer in the amount of $259,.000 will not accrue interest until after payments begin in the 60th month.

~~2.14~~2.13     Class ~~14~~13 – Impaired Unsecured Claim of Dennis Hagenauer in the amount of $57,957.36 for money advanced by Dennis Hagenauer to Valley Rolling on his personal credit lines and in cash.  This claim will be paid ~~starting 60 months after the Effective Date~~after Class 11 is paid in full with monthly payments of $1,047.87 for 60 months.  Interest will accrue starting in the ~~60th~~165th month at 3.25% per annum.

~~2.15~~2.14     Class ~~15~~14 – Impaired Unsecured Claim of Employee Bruce Kahler in the amount of $59,309.47.  This debt will be paid ~~in full with 3.25% interest starting on the Effective Date~~after Class 11 is paid in full.  Payments will be $1,072.32 per month for 60 months.  Interest will accrue starting in the 165th month at 3.25% per annum.

~~2.16~~2.15     Class ~~16~~15 – Impaired Claim for Unfunded 401(k) Plan in the amount of $~~126,709.00~~139,834.31.  This claim is for unfunded 401(k) contributions for employees of

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

Valley Rolling Corp. including Debtor and her husband.  $4,795.46 is priority debt and will be paid on the Effective Date.  Payments on this claim will start January of 2018 in the amount of $3,500 per month without interest at 3% until paid in full.

2.172.16      Class 17 16 – Impaired Secured Claim of KeyBank secured by 3071 Schmidt Lane NE, Hubbard, OR 97032, which is the amount of KeyBank's indebtedness in Class 1 by which the default rate of interest exceeds the non-default rate of interest in KeyBank's claim, and any late fees, pre-payment penalties and other default charges included in KeyBank's claim, which are subordinate to the SBA's Class 5 claim, as provided in the Prior Lienholder Agreement between SBA as assignee and KeyBank, dated February 14, 2012 and recorded February 23, 2012 in Marion County, Oregon, recording number 3359 p 88.  These amounts will be paid from the sale of 3071 Schmidt Lane NE after payment in full to SBA Class 5.  Any amount unpaid will be a Class 11 General Unsecured claim.

2.1815 Class 18 17 – Disputed Secured Claim of AMCI (Associated Management Consultants, Inc.) in the amount of $26,013.61.  Debtor asserts the claim is unsecured and intends to file an objection to secured status of the claim.  If the Court determines the claim is secured, the claim will be paid with five percent (5%) interest over sixty (60) months with monthly payments of $490.91 until paid.  If the claim is determined by the Court to be unsecured, it will be paid as part of Class 12 11 over eighty-four (84) months at three and one-quarter percent (3.25%) interest and monthly payments of $346.66.

**3.      Implementation of Second Third Amended Plan.**

The source of funds to be received by the estate for distribution to creditors will be from Debtor's income from the sale of Debtor's real estate and from the business of Valley

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

Rolling and Debtor's wages and any recovery on avoidance claims under 11 USC §§ 547, 548, 549 and 550 ("Avoidance Claims").

There is a pending motion to sell the property at 3071 Schmidt Lane NE, Hubbard, Oregon for $2,600,000. If the sale is closed prior to Confirmaton, the secured claim of KeyBank on the property will be paid in full as will the secured claim of Marion County. If the sale has not closed, then as part of this Third Amended Plan, Debtor will close the sale on the following terms noticed in the Motion to Sell.

Laura Lee Hagenauer (the "*Debtor*"), has filed a motion (the "*Motion*") for authority to sell (the "*Sale*") the commercial real property and fixtures located at 3071 Schmidt Lane, Hubbard, Oregon (the "*Property*") to R&R Property Holdings, Inc. ("*R&R*") or a higher and better bidder, free and clear of all liens, claims, encumbrances and interests pursuant to 11 U.S.C. §§ 363(b) and (f); enter into a lease of a portion of the Property (the "*Property Lease*") pursuant to 11 U.S.C. § 363(b); and pay a 4% commission to Coldwell Banker Commercial of Salem, Oregon (the "*Broker*") upon the closing of the Sale of the Property pursuant to Bankruptcy Rule 2016(a) and Local Rule 2016-1(c)(2)(A) & (B).

A hearing on the Motion and any objections to the Motion will be held on November 4, 2015 at 10:00 a.m. (the "*Hearing*") and testimony will be offered, and received if admissible, in support of the Motion and a finding that the purchase of the Property by R&R is being made in good faith and is entitled to the protections afforded by 11 U.S.C. § 363(m).

3.1     Debtor proposes to sell the Property free and clear of liens, claims, encumbrances and interests pursuant to 11 U.S.C. § 363(f)(2) and (f)(5) (and 11 U.S.C. § 363(f)(1), if applicable) and the terms of Standard Commercial Sale Agreement between the Debtor and R&R

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

dated September 29, 2015 (the "**Sale Agreement**").  A copy of the Sale Agreement is attached to this Statement as exhibit I.  Debtor also proposes to enter into the Property Lease to lease back a portion of the Property for use in her business operations.  A copy of the Property Lease is attached to this Statement as exhibit J.

3.2     R&R, the proposed buyer, is a Washington corporation and an affiliate of Cascadia Metals, Inc. ("**Cascadia**").  Cascadia is a primary vendor to the Debtor, one of the Debtor's largest unsecured and administrative creditors, and the holder of a lien against the Property.  If the sale is approved, R&R also will become the Debtor's landlord under the proposed Property Lease.  R&R's counsel is Brandy A. Sargent, Stoel Rives LLP, 900 S.W. Fifth Avenues, #2600, Portland, Oregon, 97204; Telephone: 503-294-9888; E-mail: brandy.sargent@stoel.com.

3.3     The address of the Property is 3071 Schmidt Lane, Hubbard, Oregon.  The legal description of the Property is:

A tract of land in the Southeast Quarter of Section 33, Township 4 South, Range 1 West, Willamette Meridian, Marion County, Oregon, being a portion of that tract of land described by Warranty Deed from Gregory G. Berning to PBSL, LLC and recorded in Reel 2760, Page 114, Marion County Deed Records, more particularly described as follows:

Beginning at an iron bar that is on record as being North 86° 15' East 1,611.06 feet and South 31° 26' West 1,351.88 feet and North 58° 34' West 641.52 feet from the Northwest corner of the Ewing Purvine Donation Land Claim in Section 33, Township 4 South, Range 1 West of the Willamette Meridian in Marion County, Oregon, which is at an angle point of the Northerly margin of Schmidt Lane (CR 439, 40.00 foot wide) and also being the most Southerly corner of that tract of land deeded to S.W. WEAVER, by Deed recorded in Volume 178, Page 461, Deed Records; thence North 41° 16' 23" East 402.16 feet to the Northwest corner of Parcel 1 of said PBSL, LLC deed (Paragraph 1); thence along the center of a ditch South 24° 17' 19" East 121.03 feet to an Iron pipe; thence South 49° 47' 19" East 110.55 feet to an iron rod; thence South 41° 35' 19" East 198.66 feet to an iron rod; thence South 58° 33' 19" East 137.23 feet to the Westerly margin of Relocated (1932) Highway 99E (40 feet from centerline); thence South 31° 19' 58" West

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

249.82 feet along the Westerly margin of said Highway 99E to its intersection with the North line of County Road No. 439; thence North 58° 53' 01" West 605.67 feet along the North right of way line of said Schmidt Lane (20 feet from centerline) to the point of beginning, in the City of Hubbard, Marion County, Oregon.

3.4     A copy of the full property description or inventory may be examined or obtained by contacting counsel for the Debtor.

3.5     The Property may be viewed by contacting the Debtor's counsel.

3.6     Other than the Debtor, R&R and the Broker, there are no other parties to the transaction.

3.7     Under the Sale Agreement, the gross sale price for the Property is $2,600,000. All of the liens on the Property exceed $4,469,734, of which Debtor believes a total of $2,050,033.08 need not be paid as secured claims because they have either consented or the Court can order the sale under Section 363(f)(5). KeyBank also seeks reimbursement of approximately $70,000 for fees and costs.  Total sales costs will includes a 4% commission to the Broker (*i.e.,* $104,000, assuming no change to the terms of the Sale) and other costs of closing, estimated to be approximately $6,299.00.  A preliminary list of closing costs to be satisfied by the Debtor may be obtained from the Debtor's counsel.  All tax consequences have been considered and no taxes will be owed as a result of the sale.  Absent a substantial overbid for the Property, the Sale will result in no net proceeds to the estate after payment of the Sale proceeds to satisfy valid liens on the Property (in the order of their priority) and fees, costs, and taxes payable in connection with the Sale.

3.8     The Sale is not of substantially all of the Debtor's assets.  Debtor will continue to own and operate her business after the Sale.  The terms of the Sale are: (a) sale price of $2,600,000; (b) earnest money deposit of $25,000; (c) a contingency period of up to 45 days

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

after the opening of escrow during which R&R will proceed to satisfy itself as to the condition of the Property, environmental matters, and other matters (d) a title review period of 15 days after receipt of a title report; (e) a contingency for Bankruptcy Court approval; and (f) a period of 15 days after satisfaction of contingencies for R&R to close the Sale.  In the event that R&R is not the successful purchaser of the Property, the costs of any environmental assessment will be borne by the Debtor.

If R&R is the successful purchaser of the Property, it will lease a portion of the Property back to the Debtor pursuant to the Property Lease.  In summary, the Property Lease would commence at the closing of the Sale and continue for an initial period of 12 full calendar months, and thereafter be a year-to-year lease.  Either party can terminate the Lease on 90 days' notice at the end of the initial term or any renewal term.  For the initial term, the monthly rent would be a "gross rental" of $15,000 per month, inclusive of monthly base rent of $12,650 and Debtor's proportionate share of property taxes (estimated at $1,916.67 per month) and property insurance costs (estimated at $433.34 per month).  After the first year, unless the Property Lease is terminated, the rent becomes "triple net," and Debtor would pay her proportionate share of property taxes, property insurance and maintenance costs.  Debtor is responsible for utilities that she uses.  At the start of the Property Lease, Debtor would pay the first month's rent ($15,000) and a security deposit equal to $15,000 (which would be refundable at the end of the Property Lease, unless applied to cure a breach of the Lease).

3.9     The Property has been publicly marketed since May 2015 and the offer received from R&R is the highest and best offer received after competitive bidding.  No further auction is proposed, but the Sale is expressly subject to overbid prior to the Hearing pursuant to an

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

agreement on the same or better terms and conditions (apart from the purchase price) as the Sale Agreement, including, without limitation, the Property Lease. Competing bids must be submitted to the Debtor no later than 4:00 p.m. on October 23, 2015.

3.10    Based on a November 2014 appraisal of the Property for $3,800,000, the Property was initially listed for sale for $3,775,000. In September 2015, Debtor received an offer of $2,300,000 for the Property and countered at $3,175,000. In response, the offer was raised to $2,400,000. Around the same time, R&R made its $2,600,000 offer for the Property, which the Debtor countered at $3,175,000. R&R did not raise its offer, and the Broker has not received any other formal offers for the Property.[3]

3.11    Debtor's primary secured creditor, KeyBank, National Association ("***KeyBank***"), previously filed a motion for relief from the automatic stay to begin the foreclosure process against the Property. Pursuant to a stipulated order resolving that motion, the Property was listed for sale and, in the event the Property was not sold and the Debtor had not confirmed a plan of reorganization by October 1, 2015, KeyBank was to be allowed to pursue foreclosure. Debtor believes that the proceeds of the Property that would be generated in a foreclosure would not exceed the amount to be received in the proposed Sale. Additionally, the offer received from R&R is coupled with the Property Lease, which will allow the Debtor to lease a portion of the Property and avoid moving costs.

3.12    The Debtor is proposing the sale in advance of confirmation of a plan because through the sale and leaseback debtor will be able to reduce her monthly expenses and propose a feasible plan. If the sale is not allowed KeyBank could proceed with its foreclosure proceeding.

---

[3]    The Debtor also received an informal offer of $2,000,000, but the party making the informal offer never wrote-up a formal offer.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

3.13     If the sale is not approved on November 4th 2015, debtor is requesting that the sale be approved on confirmation of the Third Amended Plan

3.14     Lienholders:  Based on filed proofs of claim, the following creditors claim liens on the Property (including security interests in fixtures, collectively, the "*Liens*"), in the following amounts and order of priority:

| Creditor | Lien Claim | Total Liens |
|---|---|---|
| Marion County Assessor's Office (Prop. Taxes) | $   131,680.15 | $   131,680.15 |
| KeyBank National Association | $1,622,645.00 | $1,754,325.15 |
| US Small Business Administration | $   860,448.55 | $2,614,773.70 |
| Oregon Business Development Corporation | $   706,588.97 | $3,321,362.67 |
| Cascadia Metals Inc. | $   634,357.58 | $3,955,720.25 |
| Internal Revenue Service – tax lien | $   514,014.53 | $4,469,734.78 |

3.15     Other than costs of the Sale, no Liens are intended to be paid without further order of the Bankruptcy Court.  All of the Liens shall attach to the Sale proceeds in the same order of priority as they attached to the Property.  Any Sale proceeds remaining after paying the Liens and expenses, taxes, commissions, fees, costs or other charges as provided in the Motion shall be held in trust until the Court orders payment.  At this time, no such excess Sale proceeds are anticipated.

3.16     The Court appointed the Broker on May 6, 2015.  Pursuant to that order, the Broker is proposed to be paid a 4% commission, which will be equal to $104,000 if the Sale to R&R is approved and closes.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

If the Court does not approve the sale at the November 4, 2015 hearing, Debtor is seeking approval of the sale as part of the Third Amended Plan on the identical terms as noticed above.

If the sale is approved, the only secured creditors that will be paid will be Marion County taxes, KeyBank approximately $1,734,432 (its secured debt minus default interest) and SBA a partial payment of approximately $581,097.24. The liens of Oregon Business Development, Cascadia Metals and the IRS will be unsecured.

3.17    Performance of Obligations of Reorganized Hagenauer. Reorganized Hagenauer will (a) in accordance with applicable law review all Claims filed against the estate, and if advisable, object to such Claims, (b) in the exercise of the business judgment, investigate, prosecute, settle or dismiss all Hagenauer's actions not otherwise settled prior to or under this ~~Second~~Third Amended Plan. Unless otherwise provided in this ~~Second~~Third Amended Plan or the ~~Second~~Third Amended Plan Documents, Reorganized Hagenauer will be entitled to receive all Hagenauer's action recoveries to be used to pay Claims pursuant to this ~~Second~~Third Amended Plan, and (c) perform all their obligations under this ~~Second~~Third Amended Plan and ~~Second~~Third Amended Plan Documents when they become due or are to be performed. Hagenauer will retain all personal property.

3.18    Prohibited Transaction. As long as payments to Classes ~~1-12 and Class 15~~1-14 remain unpaid, Reorganized Hagenauer shall not sell, lease, transfer, convey, assign, encumber or voluntarily lien any of Reorganized Hagenauer's assets, unless (i) such sale, lease, transfer, conveyance, assignment, encumbrance or lien is related to a non-material asset of Reorganized Hagenauer; (ii) the asset is replaced with an asset of equal or greater value within ten (10) days

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

after the transaction; (iii) the encumbrance or lien is the result of a refinance of an existing obligation on more favorable terms than the prior encumbrance or lien; or (iv) such sale, lease, transfer, conveyance or assignment is performed in the ordinary course of Reorganized Hagenauer's business consistent with past practices, and will not have a material adverse effect on the business or financial condition of Reorganized Hagenauer.

     3.19    <u>Objections to Claims</u>.  Objections to a Claim as to which no objection is pending as of the Effective Date, must be filed by the Claims Objection Bar Date.  Objections to such Claims may be filed by Reorganized Hagenauer, any Claimant, or any other party in interest, including, but not limited to, the Committee of Unsecured Creditors (the "Committee").

     3.20    <u>Provisions Governing Distributions</u>.

     3.20.1    <u>Distributions Only to holders of Allowed Claims</u>.  Except as otherwise provided in this section.  Distributions under this ~~Second~~Third Amended Plan and the ~~Second~~Third Amended Plan Documents will be made only to the holders of Allowed Claims.  Until a Disputed Claim becomes an Allowed Claim the holder of that Disputed Claim will not receive any distribution otherwise provided to the Claimants under this ~~Second~~Third Amended Plan or the ~~Second~~Third Amended Plan Documents.  If necessary in determining the amount of a Pro Rata distribution due to the holders of Allowed Claims in any class, Reorganized Hagenauer will make the Pro Rata calculation as if all Unresolved Claims were Allowed Claims in the full amount claimed or in the Estimated Amount.  When an Unresolved Claim in any class becomes an Allowed Claim, Reorganized Hagenauer will make distributions with respect to such Allowed Claim, together with any allowable interest accrued on the amount of each such distribution to

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

the date thereof, net of any setoff contemplated by the order, if any, allowing such Claim

and/or any required withholding of applicable federal and state taxes.

3.20.2    _Transmittal of Distributions_.  Except as otherwise provided in this

~~Second~~Third Amended Plan, in the ~~Second~~Third Amended Plan Documents, or in an

order of the Bankruptcy Court, distributions to be made under this ~~Second~~Third

Amended Plan or the ~~Second~~Third Amended Plan Documents to Claimants holding

Allowed Claims will, in each case, be made by Reorganized Hagenauer by first class

United States mail, postage prepaid, (a) to the latest mailing address set forth in a proof of

claim filed with the Bankruptcy court by or on behalf of such Claimant, or to such other

address as may be provided to Reorganized Hagenauer by such Claimant in writing, or

(b) if no such proof of claim has been filed and no written notice setting forth a mailing

address is provided by or on behalf of such Claimant to Reorganized Hagenauer to the

mailing address set forth in the schedules filed by Hagenauer in this Case.  If a

Claimant's distribution is not mailed or is returned to Reorganized Hagenauer because of

the absence of a proper mailing address, Reorganized Hagenauer shall make a reasonable

effort to locate or ascertain the correct mailing address for such Claimant from

information generally available to the public and from such party's own records, but shall

not be liable to such Claimant for having failed to find a correct mailing address.

3.20.3    _Timing of Distributions_.  Unless otherwise agreed by Reorganized

Hagenauer whenever any payment to be made is due on a day other than a Business Day,

such payment will instead be made on the next Business Day, with interest to the extent

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

expressly contemplated by this ~~Second~~Third Amended Plan or any applicable agreement or instrument.

3.20.4    Form of Distributions.  Unless otherwise agreed by Reorganized Hagenauer all Cash payments to be made by Reorganized Hagenauer pursuant to this ~~Second~~Third Amended Plan or the ~~Second~~Third Amended Plan Documents will be made, at the option of Reorganized Hagenauer by a check or wire transfer.

3.20.5    No Professional Fees or Expenses.  No professional fees or expenses will be paid by Hagenauer or Reorganized Hagenauer with respect to any Claim except as specified in this ~~Second~~Third Amended Plan, or as Allowed by Final Order of the Bankruptcy Court, as applicable.

3.20.6    Avoidance Recoveries.  Neither Hagenauer nor Reorganized Hagenauer may use any proceeds from Avoidance Claims; rather all proceeds from avoidance recoveries shall be used first to pay any unpaid Administrative Expense Claims and then any other Allowed Claims.

~~3.5~~3.21    Closing of the Case.  As soon as practicable after the Effective Date, and when Reorganized Hagenauer deems appropriate, Reorganized Hagenauer shall seek authority from the court to close the Case in accordance with the Bankruptcy Code and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Case shall, whether or not specified therein, be without prejudice to the right of Reorganized Hagenauer or other party in interest to reopen the Case for any matter over which the Court has retained jurisdiction under this ~~Second~~Third Amended Plan.  Any order closing the Case will provide that the Bankruptcy Court, (i) will retain jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation

 Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

order, any other orders entered in this Case, and the obligations created by this ~~Second~~Third

Amended Plan and the ~~Second~~Third Amended Plan Documents; and (ii) will retain all other

jurisdiction and authority granted to it under this ~~Second~~Third Amended Plan and the

~~Second~~Third Amended Plan Documents.

**4**.     **Conditions Precedent.**

    **4.1**     <u>Conditions to Effectiveness</u>.  The Effective Date will not occur and the

~~Second~~Third Amended Plan will not become effective unless and until each of the following

conditions have been satisfied or waived in accordance with Section 4.1 of this ~~Second~~Third

Amended Plan:

        (a)     the Bankruptcy Court shall have entered the Confirmation Order in form

and substance reasonably acceptable to the Proponents; and,

        (b)     no stay of the Confirmation Order shall be in effect.

**5.**     **Effects of ~~Second~~Third Amended Plan Confirmation.**

    **5.1**     <u>Discharge</u>.  Reorganized Hagenauer will not receive a Discharge until all

obligations of the ~~Second~~Third Amended Plan have been performed pursuant to 11 U.S.C. §

1141(5).  Upon completion of all obligations of the ~~Second~~Third Amended Plan, Hagenauer will

move for an entry of Discharge.  Once a Discharge Order has been entered Reorganized

Hagenauer will be Discharged from all liability and any and all claims that arose before the date

of such confirmation and from any liability of the kind specified in Sections 503(g), 503(h) and

503(i) of the Bankruptcy Code, whether or not proof of claim is filed or is deemed filed under

Section 501 of the Bankruptcy Code, such Claim is Allowed under this ~~Second~~Third Amended

Plan, or the holder of such Claim has accepted this ~~Second~~Third Amended Plan.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

**5.2** <u>Vesting</u>.  Except as otherwise expressly provided in this ~~Second~~Third Amended

Plan or in the Confirmation Order, on the Effective Date, Reorganized Hagenauer will be vested

with all of the property of the Estate free and clear of all Claims, liens, encumbrances, charges

and other interests of Creditors and Claimants.  As of the Effective Date, Reorganized Hagenauer

may hold, use, dispose, and otherwise deal with such property and conduct their affairs free of

any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court, other than those

restrictions expressly imposed by the ~~Second~~Third Amended Plan, the Confirmation Order, or

the ~~Second~~Third Amended Plan Documents.

**6.** **Treatment of Executory Contracts and Unexpired Leases.**

**6.1** <u>General; Rejected if Not Assumed</u>.  Subject to the requirements of Section 365,

all executory contracts and unexpired leases of the Debtor that have not been assumed by order

of the Bankruptcy Court, or are not the subject of a motion to assume pending on the

Confirmation Date, will be deemed rejected by the Debtor and Reorganized Hagenauer on the

Effective Date.

**6.2** <u>Claims For Contract Rejection</u>.  All proofs of claim with respect to Claims arising

from the rejection of executory contracts or unexpired leases pursuant to Section 6.1 of this

~~Second~~Third Amended Plan must be filed with the Bankruptcy Court within 30 days after the

Effective Date or such Claims will be forever barred.

**7.** **<u>Avoidance Claims</u>**

**7.1** <u>Debtor shall retain any and all claims and causes of action whatsoever (whether

known, unknown, liquidated unliquidated, fixed, contingent, matured, unmatured, disputed, or

undisputed, and whether asserted or assertable directly, indirectly, or derivatively, at law in</u>

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

equity, or otherwise), including, but not limited to, all Avoidance Claims, subject to the authority given by the bankruptcy court for the Creditors' Committee to pursue certain Avoidance Claims. Notwithstanding the entry of an order confirming the Third Amended Plan, so long as any members of the Creditors' Committee are willing to serve, the Creditors' Committee shall continue until it is dissolved by action of the members thereof or until the Third Amended Plan is complete and all creditors have been paid in full, whichever occurs first. Neither the Creditors' Committee nor any of its past, present, or future members (or any of the respective past, present, or future officers, directors, employees, or agents of such members) shall have or incur any liability to any holder of a claim or equity interest or to any entity for any act or omission in connection with or arising out of the chapter 11 case, or the negotiations and pursuit of confirmation of the Third Amended Plan, the consummation of the Third Amended Plan, the pursuit of any Avoidance Claims the Creditors' Committee has been authorized to pursue, the administration of the Third Amended Plan or the property to be distributed under the Third Amended Plan.

7.2    The Creditors' Committee also believes the Debtor may have a preference/fraudulent transfer action against Bank of America for payments by Valley Rolling Corp. on two employee credit cards. These cards were used by Valley Rolling to purchase product for Valley Rolling to manufacture. The payments were made to Bank of America within the 90 days preceding the Petition Date, were made to a creditor of Valley Rolling because if the payments had not been made, Bank of America would have asserted an unjust enrichment claim against Valley Rolling and the payments allowed Bank of America to receive more than it would have received in a liquidation under chapter 7. The payments made during the preference period

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

to Bank of America total over $620,000.  Debtor is not going to pursue these claims but the Court has entered an order authorizing the Creditors' Committee to pursue such claims.

7.3     In addition the Creditors' Committee may pursue a claim against unsecured creditor Cannonball for preferential payments made during the 90 days preceding the Petition Date on a judgement in the amount of $15,000.  The payments to Cannonball as a Class 11 Claim will only be paid if Cannonball repays the $15,000 preference payments.

7.4     The Creditors' Committee may also pursue a preference claim against FORA Financial for payments of $1,168 per business day during the 90 days preceding the Petition Date totaling $58,430.  FORA Financial's purported secured claim was actually entirely unsecured at the time the payments were made based upon the value of the personal property and the lien amounts superior to FORA  Financial.  The payments to FORA Financial as a Class 11 Claim holder will be paid, if and only if, FORA repays the $58,430 preference payments.

7.5     None of the proceeds of the Preference action litigation will be paid to Reorganized Debtor.  If the Creditors' Committee is unsuccessful in the litigation, costs of the litigation will be an administrative expense, which will be paid for by Debtor.

7.6     Allowed professional fees incurred by the Creditors' Committee, including those incurred in pursuing or analyzing the Avoidance Claims pre-confirmation will be paid prorata from the Accumulated Administrative Account on the Effective Date.  The remaining balance owed and amounts incurred post-confirmation will be paid from any Avoidance Claim recoveries and from Debtor's income from operations and/or the other assets of Debtor if liquidated after the payment of allowed secured claims encumbering such assets.  The professional person or agent seeking a payment from the Debtor shall submit an invoice to the Debtor, which (absent an

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

objection by the Debtor) the Debtor shall promptly pay. Any objection which cannot be resolved by the parties shall be resolved by the Court. Creditors' Committee counsel may withdraw from representation in the Avoidance Claim actions if counsel is not getting paid on a timely basis.

7.7 Before any Avoidance Claims are commenced, the Creditors' Committee will present to Debtor, KeyBank and Cascadia the proposal to pursue the specific Avoicance Claim together with the anticipated cost of pursuing such claim. Before the Committee is authorized to go forward, a majority of the above parties must approve the proposal.

**8 Miscellaneous Provisions.**

~~7.1~~**8.1** Retention of Jurisdiction. Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, and except as otherwise specifically set forth in this Section ~~7~~8.1, the Bankruptcy Court will retain jurisdiction over all matters arising under, in furtherance of, or in connection with this ~~Second~~Third Amended Plan, including those matters specifically described in this Section ~~7~~8.1 below.

The matters over which the Bankruptcy Court shall retain jurisdiction over this ~~Second~~Third Amended Plan include:

(a) determine any Unresolved Claims;

(b) determine the Estimated Amount of any Claim;

(c) determine requests for payment of Claims entitled to priority under Section 507 of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(d) resolve controversies and disputes regarding the modification, interpretation, and implementation of this ~~Second~~Third Amended Plan and the

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

~~Second~~Third Amended Plan Documents, including, without limitation, any amendments or modifications to loan documents;

      (e)     enter orders in aid of this ~~Second~~Third Amended Plan and the ~~Second~~Third Amended Plan Documents including, without limitation, appropriate orders (which may include contempt or other sanctions) to protect Reorganized Hagenauer from actions prohibited under this ~~Second~~Third Amended Plan or the ~~Second~~Third Amended Plan Documents;

      (f)     modify this ~~Second~~Third Amended Plan;

      (g)     determine any and all applications, adversary proceedings, and contested or litigated matters pending on the Effective Date;

      (h)     determine any and all pending motions for the assumption or rejection of executory contracts or leases, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom;

      (i)     preside over and render orders and judgments in any adversary proceedings for the recovery of Avoidance Claims commenced by the Debtor or the Committee; and

      (j)     enter Final Orders closing the Case.

8.2    Modification of ~~Second~~Third Amended Plan. The Proponents reserve the right, in accordance with the Bankruptcy Code, to amend, modify, or withdraw this ~~Second~~Third Amended Plan prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Proponents may, upon order, amend or modify this ~~Second~~Third Amended Plan in accordance with Section 1127(b) of the Bankruptcy Code.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

8.3     Severability.  In the event of a successful collateral attack on any provision of the ~~Second~~Third Amended Plan (i.e., an attack other than through a direct appeal of the Confirmation Order), the remaining provisions of this ~~Second~~Third Amended Plan will remain binding on the Debtor, Reorganized Hagenauer, all Claimants, all Creditors, and all other parties in interest.

8.4     Post-Confirmation Professional Fees and Expenses.  All Professional fees and expenses incurred or payable by Reorganized Hagenauer after the Effective Date but prior to closing of the Case will be paid in the ordinary course of business of Reorganized Hagenauer after 15 days notice to the U S Trustee and parties in interest.  If a party in interest or the U.S. Trustee objects, the court will resolve any dispute regarding the amount of the fees or costs.

8.5     Headings.  The headings of the sections and paragraphs of this ~~Second~~Third Amended Plan are inserted for convenience only and will not affect the interpretation hereof.

8.6     Computation of Time Periods.  In computing any period of time prescribed or allowed by this ~~Second~~Third Amended Plan, the day of the act, event, or default from which a designated period of time begins to run will not be included.  The last day of the period so computed will be included so long as it is a Business Day.  When the period of time prescribed or allowed is less than 11 days, any day that is not a Business Day will be excluded in the computation.

8.7     Notices.  All notices or requests to Reorganized Hagenauer in connection with this ~~Second~~Third Amended Plan shall be in writing and served either by (i) United States mail, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed given when received by the following parties, as applicable:

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

If to Hagenauer:
Laura Lee Hagenauer
1129 Belle Passi Rd.
Woodburn, OR 97071

With copies to:
Troutman Law Firm
Attn:   Ted A. Troutman
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005

All notices and requests to a Person or Entity holding any Claim will be sent to them at their last known address or to the last known address of their attorney of record.  The Debtor or Reorganized Hagenauer and any holder of a Claim may designate in writing any other address, which designation will be effective upon actual receipt by the Debtor or Reorganized Hagenauer, or by the holder of the Claim.  Any Person or Entity entitled to receive notice under this ~~Second~~Third Amended Plan will have the obligation to provide Reorganized Hagenauer with such Person's or entity's current address for notice purposes.  Reorganized Hagenauer will have no obligation to attempt to locate a more current address in the event any notice proves to be undeliverable to the most recent address which has been provided to Reorganized Hagenauer.

8.8     Post-Confirmation Court Approval.  Any action requiring Bankruptcy Court approval after the Effective Date will require the Person or Entity seeking such approval to file an application, motion, or other request with the Bankruptcy Court and obtain a Final Order approving such action before the requested action may be taken.  The Person or Entity filing such application, motion, or other request shall serve such application, motion, or other request, together with a notice setting forth the time in which objections must be filed with the court, on Reorganized Hagenauer and other affected parties by first-class mail, electronic mail, overnight courier, facsimile, or hand delivery.  Unless the Court orders otherwise, all notices shall provide

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

the recipients at least 21 days (plus 3 days if served by mail) in which to file an objection to the application, motion, or other request.  If no objection is timely filed, the Court may authorize the proposed action without further notice or a hearing.  If an objection is timely filed, the court will determine whether to conduct a hearing, or to require the submission of further documentation, prior to ruling on the application, motion, or other request.

        8.9     <u>Election Pursuant to Section 1129(b) of the Bankruptcy Code</u>.  The Proponent hereby requests confirmation of the ~~Second~~Third Amended Plan pursuant to Section 1129(b) of the Bankruptcy Code if the requirements of all provisions of Section 1129(a) of the Bankruptcy Code, except paragraph (a)(8) thereof, are met with regard to the ~~Second~~Third Amended Plan. In determining whether the requirements of Section 1129(a)(8) of the Bankruptcy Code have been met, any Class or subclass of a Class that does not contain as an element thereof an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 as of the date fixed by the Bankruptcy Court for filing acceptances or rejections of this ~~Second~~Third Amended Plan shall be deemed deleted from this ~~Second~~Third Amended Plan for purposes of voting to accept or reject this ~~Second~~Third Amended Plan and for purposes of determining acceptance or rejection of this ~~Second~~Third Amended Plan by such Class or subclass.

        ~~7~~8.10     <u>Exemption from Transfer Taxes</u>.  Pursuant to Section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this ~~Second~~Third Amended Plan, whether occurring prior or subsequent to the Confirmation Date, including any deeds, bills of sale, or assignments executed in connection with any disposition of assets contemplated by this ~~Second~~Third Amended Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax or other similar tax.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

**78.11   Waivers.**  Except as otherwise provided in the ~~Second~~Third Amended Plan or in the Confirmation Order, any term of the ~~Second~~Third Amended Plan may be waived by the party benefited by the term to be waived.

**78.12   Setoffs, Recoupments, and Defenses.**  Nothing contained in the ~~Second~~Third Amended Plan shall constitute a waiver or release by Debtor or Reorganized Hagenauer of any rights of setoff or recoupment, or of any defense, it may have with respect to any Claim (including, without limitation, rights under Section 503(d)) of the Bankruptcy Code.  Except as otherwise provided in the ~~Second~~Third Amended Plan or in the Confirmation Order or in agreements previously approved by a Final Order, Reorganized Hagenauer may, but will not be required to, set off against any Claim or any distributions with respect to such Claim any and all of the claims, rights and causes of action of any nature that the Debtor or Reorganized Hagenauer, as applicable, may hold against the holder of such Claim; provided, however, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, the payment of any distribution hereunder or any other action or omission of Reorganized Hagenauer, nor any provision of the ~~Second~~Third Amended Plan, shall constitute a waiver or release by the Debtor or Reorganized Hagenauer, as applicable, of any such claims, rights, and causes of action that the Debtor or Reorganized Hagenauer, as applicable, may possess against such holder.

**78.13   Withdrawal or Revocation of the ~~Second~~Third Amended Plan.**  The Proponent reserves the right to revoke or withdraw the ~~Second~~Third Amended Plan prior to the Confirmation Date.  If the ~~Second~~Third Amended Plan is revoked or withdrawn, or if the Confirmation Date does not occur, the ~~Second~~Third Amended Plan shall have no force and effect and in such event nothing contained herein shall be deemed to constitute a waiver or release of

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

any claims by or against the Debtor or the Estate or any other Person or Entity, or to prejudice in any other manner the rights of the Proponent, or any of them, or any other entity in further proceedings involving the Debtor and specifically shall not modify or affect the rights of any party under any prior orders of the Court.

**7~~8~~.14** <u>Default</u>. Except as otherwise provided in the ~~Second~~Third Amended Plan or in the Confirmation Order, in the event that Reorganized Hagenauer shall default in the performance of any of its obligations under the ~~Second~~Third Amended Plan or under any of the ~~Second~~Third Amended Plan Documents and shall not have cured such a default within any applicable cure period (or, if no cure period is specified in the ~~Second~~Third Amended Plan or ~~Second~~Third Amended Plan Documents or in any instrument issued to or retained by a Claimant under the ~~Second~~Third Amended Plan, then within 30 days after receipt of written notice of default), then the entity to whom the performance is due may pursue such remedies as are available at law or in equity. An event of default occurring with respect to one Claim shall not be an event of default with respect to any other Claim.

**7~~8~~.15** <u>Filing and Payment of Allowed Administrative Claims</u>. All requests for the payment of Administrative Claims must be filed with the Bankruptcy Court no later than 30 days after the Effective Date or at such time as the Bankruptcy Court may otherwise order. Once a Final Order is entered allowing a disputed administrative claim Reorganized Hagenauer will pay such Claim in accordance with this ~~Second~~Third Amended Plan.

**7~~8~~.16** <u>Payment of United States Trustee Fees</u>. Reorganized Hagenauer shall be responsible for timely payment of fees incurred pursuant to 28 USC § 1930(a)(6) until the case is closed, converted, or dismissed. After confirmation, Reorganized Hagenauer shall file with the

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

Court a monthly financial report, for each month, or portion thereof, that the case remains open. The monthly financial report shall include a statement of all disbursements made during the course of the month, whether or not pursuant to the ~~Second~~Third Amended Plan.

**7~~8~~.17** <u>Governing Law</u>. Except to the extent that federal law (including the Bankruptcy Code or Bankruptcy Rules) is applicable, the rights and obligations arising under the ~~Second~~Third Amended Plan or under the ~~Second~~Third Amended Plan Documents shall be governed by and construed and enforced in accordance with the laws of the State of Oregon without giving effect to the principles of conflicts of laws thereof.

**7~~8~~.18** <u>Reservation of Rights</u>. If the ~~Second~~Third Amended Plan is not confirmed by a Final Order, or if the ~~Second~~Third Amended Plan is confirmed and the Effective Date does not occur, the rights of all parties in interest in the Case are and will be reserved in full. Any concessions or settlement reflected herein, if any, are made for purposes of the ~~Second~~Third Amended Plan only, and if the ~~Second~~Third Amended Plan does not become effective, no party in interest in the Case shall be bound or deemed prejudiced by any such concession or settlement.

**7~~8~~.19** **~~Second~~Third Amended** <u>Plan Controls</u>. To the extent any provision of the ~~Second~~Third Amended Plan Documents is inconsistent with this ~~Second~~Third Amended Plan, the provisions of the ~~Second~~Third Amended Plan shall control.

**7~~8~~.20** <u>Successors and Assigns</u>. The ~~Second~~Third Amended Plan shall be binding upon and inure to the benefit of the Debtor, Reorganized Hagenauer, all Claimants, all Creditors, and all other parties in interest affected thereby and their respective successors, heirs, legal representatives and assigns.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

**8.9      Definitions.**

For purposes hereof, any term used in an initially capitalized form in this ~~Second~~Third Amended Plan will have the defined meaning ascribed to it in either § 101 of the Bankruptcy Code or the definitions set forth below. All definitions in the Bankruptcy Code and below will be subject to the rules of construction set forth in § 102 of the Bankruptcy Code. Whenever the context requires, such terms include the singular as well as the plural, the masculine gender includes the feminine, and the feminine gender includes the masculine. Any specific references to promissory notes, deeds of trust or other debt instruments, or security documents includes any amendments, modifications, and extensions thereto. Nothing contained in this ~~Second~~Third Amended Plan or the ~~Second~~Third Amended Disclosure Statement constitutes an admission or denial by any party of liability for, or the validity, priority, or extent of any Claim, lien, or security interest asserted against the Debtor or against any third party.

**"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in § 503(b) of the Bankruptcy Code and referred to in § 507(a)(2) of the Bankruptcy Code including, without limitation, the actual, necessary costs and expenses of preserving a Debtor's estate and operating a Debtor's business including Current Obligations, compensation for professional services provided by Debtor's and the Committee's employed professionals and reimbursement of expenses awarded under Sections 330(a) or 331 of the Bankruptcy Code, and all fees and charges assessed against a Debtor's estate under Chapter 123 of Title 28, United States Code.

**"Allowance Date"** means, with respect to a Claim, the date such Claim becomes Allowed.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

"**Allowed**" means, with respect to a Claim, the extent to which: (a) the Claim is agreed to by the Claimant and the Debtor against whom the Claim is asserted; (b) the Claim is expressly allowed in this ~~Second~~Third Amended Plan; or (c) proof of such Claim was (i) timely filed with the Bankruptcy Court, (ii) deemed filed pursuant to § 1111(a) of the Bankruptcy Code, or (iii) tardily filed with leave of the Bankruptcy Court, and, in any case, as to which the Claim is not Disputed or the Claim is Disputed and is allowed by a Final Order.

"**Ballot**" means the ballot that is used by a Creditor to accept or reject the ~~Second~~Third Amended Plan.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, principally codified in 11 USC § 101, et seq., and any amendments thereto applicable to this Case.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Oregon.

"**Bankruptcy Rules**" means the Rules and Forms of Practice and Procedures in Bankruptcy promulgated under 28 USC § 2075, as amended, and the local rules and general orders of the Bankruptcy Court, as applicable to Chapter 11 cases, together with all amendments and modifications from time to time thereto.

"**Business Day**" means any day other than Saturday, Sunday, or a "legal holiday", as that term is defined in Bankruptcy Rule 9006(a).

"**Case**" means the Debtor case commenced under Chapter 11 of the Bankruptcy Code on September 28, 2014.

"**Cash**" means cash, cash equivalents, bank deposits, and negotiable instruments payable on demand.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

"**Chapter 11 Professionals**" means the law firm of Muir & Troutman and all other professionals, if any, which the Debtor may retain to provide professional services, all in accordance with Sections 327(a) and 327(e) of the Bankruptcy Code and as approved by the Bankruptcy Court.

"**Claim**" means any claim, as that term is defined in § 101(5), arising on or before the Confirmation Date.

"**Claimant**" means a Creditor that asserts a Claim.

"**Claims Bar Date**" means February 2, 2015, the last day timely claims can be filed.

"**Claims Objection Bar Date**" means, unless extended by the Court, the first Business Day that follows the 60th day after the Effective Date, or such other date as fixed by the Bankruptcy Court, by which any objection to a Claim must be filed with the Bankruptcy Court or such objection will be forever barred.

"**Confirmation Date**" means the date of the entry of the Confirmation Order.

"**Confirmation Order**" means the order confirming this ~~Second~~Third Amended Plan.

"**Contingent**" means, with respect to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which or the obligation to make payment on which is dependent upon a future event that may or may not occur.

"**Creditor**" means any creditor, as that term is defined in § 101(10) of the Bankruptcy Code.

"**Current Obligations**" means (a) all accounts payable and other liabilities or obligations of Debtor that arose or accrued in the ordinary course of that Debtor's business during this Case, and (b) any taxes that were incurred subsequent to the Petition Date and became or become

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

legally due and payable by the Debtor subsequent to the Petition Date and prior to the Effective Date.

"**Debtor**" means Laura Lee Hagenauer.

"**Debtor's Actions**" means any and all claims, causes of action, and enforceable rights of the Debtor against third parties including, without limitation, claims of the Debtor for recovery of, or based upon, or in any manner arising from or related to damages, general or exemplary (or both), or other relief relating to (or based upon) (a) indebtedness owing to the Debtor; (b) fraud, negligence, gross negligence, willful misconduct, or any other tort actions; (c) breaches of contract; (d) violations of federal or state laws (including corporate and securities laws); (e) breaches of fiduciary or agency duties; (f) disregard of the corporate form or piercing the corporate veil or other liability theories; (g) avoidance of transfers or obligations under Chapter 5 of the Bankruptcy Code or under state law; and (h) any other claim of the Debtor to the extent not specifically compromised or released pursuant to this ~~Second~~Third Amended Plan or an agreement referred to, or incorporated into, this ~~Second~~Third Amended Plan.

"**Debtor's Action Recoveries**" means the rights of Debtor to any and all proceeds or other relief from (a) any award, judgment, relief, or other determination rendered or made as to any Debtor's Action; or (b) any compromise or settlement of any Debtor's Action.

"**Disallowed**" means, with respect to any claim, the extent to which the Claim has been disallowed pursuant to (a) a Final Order, (b) an agreement between the Claimant and the Debtor or Reorganized Hagenauer against whom the Claim is asserted, or (c) the terms of the ~~Second~~Third Amended Plan.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

**"Disclosure Statement"** means the ~~Second~~Third Amended Disclosure Statement regarding this ~~Second~~Third Amended Plan, including all exhibits and schedules attached thereto and referenced therein prepared by the Proponents pursuant to § 1125 of the Bankruptcy Code and approved by the Bankruptcy Court, as such ~~Second~~Third Amended Disclosure Statement may be amended and modified from time to time.

**"Disputed"** means, with respect to a Claim, that an objection to such Claim has been timely filed as provided in this ~~Second~~Third Amended Plan, or such Claim is listed as disputed in the applicable Debtor's schedules filed with the Bankruptcy court, and such objection or dispute has not been resolved by Final Order, or by agreement between the Claimant and the Debtor or Reorganized Hagenauer.

**"Effective Date"** means 10 days following the entry of an Order Confirming the ~~Second~~Third Amended Plan of Reorganization.

**"Estate"** means the bankruptcy estate of the Debtor as created under § 541 of the Bankruptcy Code.

**"General Unsecured Claim"** means any Claim that is not an Administrative Claim a Priority Tax Claim, or a Claim that is otherwise classified under the ~~Second~~Third Amended Plan.

**"Non-Tax Priority Claim"** means any Claim, which if allowed, would be entitled to priority under Section 507(a)(1) through (7) of the Bankruptcy Code.

**"Non-Tax Priority Claimant"** means a Person or Entity that asserts a non-Tax Priority Claim.

**"Petition Date"** means the date the Debtor filed the petition commencing this Case, September 28, 2014.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

"**Plan**" means this ~~Second~~Third Amended Plan of Reorganization and any and all modifications and/or amendments thereto.

"**Plan Documents**" means all agreements, documents, and exhibits as the same may be amended, modified, supplemented, or restated from time to time, that are necessary or appropriate to implement, authorize, consummate, and operate the ~~Second~~Third Amended Plan including without limitation any and all loan documents that are being modified by the Plan.

"**Plan Secured Interest Rate**" means the interest rate for deferred payments to secured creditors under the ~~Second~~Third Amended Plan.

"**Priority Tax Claim**" means any Claim that, if allowed, would be entitled to a priority in payment under Section 507(a)(8) of the Bankruptcy Code.

"**Proponent**" means the Debtor who are the proponents of the ~~Second~~Third Amended Plan.

"**Pro Rata**" means proportionate, and when applied to a Claim means the ratio of the amount distributed on account of an Allowed Claim in a class to the amount distributed on account of all Allowed Claims in such class.

"**Reorganized Hagenauer**" means Laura Lee Hagenauer, individually and doing business as Valley Rolling on and after the Effective Date.

"**Secured Claim**" means any Claim, including interest, fees, and charges as determined pursuant to Section 506(b) of the Bankruptcy Code, against Debtor that is (a) secured in whole or in part as of the Petition Date by a lien on any of the assets or property of the Debtor, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, but only to the extent of the value of the

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

assets or property securing any such Claim; or (b) subject to setoff under Section 553 of the Bankruptcy Code, but only to the extent of the amount subject to such setoff.

**"Statement of Financial Affairs"** means the Debtor's Statement of Financial Affairs, and any amendments or supplements thereto, filed with the Bankruptcy Court pursuant to Bankruptcy Rule 1007.

DATED:        ~~August 18~~October 23, 2015

*/s/Laura Lee Hagenauer*

_____

Laura Lee Hagenauer

Troutman Law Firm, P.C.

*/s/Ted A. Troutman*

_____

Ted A. Troutman, OSB# 844470
Attorney for Laura Lee Hagenauer

Page 42 – DEBTOR'S ~~SECOND~~THIRD AMENDED PLAN OF REORGANIZATION    Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

Case 14-63530-fra11    Doc 260    Filed 10/23/15

September 16 , 2015

FOR VALUE RECEIVED, and in consideration of the mutual promises contained in this SALE AGREEMENT (the "Agreement"), the undersigned __LAURA LEE HAGENAUER__ ("Seller") agrees to sell, and the undersigned __R & R PROPERTY HOLDINGS, INC., a Washington corporation__ ("Purchaser") agrees to purchase, subject to the conditions stated in this Agreement, the following property, situated in the State of Oregon, to-wit: __the buildings, the cranes and other improvements on the property that are used in connection with the building, and land located at 3071 Schmidt Lane NE, Hubbard, OR 97032, as more particularly described in the attached Exhibit A__ (collectively, the "Property"), on the following terms and conditions:

**1.  PURCHASE PRICE.** The purchase price ("Purchase Price") for the Property shall be TWO MILLION SIX HUNDRED THOUSAND AND 00/100THS Dollars ($2,600,000.00 ). The terms of such purchase shall be: __all cash at Closing__. This Agreement is not subject to (or conditioned upon) the need for Purchaser to obtain any financing on the Property.

**2.  DEPOSIT AND ESCROW.** Purchaser will deposit in escrow an earnest money deposit in the amount of __TWENTY-FIVE THOUSAND DOLLARS ($25,000.00)__ (the "Deposit"), within three business days after the Opening of Escrow . The escrow agent ("Escrow Agent") will be a branch office of a title company in Oregon ("Title Company") mutually acceptable to Seller and Purchaser. The earnest money deposit (the "Deposit") will be refunded to Purchaser if Purchaser terminates this Agreement during the Contingency Period described below. If this Agreement is not so terminated, the Deposit will become a forfeitable earnest money deposit and will be applied to the Purchase Price due at closing. This Agreement will constitute the parties' instructions to Escrow Agent; provided, that if Escrow Agent requires separate or additional instructions or information from the parties, the parties will reasonably and promptly execute such instructions and/or provide such information. The date on which Escrow Agent notifies the parties that it has received an executed copy or counterpart copy of this Agreement is the "Opening of Escrow."

**3.  CONTINGENCY PERIOD AND APPROVAL BY PURCHASER.** The review and contingency period ("Contingency Period") for Purchaser to satisfy itself concerning inspections, investigations or other "due diligence" reviews of the Property will be as follows: __the Contingency Period will start on the date of this Agreement and  will expire and terminate upon the date that is forty-five (45) days after the date of Opening of Escrow, within which Purchaser shall satisfy itself as to the following: (1) Property, including receipt of a "phase I" environmental assessment of the Property (as provided below), (2) the environmental condition of the Property including physical condition, zoning and use, (2) the environmental condition of the business documents pertaining to the Property, including (without limitation) any existing reports or information in Seller's possession concerning the environmental condition of the Property, any surveys, any notices of violation in Seller's possession that pertain to the Property, any other studies or notices pertaining to the Property, and copies of any other written information in Seller's possession pertaining to the condition, use, operation or ownership of the Property that Purchaser may reasonably require, and (4) any other studies or matters that Purchaser chooses to review and that are pertinent to the Property.__ During the Contingency Period, Purchaser may terminate the Agreement in its discretion, if Purchase determines that the contingencies are not satisfied. If it does so, any deposit made by Purchaser shall be refunded.

After mutual execution of this Agreement, the parties will order a "phase I" environmental assessment (the "Phase I Assessment") of the Property from an environmental consulting firm acceptable to Purchaser, which will be addressed jointly to Seller and Purchaser. Purchaser will pay for the cost of the Phase I Assessment at Closing (as provided below) or if the transaction fails to close solely because of Purchaser's default or refusal to close the purchase of the Property after removal of contingencies (and, otherwise, the cost of the Phase I Assessment will be paid by Seller or any overbidder who becomes the final purchaser of the Property pursuant to a Final Order, as defined and described below).

**4.  TITLE REVIEW AND APPROVAL.** Upon mutual execution of this Agreement, Seller will furnish to Purchaser a preliminary title report showing the status of title to the Property, along with a legible copy of the exceptions to title shown in the title report. Purchaser will have fifteen (15) days after receipt of the title report to notify Seller as to any matter shown on the title report to which Purchaser objects. Any matter shown on the title report that Purchaser does not disapprove within such 15-day period will be deemed conclusively approved by Purchaser ("Permitted Exceptions"). Seller may, but will not be required to, elect to cure any disapproved title matter or notify Purchaser that Seller elects not to cure.  If Seller elects to cure a disapproved title matter, Seller will have until Closing to cure the matter. If Seller elects not to cure or is unable to cure a disapproved title matter, Seller may so notify Purchaser, and Purchaser will have five (5) days after receipt of such notice to elect to waive any objection to the previously disapproved title matter, and if not so waived, this Agreement shall terminate. At Closing, an owner's title insurance policy will be issued to Purchaser, in form reasonably acceptable to Purchaser, insuring that Purchaser holds good and merchantable fee title to the Property, subject only to the Permitted Exceptions and any other exception specifically approved by Purchaser.

**5.  BANKRUPTCY COURT APPROVAL.** The parties acknowledge that Seller is the subject of that certain bankruptcy case, Case No. 14-63530-FRA11 (the "Bankruptcy Case"), which is pending in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court"). The parties further acknowledge that the transactions described in this Agreement are subject to the approval of the Bankruptcy Court and cannot be consummated without such approval. Seller shall file a motion with the Bankruptcy Court seeking the entry of an order (the "Approval Order") authorizing Seller to enter into this Agreement and consummate the transactions described herein. Purchaser shall use commercially reasonable efforts to cooperate with Seller in the filing of the motion for the Approval Order. The parties' obligations under this Agreement are conditioned upon the Approval Order becomes a Final Order. "Final Order" means that (i) the Approval Order has been entered in the Bankruptcy Case, and (ii) the period in which the Approval Order is subject to any rights of appeal, certiorari proceeding, or other proceeding for review or rehearing has ended, or if any appeal, certiorari proceeding or other review or rehearing occurs), it has ended and the Approval Order is not subject to further rights of legal challenge.

**6.  CLOSING.** The escrow shall be closed (the "Closing") on a date mutually acceptable to the parties ("Closing Date"), within fifteen (15) days after the date on which the conditions to Closing set forth above are satisfied. At Closing, the following will take place: (a) Seller will convey the Property to Purchaser pursuant to a good and sufficient, statutory warranty deed ("Deed") and bill of sale (the form of which will be approved by the parties within the Contingency Period); (b) the Title Company will commit to issue to Purchaser an owner's policy of title insurance, in the amount of the Purchase Price and subject to no liens or encumbrances, other than the Permitted Exceptions and any other exception specifically approved by Purchaser in its review of title; and (c) Purchaser will pay the Purchase Price to Seller.

E x I

EXHIBIT   I
Page  1  Of  5

Current property taxes shall be prorated as of the Closing Date (such property taxes, if not yet assessed, to be deemed equal to those for the last preceding year, subject to a post-Closing adjustment when the actual amount of property taxes becomes known). Seller and Purchaser shall equally divide the escrow fee, if the parties choose to close this transaction in escrow with the title company. The cost of the owner's policy of title insurance to be issued to Purchaser in the amount of the Purchase Price will be paid by Seller. Seller will be responsible for causing the Property to be released from the Bankruptcy Case and any liens on the Property, other than current property taxes. Purchaser will pay the recording fee for the Deed and the cost of its "due diligence" investigations. Each party will pay its own legal and consulting fees.

If any post-Closing reconciliation or adjustment is required between the parties pursuant to this Agreement (because of an adjustment or prorate that is done on an estimated basis, or otherwise), the parties will reasonably co-operate with each other to provide the information needed for such reconciliation and adjustment, and will promptly do the reconciliation and adjustment when the information is available to do so. If any other closing costs not specifically provided for herein are due at closing of this transaction, each party shall pay such closing costs as are normally and customarily the responsibility of such party. This paragraph 6 shall survive the Closing for all purposes.

**7. UNTIL CLOSING; SELLER'S COOPERATION.** From the date of this Agreement until the Closing Date, Seller will continue to cause the Property to be maintained in substantially the same manner and condition which now exists, and will not further mortgage or further encumber its interest in the Property. Seller will cooperate in executing any documents and doing such other things as Purchaser may reasonably request in connection with Purchaser's due diligence activities; provided, that such actions will be at no out-of-pocket expense to Seller, and neither Seller nor the Property will be bound if Purchaser does not close the purchase of the Property.

**8. CONDEMNATION.** If, prior to Closing, any part of the Property is condemned or appropriated by public authority or any party exercising the right of eminent domain, or is threatened thereby, then this Agreement shall, at the election of Purchaser, become null and void. In the event Purchaser elects not to terminate this Agreement, the purchase price shall be reduced by the amount of the Seller's award pertaining to the Property. Seller will promptly notify Purchaser as to the commencement of any such action known to Seller or any communication from a condemning authority that a condemnation or appropriation is contemplated, and will cooperate with Purchaser prior to Closing in the response to or defense of such actions in order to maximize the award.

**9. NOTICES.** All notices given pursuant to this Agreement shall be in writing and shall either be (i) mailed by first class mail, postage prepaid, certified or registered with return receipt requested, (ii) delivered in person or by nationally recognized overnight courier, or (iii) sent by facsimile or as a PDF attachment to an email, if the party has specified a facsimile number or email address to use for notice purposes. Notices shall be effective when received (or deemed received by the party). Any notice transmitted by overnight courier service or by certified mail shall be deemed received as of the date of delivery to the address of the party, as confirmed by the overnight courier or as shown on the certified mail return receipt. Any such notice transmitted by facsimile shall be deemed received 12 hours after being telecopied and receipt has been confirmed either electronically or otherwise. Notice given to a party in any manner not specified above shall be effective only if and when received by the addressee as demonstrated by objective evidence in the possession of the sender. The address of each party to this Agreement for purposes of notice are as set forth below their signatures. A copy of any notice to either party will be sent to the party's legal counsel, as the party may designate. Each party may change its address for notice by giving not less than ten (10) days' prior notice of such change to the other party in the manner set forth above. Delivery of the copy of any notice to the places to which copies are to be sent is not a precondition to the effectiveness of the notice between the parties themselves.

For the purpose of this Agreement, the term "receipt" shall include the earlier of any of the following: (i) the date of actual receipt of the notice by the office of the person or entity pursuant to this Agreement, whether or not any named individual at such address receives the notice, or (ii) in the case of refusal to accept delivery or inability to deliver the notice because of the recipient's failure to maintain an address at which notices can be delivered, then the earlier of (A) the date of the attempted delivery or refusal to accept delivery, or (B) the date of receipt of notice of refusal or notice of non-delivery by the sending party.

**10. REPRESENTATIONS AND WARRANTIES.** Seller warrants and represents to Purchaser as follows: (1) to Seller's knowledge, the Property is not in violation of any zoning, land-use, environmental, public health, or safety laws; (2) to Seller's knowledge, the Property, buildings and improvements (including any HVAC, plumbing, life-safety and other installed building systems and cranes) are in good and working condition and free of any known defects; (3) Seller is not aware of any pending or threatened litigation affecting the Property; (4) Seller is not aware of any pending or threatened condemnation proceedings or change in zoning affecting the Property; and (5) this Agreement has been, and all the documents to be delivered by Seller to Purchaser at Closing will be, duly authorized, executed and delivered by Seller, are or will be legal, valid, and binding obligations of Seller, will be sufficient to convey title to the Property, are or will be enforceable in accordance with their respective terms, and do not and will not at Closing violate any provisions of any agreement to which Seller is a party or by which the Property is bound.

Seller represents that, to Seller's knowledge, (a) there are no known hazardous substances on, under, in or about the Property in violation of any applicable environmental laws; (b) there have been no known spills, releases, discharges or disposal of any hazardous substances that have occurred or are presently occurring on or onto the Property or off the Property as a result of any construction on or operation and use of the Property; (c) there are no known underground storage tanks located on or immediately adjacent to the Property; or (d) there is no known contamination in the ground water on, under or about the Property. The term "hazardous substances" would not include cleaning materials, landscape fertilizer and other products and materials ("Permitted Materials") typically used in the ordinary course of maintaining and operating a commercial property similar to the Property (provided such Permitted Materials are in ordinary quantities and have been used in accordance with applicable environmental laws).

As used in the Agreement, the terms "known" or "knowledge" (or similar terms) means the actual, conscious knowledge of facts by Seller (and does not include "constructive" knowledge or imply any particular duty of investigation of facts not actually known by Seller). Seller's representations and warranties are made as of the Effective Date and will be deemed to be re-made as of the Closing Date. This paragraph 10 shall survive the Closing Date and be fully enforceable thereafter; provided, that Seller will not be deemed in breach of the representations or warranties in this Agreement or be liable to Purchaser for any claimed misrepresentation in this Agreement after the Closing Date on a representation made to Seller's knowledge unless Seller had actual knowledge on the Closing Date that the representation or warranty was false and failed to provide promptly the Discovery Notice (as defined and set forth

below) to disclose to Purchaser the matter, occurrence or condition that was discovered by or made known to Seller which made the representation or warranty false.

If, prior to the Closing, Seller obtains actual knowledge of a matter, occurrence or condition that would cause any representation made by Seller in this Agreement to be misleading or inaccurate, then (i) Seller will promptly notify Purchaser ("Discovery Notice") of the fact discovered by or made known to that would cause such any such representation to be misleading or inaccurate, and (ii) Purchaser will have the option to terminate this Agreement within five (5) days after receipt of such Discovery Notice if the matter, occurrence or event that was disclosed might adversely affect the value of the Property or Purchaser's ability to use the Property after the Closing Date. If Purchaser terminates this Agreement pursuant to this paragraph, the Deposit will be refunded to Purchaser, and neither party will have any further obligation to the other party under this Agreement (whether or not such events occur during or after the end of any contingency period provided in this Agreement).

## 11. REMEDIES; COSTS AND ATTORNEYS' FEES.

**11.1** _Seller's Default._ Seller shall be deemed to be in default under this Agreement if Seller fails, for any reason other than Purchaser's default under this Agreement, to meet, comply with, or perform any covenant, agreement, or obligation required on its part within the time limits and in the manner required in this Agreement, or a material breach shall have occurred of any representation or warranty made by Seller ("Seller's Default"). In the event of Seller's Default, Purchaser shall be entitled to exercise all remedies available under applicable law for breach of contract, including (without limitation) specific performance, and collection of damages and costs and attorneys' fees in connection with enforcement of this Agreement, and other sums allowed by law.

**11.2** _Purchaser's Default and Failure to Close._ If Purchaser defaults and fails to close the purchase, and neither party has exercised any right to terminate or rescind this Agreement as provided herein, the Deposit shall be retained by Seller as liquidated damages. PURCHASER AND SELLER ACKNOWLEDGE AND AGREE THAT SELLER'S DAMAGES IN THE EVENT OF BREACH BY PURCHASER WOULD BE EXTREMELY DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT THE DEPOSIT AMOUNT IS THE PARTIES' BEST ESTIMATE OF THE DAMAGES SELLER WOULD SUFFER IN THE EVENT THIS TRANSACTION FAILS TO CLOSE BY REASON OF PURCHASER'S BREACH OF THIS AGREEMENT, AND THAT SUCH ESTIMATE IS REASONABLE COMPENSATION UNDER THE CIRCUMSTANCES EXISTING ON THE EFFECTIVE DATE OF THIS AGREEMENT AND THE EXCLUSIVE REMEDY FOR PURCHASER'S DEFAULT, SINCE THE PRECISE AMOUNT OF SUCH COMPENSATION WOULD BE DIFFICULT TO DETERMINE. In addition, Purchaser will pay the cost of the Phase I Assessment, as provided in Section 3.

The foregoing is accepted and agreed to

Initials of: _____ Seller    _____ Purchaser

If this transaction fails to close for any reason other than Purchaser's default, Purchaser will be entitled to a refund of the Deposit upon demand.

## 12. GENERAL PROVISIONS. (a) _Time of Essence._ TIME IS OF THE ESSENCE of each and every provision of this Agreement.

(a) _Brokers._ Each party will defend, indemnify and hold the other party harmless from any claim, loss or liability made or imposed by any party claiming a commission or fee in connection with this transaction and arising out of its own conduct. Seller has used ALEX RHOTEN/TIFFANY JONES of COLDWELL BANKER COMMERCIAL MWRE, LLC on this transaction.

(b) _Prior Agreements._ This document is the entire, final and complete agreement of the parties with respect to this transaction, and supersedes and replaces all written and oral agreements previously made or existing between the parties or their representatives with respect to the Option.

(c) _Counterparts; PDF and Facsimile Transmissions._ This Agreement may be executed simultaneously or in separate counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties to this Agreement may execute the Agreement by signing counterpart signature pages. Signatures transmitted by telecopy or as emailed PDF copies shall be binding as originals, and each party hereby waive any defenses to the enforcement of the terms of this Agreement or any document sent by emailed PDF, based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").

(d) _Invalidity of Provisions._ In the event any provision of this Agreement is declared invalid or is unenforceable for any reason, such provision shall be deleted from the Agreement and shall not invalidate any other provision contained in the Agreement.

(e) _Governing Law._ This Agreement affects property located in the State of OREGON, and this Agreement will be interpreted and enforced in accordance with the laws of the State of Oregon.

(f) _Waiver._ Failure of either party at any time to require performance of any provision of this Agreement shall not limit the party's right to enforce the provision. Waiver of any breach of any provision shall not be a waiver of any succeeding breach of the provision or a waiver of the provision itself or any other provision.

(g) _Legal Effect._ THIS IS A LEGALLY BINDING CONTRACT. ALL PARTIES SHOULD SEEK ADVICE OF COUNSEL BEFORE SIGNING.

(h) _Saturday, Sunday and Legal Holidays._ If the time for performance of any of the terms, conditions and provisions of this Agreement shall fall on a Saturday, Sunday or legal holiday, then the time of such performance shall be extended to the next business day thereafter. As used in this Agreement, the expression (i) "business day" means every day other than a Saturday, Sunday or legal holiday in the State of Oregon, and (ii) "nonbusiness day" means a Saturday, Sunday or legal holiday in the State of Oregon. In any case where a payment is due, an act is to be performed, a notice is to be delivered or a period expires under this Agreement on a non-business day, such occurrence shall be deferred until the next succeeding business day.

(i) _Assignment and Succession._ This Agreement shall be binding upon and inure to the benefit of the parties, and their respective heirs, personal representatives, successors, and assigns, but Purchaser shall not assign or otherwise transfer any interest without the prior written consent of Seller, which may be given (or withheld) in Seller's commercially reasonable judgment. Without the need for such consent, Purchaser may assign its rights under this Agreement at any time to any person or entity that is affiliated with or under common control with Purchaser or Purchaser's principals or affiliates and may cause the title to be taken in the name of a nominee or third party at Closing, but no such action will constitute a release of Purchaser's liability under this Agreement.

(j) _Oregon Statutory Notice._ THE PROPERTY DESCRIBED IN THIS INSTRUMENT MAY NOT BE WITHIN A FIRE PROTECTION DISTRICT PROTECTING STRUCTURES. THE PROPERTY IS SUBJECT TO LAND USE LAWS AND REGULATIONS THAT, IN FARM OR FOREST ZONES, MAY NOT AUTHORIZE CONSTRUCTION OR SITING OF A RESIDENCE AND THAT LIMIT LAWSUITS AGAINST FARMING OR FOREST PRACTICES AS DEFINED IN ORS 30.930 IN ALL ZONES. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER ORS 195.300, 195.301, AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON

FORM - Purchase and Sale Agreement (Oregon)
79982533.1 0200079-00001

EXHIBIT 1
Page 3 Of 5

Case 14-63530-fra11   Doc 260   Filed 10/23/15

LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY THAT THE UNIT OF LAND BEING TRANSFERRED IS A LAWFULLY ESTABLISHED LOT OR PARCEL, AS DEFINED IN ORS 92.010 OR 215.010, TO VERIFY THE APPROVED USES OF THE LOT OR PARCEL, TO VERIFY THE EXISTENCE OF FIRE PROTECTION FOR STRUCTURES AND THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the dates shown below.

Dated: 9 - 29 - 15 , 2015

SELLER: LAURA LEE HAGENAUER

By
Name:

Address for Notices to Seller:
To be provided by Seller

Dated: Sept 16 , 2015

PURCHASER: R & R PROPERTY HOLDINGS, INC.,
a Washington corporation

By
Name: Dwaine Odinson, CA
Title: Controller

Address for Notices to Purchaser:
R & R PROPERTY HOLDINGS, INC.
Attention: Dwaine Odinson, CA
Controller
7449 River Rd.
Delta, British Columbia
CANADA V4G1B9

Telephone: (604) 946-0916
Facsimile: (604) 946-0783
Email: dwaineo@napsteel.com

FORM - Purchase and Sale Agreement (Oregon)
79982533.1 0200079-00001

EXHIBIT 1
Page 4 Of 5

# EXHIBIT A

## DESCRIPTION OF PROPERTY

The Property is known also known as: 041W33DC, Tax Lot 400, Marion County, Oregon; Tax Assessor's Parcel No. R11578. The legal description of the Property is set forth below or attached to this Exhibit A (or, if not, then the parties will use the legal description as it appears in the preliminary title commitment referred to in this Agreement, and will reasonably approve and attach it as soon as available).

The Property includes, without limitation, the land, the manufacturing building and coil storage building located thereon ("Building(s)"), the cranes used in connection with the operation of the Building(s), and the chain link fence at the perimeter of the Property boundary lines, and other improvements that are located on the land and/or that are in or a part of the Building(s).

*THIS INDENTURE OF LEASE, entered into this* .................................. *day of* ..................................,
*between* ..................................
R & R PROPERTY HOLDINGS, INC., a Washington corporation
*hereinafter called the lessor, and* ..................................
LAURA LEE HAGENAUER
.................................., *hereinafter called the lessee,*

*WITNESSETH: In consideration of the covenants herein, the lessor hereby leases unto the lessee those certain premises, as is, situated in the City of* ... Hubbard .................................., *County of* ... Marion .................................. *and State of* .................................., *hereinafter called the premises, described as follows:*

See attached ADDENDUM, incorporated into this Lease by this reference.

*To Have and to Hold the premises commencing with the* .................... _____ *day of* See attached Addendum ...................., *and ending at midnight on the* _____ *day of* _____, _____, *for a rental of $* _____ *for the whole term, which lessee agrees to pay, at* Landlord's address under this Lease .................................. *City of* _____, *State of* _____, *at the following times and in the following amounts, to-wit:*

SEE ATTACHED ADDENDUM

*In consideration of the leasing of the premises and of the mutual agreements herein contained, the parties agree as follows:*

EXHIBIT J
Page 1 Of 11

**LESSEE'S ACCEPTANCE OF LEASE**

(1) The lessee accepts ..... letting and agrees to pay to the order of the lessor the monthly rentals above stated for the full term of this lease, in advance, at the times and in the manner aforesaid.

**USE OF PREMISES**

(2a) The lessee shall use the premises during the term of this lease for the conduct of the following business:

See Addendum

and for no other purpose whatsoever without lessor's written consent.

(2b) The lessee will not make any unlawful, improper or offensive use of the premises; the lessee will not suffer any strip or waste thereof; the lessee will not permit any objectionable noise or odor to escape or to be emitted from the premises or do anything or permit anything to be done upon or about the premises in any way tending to create a nuisance; the lessee will not sell or permit to be sold any product, substance or service upon or about the premises, excepting such as lessee may be licensed by law to sell and as may be herein expressly permitted.

(2c) The lessee will not allow the premises at any time to fall into such a state of repair or disorder as to increase the fire hazard thereon; the lessee will not install any power machinery on the premises except under the supervision and with written consent of the lessor; the lessee will not store gasoline or other highly combustible materials on the premises at any time; the lessee will not use the premises in such a way or for such a purpose that the fire insurance rate on the improvements on the premises is thereby increased or that would prevent the lessor from taking advantage of any rulings of any agency of the state in which the premises are situated, or which would allow the lessor to obtain reduced premium rates for long term fire insurance policies.

(2d) The lessee shall comply at lessee's own expense with all laws and regulations of any municipal, county, state, federal or other public authority respecting the use of the premises. These include, without limitation, all laws, regulations and ordinances pertaining to air and water quality, Hazardous Materials as herein defined, waste disposal, air emissions, and other environmental matters. As used herein, Hazardous Material means any hazardous or toxic substance, material, or waste, including but not limited to those substances, materials, and waste listed in the U.S. Department of Transportation Hazardous Materials Table or by the U.S. Environmental Protection Agency as hazardous substances and amendments thereto, petroleum products, or such other substances, materials, and waste that are or become regulated under any applicable local, state, or federal law.

(2e) The lessee shall regularly occupy and use the premises for the conduct of lessee's business, and shall not abandon or vacate the premises for more than ten days without written approval of lessor.

(2f) Lessee shall not cause or permit any Hazardous Material to be brought upon, kept or used in or about the premises by lessee, its agents, employees, contractors, or invitees without the prior written consent of lessor, which consent will not be unreasonably withheld so long as lessee demonstrates to lessor's reasonable satisfaction that such Hazardous Material is necessary or useful to lessee's business and will be used, kept, and stored in a manner that will comply at all times with all laws regulating any such Hazardous Material so brought upon or used or kept on or about the premises.

**UTILITIES**

(3) The lessee shall pay for all heat, light, water, power, and other services or utilities used in the premises during the term of this lease.

**REPAIRS AND IMPROVEMENTS**

(4a) The lessor shall not be required to make any repairs, alterations, additions or improvements to or upon the premises during the term of this lease, except only those hereinafter specifically provided for; the lessee hereby agrees to maintain and keep the premises, including all interior and exterior walls and doors, heating, ventilating and cooling systems, interior wiring, plumbing and drain pipes to sewers or septic tank, in good order and repair during the entire term of this lease, at lessee's own cost and expense, and to replace all glass which may be broken or damaged during the term hereof in the windows and doors of the premises with glass of as good or better quality as that now in use; it is further agreed that the lessee will make no alterations, additions or improvements to or upon the premises without the written consent of the lessor first being obtained.

(4b) The lessor agrees to make all necessary structural repairs to the building, including exterior walls, foundation, roof, gutters and downspouts, and the abutting sidewalks. The lessor reserves and at any and all times shall have the right to alter, repair or improve the building of which the premises are a part, or to add thereto, and for that purpose at any time may erect scaffolding and all other necessary structures about and upon the premises and lessor and lessor's representatives, contractors and workers for that purpose may enter in or about the premises with such materials as lessor may deem necessary therefor, and lessee waives any claim to damages, including loss of business resulting therefrom.

**LESSOR'S RIGHT OF ENTRY**

(5) It shall be lawful for the lessor, the lessor's agents and representatives, at any reasonable time to enter into or upon the premises for the purpose of examining into the condition thereof, or for any other lawful purpose.

**RIGHT OF ASSIGNMENT**

(6) The lessee will not assign, transfer, pledge, hypothecate, surrender or dispose of this lease, or any interest herein, sublet, or permit any other person or persons whomsoever to occupy the premises without the written consent of the lessor being first obtained in writing; this lease is personal to lessee; lessee's interests, in whole or in part, cannot be sold, assigned, transferred, seized or taken by operation at law, or under or by virtue of any execution or legal process, attachment or proceedings instituted against the lessee, or under or by virtue of any bankruptcy or insolvency proceedings had in regard to the lessee, or in any other manner, except as above mentioned.

**LIENS**

(7) The lessee will not permit any lien of any kind, type or description to be placed or imposed upon the improvements in which the premises are situated, or any part thereof, or the land on which they stand.

**ICE, SNOW, DEBRIS**

(8) If the premises are located at street level, then at all times lessee shall keep the sidewalks in front of the premises free and clear of ice, snow, rubbish, debris and obstruction; and if the lessee occupies the entire building, the lessee will not permit rubbish, debris, ice or snow to accumulate on the roof of the building so as to stop up or obstruct gutters or downspouts or cause damage to the roof, and will save harmless and protect the lessor against any injury whether to lessor or to lessor's property or to any other person or property caused by lessee's failure in that regard.

**OVERLOADING OF FLOORS**

(9) The lessee will not overload the floors of the premises in such a way as to cause any undue or serious stress or strain upon the building in which the premises are located, or any part thereof, and the lessor shall have the right, at any time, to call upon any competent engineer or architect whom the lessor may choose, to decide whether or not the floors of the premises, or any part thereof, are being overloaded so as to cause any undue or serious stress or strain on the building, or any part thereof, and the decision of the engineer or architect shall be final and binding upon the lessee; and in the event that it is the opinion of the engineer or architect that the stress or strain is such as to endanger or injure the building, or any part thereof, then and in that event the lessee agrees immediately to relieve the stress or strain, either by reinforcing the building or by lightening the load which causes such stress or strain, in a manner satisfactory to the lessor.

**ADVERTISING SIGNS**

(10) The lessee will not use the outside walls of the premises, or allow signs or devices of any kind to be attached thereto or suspended therefrom, for advertising or displaying the name or business of the lessee or for any purpose whatsoever without the written consent of the lessor; however, the lessee may make use of the windows of the premises to display lessee's name and business when the workmanship of such signs shall be of good quality and permanent nature; provided further that the lessee may not suspend or place within said windows or paint thereon any banners, signs, sign-boards or other devices in violation of the intent and meaning of this section.

EXHIBIT J

Page 2 Of 11

Case 14-63530-fra11    Doc 260    Filed 10/23/15

**LIABILITY INSURANCE** (11) At all times during the term hereof, the lessee will, at the lessee's own expense, keep in effect and deliver to the lessor and the lessee against all liability for damage to persons or property in, upon, or about the premises. The amount of such insurance shall be not less than $ _____ for injury to one person, not less than $ _____ for injuries to all persons arising out of any single incident, and not less than $ _____ for damage to property, or a combined single limit of not less than $ 1,000,000.00 _____ It shall be the responsibility of lessor to purchase casualty insurance with extended coverage so as to insure any structure on the premises against damage caused by fire or the effects of fire (smoke, heat, means of extinguishment, etc.), or any other means of loss. It shall be the responsibility of the lessee to insure all of the lessee's belongings upon the premises, of whatsoever nature, against the same. With respect to these policies, lessee shall cause the lessor to be named as an additional insured party. Lessee agrees to and shall indemnify and hold lessor harmless against any and all claims and demands arising from the negligence of the lessee, lessee's officers, agents, invitees and/or employees, as well as those arising from lessee's failure to comply with any covenant of this lease on lessee's part to be performed, and shall at lessee's own expense defend the lessor against any and all suits or actions arising out of such negligence, actual or alleged, and all appeals therefrom and shall satisfy and discharge any judgment which may be awarded against lessor in any such suit or action.

**FIXTURES** (12) All partitions, plumbing, electrical wiring, additions to or improvements upon the premises, whether installed by the lessor or lessee, shall be and become a part of the building in which the premises are located as soon as installed and the property of the lessor unless otherwise herein provided.

**LIGHT AND AIR** (13) This lease does not grant any rights of access to light and air over the premises or any adjacent property.

**DAMAGE BY CASUALTY, FIRE AND DUTY TO REPAIR** (14) In the event of the destruction of the improvements in which the premises are located by fire or other casualty, either party hereto may terminate this lease as of the date of fire or casualty, provided, however, that in the event of damage to the improvements by fire or other casualty to the extent of ........30........ per cent or more of the sound value thereof, the lessor may or may not elect to repair the same; written notice of lessor's election shall be given lessee within fifteen days after the occurrence of the damage; if notice is not so given, lessor conclusively shall be deemed to have elected not to repair; in the event lessor elects not to repair, then and in that event this lease shall terminate with the date of the damage; but if the improvements in which the premises are located be but partially destroyed and the damage so occasioned shall not amount to the extent indicated above, or if greater than said extent and lessor elects to repair, as aforesaid, then the lessor shall repair the same with all convenient speed and shall have the right to take possession of and occupy, to the exclusion of the lessee, all or any part thereof in order to make the necessary repairs, and the lessee hereby agrees to vacate upon request, all or any part thereof which the lessor may require for the purpose of making necessary repairs, and for the period of time between the day of such damage and until such repairs have been substantially completed there shall be such an abatement of rent as the nature of the injury or damage and its interference with the occupancy of the premises by the lessee shall warrant; however, if the premises be but slightly injured and the damage so occasioned shall not cause any material interference with the occupation of the premises by lessee, then there shall be no abatement of rent and the lessor shall repair the damage with all convenient speed.

**WAIVER OF SUBROGATION RIGHTS** (15) Neither the lessor nor the lessee shall be liable to the other for loss arising out of damage to or destruction of the premises, or the building or improvement of which the premises are a part or with which they are connected, or the contents of any thereof, when such loss is caused by any of the perils which are or could be included within or insured against by a standard form of fire insurance with extended coverage, including sprinkler leakage insurance, if any. All such claims for any and all loss, however caused, hereby are waived. Such absence of liability shall exist whether or not the damage or destruction is caused by the negligence of either lessor or lessee or by any of their respective agents, servants or employees. It is the intention and agreement of the lessor and the lessee that the rentals reserved by this lease have been fixed in contemplation that both parties shall fully provide their own insurance protection at their own expense, and that both parties shall look to their respective insurance carriers for reimbursement of any such loss, and further, that the insurance carriers involved shall not be entitled to subrogation under any circumstances against any party to this lease. Neither the lessor nor the lessee shall have any interest or claim in the other's insurance policy or policies, or the proceeds thereof, unless specifically covered therein as a joint assured.

**EMINENT DOMAIN** (16) In case of the condemnation or purchase of all or any substantial part of the premises by any public or private corporation with the power of condemnation this lease may be terminated, effective on the date possession is taken, by either party hereto on written notice to the other and in that case the lessee shall not be liable for any rent after the termination date. Lessee shall not be entitled to and hereby expressly waives any right to any part of the condemnation award or purchase price.

**FOR SALE AND FOR RENT SIGNS** (17) During the period of ........30........ days prior to the date above fixed for the termination of this lease, the lessor herein may post on the premises or in the windows thereof signs of moderate size notifying the public that the premises are "for sale" or "for lease."

**DELIVERING UP PREMISES ON TERMINATION** (18) At the expiration of the lease term or upon any sooner termination thereof, the lessee will quit and deliver up the premises and all future erections or additions to or upon the same, broom-clean, to the lessor or those having lessor's estate in the premises, peaceably, quietly, and in as good order and condition, reasonable use and wear thereof, damage by fire, unavoidable casualty and the elements alone excepted, as the same are now in or hereafter may be put in by the lessor.

**ADDITIONAL COVENANTS OR EXCEPTIONS** (19)

### SEE ATTACHED ADDENDUM

*PROVIDED, ALWAYS,* and these presents are upon these conditions, that (1) if the lessee shall be in arrears in the payment of rent for a period of ten days after the same becomes due, or (2) if the lessee shall fail or neglect to perform or observe any of the covenants and agreements contained herein on lessee's part to be done, kept, performed and observed and such default shall continue for ten days or more after written notice of such failure or neglect shall be given to lessee, or (3) if the lessee shall be declared bankrupt or insolvent according to law, or (4) if any assignment of lessee's property shall be made for the benefit of creditors, or (5) if on the expiration of this lease lessee fails to surrender possession of the premises, the lessor or those having lessor's estate in the premises, may terminate this lease and, lawfully, at lessor's option immediately or at any time thereafter, without demand or notice, enter into and upon the premises and every part thereof and repossess the same, and expel lessee and those claiming by, through and under lessee and remove lessee's effects at lessee's expense, forcibly if necessary and store the same, all without being deemed guilty of trespass and without prejudice to any remedy which otherwise might be used for arrears of rent or preceding breach of covenant.

Neither the termination of this lease by forfeiture nor the taking or recovery of possession of the premises shall deprive lessor of any other action, right, or remedy against lessee for possession, rent or damages, nor shall any omission by lessor to enforce any forfeiture, right or remedy to which lessor may be entitled be deemed a waiver by lessor of the right to enforce the performance of all terms and conditions of this lease by lessee.

In the event of any re-entry by lessor, lessor may lease or relet the premises in whole or in part to any tenant or tenants who may be satisfactory to lessor, for any duration, and for the best rent, terms and conditions as lessor may reasonably obtain. Lessor shall apply the rent received from any such tenant first to the cost of retaking and reletting the premises, including remodeling required to obtain any such tenant, and then to any arrears of rent and future rent payable under this lease and any other damages to which lessor may be entitled hereunder.

Any property which lessee leaves on the premises after abandonment or expiration of the lease, or for more than ten days after any termination of the lease by landlord, shall be deemed to have been abandoned, and lessor may remove and sell the property at public or private sale as lessor sees fit, without being liable for any prosecution therefor or for damages by reason thereof, and the net proceeds of any such sale shall be applied toward the expenses of landlord and rent as aforesaid, and the balance of such amounts, if any, shall be held for and paid to the lessee.

In the event the lessee for any reason shall hold over after the expiration of this lease, such holding over shall not be deemed to operate as a renewal or extension of this lease, but shall only create a tenancy at sufferance which may be terminated at will at any time by the lessor.

In case suit or action is instituted to enforce compliance with any of the terms, covenants or conditions of this lease, or to collect the rental which may become due hereunder, or any portion thereof, the losing party agrees to pay the prevailing party's reasonable attorney fees incurred throughout such proceeding, including at trial, on appeal, and for post-judgment collection. The lessee agrees to pay and discharge all lessor's costs and expenses, including lessor's reasonable attorney's fees that shall arise from enforcing any provision or covenants of this lease even though no suit or action is instituted.

Should the lessee be or become the debtor in any bankruptcy proceeding, voluntarily, involuntarily or otherwise, either during the period this lease is in effect or while there exists any outstanding obligation of the lessee created by this lease in favor of the lessor, the lessee agrees to pay the lessor's reasonable attorney fees and costs which the lessor may incur as the result of lessor's participation in such bankruptcy proceedings. It is understood and agreed by both parties that applicable federal bankruptcy law or rules of procedure may affect, alter, reduce or nullify the attorney fee and cost awards mentioned in the preceding sentence.

Any waiver by the lessor of any breach of any covenant herein contained to be kept and performed by the lessee shall not be deemed or considered as a continuing waiver, and shall not operate to bar or prevent the lessor from declaring a forfeiture for any succeeding breach, either of the same condition or covenant or otherwise.

Any notice required by the terms of this lease to be given by one party hereto to the other or desired so to be given, shall be sufficient if in writing, contained in a sealed envelope, and sent first class mail, with postage fully prepaid, and if intended for the lessor herein, then if addressed to the lessor at ........... SEE ADDENDUM .................................. and if intended for the lessee, then if addressed to the lessee at ___Tenant's address or the leased premises_____ ..... Any such notice shall be deemed conclusively to have been delivered to the addressee forty-eight hours after the deposit thereof in the U.S. Mail.

All rights, remedies and liabilities herein given to or imposed upon either of the parties hereto shall extend to, inure to the benefit of and bind, as the circumstances may require, the heirs, successors, personal representatives and so far as this lease is assignable by the terms hereof, to the assigns of such parties.

In construing this lease, it is understood that the lessor or the lessee may be more than one person; that if the context so requires, the singular pronoun shall be taken to mean and include the plural, and that generally all grammatical changes shall be made, assumed and implied to make the provisions hereof apply equally to corporations and to individuals.

*IN WITNESS WHEREOF,* the parties have executed this lease on the day and year first hereinabove written, any corporation signature being by authority of its Board of Directors.

LANDLORD:

R & R PROPERTY HOLDINGS, INC.,

a Washington corporation

Signature on attached ADDENDUM

TENANT:

LAURA LEE HAGENAUER

Signature on attached ADDENDUM

The publisher strongly recommends that both the lessor and the lessee become familiar with the Americans with Disabilities Act of 1990, Public Laws 101-336. The Act may impose certain duties and responsibilities upon either or both parties to this lease. These duties and responsibilities may include but not be limited to the removal of certain architectural barriers and ensuring that disabled persons are not denied the opportunity to benefit from the same goods and services as those available to persons without disabilities. Under the Act, prohibition against discrimination applies to any person who is the owner, operator, lessor, or lessee of a place of public accommodation.

EXHIBIT 1
Page 4 Of 11

# ADDENDUM TO LEASE

DATED:     As of October ___, 2015

BETWEEN:    **R & R PROPERTY HOLDINGS, INC.,**
a Washington corporation

                                                             "Lessor" or "Landlord"

AND:        **LAURA LEE HAGENAUER (successor-in-interest to, and
formerly doing business as, "VALLEY ROLLING LLC")**

                                                            "Lessee" or "Tenant"

This Addendum to Lease ("**Addendum**") and the attached Business Lease [Stevens Ness Form No. 812] by Landlord (with this Addendum, the "**Lease**") are executed to document the terms of the lease between the parties for the following premises ("**Premises**"): approximately **27,500 square feet of space, including office space**, in the building ("**Building**") located at **3071 Schmidt Lane NE, Hubbard, Oregon 97032**, as more particularly described on the attachments to this Lease, subject to the provisions of this Addendum. The Building is located on a larger parcel of property shown on the drawing attached to this Lease as the "**Valley Rolling**" property, known as **Tax Lot 400, Marion County, Oregon** (the "**Property**").

This Addendum hereby amends, supplements and is incorporated into the Lease, as follows:

1.    **Bankruptcy Case; Closing of Purchase.** The parties acknowledge that the Property is the subject of the bankruptcy case, Case No. 14-63530-FRA11 (the "**Bankruptcy Case**"), which is pending in the United States Bankruptcy Court for the District of Oregon (the "**Bankruptcy Court**") and an executory Sale Agreement, dated as of September 16, 2015 ("**Sale Agreement**"), under which Landlord would purchase the Property and lease the Premises back to Tenant. This Lease is subject to the closing of the purchase of the Property pursuant to the Sale Agreement (the "**Closing**").

2.    **Commencement Date.** Possession will be deemed delivered to Tenant at Closing, which will be the commencement of the Lease term ("**Commencement Date**"). Rent will commence as of the Commencement Date.

3.    **Future Demising of Office Space into Two Spaces.** Initially, the Premises includes use of the entire office space within the Building, which contains approximately 4,276 square feet. However, Landlord will have the right and option to demise separately (and lease or occupy for any office-warehouse purpose) up to one-half of such office space (the "**Separate Office Space**"), so long as Landlord provides to Tenant additional warehouse space in the Building with a gross square footage equal to the area of the Separate Office Space taken from the Premises.

4.    **Year-to-Year Lease Term.** The initial Lease term (the "**Term**") will commence on the Commencement Date and continue until the last day of the calendar month in which the first anniversary of the Commencement Date occurs (the "**Renewal Date**"), at which time this Lease will be automatically renewed for an additional period of twelve (12) calendar months (a "**Renewal Term**"), and thereafter on each anniversary of the first Renewal Date will be automatically renewed for additional period(s) of twelve (12) calendar months each, <u>unless and until</u> either party notifies the other party at least ninety (90) days before a Renewal Date that the party is electing to terminate this Lease at the end of the current Term, immediately before such renewal.

5.    **Base Rent.** The regular monthly base rent amount will be **<u>$12,650.00</u>**. The monthly base rent will be due as of the fifteenth (15th) day of each month. Rent for any partial month will be prorated on the basis of a 30-day month. Rent is payable in advance. During the initial term of this Lease (ending on the first Renewal Date), the monthly base rent is included in the gross rent amount of $15,000 per month, and thereafter will be paid as part of the "triple net" Lease rental, as provided in Section 6.

6.    **Gross Lease for First Year; Triple Net Lease Thereafter.** For the initial Term of this Lease ending on the first Renewal Date, Tenant will pay a "gross" rent of $15,000 per month, including the monthly base rent amount and all other amounts to be reimbursed to Landlord for property taxes, insurance and maintenance. Thereafter,

if the Lease is renewed and exten_d, this Lease is a so-called "triple net" l_e, pursuant to which Tenant will be responsible for its proportionate and allocated share of taxes, maintenance, insurance and other costs in operating the Premises during the Term. Tenant's share of such costs is referred to as **"Additional Rent."** The term **"Rent"** means the monthly base rent and all Additional Rent.

7. **Security Deposit; Payment.** As a condition to the commencement of the Term, Tenant will pay to Landlord (i) the monthly "gross" rent of $15,000 for the first month of the Term, and (ii) a Security Deposit of $15,000. All payments by Tenant to Landlord under the Lease will be made by wire transfer to a bank account of Landlord to be designated by written notice to Tenant.

8. **Property Taxes and Assessments.** Landlord is responsible for paying the property taxes and assessments ("taxes") against the Building and land area being used by Tenant, as they become due, subject to Landlord's right to collect back from Tenant during the Term Tenant's proportionate share of such amounts, as Additional Rent, commencing with the first Renewal Term. Taxes for the year in which the Lease terminates will be prorated and adjusted for any partial year. As used in this Lease, the term **"proportionate share"** of Additional Rent items that are attributable to the Building will be fixed at fifty percent (50%). The initial estimated amount payable by Tenant is: **50% of $3,833.33, equaling $1,916.67 per month** (which is included in the "gross" rent amount under this Lease for the initial Term). Tenant's proportionate share of property taxes will be due on November 1st of each year, unless Tenant is paying monthly installments as referenced below.

Commencing with the first Renewal Term, Landlord may elect to require that Tenant shall pay to Landlord, on the fifteenth (15th) day of each month in advance, an amount equal to one twelfth (1/12) of Tenant's proportionate share of taxes to be paid for the year. The monthly payment for taxes may be adjusted by Landlord during the Term, based on Landlord's reasonable estimate of changes in the amount of annual property taxes and assessments to be paid. There will be an annual reconciliation and adjustment between the parties when the actual amount of taxes is determined. If the monthly estimated payments were less than Tenant's proportionate share of the actual taxes, Tenant will pay the deficiency to Landlord at the time Landlord submits an invoice therefor. If the monthly estimated payments were greater than the actual amount due, Landlord will credit the difference against the next monthly payments due from Tenant.

Tenant will pay any personal property taxes on Tenant's trade fixtures and personal property.

9. **Maintenance and Repair.** Tenant will maintain the Premises, and Landlord will maintain the Building, parking areas, accessways, landscaping and other common area portions of the Property ("**Common Areas**"), and the parties will otherwise perform their respective obligations in **Sections 2 and 4(a)** of the Lease. If any maintenance expenses are incurred by Landlord for the Building or Common Areas, and the work performed is not specific to the correction of a maintenance problem caused by a tenant within its tenant space, such maintenance expenses will be allocated proportionately to the tenant space in the Building as a whole, and Tenant will pay its proportionate share (i.e., 50%, if it is leasing one-half of the Building) of such maintenance expenses, as Additional Rent, commencing with the first Renewal Term. Maintenance charges for the Building and Common Areas are included in the "gross" rent amount under this Lease for the initial Term.

10. **Property Insurance.** Landlord will maintain property casualty insurance on the Building (but not any of Tenant's own trade fixtures, inventory and personal property), as Landlord determines to be appropriate. Tenant will reimburse Landlord for Tenant's allocated and proportionate share of the cost of Landlord's property insurance, as Additional Rent, commencing with the first Renewal Term. The initial estimated amount payable by Tenant is: **$433.34 per month** (which is included in the "gross" rent amount under this Lease for the initial Term). Tenant will maintain such casualty insurance on Tenant's own trade fixtures, inventory and personal property, as Tenant determines to be appropriate.

11. **Liability Insurance; Indemnity** Tenant must provide Landlord with a certificate of commercial general liability insurance in the amount of at least $1,000,000 (combined single limit), as provided in **Section 11** of the Lease, naming Landlord as additional named insured and with a contractual liability endorsement covering the

Addendum to Lease - Stevens Ness
Business Lease Form 812
8/0227578.1 0052781-00013

Rider - 2

EXHIBIT __J__
Page __2__ Of __11__

Case 14-63530-fra11   Doc 260   Filed 10/23/15

indemnification obligations referenced in this Lease. The certificate must have a minimum 10-day written cancellation notice clause in favor of Landlord. **Failure to provide such insurance certificate may result in termination of this Lease by Landlord and/or Tenant's not being entitled to enter and continue to use the Premises.**

Tenant will defend, indemnify, and hold Landlord, and its agents and representatives, harmless from any claim, loss, or liability (including attorneys' fees incurred) arising out of or in connection with any use, entry or activity on the Premises or any injury or damage to the Premises or Building or to any person or property therein or thereon during the term of this Lease, whether or not caused or contributed to by any act or omission of Landlord, its agents or representatives.

**12.    Utilities; Telephone.** Except as otherwise provided below, Tenant will pay for all utilities used by Tenant in the Premises. For utilities provided to the Building that are not separately metered, Tenant will pay 100% of such utilities until the other portion of the Building is leased, and thereafter will pay its proportionate share (50%), unless otherwise reasonably allocated by Landlord, of such utilities. Tenant will arrange for its own trash removal and arrange for its own janitorial service, if any. Water and sewer and natural gas charges will be paid by Landlord unless and until the costs are separately metered or submetered.

The telephone service for the Building will be initially in the name of Tenant and paid by Tenant. If an additional tenant is added by Landlord to the Building, the added tenant will arrange for its own telephone line.

**13.    Alterations.** Any proposed alterations by Tenant to the Premises or Building will be subject to Landlord's prior written consent, as required by this Lease.

**14.    Tenant's Use.** Under **Section 2(a)** of the Lease, Tenant's intended and permitted use of the Premises is for the following: **office and warehouse use**, and no other use without Landlord's prior written consent. Tenant keep its hours of operation posted at the Premises. Tenant will have the right to use a reasonable number of parking spaces, which will be equitably allocated by Landlord to Tenant and other tenants of the Building from time to time, but will not occupy any parking spaces designated for customers.

**15.    Tenant's Work.** There is no work required to be performed by Landlord to ready the Premises for use by Tenant. Tenant will be responsible for moving to the Premises any of Tenant's furniture, fixtures and equipment ("**FF&E**") that Tenant wants to use within the Premises. The Premises will be modified by Tenant to accommodate its intended use, in accordance with this Lease, but any such work must meet Code requirements.

**16.    Rent Not Paid When Due; NSF Checks.** Rent will be received by Landlord without set-off, offset, abatement or deduction of any kind. Such payments will be made in advance to Landlord's address as stated below (or as Landlord may subsequently specify by written notice to Tenant). Any rent not paid within ten (10) days after it is due will be assessed a late charge equal to **Five percent (5%) of the overdue amount**. Tenant shall pay the late charge without the need for demand by Landlord, and will reimburse Landlord for reasonable attorneys' fees incurred by Landlord in connection with any overdue payment (if Landlord consults an attorney or takes other action to collect the amounts owed). Landlord may levy and collect a late charge and/or interest in addition to all other remedies available for Tenant's default. If any check is returned by Tenant's bank for insufficient funds ("**NSF**"), then the bank service charges resulting from the NSF check will be promptly paid by Tenant, in addition to the late charge.

**17.    Rights of Use; Rules.** Tenant will (a) reasonably co-operate on any security measures that Landlord may take from time to time, and (b) promptly comply with reasonable rules and regulations that Landlord may adopt from time to time in order to promote safety, order, cleanliness, operation of business, and good service to the Building and its tenants, so long as they are required of all tenants at Landlord's Property. Such rules will include (without limitation) the following: (i) there is NO SMOKING allowed in the Premises, Building or restrooms; and (ii) no portion of the Premises may be used for overnight sleeping.

**18.    Transfers.** Tenant shall not assign, mortgage, lien or encumber the Premises or Tenant's leasehold estate, or sublet any portion of the Premises, or license the use of any portion of the Premises, or otherwise transfer any

Addendum to Lease - Stevens Ness
Business Lease Form 812
86227578.1 0052781-00013

Rider - 3

EXHIBIT    J
Page  7  Of  11

interest in the Premises (whether voluntary, involuntary, by operation of law or otherwise) (collectively, a "**transfer**"), without the prior written consent of Landlord pursuant to **Section 6** of the body of this Lease. Any attempted transfer without consent shall be null and void and, at the option of Landlord, will cause termination of this Lease. The giving of such consent in one instance shall not preclude the need for Tenant to obtain Landlord's consent to further transfers. If Tenant is permitted to make any transfer, Tenant shall not be relieved of its obligations, but shall remain primarily liable to Landlord for performance of all obligations.

19. **Methods for Notices**. Notices may be given by utilization of the method(s) in the Lease, or by registered mail, or by facsimile or other telecommunication device capable of transmitting or creating a written record, or personally. Notices are effective on receipt. A notice will also be deemed received if posted at or delivered to the Premises.

20. **Conduct of Business; Maintenance; Signage**. Tenant will cause its employees, customers and invitees on the Premises to conduct themselves in a good and orderly manner. Tenant will keep the interior of the Premises in good condition, repair and appearance. To identify Tenant's business, Tenant may maintain signage appropriate for the conduct of its business, subject to compliance with applicable sign codes and Landlord's prior written approval of the size, design, placement and other details of such signage.

21. **Default**. Tenant will not be in default under the Lease unless Tenant fails to pay rent or other charges within **FIVE (5) days** after receipt of written notice of nonpayment when due (which notice can be given within the 10-day grace period in the Lease and need not wait until the end of the 10-day period) or fails to perform other obligations under the Lease within **twenty (20) days** after receipt of written notice of nonperformance by Landlord, specifying in reasonable detail the nature of Tenant's default.

22. **General Provisions**. The following are added as Miscellaneous Provisions of the Lease:

(a) **Surrender of Premises**. Upon expiration of the Term or earlier termination of this Lease, Tenant shall deliver all keys to Landlord and surrender the Premises in good condition, subject to reasonable wear and tear. Tenant shall remove all of its furnishings, furniture, and trade fixtures that remain the property of Tenant (and if Tenant has made any alterations, Landlord may require that Tenant remove them. **Tenant will restore any physical damage caused by such removal (including, without limitation, resurfacing or covering holes in the walls, floors or other parts of the Premises and any necessary repainting to put the Premises in the condition required by this Lease)**. If Tenant fails to do so, such failure shall, at Landlord's option, be deemed an abandonment of the property and Landlord may retain the property and all rights of Tenant with respect to it shall cease or, by notice in writing given to Tenant within 20 days after removal was required, Landlord may elect to hold Tenant to its obligation of removal. If Landlord elects to require Tenant to remove, Landlord may effect a removal and place the property in public storage for Tenant's account. Tenant shall be liable to Landlord for the cost of removal, restoration, transportation to storage, and storage, with interest on all such expenses as provided in this Lease.

(b) **Holdover**. If Tenant does not vacate the Premises at the time required, Landlord shall have the option to treat Tenant as a tenant from month to month, subject to all of the provisions of this Lease (except that the term will be month to month and the initial base rent will be 150 percent of the base rent then being paid by Tenant), or to eject Tenant from the Building and Premises and recover damages caused by wrongful holdover. Failure of Tenant to remove property or installations which Tenant is required to remove under **paragraph 20 (b)** above shall constitute a failure to vacate to which this paragraph shall apply.

(c) **Security Deposit**. Tenant shall maintain with Landlord the security deposit as listed above. The deposit shall be held by Landlord to secure all payments and performances due from Tenant under this Lease. Landlord may commingle the deposit with its funds and will owe no interest on the deposit. Landlord may apply the deposit to the cost of performing any obligation which Tenant fails to perform within the time required by this Lease, but application by Landlord will not be the exclusive remedy for Tenant's default. If the deposit is applied by Landlord, Tenant shall pay the sum necessary to restore the deposit to its original amount on Landlord's demand. To the extent not applied by Landlord, the deposit shall be refunded to Tenant within 30 days after expiration of the Term.

Addendum to Lease - Stevens Ness
Business Lease Form 812
80227578.1 0052781-00013

Rider - 4

EXHIBIT __J__
Page __8__ of __11__

Case 14-63530-fra11    Doc 260    Filed 10/23/15

(d)  **Address.** Tenant's addresses for notice purposes a. **Business Address: 3071 Schmidt Lane, Hubbard, OR 97032; and Personal Address: 1129 Belle Passi Rd., Woodburn, OR 97071.** Landlord's address for notice purposes and for payment of rent is: **R & R PROPERTY HOLDINGS, INC., Attention: Dwaine Odinson, CA, Controller, 7449 River Rd., Delta, British Columbia, CANADA V4G1B9.** Landlord's representative: **Dwaine Odinson. Telephone: (604) 946-0916, Facsimile: (604) 946-0783. Email: dwaineo@napsteel.com .**

(e)  **Counterparts; Fax or PDF Transmission.** This Lease (Addendum) may be executed in separate counterpart signature pages with the same effect as if both parties had signed the same document. All counterparts shall be taken together and shall constitute a single Lease. Any counterparts that are signed and transmitted by facsimile machine or as an emailed PDF copy shall be treated as an original document. Each party hereby waives any defenses to the enforcement of the terms of this document if sent by facsimile or as an emailed PDF, based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").

IN WITNESS WHEREOF, the parties have executed this instrument as of the date first above written.

Tenant:

**LAURA LEE HAGENAUER** (successor-in-interest to, and formerly doing business as "VALLEY ROLLING LLC")

By _____

Landlord:

**R & R PROPERTY HOLDINGS, INC.,**
**a Washington corporation**

By: _____
Name: **Dwaine Odinson, CA**
Title: **Controller**

Addendum to Lease - Stevens Ness
Business Lease Form 812
80227578.1 0052781-00013

Rider - 5

# DRAWING OF PREMISES AND BUILDING



12,500 sqft

NONE LEASE

R + R

6" of 10" Protection
CURB AGAINST
BUILDING STREET MALL

22' DRIVEWAY

27,500 sqft
to Include Office
Valley Rolling

NONE LEASED Space

R+R

NAZARAPH HEAD

80' RIPARIAN SETBACK

TOTAL SQ. FT 57,500

EXHIBIT I
Page 10 Of 11

Case 14-63530-fra11   Doc 260   Filed 10/23/15



# DRAWING OF PROPERTY

SCALE : 1" = 60'
DATE : 10 FEBRUARY 2009
BY : MAGNESS LAND SURVEYING
PO BOX 1239
WILLAMINA, OREGON  97396
PHONE : 503-843-3404
CELL : 971-237-2413
E-MAIL : MAGNESS@WBCABLE.NET

Scale: 1" = 60'

S        N
TRUE

VALLEY ROLLING

KEVIN CHAPPELLE
REEL 979, PAGE 287

WILLIAM D. OSTROM
REEL 1575, PAGE 26.

BURLINGHAM FARMS,
REEL 2463, PAGE 254

10' NATURAL GAS
PIPELINE EASEMENT
PER REEL 1181,
PAGE 700.

FUTURE RIGHT
OF WAY LINE

FUTURE RIGHT
OF WAY LINE

PBSL, LLC
REEL 2760, PAGE 114
(PARCEL 1)

5/8 IRON ROD
W/YELLOW PLASTIC CAP
MARKED "DLT &
ASSOC" PER MCSR-29205

5/8 IRON ROD
W/YELLOW PLASTIC
CAP MARKED "DLT &
ASSOC" PER MCSR-
29205

5/8" IRON PIPE W/YPC
MARKED ORLS 1677
PER MCSR-35375

5/8 IRON ROD W/YPC
MARKED "RIVERSIDE
ENG" PER MCSR-35929

R=280.00
L=24.43
Δ=4°59'39"
Chord=24.43'
S56°28'11"E

JOB# 149

Ted A. Troutman
Troutman Law Firm, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97006
Tel:     503-292-6788
Fax:     503-596-2371
E-mail: tedtroutman@sbcglobal.net


UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Bankruptcy Case No.: 14-63530-fra11 |
| LAURA LEE HAGENAUER, | ) | |
| | ) | DEBTOR'S THIRD AMENDED PLAN |
| Debtor. | ) | OF REORGANIZATION |

TABLE OF CONTENTS

1.     Treatment of Unclassified Claims

2.     Treatment of Classes of Claims and Equity Interests

Class 1:     Impaired Secured Claim of KeyBank

Class 2:     Impaired Secured Claim of KeyBank

Class 3:     Impaired Secured Claim of Valley Development Initiatives

Class 4:     Impaired Claim of Oregon Business Development Initiatives

Class 5:     Impaired Secured Claim of US Small Business Administration

Class 6:     Impaired Unsecured Inventory Related Claims of Current Suppliers

Class 7:     Impaired Unsecured Claim of Cascadia Metals

Class 8:     Unimpaired Secured Claim of GreenTree Home Mortgage

Class 9:     Impaired Secured Claim of Marion County

Page 1 – DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

Class 10: Impaired Claim of Unsecured Claim Under $1,000

Class 11: Impaired Claim of Unsecured Creditors with Claims Over $1,000 that are not Current Inventory Suppliers.

Class 12: Impaired Unsecured Claim of Agnes Hagenauer

Class 13: Impaired Unsecured Claim of Dennis Hagenauer

Class 14: Impaired Unsecured Claim of Employee Bruce Kahler

Class 15: Impaired Claim for Unfunded 401(k) Plan

Class 16: Impaired Secured Claim of KeyBank

Class 17: Disputed Secured Claim of AMCI (Associated Management Consultants Inc.)

3. Implementation of Third Amended Plan

4. Conditions Precedent

5. Effects of Confirmation

6. Treatment of Executory Contract and Unexpired Leases

7. Avoidance Claims

8. Miscellaneous Provisions

9. Definitions

**1. Treatment of Unclassified Claims.**

**Administrative Claims** allowed by the Court for professional fees of Debtor's counsel, Debtor's financial consultant and Committee's Counsel shall be paid as follows: (1) a pro rata share of the account established pursuant to the Stipulated Final Order For Use of Cash Collateral (Doc. No. 153) at paragraph 10, (the "Accumulated Administrative Account") along

Page 2 – DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

with the Allowed 503(b)(9) Claims as set forth below, upon the Effective Date; (2) a pro rata share of any Avoidance Claims recoveries; (3) a pro rata share of monthly payments of $4,000 per month starting 30 days after the Effective Date until paid in full.

**IRS Secured Claim for Amounts Due that Would Otherwise be General Unsecured Claim pursuant to Bankruptcy Code.** The IRS secured claims that, but for the security would otherwise be general unsecured claims can be paid over a longer period than sixty (60) months. The claim for penalty is secured by Debtor's personal property valued at $109,745.00. It will be paid over 84 months with equal payments of $1,288 starting 30 days after-+ the Effective Date.. Interest will accrue on the unpaid balance at 3% per annum.

**IRS Priority Claim** in the amount of $363,337.83 will be paid starting January 20, 2016 with monthly payments of $8,730.48 and interest at three percent (3%) until paid in full.

**Oregon Department of Revenue Priority Claim**. Upon the Effective Date of the Third Amended Plan, the unpaid balance of $56,690 will be paid over 45 months with monthly payments of $1,462.34. The claim will be paid with interest of 8% per annum as required under § 511 of the bankruptcy code.

**Priority Tax Claim of California Board of Equalization** in the amount of $9,838.97 will be paid over 45 months with interest at the statutory rate of 9% per annum. Monthly payments starting on the Effective Date of the Third Amended Plan will be $258.42.

**Priority Claim of the Oregon Employment Division** in the amount of $50,902.49 will be paid over 45 months with the statutory interest rate of 8% per annum and

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

monthly payments starting on the Effective Date of the Third Amended Plan in the amount of $1,313.05.

**503(b)(9) Claims.** There are filed 503(b)(9) administrative claims of $332,068.28. These claims are all from current suppliers including Cascadia Metals, Inc, which has filed a 503(b)(9) claim for $137,544.18, West Coast Metals for $174,456.90 and Atlas Bolt for $20,067.20. These claims will be paid 1.5% additional funds for each invoice for goods sold to Debtor. If the creditor ships goods invoiced at $100,000 they will be paid $100,000 plus 1.5% toward the 503(b)(3) claim which would equal an additional $1,800. This will continue until the claim, plus 3.25% interest, is paid in full. It is estimated that the amount of time required to pay the 503(b)(9) claims in full is 36 months from the Date of Confirmation as set forth on Attached Exhibit B. Cascadia Metals and West Coast Metals have verbally agreed to the proposed treatment.

**Penske Administrative Claim** for post-petition charges incurred between September 29, 2014 and November 4, 2014 in the amount of $25,976.75. Debtor and Penske have agreed this claim will be paid $12,988.38 on the Effective Date, plus 9 monthly payments of $1,443.15 starting 30 days after the Effective Date.

**2.     Treatment of Claims.**

**2.1**     <u>Class 1 – Impaired Secured Claim of KeyBank</u> secured by 3071 Schmidt Lane NE, Hubbard, OR 97032 in the approximate amount of $1,787,432.28. The claim will be paid from the sale of the property at 3071 Schmidt Lane NE, Hubbard, OR 97032. Debtor expects the sale of the property for $2,600,000 will be approved at a hearing for approval to sell the property free of liens scheduled for November 4, 2015. The additional approximately $55,333.74 owed to

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

KeyBank for default interest will be subordinated to the claim of SBA and will become a Class 11 unsecured debt.

    **2.2**    <u>Class 2 – Impaired Secured Claim of KeyBank</u> secured by the accounts receivable, equipment and accounts of Debtor in the approximate balance of $430.932.11. The loan documents will be modified to reduce the interest rate to 6.5% per annum. The loan will be modified to require monthly payments of $8,431.68 for 60 months starting 30 days after the Effective Date of the Third Amended Plan. Any pre-petition default on the loan will be waived.

    **2.3**    <u>Class 3 – Impaired Secured Claim of Valley Development Initiatives</u> secured by the equipment formerly owned by Valley Rolling, Inc. and DeLaMCC, LLC. The balance of the loan is approximately $229,028.88. The loan documents will be modified to require monthly payments of $2,542.69 with interest at 6% per annum. These payments will start 30 days after the Effective Date and continue for a period of 120 months.

    **2.4**    <u>Class 4 – Impaired Claim of Oregon Business Development Initiatives</u> secured by a second lien on Debtor's residence, a third lien on Debtor's building at 3071 Schmidt Lane NE, Hubbard, OR 97032, and a third lien on the personal property of Valley Rolling. Any pre-petition default on the loan will be waived. The loan is in the approximate amount of $706,588.00. There is no equity in the building at 3071 Schmidt Lane NE, Hubbard OR 97032 to support the secured claim on the building. There is no equity in the personal property to support the secured claim. There is $350,000 in equity in Debtor's residence to support the lien. The balance of the lien in the amount of $356,588 will be paid as an unsecured claim pursuant to Class 11. The secured claim in the amount of $350,000 will be paid interest only at 4% with monthly payments of $1,166.67 for 45 months. The balance of $350,000 will then be re-

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

amortized over 240 months at 4% interest and monthly payments of $2,120.93.  The first payment will be due 30 days after the Effective Date.

      **2.5**     <u>Class 5 – Impaired Secured Claim of US Small Business Administration</u> of $860,448.55 secured by a third lien on the property at 3071 Schmidt Lane NE, Hubbard, OR 97032.  The loan will be paid approximately $581,097.24 upon the sale of the business property at 3071 Schmidt Lane NE, Hubbard, OR 97032.  The balance of the loan will be paid as a Class 11 unsecured claim.

      **2.6**     <u>Class 6 – Impaired Unsecured Inventory Related Claims of Current Suppliers.</u>
These claimants are:

| | |
|---|---:|
| RF Factor | 61,107.25 |
| Winrock – Superior Plus | 42,922.41 |
| Atlas Bolt & Screw | 8,109.88 |
| Champion Metal of Washington | <u>12,167.97</u> |
| TOTAL | $124,307.51 |

      These creditors will be paid the amount of any current invoice shipped after confirmation of the Third Amended Plan plus an additional 1.5% of the invoice to apply toward the unpaid claim.  These payments will continue until the claim is paid in full plus 3.25% interest.  The payments will start 30 days after the Effective Date.  If any of the claimants cease to be suppliers of Debtor, the balance left owing on the claim will be amortized with monthly payments for 120 months with 3.25% interest.

      **2.7**     <u>Class 7 – Impaired Unsecured Claim of Cascadia</u> for balance of $634,357.58. This balance will be paid after the 503(b)(5) Claim of Cascadia has been paid in full.  The

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

balance will be paid the amount of any current invoice shipped after confirmation of the Third Amended Plan plus 1.5% of the invoice.

**2.8** Class 8 – Unimpaired Secured Claim of GreenTree Home Mortgage in the amount of $159,004.44 secured by Debtor's personal residence at 1129 Belle Passi Rd., Woodburn, OR 97071.  Debtor will continue to make the payments according to the terms of the mortgage.  At the time the case was filed, there was no arrearage on the GreenTree Home Mortgage.  Since the filing of the case, Debtor did become delinquent on the mortgage, however that delinquency has been cured.  Debtor will stay current on the GreenTree Home Mortgage loan.

**2.9** Class 9 – Impaired Secured Claim of Marion County secured by Debtor's real property at 3071 Schmidt Lane NE, Hubbard, OR 97032 in the approximate amount of $124,167. The claim will be paid in full upon sale of the property.

**2.10** Class 10 – Impaired Unsecured Claims Under $1,000 will be paid 60 days after the Effective Date of the Third Amended Plan without interest.  These claims are as follows:

| | |
|---|---|
| Primesource Building Products | $935.20 |
| Wells Fargo | 870.00 |
| Century Link | 773.29 |
| Pitney Bowes Purchase Power | 730.14 |
| Long Brothers Building Supply Inc. | 630.15 |
| AT&T | 610.74 |
| Pacific Marketing | 583.68 |
| J.J. Thayer Company | 569.73 |

Page 7 – DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

| | |
|---|---:|
| Pitney Bowes | 432.40 |
| Davison Auto Parts | 384.39 |
| Teletrac | 337.00 |
| Commercial Business Machines | 250.00 |
| Amerititle | 200.00 |
| G.W. Hardware | 199.19 |
| Industrial Welding Supply, Inc. | 165.69 |
| Oak Harbor Freight Lines, Inc. | 69.84 |
| Marion County Tax Collector | 42.99 |
| Northwest Natural Gas | 13.16 |
| Fastenal | 8.89 |
| TOTAL | $7,806.48 |

**2.11**    <u>Class 11 – Impaired Claim of Unsecured Creditors with claims over $1,000 that are not Current Inventory Suppliers</u>.  These claims total $1,345,139.30 and will be paid interest only payments for the first 45 months starting  30 days after the Effective Date.  The total monthly payment amount will be $3,643.09.  After 45 months the payments will increase to amortize the debt over 120 months with total monthly payments of $14,243.08.  These creditors and monthly payments are as follows:

| | Balance Owed | Interest Only Payment | After 45 Months |
|---|---|---|---|
| Marc Nelson Oil Products | $17,985.35 | $    48.71 | $    190.44 |
| Discover | 17,175.84 | 46.52 | 181.87 |
| Mackey Porth & Unrein | 9,838.97 | 26.65 | 104.18 |

Page 8 – DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

| | | | |
|---|---|---|---|
| Toyota Lift Northwest | 5,078.80 | 13.76 | 53.78 |
| KeyBank (default interest) | 55,333.74 | 149.86 | 585.90 |
| SBA | 279,351.31 | 756.58 | 2,957.93 |
| FORA Financial [1] | 45,576.20 | 123.44 | 482.59 |
| Chase Bank | 110,496.69 | 299.26 | 1,170.00 |
| Oregon Business Development | 356,588.97 | 965.76 | 3,775.76 |
| Les Schwab | 2,901.89 | 7.86 | 30.73 |
| MWI Components | 2,950.74 | 7.99 | 31.24 |
| Mt. Angel Telephone | 2,492.44 | 6.75 | 26.39 |
| National Manufacturing Co. | 2,014.98 | 5.46 | 21.34 |
| Aramark Uniform Services | 1,927.19 | 5.22 | 20.41 |
| Artis Metals Company, Inc. | 1,455.31 | 3.94 | 15.41 |
| McMinnville Gas Inc. | 1,406.36 | 3.81 | 14.89 |
| Portland General Electric | 1,332.90 | 3.61 | 14.11 |
| Protec, Inc. Security, Fire & Video | 1,295.00 | 3.51 | 13.71 |
| Cannonball [2] | 29,134.12 | 78.90 | 308.49 |
| ISS West | 224,493.64 | 608.00 | 2,377.06 |
| Euler Hermes | 48,414.04 | 131.12 | 512.63 |
| Penske (Disputed) | 60,949.29 | 165.07 | 645.36 |
| IRS General Unsecured | 50,931.92 | 110.86 | 433.41 |

---

[1] But see Paragraph 3, Page 18 above. Before FORA Financial can receive any distribution, it must pay back the preference payments.
[2] But see Paragraph 2, Page 18 above. Before Cannonball receives any distributions, it must pay back the preference amounts.

Page 9 – DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

Associated Management Consultants (AMCI) 26,013.61          70.45          275.45

TOTAL          $1,345,139.30          $3,643.09          $14,243.08

**2.12**    Class 12 – Impaired Unsecured Claim of Agnes Hagenauer in the amount of $259,000.  This claim will be paid starting in the 60th month after confirmation with 3.25% interest only if she has repaid to the Creditors' Committee, pursuant to Section 7 of the Third Amended Plan, the preference payment of $21,189.58 she received.  Monthly payments starting the 60th month after confirmation will be $4,682.72 per month until paid in full.  The claim of Agnes Hagenauer in the amount of $259,000 will not accrue interest until after payments begin in the 60th month.

**2.13**    Class 13 – Impaired Unsecured Claim of Dennis Hagenauer in the amount of $57,957.36 for money advanced by Dennis Hagenauer to Valley Rolling on his personal credit lines and in cash.  This claim will be paid after Class 11 is paid in full with monthly payments of $1,047.87 for 60 months.  Interest will accrue starting in the 165th month at 3.25% per annum.

**2.14**    Class 14 – Impaired Unsecured Claim of Employee Bruce Kahler in the amount of $59,309.47.  This debt will be paid after Class 11 is paid in full.  Payments will be $1,072.32 per month for 60 months.  Interest will accrue starting in the 165th month at 3.25% per annum.

**2.15**    Class 15 – Impaired Claim for Unfunded 401(k) Plan in the amount of $139,834.31.  This claim is for unfunded 401(k) contributions for employees of Valley Rolling Corp. including Debtor and her husband.  $4,795.46 is priority debt and will be paid on the Effective Date.  Payments on this claim will start January of 2018 in the amount of $3,500 per month with interest at 3% until paid in full.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

**2.16** Class 16 – Impaired Secured Claim of KeyBank secured by 3071 Schmidt Lane NE, Hubbard, OR 97032, which is the amount of KeyBank's indebtedness in Class 1 by which the default rate of interest exceeds the non-default rate of interest in KeyBank's claim, and any late fees, pre-payment penalties and other default charges included in KeyBank's claim, which are subordinate to the SBA's Class 5 claim, as provided in the Prior Lienholder Agreement between SBA as assignee and KeyBank, dated February 14, 2012 and recorded February 23, 2012 in Marion County, Oregon, recording number 3359 p 88. These amounts will be paid from the sale of 3071 Schmidt Lane NE after payment in full to SBA Class 5. Any amount unpaid will be a Class 11 General Unsecured claim.

**2.17** Class 17 – Disputed Secured Claim of AMCI (Associated Management Consultants, Inc.) in the amount of $26,013.61. Debtor asserts the claim is unsecured and intends to file an objection to secured status of the claim. If the Court determines the claim is secured, the claim will be paid with five percent (5%) interest over sixty (60) months with monthly payments of $490.91 until paid. If the claim is determined by the Court to be unsecured, it will be paid as part of Class 11.

**3.** **Implementation of Third Amended Plan.**

The source of funds to be received by the estate for distribution to creditors will be from Debtor's income from the sale of Debtor's real estate and from the business of Valley Rolling and Debtor's wages and any recovery on avoidance claims under 11 USC §§ 547, 548, 549 and 550 ("Avoidance Claims").

There is a pending motion to sell the property at 3071 Schmidt Lane NE, Hubbard, Oregon for $2,600,000. If the sale is closed prior to Confirmaton, the secured claim of

Page 11 – DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

KeyBank on the property will be paid in full as will the secured claim of Marion County. If the sale has not closed, then as part of this Third Amended Plan, Debtor will close the sale on the following terms noticed in the Motion to Sell.

Laura Lee Hagenauer (the "*Debtor*"), has filed a motion (the "*Motion*") for authority to sell (the "*Sale*") the commercial real property and fixtures located at 3071 Schmidt Lane, Hubbard, Oregon (the "*Property*") to R&R Property Holdings, Inc. ("*R&R*") or a higher and better bidder, free and clear of all liens, claims, encumbrances and interests pursuant to 11 U.S.C. §§ 363(b) and (f); enter into a lease of a portion of the Property (the "*Property Lease*") pursuant to 11 U.S.C. § 363(b); and pay a 4% commission to Coldwell Banker Commercial of Salem, Oregon (the "*Broker*") upon the closing of the Sale of the Property pursuant to Bankruptcy Rule 2016(a) and Local Rule 2016-1(c)(2)(A) & (B).

A hearing on the Motion and any objections to the Motion will be held on November 4, 2015 at 10:00 a.m. (the "*Hearing*") and testimony will be offered, and received if admissible, in support of the Motion and a finding that the purchase of the Property by R&R is being made in good faith and is entitled to the protections afforded by 11 U.S.C. § 363(m).

3.1     Debtor proposes to sell the Property free and clear of liens, claims, encumbrances and interests pursuant to 11 U.S.C. § 363(f)(2) and (f)(5) (and 11 U.S.C. § 363(f)(1), if applicable) and the terms of Standard Commercial Sale Agreement between the Debtor and R&R dated September 29, 2015 (the "*Sale Agreement*"). A copy of the Sale Agreement is attached to this Statement as exhibit I. Debtor also proposes to enter into the Property Lease to lease back a portion of the Property for use in her business operations. A copy of the Property Lease is attached to this Statement as exhibit J.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

3.2     R&R, the proposed buyer, is a Washington corporation and an affiliate of

Cascadia Metals, Inc. ("***Cascadia***").  Cascadia is a primary vendor to the Debtor, one of the

Debtor's largest unsecured and administrative creditors, and the holder of a lien against the

Property.  If the sale is approved, R&R also will become the Debtor's landlord under the

proposed Property Lease.  R&R's counsel is Brandy A. Sargent, Stoel Rives LLP, 900 S.W.

Fifth Avenues, #2600, Portland, Oregon, 97204; Telephone: 503-294-9888; E-mail:

brandy.sargent@stoel.com.

3.3     The address of the Property is 3071 Schmidt Lane, Hubbard, Oregon.  The legal

description of the Property is:

> A tract of land in the Southeast Quarter of Section 33, Township 4 South, Range 1 West, Willamette Meridian, Marion County, Oregon, being a portion of that tract of land described by Warranty Deed from Gregory G. Berning to PBSL, LLC and recorded in Reel 2760, Page 114, Marion County Deed Records, more particularly described as follows:

> Beginning at an iron bar that is on record as being North 86° 15' East 1,611.06 feet and South 31° 26' West 1,351.88 feet and North 58° 34' West 641.52 feet from the Northwest corner of the Ewing Purvine Donation Land Claim in Section 33, Township 4 South, Range 1 West of the Willamette Meridian in Marion County, Oregon, which is at an angle point of the Northerly margin of Schmidt Lane (CR 439, 40.00 foot wide) and also being the most Southerly corner of that tract of land deeded to S.W. WEAVER, by Deed recorded in Volume 178, Page 461, Deed Records; thence North 41° 16' 23" East 402.16 feet to the Northwest corner of Parcel 1 of said PBSL, LLC deed (Paragraph 1); thence along the center of a ditch South 24° 17' 19" East 121.03 feet to an Iron pipe; thence South 49° 47' 19" East 110.55 feet to an iron rod; thence South 41° 35' 19" East 198.66 feet to an iron rod; thence South 58° 33' 19" East 137.23 feet to the Westerly margin of Relocated (1932) Highway 99E (40 feet from centerline); thence South 31° 19' 58" West 249.82 feet along the Westerly margin of said Highway 99E to its intersection with the North line of County Road No. 439; thence North 58° 53' 01" West 605.67 feet along the North right of way line of said Schmidt Lane (20 feet from centerline) to the point of beginning, in the City of Hubbard, Marion County, Oregon.

3.4     A copy of the full property description or inventory may be examined or obtained

by contacting counsel for the Debtor.

Page 13 – DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

3.5     The Property may be viewed by contacting the Debtor's counsel.

3.6     Other than the Debtor, R&R and the Broker, there are no other parties to the transaction.

3.7     Under the Sale Agreement, the gross sale price for the Property is $2,600,000. All of the liens on the Property exceed $4,469,734, of which Debtor believes a total of $2,050,033.08 need not be paid as secured claims because they have either consented or the Court can order the sale under Section 363(f)(5). KeyBank also seeks reimbursement of approximately $70,000 for fees and costs.  Total sales costs will includes a 4% commission to the Broker (*i.e.,* $104,000, assuming no change to the terms of the Sale) and other costs of closing, estimated to be approximately $6,299.00.  A preliminary list of closing costs to be satisfied by the Debtor may be obtained from the Debtor's counsel.  All tax consequences have been considered and no taxes will be owed as a result of the sale.  Absent a substantial overbid for the Property, the Sale will result in no net proceeds to the estate after payment of the Sale proceeds to satisfy valid liens on the Property (in the order of their priority) and fees, costs, and taxes payable in connection with the Sale.

3.8     The Sale is not of substantially all of the Debtor's assets.  Debtor will continue to own and operate her business after the Sale.  The terms of the Sale are: (a) sale price of $2,600,000; (b) earnest money deposit of $25,000; (c) a contingency period of up to 45 days after the opening of escrow during which R&R will proceed to satisfy itself as to the condition of the Property, environmental matters, and other matters (d) a title review period of 15 days after receipt of a title report; (e) a contingency for Bankruptcy Court approval; and (f) a period of 15 days after satisfaction of contingencies for R&R to close the Sale.  In the event that R&R is not

Page 14 – DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

the successful purchaser of the Property, the costs of any environmental assessment will be borne by the Debtor.

If R&R is the successful purchaser of the Property, it will lease a portion of the Property back to the Debtor pursuant to the Property Lease. In summary, the Property Lease would commence at the closing of the Sale and continue for an initial period of 12 full calendar months, and thereafter be a year-to-year lease. Either party can terminate the Lease on 90 days' notice at the end of the initial term or any renewal term. For the initial term, the monthly rent would be a "gross rental" of $15,000 per month, inclusive of monthly base rent of $12,650 and Debtor's proportionate share of property taxes (estimated at $1,916.67 per month) and property insurance costs (estimated at $433.34 per month). After the first year, unless the Property Lease is terminated, the rent becomes "triple net," and Debtor would pay her proportionate share of property taxes, property insurance and maintenance costs. Debtor is responsible for utilities that she uses. At the start of the Property Lease, Debtor would pay the first month's rent ($15,000) and a security deposit equal to $15,000 (which would be refundable at the end of the Property Lease, unless applied to cure a breach of the Lease).

3.9    The Property has been publicly marketed since May 2015 and the offer received from R&R is the highest and best offer received after competitive bidding. No further auction is proposed, but the Sale is expressly subject to overbid prior to the Hearing pursuant to an agreement on the same or better terms and conditions (apart from the purchase price) as the Sale Agreement, including, without limitation, the Property Lease. Competing bids must be submitted to the Debtor no later than 4:00 p.m. on October 23, 2015.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

3.10     Based on a November 2014 appraisal of the Property for $3,800,000, the Property

was initially listed for sale for $3,775,000.  In September 2015, Debtor received an offer of

$2,300,000 for the Property and countered at $3,175,000.  In response, the offer was raised to

$2,400,000.  Around the same time, R&R made its $2,600,000 offer for the Property, which the

Debtor countered at $3,175,000.  R&R did not raise its offer, and the Broker has not received

any other formal offers for the Property.[3]

3.11     Debtor's primary secured creditor, KeyBank, National Association ("*KeyBank*"),

previously filed a motion for relief from the automatic stay to begin the foreclosure process

against the Property.  Pursuant to a stipulated order resolving that motion, the Property was listed

for sale and, in the event the Property was not sold and the Debtor had not confirmed a plan of

reorganization by October 1, 2015, KeyBank was to be allowed to pursue foreclosure.  Debtor

believes that the proceeds of the Property that would be generated in a foreclosure would not

exceed the amount to be received in the proposed Sale.  Additionally, the offer received from

R&R is coupled with the Property Lease, which will allow the Debtor to lease a portion of the

Property and avoid moving costs.

3.12     The Debtor is proposing the sale in advance of confirmation of a plan because

through the sale and leaseback debtor will be able to reduce her monthly expenses and propose a

feasible plan.  If the sale is not allowed KeyBank could proceed with its foreclosure proceeding.

3.13     If the sale is not approved on November 4th 2015, debtor is requesting that the

sale be approved on confirmation of the Third Amended Plan

---

[3]     The Debtor also received an informal offer of $2,000,000, but the party making the
informal offer never wrote-up a formal offer.

Page 16 – DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

3.14    Lienholders:  Based on filed proofs of claim, the following creditors claim liens on the Property (including security interests in fixtures, collectively, the "**Liens**"), in the following amounts and order of priority:

| Creditor | Lien Claim | Total Liens |
|---|---|---|
| Marion County Assessor's Office (Prop. Taxes) | $  131,680.15 | $   131,680.15 |
| KeyBank National Association | $1,622,645.00 | $1,754,325.15 |
| US Small Business Administration | $  860,448.55 | $2,614,773.70 |
| Oregon Business Development Corporation | $  706,588.97 | $3,321,362.67 |
| Cascadia Metals Inc. | $  634,357.58 | $3,955,720.25 |
| Internal Revenue Service – tax lien | $  514,014.53 | $4,469,734.78 |

3.15    Other than costs of the Sale, no Liens are intended to be paid without further order of the Bankruptcy Court.  All of the Liens shall attach to the Sale proceeds in the same order of priority as they attached to the Property.  Any Sale proceeds remaining after paying the Liens and expenses, taxes, commissions, fees, costs or other charges as provided in the Motion shall be held in trust until the Court orders payment.  At this time, no such excess Sale proceeds are anticipated.

3.16    The Court appointed the Broker on May 6, 2015.  Pursuant to that order, the Broker is proposed to be paid a 4% commission, which will be equal to $104,000 if the Sale to R&R is approved and closes.

If the Court does not approve the sale at the November 4, 2015 hearing, Debtor is seeking approval of the sale as part of the Third Amended Plan on the identical terms as noticed above.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

3.17    If the sale is approved, the only secured creditors that will be paid will be Marion County taxes, KeyBank approximately $1,734,432 (its secured debt minus default interest) and SBA a partial payment of approximately $581,097.24.  The liens of Oregon Business Development, Cascadia Metals and the IRS will be unsecured. Performance of Obligations of Reorganized Hagenauer.  Reorganized Hagenauer will (a) in accordance with applicable law review all Claims filed against the estate, and if advisable, object to such Claims, (b) in the exercise of the business judgment, investigate, prosecute, settle or dismiss all Hagenauer's actions not otherwise settled prior to or under this Third Amended Plan.  Unless otherwise provided in this Third Amended Plan or the Third Amended Plan Documents, Reorganized Hagenauer will be entitled to receive all Hagenauer's action recoveries to be used to pay Claims pursuant to this Third Amended Plan, and (c) perform all their obligations under this Third Amended Plan and Third Amended Plan Documents when they become due or are to be performed.  Hagenauer will retain all personal property.

3.18    Prohibited Transaction.  As long as payments to Classes 1-14 remain unpaid, Reorganized Hagenauer shall not sell, lease, transfer, convey, assign, encumber or voluntarily lien any of Reorganized Hagenauer's assets, unless (i) such sale, lease, transfer, conveyance, assignment, encumbrance or lien is related to a non-material asset of Reorganized Hagenauer; (ii) the asset is replaced with an asset of equal or greater value within ten (10) days after the transaction; (iii) the encumbrance or lien is the result of a refinance of an existing obligation on more favorable terms than the prior encumbrance or lien; or (iv) such sale, lease, transfer, conveyance or assignment is performed in the ordinary course of Reorganized Hagenauer's

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

business consistent with past practices, and will not have a material adverse effect on the business or financial condition of Reorganized Hagenauer.

       3.19    <u>Objections to Claims</u>.  Objections to a Claim as to which no objection is pending as of the Effective Date, must be filed by the Claims Objection Bar Date.  Objections to such Claims may be filed by Reorganized Hagenauer, any Claimant, or any other party in interest, including, but not limited to, the Committee of Unsecured Creditors (the "Committee").

       3.20    <u>Provisions Governing Distributions</u>.

       3.20.1    <u>Distributions Only to holders of Allowed Claims</u>.  Except as otherwise provided in this section.  Distributions under this Third Amended Plan and the Third Amended Plan Documents will be made only to the holders of Allowed Claims.  Until a Disputed Claim becomes an Allowed Claim the holder of that Disputed Claim will not receive any distribution otherwise provided to the Claimants under this Third Amended Plan or the Third Amended Plan Documents.  If necessary in determining the amount of a Pro Rata distribution due to the holders of Allowed Claims in any class, Reorganized Hagenauer will make the Pro Rata calculation as if all Unresolved Claims were Allowed Claims in the full amount claimed or in the Estimated Amount.  When an Unresolved Claim in any class becomes an Allowed Claim, Reorganized Hagenauer will make distributions with respect to such Allowed Claim, together with any allowable interest accrued on the amount of each such distribution to the date thereof, net of any setoff contemplated by the order, if any, allowing such Claim and/or any required withholding of applicable federal and state taxes.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

3.20.2    Transmittal of Distributions.  Except as otherwise provided in this Third

Amended Plan, in the Third Amended Plan Documents, or in an order of the Bankruptcy

Court, distributions to be made under this Third Amended Plan or the Third Amended

Plan Documents to Claimants holding Allowed Claims will, in each case, be made by

Reorganized Hagenauer by first class United States mail, postage prepaid, (a) to the latest

mailing address set forth in a proof of claim filed with the Bankruptcy court by or on

behalf of such Claimant, or to such other address as may be provided to Reorganized

Hagenauer by such Claimant in writing, or (b) if no such proof of claim has been filed

and no written notice setting forth a mailing address is provided by or on behalf of such

Claimant to Reorganized Hagenauer to the mailing address set forth in the schedules filed

by Hagenauer in this Case.  If a Claimant's distribution is not mailed or is returned to

Reorganized Hagenauer because of the absence of a proper mailing address, Reorganized

Hagenauer shall make a reasonable effort to locate or ascertain the correct mailing

address for such Claimant from information generally available to the public and from

such party's own records, but shall not be liable to such Claimant for having failed to find

a correct mailing address.

3.20.3    Timing of Distributions.  Unless otherwise agreed by Reorganized

Hagenauer whenever any payment to be made is due on a day other than a Business Day,

such payment will instead be made on the next Business Day, with interest to the extent

expressly contemplated by this Third Amended Plan or any applicable agreement or

instrument.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

3.20.4    Form of Distributions.  Unless otherwise agreed by Reorganized Hagenauer all Cash payments to be made by Reorganized Hagenauer pursuant to this Third Amended Plan or the Third Amended Plan Documents will be made, at the option of Reorganized Hagenauer by a check or wire transfer.

3.20.5    No Professional Fees or Expenses.  No professional fees or expenses will be paid by Hagenauer or Reorganized Hagenauer with respect to any Claim except as specified in this Third Amended Plan, or as Allowed by Final Order of the Bankruptcy Court, as applicable.

3.20.6    Avoidance Recoveries.  Neither Hagenauer nor Reorganized Hagenauer may use any proceeds from Avoidance Claims; rather all proceeds from avoidance recoveries shall be used first to pay any unpaid Administrative Expense Claims and then any other Allowed Claims.

**3.21**    Closing of the Case.  As soon as practicable after the Effective Date, and when Reorganized Hagenauer deems appropriate, Reorganized Hagenauer shall seek authority from the court to close the Case in accordance with the Bankruptcy Code and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Case shall, whether or not specified therein, be without prejudice to the right of Reorganized Hagenauer or other party in interest to reopen the Case for any matter over which the Court has retained jurisdiction under this Third Amended Plan.  Any order closing the Case will provide that the Bankruptcy Court, (i) will retain jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation order, any other orders entered in this Case, and the obligations created by this Third Amended Plan and the

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

Third Amended Plan Documents; and (ii) will retain all other jurisdiction and authority granted to it under this Third Amended Plan and the Third Amended Plan Documents.

**4**.    **Conditions Precedent.**

    **4.1**    <u>Conditions to Effectiveness</u>.  The Effective Date will not occur and the Third Amended Plan will not become effective unless and until each of the following conditions have been satisfied or waived in accordance with Section 4.1 of this Third Amended Plan:

        (a)    the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Proponents; and,

        (b)    no stay of the Confirmation Order shall be in effect.

**5.**    **Effects of Third Amended Plan Confirmation.**

    **5.1**    <u>Discharge</u>.  Reorganized Hagenauer will not receive a Discharge until all obligations of the Third Amended Plan have been performed pursuant to 11 U.S.C. § 1141(5). Upon completion of all obligations of the Third Amended Plan, Hagenauer will move for an entry of Discharge.  Once a Discharge Order has been entered Reorganized Hagenauer will be Discharged from all liability and any and all claims that arose before the date of such confirmation and from any liability of the kind specified in Sections 503(g), 503(h) and 503(i) of the Bankruptcy Code, whether or not proof of claim is filed or is deemed filed under Section 501 of the Bankruptcy Code, such Claim is Allowed under this Third Amended Plan, or the holder of such Claim has accepted this Third Amended Plan.

    **5.2**    <u>Vesting</u>.  Except as otherwise expressly provided in this Third Amended Plan or in the Confirmation Order, on the Effective Date, Reorganized Hagenauer will be vested with all of the property of the Estate free and clear of all Claims, liens, encumbrances, charges and other

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

interests of Creditors and Claimants. As of the Effective Date, Reorganized Hagenauer may hold, use, dispose, and otherwise deal with such property and conduct their affairs free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court, other than those restrictions expressly imposed by the Third Amended Plan, the Confirmation Order, or the Third Amended Plan Documents.

## 6. Treatment of Executory Contracts and Unexpired Leases.

**6.1** <u>General; Rejected if Not Assumed</u>. Subject to the requirements of Section 365, all executory contracts and unexpired leases of the Debtor that have not been assumed by order of the Bankruptcy Court, or are not the subject of a motion to assume pending on the Confirmation Date, will be deemed rejected by the Debtor and Reorganized Hagenauer on the Effective Date.

**6.2** <u>Claims For Contract Rejection</u>. All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Section 6.1 of this Third Amended Plan must be filed with the Bankruptcy Court within 30 days after the Effective Date or such Claims will be forever barred.

## 7. Avoidance Claims

**7.1** Debtor shall retain any and all claims and causes of action whatsoever (whether known, unknown, liquidated unliquidated, fixed, contingent, matured, unmatured, disputed, or undisputed, and whether asserted or assertable directly, indirectly, or derivatively, at law in equity, or otherwise), including, but not limited to, all Avoidance Claims, subject to the authority given by the bankruptcy court for the Creditors' Committee to pursue certain Avoidance Claims. Notwithstanding the entry of an order confirming the Third Amended Plan, so long as any

Page 23 – DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

members of the Creditors' Committee are willing to serve, the Creditors' Committee shall continue until it is dissolved by action of the members thereof or until the Third Amended Plan is complete and all creditors have been paid in full, whichever occurs first. Neither the Creditors' Committee nor any of its past, present, or future members (or any of the respective past, present, or future officers, directors, employees, or agents of such members) shall have or incur any liability to any holder of a claim or equity interest or to any entity for any act or omission in connection with or arising out of the chapter 11 case, or the negotiations and pursuit of confirmation of the Third Amended Plan, the consummation of the Third Amended Plan, the pursuit of any Avoidance Claims the Creditors' Committee has been authorized to pursue, the administration of the Third Amended Plan or the property to be distributed under the Third Amended Plan.

7.2     The Creditors' Committee also believes the Debtor may have a preference/fraudulent transfer action against Bank of America for payments by Valley Rolling Corp. on two employee credit cards. These cards were used by Valley Rolling to purchase product for Valley Rolling to manufacture. The payments were made to Bank of America within the 90 days preceding the Petition Date, were made to a creditor of Valley Rolling because if the payments had not been made, Bank of America would have asserted an unjust enrichment claim against Valley Rolling and the payments allowed Bank of America to receive more than it would have received in a liquidation under chapter 7. The payments made during the preference period to Bank of America total over $620,000. Debtor is not going to pursue these claims but the Court has entered an order authorizing the Creditors' Committee to pursue such claims.

Page 24 – DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

7.3     In addition the Creditors' Committee may pursue a claim against unsecured creditor Cannonball for preferential payments made during the 90 days preceding the Petition Date on a judgment in the amount of $15,000.  The payments to Cannonball as a Class 11 Claim will only be paid if Cannonball repays the $15,000 preference payments.

7.4     The Creditors' Committee may also pursue a preference claim against FORA Financial for payments of $1,168 per business day during the 90 days preceding the Petition Date totaling $58,430.  FORA Financial's purported secured claim was actually entirely unsecured at the time the payments were made based upon the value of the personal property and the lien amounts superior to FORA  Financial.  The payments to FORA Financial as a Class 11 Claim holder will be paid, if and only if, FORA repays the $58,430 preference payments.

7.5     None of the proceeds of the Preference action litigation will be paid to Reorganized Debtor.  If the Creditors Committee is unsuccessful in the litigation, costs of the litigation will be an administrative expense, which will be paid for by Debtor.

7.6     Allowed professional fees incurred by the Creditors' Committee, including those incurred in pursuing or analyzing the Avoidance Claims pre-confirmation will be paid pro rata from the Accumulated Administrative Account on the Effective Date.  The remaining balance owed and amounts incurred post-confirmation will be paid from any Avoidance Claim recoveries and from Debtor's income from operations and/or the other assets of Debtor if liquidated after the payment of allowed secured claims encumbering such assets.  The professional person or agent seeking a payment from the Debtor shall submit an invoice to the Debtor, which (absent an objection by the Debtor) the Debtor shall promptly pay.  Any objection which cannot be resolved

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

by the parties shall be resolved by the Court. Creditors' Committee counsel may withdraw from representation in the Avoidance Claim accounts if counsel is not getting paid on a timely basis.

7.7 Before any Avoidance Claims are commenced, the Creditors' Committee will present to Debtor, KeyBank and Cascadia the proposal to pursue the specific Avoidance Claim together with the anticipated cost of pursuing such claim. Before the Committee is authorized to go forward, a majority of the above parties must approve the proposal.

## 8 Miscellaneous Provisions.

**8.1** <u>Retention of Jurisdiction</u>. Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, and except as otherwise specifically set forth in this Section 8.1, the Bankruptcy Court will retain jurisdiction over all matters arising under, in furtherance of, or in connection with this Third Amended Plan, including those matters specifically described in this Section 8.1 below.

The matters over which the Bankruptcy Court shall retain jurisdiction over this Third Amended Plan include:

      (a)      determine any Unresolved Claims;

      (b)      determine the Estimated Amount of any Claim;

      (c)      determine requests for payment of Claims entitled to priority under Section 507 of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

      (d)      resolve controversies and disputes regarding the modification, interpretation, and implementation of this Third Amended Plan and the Third Amended

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

Plan Documents, including, without limitation, any amendments or modifications to loan documents;

(e) enter orders in aid of this Third Amended Plan and the Third Amended Plan Documents including, without limitation, appropriate orders (which may include contempt or other sanctions) to protect Reorganized Hagenauer from actions prohibited under this Third Amended Plan or the Third Amended Plan Documents;

(f) modify this Third Amended Plan;

(g) determine any and all applications, adversary proceedings, and contested or litigated matters pending on the Effective Date;

(h) determine any and all pending motions for the assumption or rejection of executory contracts or leases, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom;

(i) preside over and render orders and judgments in any adversary proceedings for the recovery of Avoidance Claims commenced by the Debtor or the Committee; and

(j) enter Final Orders closing the Case.

**8.2**    Modification of Third Amended Plan.  The Proponents reserve the right, in accordance with the Bankruptcy Code, to amend, modify, or withdraw this Third Amended Plan prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, the Proponents may, upon order, amend or modify this Third Amended Plan in accordance with Section 1127(b) of the Bankruptcy Code.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

**8.3**     Severability.  In the event of a successful collateral attack on any provision of the Third Amended Plan (i.e., an attack other than through a direct appeal of the Confirmation Order), the remaining provisions of this Third Amended Plan will remain binding on the Debtor, Reorganized Hagenauer, all Claimants, all Creditors, and all other parties in interest.

**8.4**     Post-Confirmation Professional Fees and Expenses.  All Professional fees and expenses incurred or payable by Reorganized Hagenauer after the Effective Date but prior to closing of the Case will be paid in the ordinary course of business of Reorganized Hagenauer after 15 days notice to the U S Trustee and parties in interest.  If a party in interest or the U.S. Trustee objects, the court will resolve any dispute regarding the amount of the fees or costs.

**8.5**     Headings.  The headings of the sections and paragraphs of this Third Amended Plan are inserted for convenience only and will not affect the interpretation hereof.

**8.6**     Computation of Time Periods.  In computing any period of time prescribed or allowed by this Third Amended Plan, the day of the act, event, or default from which a designated period of time begins to run will not be included.  The last day of the period so computed will be included so long as it is a Business Day.  When the period of time prescribed or allowed is less than 11 days, any day that is not a Business Day will be excluded in the computation.

**8.7**     Notices.  All notices or requests to Reorganized Hagenauer in connection with this Third Amended Plan shall be in writing and served either by (i) United States mail, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed given when received by the following parties, as applicable:

If to Hagenauer:
Laura Lee Hagenauer

Page 28 – DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

1129 Belle Passi Rd.
Woodburn, OR 97071

<u>With copies to</u>:
Troutman Law Firm
Attn:   Ted A. Troutman
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005

   All notices and requests to a Person or Entity holding any Claim will be sent to them at their last known address or to the last known address of their attorney of record.  The Debtor or Reorganized Hagenauer and any holder of a Claim may designate in writing any other address, which designation will be effective upon actual receipt by the Debtor or Reorganized Hagenauer, or by the holder of the Claim.  Any Person or Entity entitled to receive notice under this Third Amended Plan will have the obligation to provide Reorganized Hagenauer with such Person's or entity's current address for notice purposes.  Reorganized Hagenauer will have no obligation to attempt to locate a more current address in the event any notice proves to be undeliverable to the most recent address which has been provided to Reorganized Hagenauer.

   **8.8** <u>Post-Confirmation Court Approval</u>.  Any action requiring Bankruptcy Court approval after the Effective Date will require the Person or Entity seeking such approval to file an application, motion, or other request with the Bankruptcy Court and obtain a Final Order approving such action before the requested action may be taken.  The Person or Entity filing such application, motion, or other request shall serve such application, motion, or other request, together with a notice setting forth the time in which objections must be filed with the court, on Reorganized Hagenauer and other affected parties by first-class mail, electronic mail, overnight courier, facsimile, or hand delivery.  Unless the Court orders otherwise, all notices shall provide the recipients at least 21 days (plus 3 days if served by mail) in which to file an objection to the

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

application, motion, or other request.  If no objection is timely filed, the Court may authorize the proposed action without further notice or a hearing.  If an objection is timely filed, the court will determine whether to conduct a hearing, or to require the submission of further documentation, prior to ruling on the application, motion, or other request.

**8.9**    Election Pursuant to Section 1129(b) of the Bankruptcy Code.  The Proponent hereby requests confirmation of the Third Amended Plan pursuant to Section 1129(b) of the Bankruptcy Code if the requirements of all provisions of Section 1129(a) of the Bankruptcy Code, except paragraph (a)(8) thereof, are met with regard to the Third Amended Plan.  In determining whether the requirements of Section 1129(a)(8) of the Bankruptcy Code have been met, any Class or subclass of a Class that does not contain as an element thereof an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 as of the date fixed by the Bankruptcy Court for filing acceptances or rejections of this Third Amended Plan shall be deemed deleted from this Third Amended Plan for purposes of voting to accept or reject this Third Amended Plan and for purposes of determining acceptance or rejection of this Third Amended Plan by such Class or subclass.

**8.10**    Exemption from Transfer Taxes.  Pursuant to Section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Third Amended Plan, whether occurring prior or subsequent to the Confirmation Date, including any deeds, bills of sale, or assignments executed in connection with any disposition of assets contemplated by this Third Amended Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax or other similar tax.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

**8.11**    Waivers.  Except as otherwise provided in the Third Amended Plan or in the Confirmation Order, any term of the Third Amended Plan may be waived by the party benefited by the term to be waived.

**8.12**    Setoffs, Recoupments, and Defenses.  Nothing contained in the Third Amended Plan shall constitute a waiver or release by Debtor or Reorganized Hagenauer of any rights of setoff or recoupment, or of any defense, it may have with respect to any Claim (including, without limitation, rights under Section 503(d)) of the Bankruptcy Code.  Except as otherwise provided in the Third Amended Plan or in the Confirmation Order or in agreements previously approved by a Final Order, Reorganized Hagenauer may, but will not be required to, set off against any Claim or any distributions with respect to such Claim any and all of the claims, rights and causes of action of any nature that the Debtor or Reorganized Hagenauer, as applicable, may hold against the holder of such Claim; provided, however, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, the payment of any distribution hereunder or any other action or omission of Reorganized Hagenauer, nor any provision of the Third Amended Plan, shall constitute a waiver or release by the Debtor or Reorganized Hagenauer, as applicable, of any such claims, rights, and causes of action that the Debtor or Reorganized Hagenauer, as applicable, may possess against such holder.

**8.13**    Withdrawal or Revocation of the Third Amended Plan.  The Proponent reserves the right to revoke or withdraw the Third Amended Plan prior to the Confirmation Date.  If the Third Amended Plan is revoked or withdrawn, or if the Confirmation Date does not occur, the Third Amended Plan shall have no force and effect and in such event nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or the

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

Estate or any other Person or Entity, or to prejudice in any other manner the rights of the Proponent, or any of them, or any other entity in further proceedings involving the Debtor and specifically shall not modify or affect the rights of any party under any prior orders of the Court.

**8.14** <u>Default</u>.  Except as otherwise provided in the Third Amended Plan or in the Confirmation Order, in the event that Reorganized Hagenauer shall default in the performance of any of its obligations under the Third Amended Plan or under any of the Third Amended Plan Documents and shall not have cured such a default within any applicable cure period (or, if no cure period is specified in the Third Amended Plan or Third Amended Plan Documents or in any instrument issued to or retained by a Claimant under the Third Amended Plan, then within 30 days after receipt of written notice of default), then the entity to whom the performance is due may pursue such remedies as are available at law or in equity.  An event of default occurring with respect to one Claim shall not be an event of default with respect to any other Claim.

**8.15** <u>Filing and Payment of Allowed Administrative Claims</u>.  All requests for the payment of Administrative Claims must be filed with the Bankruptcy Court no later than 30 days after the Effective Date or at such time as the Bankruptcy Court may otherwise order.  Once a Final Order is entered allowing a disputed administrative claim Reorganized Hagenauer will pay such Claim in accordance with this Third Amended Plan.

**8.16** <u>Payment of United States Trustee Fees</u>.  Reorganized Hagenauer shall be responsible for timely payment of fees incurred pursuant to 28 USC § 1930(a)(6) until the case is closed, converted, or dismissed.  After confirmation, Reorganized Hagenauer shall file with the Court a monthly financial report, for each month, or portion thereof, that the case remains open.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

The monthly financial report shall include a statement of all disbursements made during the course of the month, whether or not pursuant to the Third Amended Plan.

**8.17**   <u>Governing Law</u>.  Except to the extent that federal law (including the Bankruptcy Code or Bankruptcy Rules) is applicable, the rights and obligations arising under the Third Amended Plan or under the Third Amended Plan Documents shall be governed by and construed and enforced in accordance with the laws of the State of Oregon without giving effect to the principles of conflicts of laws thereof.

**8.18**   <u>Reservation of Rights</u>.  If the Third Amended Plan is not confirmed by a Final Order, or if the Third Amended Plan is confirmed and the Effective Date does not occur, the rights of all parties in interest in the Case are and will be reserved in full.  Any concessions or settlement reflected herein, if any, are made for purposes of the Third Amended Plan only, and if the Third Amended Plan does not become effective, no party in interest in the Case shall be bound or deemed prejudiced by any such concession or settlement.

**8.19**   <u>Third Amended Plan Controls</u>.  To the extent any provision of the Third Amended Plan Documents is inconsistent with this Third Amended Plan, the provisions of the Third Amended Plan shall control.

**8.20**   <u>Successors and Assigns</u>.  The Third Amended Plan shall be binding upon and inure to the benefit of the Debtor, Reorganized Hagenauer, all Claimants, all Creditors, and all other parties in interest affected thereby and their respective successors, heirs, legal representatives and assigns.

**9**      **Definitions.**

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

For purposes hereof, any term used in an initially capitalized form in this Third Amended Plan will have the defined meaning ascribed to it in either § 101 of the Bankruptcy Code or the definitions set forth below. All definitions in the Bankruptcy Code and below will be subject to the rules of construction set forth in § 102 of the Bankruptcy Code. Whenever the context requires, such terms include the singular as well as the plural, the masculine gender includes the feminine, and the feminine gender includes the masculine. Any specific references to promissory notes, deeds of trust or other debt instruments, or security documents includes any amendments, modifications, and extensions thereto. Nothing contained in this Third Amended Plan or the Third Amended Disclosure Statement constitutes an admission or denial by any party of liability for, or the validity, priority, or extent of any Claim, lien, or security interest asserted against the Debtor or against any third party.

**"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in § 503(b) of the Bankruptcy Code and referred to in § 507(a)(2) of the Bankruptcy Code including, without limitation, the actual, necessary costs and expenses of preserving a Debtor's estate and operating a Debtor's business including Current Obligations, compensation for professional services provided by Debtor's and the Committee's employed professionals and reimbursement of expenses awarded under Sections 330(a) or 331 of the Bankruptcy Code, and all fees and charges assessed against a Debtor's estate under Chapter 123 of Title 28, United States Code.

**"Allowance Date"** means, with respect to a Claim, the date such Claim becomes Allowed.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

"**Allowed**" means, with respect to a Claim, the extent to which: (a) the Claim is agreed to by the Claimant and the Debtor against whom the Claim is asserted; (b) the Claim is expressly allowed in this Third Amended Plan; or (c) proof of such Claim was (i) timely filed with the Bankruptcy Court, (ii) deemed filed pursuant to § 1111(a) of the Bankruptcy Code, or (iii) tardily filed with leave of the Bankruptcy Court, and, in any case, as to which the Claim is not Disputed or the Claim is Disputed and is allowed by a Final Order.

"**Ballot**" means the ballot that is used by a Creditor to accept or reject the Third Amended Plan.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, principally codified in 11 USC § 101, et seq., and any amendments thereto applicable to this Case.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Oregon.

"**Bankruptcy Rules**" means the Rules and Forms of Practice and Procedures in Bankruptcy promulgated under 28 USC § 2075, as amended, and the local rules and general orders of the Bankruptcy Court, as applicable to Chapter 11 cases, together with all amendments and modifications from time to time thereto.

"**Business Day**" means any day other than Saturday, Sunday, or a "legal holiday", as that term is defined in Bankruptcy Rule 9006(a).

"**Case**" means the Debtor case commenced under Chapter 11 of the Bankruptcy Code on September 28, 2014.

"**Cash**" means cash, cash equivalents, bank deposits, and negotiable instruments payable on demand.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

"**Chapter 11 Professionals**" means the law firm of Muir & Troutman and all other professionals, if any, which the Debtor may retain to provide professional services, all in accordance with Sections 327(a) and 327(e) of the Bankruptcy Code and as approved by the Bankruptcy Court.

"**Claim**" means any claim, as that term is defined in § 101(5), arising on or before the Confirmation Date.

"**Claimant**" means a Creditor that asserts a Claim.

"**Claims Bar Date**" means February 2, 2015, the last day timely claims can be filed.

"**Claims Objection Bar Date**" means, unless extended by the Court, the first Business Day that follows the 60th day after the Effective Date, or such other date as fixed by the Bankruptcy Court, by which any objection to a Claim must be filed with the Bankruptcy Court or such objection will be forever barred.

"**Confirmation Date**" means the date of the entry of the Confirmation Order.

"**Confirmation Order**" means the order confirming this Third Amended Plan.

"**Contingent**" means, with respect to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which or the obligation to make payment on which is dependent upon a future event that may or may not occur.

"**Creditor**" means any creditor, as that term is defined in § 101(10) of the Bankruptcy Code.

"**Current Obligations**" means (a) all accounts payable and other liabilities or obligations of Debtor that arose or accrued in the ordinary course of that Debtor's business during this Case, and (b) any taxes that were incurred subsequent to the Petition Date and became or become

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

legally due and payable by the Debtor subsequent to the Petition Date and prior to the Effective Date.

**"Debtor"** means Laura Lee Hagenauer.

**"Debtor's Actions"** means any and all claims, causes of action, and enforceable rights of the Debtor against third parties including, without limitation, claims of the Debtor for recovery of, or based upon, or in any manner arising from or related to damages, general or exemplary (or both), or other relief relating to (or based upon) (a) indebtedness owing to the Debtor; (b) fraud, negligence, gross negligence, willful misconduct, or any other tort actions; (c) breaches of contract; (d) violations of federal or state laws (including corporate and securities laws); (e) breaches of fiduciary or agency duties; (f) disregard of the corporate form or piercing the corporate veil or other liability theories; (g) avoidance of transfers or obligations under Chapter 5 of the Bankruptcy Code or under state law; and (h) any other claim of the Debtor to the extent not specifically compromised or released pursuant to this Third Amended Plan or an agreement referred to, or incorporated into, this Third Amended Plan.

**"Debtor's Action Recoveries"** means the rights of Debtor to any and all proceeds or other relief from (a) any award, judgment, relief, or other determination rendered or made as to any Debtor's Action; or (b) any compromise or settlement of any Debtor's Action.

**"Disallowed"** means, with respect to any claim, the extent to which the Claim has been disallowed pursuant to (a) a Final Order, (b) an agreement between the Claimant and the Debtor or Reorganized Hagenauer against whom the Claim is asserted, or (c) the terms of the Third Amended Plan.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

**"Disclosure Statement"** means the Third Amended Disclosure Statement regarding this Third Amended Plan, including all exhibits and schedules attached thereto and referenced therein prepared by the Proponents pursuant to § 1125 of the Bankruptcy Code and approved by the Bankruptcy Court, as such Third Amended Disclosure Statement may be amended and modified from time to time.

**"Disputed"** means, with respect to a Claim, that an objection to such Claim has been timely filed as provided in this Third Amended Plan, or such Claim is listed as disputed in the applicable Debtor's schedules filed with the Bankruptcy court, and such objection or dispute has not been resolved by Final Order, or by agreement between the Claimant and the Debtor or Reorganized Hagenauer.

**"Effective Date"** means 10 days following the entry of an Order Confirming the Third Amended Plan of Reorganization.

**"Estate"** means the bankruptcy estate of the Debtor as created under § 541 of the Bankruptcy Code.

**"General Unsecured Claim"** means any Claim that is not an Administrative Claim a Priority Tax Claim, or a Claim that is otherwise classified under the Third Amended Plan.

**"Non-Tax Priority Claim"** means any Claim, which if allowed, would be entitled to priority under Section 507(a)(1) through (7) of the Bankruptcy Code.

**"Non-Tax Priority Claimant"** means a Person or Entity that asserts a non-Tax Priority Claim.

**"Petition Date"** means the date the Debtor filed the petition commencing this Case, September 28, 2014.

Page 38 – DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

"**Plan**" means this Third Amended Plan of Reorganization and any and all modifications and/or amendments thereto.

"**Plan Documents**" means all agreements, documents, and exhibits as the same may be amended, modified, supplemented, or restated from time to time, that are necessary or appropriate to implement, authorize, consummate, and operate the Third Amended Plan including without limitation any and all loan documents that are being modified by the Plan.

"**Plan Secured Interest Rate**" means the interest rate for deferred payments to secured creditors under the Third Amended Plan.

"**Priority Tax Claim**" means any Claim that, if allowed, would be entitled to a priority in payment under Section 507(a)(8) of the Bankruptcy Code.

"**Proponent**" means the Debtor who are the proponents of the Third Amended Plan.

"**Pro Rata**" means proportionate, and when applied to a Claim means the ratio of the amount distributed on account of an Allowed Claim in a class to the amount distributed on account of all Allowed Claims in such class.

"**Reorganized Hagenauer**" means Laura Lee Hagenauer, individually and doing business as Valley Rolling on and after the Effective Date.

"**Secured Claim**" means any Claim, including interest, fees, and charges as determined pursuant to Section 506(b) of the Bankruptcy Code, against Debtor that is (a) secured in whole or in part as of the Petition Date by a lien on any of the assets or property of the Debtor, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, but only to the extent of the value of the

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

assets or property securing any such Claim; or (b) subject to setoff under Section 553 of the

Bankruptcy Code, but only to the extent of the amount subject to such setoff.

**"Statement of Financial Affairs"** means the Debtor's Statement of Financial Affairs,

and any amendments or supplements thereto, filed with the Bankruptcy Court pursuant to

Bankruptcy Rule 1007.

DATED:          October 23, 2015


*/s/Laura Lee Hagenauer*

_____

Laura Lee Hagenauer


Troutman Law Firm, P.C.

*/s/Ted A. Troutman*

_____

Ted A. Troutman, OSB# 844470
Attorney for Laura Lee Hagenauer

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371
tedtroutman@sbcglobal.net

September 16, 2015

FOR VALUE RECEIVED, and in consideration of the mutual promises contained in this SALE AGREEMENT (the "Agreement"), the undersigned **LAURA LEE HAGENAUER** ("Seller") agrees to sell, and the undersigned **R & R PROPERTY HOLDINGS, INC., a Washington corporation** ("Purchaser") agrees to purchase, subject to the conditions stated in this Agreement, the following property, situated in the State of Oregon, to-wit: **the buildings, the cranes and other improvements on the property that are used in connection with the building, and land located at 3071 Schmidt Lane NE, Hubbard, OR 97032, as more particularly described in the attached Exhibit A** (collectively, the "Property"), on the following terms and conditions:

**1. PURCHASE PRICE.** The purchase price ("Purchase Price") for the Property shall be TWO MILLION SIX HUNDRED THOUSAND AND 00/100THS Dollars (**$2,600,000.00** ). The terms of such purchase shall be: **all cash at Closing**. This Agreement is not subject to (or conditioned upon) the need for Purchaser to obtain any financing on the Property.

**2. DEPOSIT AND ESCROW.** Purchaser will deposit in escrow an earnest money deposit in the amount of **TWENTY-FIVE THOUSAND DOLLARS ($25,000.00)** (the "Deposit"), within three business days after the Opening of Escrow . The escrow agent ("Escrow Agent") will be a branch office of a title company in Oregon ("Title Company") mutually acceptable to Seller and Purchaser. The earnest money deposit (the "Deposit") will be refunded to Purchaser if Purchaser terminates this Agreement during the Contingency Period described below. If this Agreement is not so terminated, the Deposit will become a forfeitable earnest money deposit and will be applied to the Purchase Price due at closing. This Agreement will constitute the parties' instructions to Escrow Agent; provided, that if Escrow Agent requires separate or additional instructions or information from the parties, the parties will reasonably and promptly execute such instructions and/or provide such information. The date on which Escrow Agent notifies the parties that it has received an executed copy or counterpart copy of this Agreement is the "Opening of Escrow."

**3. CONTINGENCY PERIOD AND APPROVAL BY PURCHASER.** The review and contingency period ("Contingency Period") for Purchaser to satisfy itself concerning inspections, investigations or other "due diligence" reviews of the Property will be as follows: **the Contingency Period will start on the date of this Agreement and will expire and terminate upon the date that is forty-five (45) days after the date of Opening of Escrow, within which Purchaser shall satisfy itself as to the following: (1) the physical condition of the Property including physical condition, zoning and use, (2) the environmental condition of the Property, including receipt of a "phase I" environmental assessment of the Property (as provided below), (3) all relevant business documents pertaining to the Property, including (without limitation) any existing reports or information in Seller's possession concerning the environmental condition of the Property, any surveys, any notices of violation in Seller's possession that pertain to the Property, any other studies or notices pertaining to the Property, and copies of any other written information in Seller's possession pertaining to the condition, use, operation or ownership of the Property that Purchaser may reasonably require, and (4) any other studies or matters that Purchaser chooses to review and that are pertinent to the Property.** During the Contingency Period, Purchaser may terminate the Agreement in its discretion, if Purchase determines that the contingencies are not satisfied. If it does so, any deposit made by Purchaser shall be refunded.

After mutual execution of this Agreement, the parties will order a "phase I" environmental assessment (the "Phase I Assessment") of the Property from an environmental consulting firm acceptable to Purchaser, which will be addressed jointly to Seller and Purchaser. Purchaser will pay for the cost of the Phase I Assessment at Closing (as provided below) or if the transaction fails to close solely because of Purchaser's default or refusal to close the purchase of the Property after removal of contingencies (and, otherwise, the cost of the Phase I Assessment will be paid by Seller or any overbidder who becomes the final purchaser of the Property pursuant to a Final Order, as defined and described below).

**4. TITLE REVIEW AND APPROVAL.** Upon mutual execution of this Agreement, Seller will furnish to Purchaser a preliminary title report showing the status of title to the Property, along with a legible copy of the exceptions to title shown in the title report. Purchaser will have fifteen (15) days after receipt of the title report to notify Seller as to any matter shown on the title report to which Purchaser objects. Any matter shown on the title report that Purchaser does not disapprove within such 15-day period will be deemed conclusively approved by Purchaser ("Permitted Exceptions"). Seller may, but will not be required to, elect to cure any disapproved title matter or notify Purchaser that Seller elects not to cure. If Seller elects to cure a disapproved title matter, Seller will have until Closing to cure the matter. If Seller elects not to cure or is unable to cure a disapproved title matter, Seller may so notify Purchaser, and Purchaser will have five (5) days after receipt of such notice to elect to waive any objection to the previously disapproved title matter, and if not so waived, this Agreement shall terminate. At Closing, an owner's title insurance policy will be issued to Purchaser, in form reasonably acceptable to Purchaser, insuring that Purchaser holds good and merchantable fee title to the Property, subject only to the Permitted Exceptions and any other exception specifically approved by Purchaser.

**5. BANKRUPTCY COURT APPROVAL.** The parties acknowledge that Seller is the subject of that certain bankruptcy case, Case No. 14-63530-FRA11 (the "Bankruptcy Case"), which is pending in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court"). The parties further acknowledge that the transactions described in this Agreement are subject to the approval of the Bankruptcy Court and cannot be consummated without such approval. Seller shall file a motion with the Bankruptcy Court seeking the entry of an order (the "Approval Order") authorizing Seller to enter into this Agreement and consummate the transactions described herein. Purchaser shall use commercially reasonable efforts to cooperate with Seller in the filing of the motion for the Approval Order. The parties' obligations under this Agreement are conditioned upon the Approval Order becomes a Final Order. "Final Order" means that (i) the Approval Order has been entered in the Bankruptcy Case, and (ii) the period in which the Approval Order is subject to any rights of appeal, certiorari proceeding, or other proceeding for review or rehearing has ended, or if any appeal, certiorari proceeding or other review or rehearing occurs), it has ended and the Approval Order is not subject to further rights of legal challenge.

**6. CLOSING.** The escrow shall be closed (the "Closing") on a date mutually acceptable to the parties ("Closing Date"), within fifteen (15) days after the date on which the conditions to Closing set forth above are satisfied. At Closing, the following will take place: (a) Seller will convey the Property to Purchaser pursuant to a good and sufficient, statutory warranty deed ("Deed") and bill of sale (the form of which will be approved by the parties within the Contingency Period); (b) the Title Company will commit to issue to Purchaser an owner's policy of title insurance, in the amount of the Purchase Price and subject to no liens or encumbrances, other than the Permitted Exceptions and any other exception specifically approved by Purchaser in its review of title; and (c) Purchaser will pay the Purchase Price to Seller.

Ex I

EXHIBIT I
Page 1 Of 2

Current property taxes shall be prorated as of the Closing Date (such property taxes, if not yet assessed, to be deemed equal to those for the last preceding year, subject to a post-Closing adjustment when the actual amount of property taxes becomes known). Seller and Purchaser shall equally divide the escrow fee, if the parties choose to close this transaction in escrow with the title company. The cost of the owner's policy of title insurance to be issued to Purchaser in the amount of the Purchase Price will be paid by Seller. Seller will be responsible for causing the Property to be released from the Bankruptcy Case and any liens on the Property, other than current property taxes. Purchaser will pay the recording fee for the Deed and the cost of its "due diligence" investigations. Each party will pay its own legal and consulting fees.

If any post-Closing reconciliation or adjustment is required between the parties pursuant to this Agreement (because of an adjustment or prorate that is done on an estimated basis, or otherwise), the parties will reasonably co-operate with each other to provide the information needed for such reconciliation and adjustment, and will promptly do the reconciliation and adjustment when the information is available to do so. If any other closing costs not specifically provided for herein are due at closing of this transaction, each party shall pay such closing costs as are normally and customarily the responsibility of such party. This paragraph 6 shall survive the Closing for all purposes.

**7. UNTIL CLOSING; SELLER'S COOPERATION.** From the date of this Agreement until the Closing Date, Seller will continue to cause the Property to be maintained in substantially the same manner and condition which now exists, and will not further mortgage or further encumber its interest in the Property. Seller will cooperate in executing any documents and doing such other things as Purchaser may reasonably request in connection with Purchaser's due diligence activities; provided, that such actions will be at no out-of-pocket expense to Seller, and neither Seller nor the Property will be bound if Purchaser does not close the purchase of the Property.

**8. CONDEMNATION.** If, prior to Closing, any part of the Property is condemned or appropriated by public authority or any party exercising the right of eminent domain, or is threatened thereby, then this Agreement shall, at the election of Purchaser, become null and void. In the event Purchaser elects not to terminate this Agreement, the purchase price shall be reduced by the amount of the Seller's award pertaining to the Property. Seller will promptly notify Purchaser as to the commencement of any such action known to Seller or any communication from a condemning authority that a condemnation or appropriation is contemplated, and will cooperate with Purchaser prior to Closing in the response to or defense of such actions in order to maximize the award.

**9. NOTICES.** All notices given pursuant to this Agreement shall be in writing and shall either be (i) mailed by first class mail, postage prepaid, certified or registered with return receipt requested, (ii) delivered in person or by nationally recognized overnight courier, or (iii) sent by facsimile or as a PDF attachment to an email, if the party has specified a facsimile number or email address to use for notice purposes. Notices shall be effective when received (or deemed received by the party). Any notice transmitted by overnight courier service or by certified mail shall be deemed received as of the date of delivery to the address of the party, as confirmed by the overnight courier or as shown on the certified mail return receipt. Any such notice transmitted by facsimile shall be deemed received 12 hours after being telecopied and receipt has been confirmed either electronically or otherwise. Notice given to a party in any manner not specified above shall be effective only if and when received by the addressee as demonstrated by objective evidence in the possession of the sender. The address of each party to this Agreement for purposes of notice are as set forth below their signatures. A copy of any notice to either party will be sent to the party's legal counsel, as the party may designate. Each party may change its address for notice by giving not less than ten (10) days' prior notice of such change to the other party in the manner set forth above. Delivery of the copy of any notice to the places to which copies are to be sent is not a precondition to the effectiveness of the notice between the parties themselves.

For the purpose of this Agreement, the term "receipt" shall include the earlier of any of the following: (i) the date of actual receipt of the notice by the office of the person or entity pursuant to this Agreement, whether or not any named individual at such address receives the notice, or (ii) in the case of refusal to accept delivery or inability to deliver the notice because of the recipient's failure to maintain an address at which notices can be delivered, then the earlier of (A) the date of the attempted delivery or refusal to accept delivery, or (B) the date of receipt of notice of refusal or notice of non-delivery by the sending party.

**10. REPRESENTATIONS AND WARRANTIES.** Seller warrants and represents to Purchaser as follows: (1) to Seller's knowledge, the Property is not in violation of any zoning, land-use, environmental, public health, or safety laws; (2) to Seller's knowledge, the Property, buildings and improvements (including any HVAC, plumbing, life-safety and other installed building systems and cranes) are in good and working condition and free of any known defects; (3) Seller is not aware of any pending or threatened litigation affecting the Property; (4) Seller is not aware of any pending or threatened condemnation proceedings or change in zoning affecting the Property; and (5) this Agreement has been, and all the documents to be delivered by Seller to Purchaser at Closing will be, duly authorized, executed and delivered by Seller, are or will be legal, valid, and binding obligations of Seller, will be sufficient to convey title to the Property, are or will be enforceable in accordance with their respective terms, and do not and will not at Closing violate any provisions of any agreement to which Seller is a party or by which the Property is bound.

Seller represents that, to Seller's knowledge, (a) there are no known hazardous substances on, under, in or about the Property in violation of any applicable environmental laws; (b) there have been no known spills, releases, discharges or disposal of any hazardous substances that have occurred or are presently occurring on or onto the Property or off the Property as a result of any construction on or operation and use of the Property; (c) there are no known underground storage tanks located on or immediately adjacent to the Property; or (d) there is no known contamination in the ground water on, under or about the Property. The term "hazardous substances" would not include cleaning materials, landscape fertilizer and other products and materials ("Permitted Materials") typically used in the ordinary course of maintaining and operating a commercial property similar to the Property (provided such Permitted Materials are in ordinary quantities and have been used in accordance with applicable environmental laws).

As used in the Agreement, the terms "known" or "knowledge" (or similar terms) means the actual, conscious knowledge of facts by Seller (and does not include "constructive" knowledge or imply any particular duty of investigation of facts not actually known by Seller). Seller's representations and warranties are made as of the Effective Date and will be deemed to be re-made as of the Closing Date. This paragraph 10 will survive the Closing Date and be fully enforceable thereafter; provided, that Seller will not be deemed in breach of the representations or warranties in this Agreement or be liable to Purchaser for any claimed misrepresentation in this Agreement after the Closing Date on a representation made to Seller's knowledge unless Seller had actual knowledge on the Closing Date that the representation or warranty was false and failed to provide promptly the Discovery Notice (as defined and set forth

below) to disclose to Purchaser the matter, occurrence or condition that was discovered by or made known to Seller which made the representation or warranty false.

If, prior to the Closing, Seller obtains actual knowledge of a matter, occurrence or condition that would cause any representation made by Seller in this Agreement to be misleading or inaccurate, then (i) Seller will promptly notify Purchaser ("Discovery Notice") of the fact discovered by or made known to that would cause such any such representation to be misleading or inaccurate, and (ii) Purchaser will have the option to terminate this Agreement within five (5) days after receipt of such Discovery Notice if the matter, occurrence or event that was disclosed might adversely affect the value of the Property or Purchaser's ability to use the Property after the Closing Date. If Purchaser terminates this Agreement pursuant to this paragraph, the Deposit will be refunded to Purchaser, and neither party will have any further obligation to the other party under this Agreement (whether or not such events occur during or after the end of any contingency period provided in this Agreement).

## 11. REMEDIES; COSTS AND ATTORNEYS' FEES.

**11.1** _Seller's Default._ Seller shall be deemed to be in default under this Agreement if Seller fails, for any reason other than Purchaser's default under this Agreement, to meet, comply with, or perform any covenant, agreement, or obligation required on its part within the time limits and in the manner required in this Agreement, or a material breach shall have occurred of any representation or warranty made by Seller ("Seller's Default"). In the event of Seller's Default, Purchaser shall be entitled to exercise all remedies available under applicable law for breach of contract, including (without limitation) specific performance, and collection of damages and costs and attorneys' fees in connection with enforcement of this Agreement, and other sums allowed by law.

**11.2** _Purchaser's Default and Failure to Close._ If Purchaser defaults and fails to close the purchase, and neither party has exercised any right to terminate or rescind this Agreement as provided herein, the Deposit shall be retained by Seller as liquidated damages. PURCHASER AND SELLER ACKNOWLEDGE AND AGREE THAT SELLER'S DAMAGES IN THE EVENT OF BREACH BY PURCHASER WOULD BE EXTREMELY DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT THE DEPOSIT AMOUNT IS THE PARTIES' BEST ESTIMATE OF THE DAMAGES SELLER WOULD SUFFER IN THE EVENT THIS TRANSACTION FAILS TO CLOSE BY REASON OF PURCHASER'S BREACH OF THIS AGREEMENT, AND THAT SUCH ESTIMATE IS REASONABLE COMPENSATION UNDER THE CIRCUMSTANCES EXISTING ON THE EFFECTIVE DATE OF THIS AGREEMENT AND THE EXCLUSIVE REMEDY FOR PURCHASER'S DEFAULT, SINCE THE PRECISE AMOUNT OF SUCH COMPENSATION WOULD BE DIFFICULT TO DETERMINE. In addition, Purchaser will pay the cost of the Phase I Assessment, as provided in Section 3.

The foregoing is accepted and agreed to:

Initials of: _____ Seller _____ Purchaser

If this transaction fails to close for any reason other than Purchaser's default, Purchaser will be entitled to a refund of the Deposit upon demand.

## 12. GENERAL PROVISIONS. (a) _Time of Essence._ TIME IS OF THE ESSENCE of each and every provision of this Agreement.

(a) _Brokers._ Each party will defend, indemnify and hold the other party harmless from any claim, loss or liability made or imposed by any party claiming a commission or fee in connection with this transaction and arising out of its own conduct. Seller has used ALEX RHOTEN/TIFFANY JONES of COLDWELL BANKER COMMERCIAL MWRE, LLC on this transaction.

(b) _Prior Agreements._ This document is the entire, final and complete agreement of the parties with respect to this transaction, and supersedes and replaces all written and oral agreements previously made or existing between the parties or their representatives with respect to the Option.

(c) _Counterparts; PDF and Facsimile Transmissions._ This Agreement may be executed simultaneously or in separate counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties to this Agreement may execute the Agreement by signing counterpart signature pages. Signatures transmitted by telecopy or as emailed PDF copies shall be binding as originals, and each party hereby waive any defenses to the enforcement of the terms of this Agreement or any document sent by emailed PDF, based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").

(d) _Invalidity of Provisions._ In the event any provision of this Agreement is declared invalid or is unenforceable for any reason, such provision shall be deleted from the Agreement and shall not invalidate any other provision contained in the Agreement.

(e) _Governing Law._ This Agreement affects property located in the State of OREGON, and this Agreement will be interpreted and enforced in accordance with the laws of the State of Oregon.

(f) _Waiver._ Failure of either party at any time to require performance of any provision of this Agreement shall not limit the party's right to enforce the provision. Waiver of any breach of any provision shall not be a waiver of any succeeding breach of the provision or a waiver of the provision itself or any other provision.

(g) _Legal Effect._ THIS IS A LEGALLY BINDING CONTRACT. ALL PARTIES SHOULD SEEK ADVICE OF COUNSEL BEFORE SIGNING.

(h) _Saturday, Sunday and Legal Holidays._ If the time for performance of any of the terms, conditions and provisions of this Agreement shall fall on a Saturday, Sunday or legal holiday, then the time of such performance shall be extended to the next business day thereafter. As used in this Agreement, the expression (i) "business day" means every day other than a Saturday, Sunday or legal holiday in the State of Oregon, and (ii) "nonbusiness day" means a Saturday, Sunday or legal holiday in the State of Oregon. In any case where a payment is due, an act is to be performed, a notice is to be delivered or a period expires under this Agreement on a non-business day, such occurrence shall be deferred until the next succeeding business day.

(i) _Assignment and Succession._ This Agreement shall be binding upon and inure to the benefit of the parties, and their respective heirs, personal representatives, successors, and assigns, but Purchaser shall not assign or otherwise transfer any interest without the prior written consent of Seller, which may be given (or withheld) in Seller's commercially reasonable judgment. Without the need for such consent, Purchaser may assign its rights under this Agreement at any time to any person or entity that is affiliated with or under common control with Purchaser or Purchaser's principals or affiliates and may cause the title to be taken in the name of a nominee or third party at Closing, but no such action will constitute a release of Purchaser's liability under this Agreement..

(j) _Oregon Statutory Notice._ THE PROPERTY DESCRIBED IN THIS INSTRUMENT MAY NOT BE WITHIN A FIRE PROTECTION DISTRICT PROTECTING STRUCTURES. THE PROPERTY IS SUBJECT TO LAND USE LAWS AND REGULATIONS THAT, IN FARM OR FOREST ZONES, MAY NOT AUTHORIZE CONSTRUCTION OR SITING OF A RESIDENCE AND THAT LIMIT LAWSUITS AGAINST FARMING OR FOREST PRACTICES AS DEFINED IN ORS 30.930 IN ALL ZONES. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER ORS 195.300, 195.301, AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON

EXHIBIT 1
Page 3 Of 5

LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY THAT THE UNIT OF LAND BEING TRANSFERRED IS A LAWFULLY ESTABLISHED LOT OR PARCEL, AS DEFINED IN ORS 92.010 OR 215.010, TO VERIFY THE APPROVED USES OF THE LOT OR PARCEL, TO VERIFY THE EXISTENCE OF FIRE PROTECTION FOR STRUCTURES AND THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the dates shown below.

Dated: 9 29-15, 2015

SELLER: LAURA LEE HAGENAUER

By
Name:

Address for Notices to Seller:
To be provided by Seller

Dated: Sept 16, 2015

PURCHASER: R & R PROPERTY HOLDINGS, INC.,
a Washington corporation

By
Name: Dwaine Odinson, CA
Title: Controller

Address for Notices to Purchaser:
R & R PROPERTY HOLDINGS, INC.
Attention: Dwaine Odinson, CA
Controller
7449 River Rd.
Delta, British Columbia
CANADA V4G1B9

Telephone: (604) 946-0916
Facsimile: (604) 946-0783
Email: dwaineo@napsteel.com

FORM - Purchase and Sale Agreement (Oregon)
79982533.1 0200079-00001

EXHIBIT I
Page 4 Of 5

## EXHIBIT A

## DESCRIPTION OF PROPERTY

The Property is known also known as: 041W33DC, Tax Lot 400, Marion County, Oregon; Tax Assessor's Parcel No. R11578. The legal description of the Property is set forth below or attached to this Exhibit A (or, if not, then the parties will use the legal description as it appears in the preliminary title commitment referred to in this Agreement, and will reasonably approve and attach it as soon as available).

The Property includes, without limitation, the land, the manufacturing building and coil storage building located thereon ("Building(s)"), the cranes used in connection with the operation of the Building(s), and the chain link fence at the perimeter of the Property boundary lines, and other improvements that are located on the land and/or that are in or a part of the Building(s).

FORM - Purchase and Sale Agreement (Oregon)
79982533.1 0200079-00001

EXHIBIT 1
Page 5 Of 5

Case 14-63530-fra11    Doc 260    Filed 10/23/15

*THIS INDENTURE OF LEASE, entered into this* ............................................................ *day of* ............................................................ *,* ....................... *,*
*between* ....................................................................................................................................................................................................

R & R PROPERTY HOLDINGS, INC., a Washington corporation

....................................................................................................................................................................................................

*hereinafter called the lessor, and* ............................................................................................................................

LAURA LEE HAGENAUER

....................................................................................................................................................................................................
............................................................................................................................*, hereinafter called the lessee,*

**WITNESSETH:** *In consideration of the covenants herein, the lessor hereby leases unto the lessee those certain premises, as is, situated in the City of* ... Hubbard ....................*, County of* ... Marion .................... *and State of* ...................................*, hereinafter called the premises, described as follows:*

See attached ADDENDUM, incorporated into this Lease by this reference.

*To Have and to Hold the premises commencing with the* .................. *day of* See attached Addendum ....................*, and ending at midnight on the* ................ *day of* ........................*,* ...........*, for a rental of $* ................. *for the whole term, which lessee agrees to pay, at* Landlord's address under this Lease ...................*, City of* ........................*, State of* ........................*, at the following times and in the following amounts, to-wit:*

SEE ATTACHED ADDENDUM

*In consideration of the leasing of the premises and of the mutual agreements herein contained, the parties agree as follows:*

**LESSEE'S ACCEPTANCE OF LEASE** (1) The lessee accepts ...... letting and agrees to pay to the order of the lessor the monthly rentals above stated for the full term of this lease, in advance, at the times and in the manner aforesaid.

**USE OF PREMISES** (2a) The lessee shall use the premises during the term of this lease for the conduct of the following business:

See Addendum

and for no other purpose whatsoever without lessor's written consent.

(2b) The lessee will not make any unlawful, improper or offensive use of the premises; the lessee will not suffer any strip or waste thereof; the lessee will not permit any objectionable noise or odor to escape or to be emitted from the premises or do anything or permit anything to be done upon or about the premises in any way tending to create a nuisance; the lessee will not sell or permit to be sold any product, substance or service upon or about the premises, excepting such as lessee may be licensed by law to sell and as may be herein expressly permitted.

(2c) The lessee will not allow the premises at any time to fall into such a state of repair or disorder as to increase the fire hazard thereon; the lessee will not install any power machinery on the premises except under the supervision and with written consent of the lessor; the lessee will not store gasoline or other highly combustible materials on the premises at any time; the lessee will not use the premises in such a way or for such a purpose that the fire insurance rate on the improvements on the premises is thereby increased or that would prevent the lessor from taking advantage of any rulings of any agency of the state in which the premises are situated, or which would allow the lessor to obtain reduced premium rates for long term fire insurance policies.

(2d) The lessee shall comply at lessee's own expense with all laws and regulations of any municipal, county, state, federal or other public authority respecting the use of the premises. These include, without limitation, all laws, regulations and ordinances pertaining to air and water quality, Hazardous Materials as herein defined, waste disposal, air emissions, and other environmental matters. As used herein, Hazardous Material means any hazardous or toxic substance, material, or waste, including but not limited to those substances, materials, and waste listed in the U.S. Department of Transportation Hazardous Materials Table or by the U.S. Environmental Protection Agency as hazardous substances and amendments thereto, petroleum products, or such other substances, materials, and waste that are or become regulated under any applicable local, state, or federal law.

(2e) The lessee shall regularly occupy and use the premises for the conduct of lessee's business, and shall not abandon or vacate the premises for more than ten days without written approval of lessor.

(2f) Lessee shall not cause or permit any Hazardous Material to be brought upon, kept or used in or about the premises by lessee, its agents, employees, contractors, or invitees without the prior written consent of lessor, which consent will not be unreasonably withheld so long as lessee demonstrates to lessor's reasonable satisfaction that such Hazardous Material is necessary or useful to lessee's business and will be used, kept, and stored in a manner that will comply at all times with all laws regulating any such Hazardous Material so brought upon or used or kept on or about the premises.

**UTILITIES** (3) The lessee shall pay for all heat, light, water, power, and other services or utilities used in the premises during the term of this lease.

**REPAIRS AND IMPROVEMENTS** (4a) The lessor shall not be required to make any repairs, alterations, additions or improvements to or upon the premises during the term of this lease, except only those hereinafter specifically provided for; the lessee hereby agrees to maintain and keep the premises, including all interior and exterior walls and doors, heating, ventilating and cooling systems, interior wiring, plumbing and drain pipes to sewers or septic tank, in good order and repair during the entire term of this lease, at lessee's own cost and expense, and to replace all glass which may be broken or damaged during the term hereof in the windows and doors of the premises with glass of as good or better quality as that now in use; it is further agreed that the lessee will make no alterations, additions or improvements to or upon the premises without the written consent of the lessor first being obtained.

(4b) The lessor agrees to make all necessary structural repairs to the building, including exterior walls, foundation, roof, gutters and downspouts, and the abutting sidewalks. The lessor reserves and at any and all times shall have the right to alter, repair or improve the building of which the premises are a part, or to add thereto, and for that purpose at any time may erect scaffolding and all other necessary structures about and upon the premises and lessor and lessor's representatives, contractors and workers for that purpose may enter in or about the premises with such materials as lessor may deem necessary therefor, and lessee waives any claim to damages, including loss of business resulting therefrom.

**LESSOR'S RIGHT OF ENTRY** (5) It shall be lawful for the lessor, the lessor's agents and representatives, at any reasonable time to enter into or upon the premises for the purpose of examining into the condition thereof, or for any other lawful purpose.

**RIGHT OF ASSIGNMENT** (6) The lessee will not assign, transfer, pledge, hypothecate, surrender or dispose of this lease, or any interest herein, sublet, or permit any other person or persons whomsoever to occupy the premises without the written consent of the lessor being first obtained in writing; this lease is personal to lessee; lessee's interests, in whole or in part, cannot be sold, assigned, transferred, seized or taken by operation at law, or under or by virtue of any execution or legal process, attachment or proceedings instituted against the lessee, or under or by virtue of any bankruptcy or insolvency proceedings had in regard to the lessee, or in any other manner, except as above mentioned.

**LIENS** (7) The lessee will not permit any lien of any kind, type or description to be placed or imposed upon the improvements in which the premises are situated, or any part thereof, or the land on which they stand.

**ICE, SNOW, DEBRIS** (8) If the premises are located at street level, then at all times lessee shall keep the sidewalks in front of the premises free and clear of ice, snow, rubbish, debris and obstruction; and if the lessee occupies the entire building, the lessee will not permit rubbish, debris, ice or snow to accumulate on the roof of the building so as to stop up or obstruct gutters or downspouts or cause damage to the roof, and will save harmless and protect the lessor against any injury whether to lessor or to lessor's property or to any other person or property caused by lessee's failure in that regard.

**OVERLOADING OF FLOORS** (9) The lessee will not overload the floors of the premises in such a way as to cause any undue or serious stress or strain upon the building in which the premises are located, or any part thereof, and the lessor shall have the right, at any time, to call upon any competent engineer or architect whom the lessor may choose, to decide whether or not the floors of the premises, or any part thereof, are being overloaded so as to cause any undue or serious stress or strain on the building, or any part thereof, and the decision of the engineer or architect shall be final and binding upon the lessee; and in the event that it is the opinion of the engineer or architect that the stress or strain is such as to endanger or injure the building, or any part thereof, then and in that event the lessee agrees immediately to relieve the stress or strain, either by reinforcing the building or by lightening the load which causes such stress or strain, in a manner satisfactory to the lessor.

**ADVERTISING SIGNS** (10) The lessee will not use the outside walls of the premises, or allow signs or devices of any kind to be attached thereto or suspended therefrom, for advertising or displaying the name or business of the lessee or for any purpose whatsoever without the written consent of the lessor; however, the lessee may make use of the windows of the premises to display lessee's name and business when the workmanship of such signs shall be of good quality and permanent nature; provided further that the lessee may not suspend or place within said windows or paint thereon any banners, signs, sign-boards or other devices in violation of the intent and meaning of this section.

**LIABILITY INSURANCE** (11) At all times during the term hereof, the lessee will, at the lessee's own expense, keep in effect and deliver to the lessor and the lessee against all liability for damage to persons or property in, upon, or about the premises. The amount of such insurance shall be not less than $_____ for injury to one person, not less than $_____ for injuries to all persons arising out of any single incident, and not less than $_____ for damage to property, or a combined single limit of not less than $ 1,000,000.00 _____ It shall be the responsibility of lessor to purchase casualty insurance with extended coverage so as to insure any structure on the premises against damage caused by fire or the effects of fire (smoke, heat, means of extinguishment, etc.), or any other means of loss. It shall be the responsibility of the lessee to insure all of the lessee's belongings upon the premises, of whatsoever nature, against the same. With respect to these policies, lessee shall cause the lessor to be named as an additional insured party. Lessee agrees to and shall indemnify and hold lessor harmless against any and all claims and demands arising from the negligence of the lessee, lessee's officers, agents, invitees and/or employees, as well as those arising from lessee's failure to comply with any covenant of this lease on lessee's part to be performed, and shall at lessee's own expense defend the lessor against any and all suits or actions arising out of such negligence, actual or alleged, and all appeals therefrom and shall satisfy and discharge any judgment which may be awarded against lessor in any such suit or action.

**FIXTURES** (12) All partitions, plumbing, electrical wiring, additions to or improvements upon the premises, whether installed by the lessor or lessee, shall be and become a part of the building in which the premises are located as soon as installed and the property of the lessor unless otherwise herein provided.

**LIGHT AND AIR** (13) This lease does not grant any rights of access to light and air over the premises or any adjacent property.

**DAMAGE BY CASUALTY, FIRE AND DUTY TO REPAIR** (14) In the event of the destruction of the improvements in which the premises are located by fire or other casualty, either party hereto may terminate this lease as of the date of fire or casualty, provided, however, that in the event of damage to the improvements by fire or other casualty to the extent of ........ 30 ........ per cent or more of the sound value thereof, the lessor may or may not elect to repair the same; written notice of lessor's election shall be given lessee within fifteen days after the occurrence of the damage; if notice is not so given, lessor conclusively shall be deemed to have elected not to repair; in the event lessor elects not to repair, then and in that event this lease shall terminate with the date of the damage; but if the improvements in which the premises are located be but partially destroyed and the damage so occasioned shall not amount to the extent indicated above, or if greater than said extent and lessor elects to repair, as aforesaid, then the lessor shall repair the same with all convenient speed and shall have the right to take possession of and occupy, to the exclusion of the lessee, all or any part thereof in order to make the necessary repairs, and the lessee hereby agrees to vacate upon request, all or any part thereof which the lessor may require for the purpose of making necessary repairs, and for the period of time between the day of such damage and until such repairs have been substantially completed there shall be such an abatement of rent as the nature of the injury or damage and its interference with the occupancy of the premises by the lessee shall warrant; however, if the premises be but slightly injured and the damage so occasioned shall not cause any material interference with the occupation of the premises by lessee, then there shall be no abatement of rent and the lessor shall repair the damage with all convenient speed.

**WAIVER OF SUBROGATION RIGHTS** (15) Neither the lessor nor the lessee shall be liable to the other for loss arising out of damage to or destruction of the premises, or the building or improvement of which the premises are a part or with which they are connected, or the contents of any thereof, when such loss is caused by any of the perils which are or could be included within or insured against by a standard form of fire insurance with extended coverage, including sprinkler leakage insurance, if any. All such claims for any and all loss, however caused, hereby are waived. Such absence of liability shall exist whether or not the damage or destruction is caused by the negligence of either lessor or lessee or by any of their respective agents, servants or employees. It is the intention and agreement of the lessor and the lessee that the rentals reserved by this lease have been fixed in contemplation that both parties shall fully provide their own insurance protection at their own expense, and that both parties shall look to their respective insurance carriers for reimbursement of any such loss, and further, that the insurance carriers involved shall not be entitled to subrogation under any circumstances against any party to this lease. Neither the lessor nor the lessee shall have any interest or claim in the other's insurance policy or policies, or the proceeds thereof, unless specifically covered therein as a joint assured.

**EMINENT DOMAIN** (16) In case of the condemnation or purchase of all or any substantial part of the premises by any public or private corporation with the power of condemnation this lease may be terminated, effective on the date possession is taken, by either party hereto on written notice to the other and in that case the lessee shall not be liable for any rent after the termination date. Lessee shall not be entitled to and hereby expressly waives any right to any part of the condemnation award or purchase price.

**FOR SALE AND FOR RENT SIGNS** (17) During the period of ........ 30 ........ days prior to the date above fixed for the termination of this lease, the lessor herein may post on the premises or in the windows thereof signs of moderate size notifying the public that the premises are "for sale" or "for lease."

**DELIVERING UP PREMISES ON TERMINATION** (18) At the expiration of the lease term or upon any sooner termination thereof, the lessee will quit and deliver up the premises and all future erections or additions to or upon the same, broom-clean, to the lessor or those having lessor's estate in the premises, peaceably, quietly, and in as good order and condition, reasonable use and wear thereof, damage by fire, unavoidable casualty and the elements alone excepted, as the same are now in or hereafter may be put in by the lessor.

**ADDITIONAL COVENANTS OR EXCEPTIONS** (19)

### SEE ATTACHED ADDENDUM

PROVIDED, ALWAYS, and these presents are upon these conditions, that (1) if the lessee shall be in arrears in the payment of rent for a period of ten days after the same becomes due, or (2) if the lessee shall fail or neglect to perform or observe any of the covenants and agreements contained herein on lessee's part to be done, kept, performed and observed and such default shall continue for ten days or more after written notice of such failure or neglect shall be given to lessee, or (3) if the lessee shall be declared bankrupt or insolvent according to law, or (4) if any assignment of lessee's property shall be made for the benefit of creditors, or (5) if on the expiration of this lease lessee fails to surrender possession of the premises, the lessor or those having lessor's estate in the premises, may terminate this lease and, lawfully, at lessor's option immediately or at any time thereafter, without demand or notice, enter into and upon the premises and every part thereof and repossess the same, and expel lessee and those claiming by, through and under lessee and remove lessee's effects at lessee's expense, forcibly if necessary and store the same, all without being deemed guilty of trespass and without prejudice to any remedy which otherwise might be used for arrears of rent or preceding breach of covenant.

Neither the termination of this lease by forfeiture nor the taking or recovery of possession of the premises shall deprive lessor of any other action, right, or remedy against lessee for possession, rent or damages, nor shall any omission by lessor to enforce any forfeiture, right or remedy in which lessor may be entitled be deemed a waiver by lessor of the right to enforce the performance of all terms and conditions of this lease by lessee.

In the event of any re-entry by lessor, lessor may lease or relet the premises in whole or in part to any tenant or tenants who may be satisfactory to lessor, for any duration, and for the best rent, terms and conditions as lessor may reasonably obtain. Lessor shall apply the rent received from any such tenant first to the cost of retaking and reletting the premises, including remodeling required to obtain any such tenant, and then to any arrears of rent and future rent payable under this lease and any other damages to which lessor may be entitled hereunder.

Any property which lessee leaves on the premises after abandonment or expiration of the lease, or for more than ten days after any termination of the lease by landlord, shall be deemed to have been abandoned, and lessor may remove and sell the property at public or private sale as lessor sees fit, without being liable for any prosecution therefor or for damages by reason thereof, and the net proceeds of any such sale shall be applied toward the expenses of landlord and rent as aforesaid, and the balance of such amounts, if any, shall be held for and paid to the lessee.

In the event the lessee for any reason shall hold over after the expiration of this lease, such holding over shall not be deemed to operate as a renewal or extension of this lease, but shall only create a tenancy at sufferance which may be terminated at will at any time by the lessor.

In case suit or action is instituted to enforce compliance with any of the terms, covenants or conditions of this lease, or to collect the rental which may become due hereunder, or any portion thereof, the losing party agrees to pay the prevailing party's reasonable attorney fees incurred throughout such proceeding, including at trial, on appeal, and for post-judgment collection. The lessee agrees to pay and discharge all lessor's costs and expenses, including lessor's reasonable attorney's fees that shall arise from enforcing any provision or covenants of this lease even though no suit or action is instituted.

Should the lessee be or become the debtor in any bankruptcy proceeding, voluntarily, involuntarily or otherwise, either during the period this lease is in effect or while there exists any outstanding obligation of the lessee created by this lease in favor of the lessor, the lessee agrees to pay the lessor's reasonable attorney fees and costs which the lessor may incur as the result of lessor's participation in such bankruptcy proceedings. It is understood and agreed by both parties that applicable federal bankruptcy law or rules of procedure may affect, alter, reduce or nullify the attorney fee and cost awards mentioned in the preceding sentence.

Any waiver by the lessor of any breach of any covenant herein contained to be kept and performed by the lessee shall not be deemed or considered as a continuing waiver, and shall not operate to bar or prevent the lessor from declaring a forfeiture for any succeeding breach, either of the same condition or covenant or otherwise.

Any notice required by the terms of this lease to be given by one party hereto to the other or desired so to be given, shall be sufficient if in writing, contained in a sealed envelope, and sent first class mail, with postage fully prepaid, and if intended for the lessor herein, then if addressed to the lessor at ................. SEE ADDENDUM

lessee at _Tenant's address or the leased premises_ ........................ and if intended for the lessee, then if addressed to the notice shall be deemed conclusively to have been delivered to the addressee forty-eight hours after the deposit thereof in the U.S. Mail.

All rights, remedies and liabilities herein given to or imposed upon either of the parties hereto shall extend to, inure to the benefit of and bind, as the circumstances may require, the heirs, successors, personal representatives and so far as this lease is assignable by the terms hereof, to the assigns of such parties.

In construing this lease, it is understood that the lessor or the lessee may be more than one person; that if the context so requires, the singular pronoun shall be taken to mean and include the plural, and that generally all grammatical changes shall be made, assumed and implied to make the provisions hereof apply equally to corporations and to individuals.

**IN WITNESS WHEREOF,** the parties have executed this lease on the day and year first hereinabove written, any corporation signature being by authority of its Board of Directors.

LANDLORD:

R & R PROPERTY HOLDINGS, INC.,

a Washington corporation

Signature on attached ADDENDUM

TENANT:

LAURA LEE HAGENAUER

Signature on attached ADDENDUM

The publisher strongly recommends that both the lessor and the lessee become familiar with the Americans with Disabilities Act of 1990, Public Laws 101-336. The Act may impose certain duties and responsibilities upon either or both parties to this lease. These duties and responsibilities may include but not be limited to the removal of certain architectural barriers and ensuring that disabled persons are not denied the opportunity to benefit from the same goods and services as those available to persons without disabilities. Under the Act, prohibition against discrimination applies to any person who is the owner, operator, lessor, or lessee of a place of public accommodation.

EXHIBIT 1
Page 4 Of 11

DATED:    As of October ___, 2015

BETWEEN:    **R & R PROPERTY HOLDINGS, INC.,**
a Washington corporation

                                               "Lessor" or "Landlord"

AND:    **LAURA LEE HAGENAUER (successor-in-interest to, and
formerly doing business as, "VALLEY ROLLING LLC")**

                                               "Lessee" or "Tenant"

This Addendum to Lease ("**Addendum**") and the attached Business Lease [Stevens Ness Form No. 812] by Landlord (with this Addendum, the "**Lease**") are executed to document the terms of the lease between the parties for the following premises ("**Premises**"): approximately **27,500 square feet of space, including office space,** in the building ("**Building**") located at **3071 Schmidt Lane NE, Hubbard, Oregon 97032**, as more particularly described in the attachments to this Lease, subject to the provisions of this Addendum. The Building is located on a larger parcel of property shown on the drawing attached to this Lease as the "**Valley Rolling**" property, known as **Tax Lot 400, Marion County, Oregon** (the "**Property**").

This Addendum hereby amends, supplements and is incorporated into the Lease, as follows:

1.    **Bankruptcy Case; Closing of Purchase.** The parties acknowledge that the Property is the subject of the bankruptcy case, Case No. 14-63530-FRA11 (the "**Bankruptcy Case**"), which is pending in the United States Bankruptcy Court for the District of Oregon (the "**Bankruptcy Court**") and an executory Sale Agreement, dated as of September 16, 2015 ("**Sale Agreement**"), under which Landlord would purchase the Property and lease the Premises back to Tenant. This Lease is subject to the closing of the purchase of the Property pursuant to the Sale Agreement (the "**Closing**").

2.    **Commencement Date.** Possession will be deemed delivered to Tenant at Closing, which will be the commencement of the Lease term ("**Commencement Date**"). Rent will commence as of the Commencement Date.

3.    **Future Demising of Office Space into Two Spaces.** Initially, the Premises includes use of the entire office space within the Building, which contains approximately 4,276 square feet. However, Landlord will have the right and option to demise separately (and lease or occupy for any office-warehouse purpose) up to one-half of such office space (the "**Separate Office Space**"), so long as Landlord provides to Tenant additional warehouse space in the Building with a gross square footage equal to the area of the Separate Office Space taken from the Premises.

4.    **Year-to-Year Lease Term.** The initial Lease term (the "**Term**") will commence on the Commencement Date and continue until the last day of the calendar month in which the first anniversary of the Commencement Date occurs (the "**Renewal Date**"), at which time this Lease will be automatically renewed for an additional period of twelve (12) calendar months (a "**Renewal Term**"), and thereafter on each anniversary of the first Renewal Date will be automatically renewed for additional period(s) of twelve (12) calendar months each, <u>unless and until</u> either party notifies the other party at least ninety (90) days before a Renewal Date that the party is electing to terminate this Lease at the end of the current Term, immediately before such renewal.

5.    **Base Rent.** The regular monthly base rent amount will be **$12,650.00**. The monthly base rent will be due as of the fifteenth (15th) day of each month. Rent for any partial month will be prorated on the basis of a 30-day month. Rent is payable in advance. During the initial term of this Lease (ending on the first Renewal Date), the monthly base rent is included in the gross rent amount of $15,000 per month, and thereafter will be paid as part of the "triple net" Lease rental, as provided in Section 6.

6.    **Gross Lease for First Year; Triple Net Lease Thereafter.** For the initial Term of this Lease ending on the first Renewal Date, Tenant will pay a "gross" rent of $15,000 per month, including the monthly base rent amount and all other amounts to be reimbursed to Landlord for property taxes, insurance and maintenance. Thereafter,

if the Lease is renewed and exten...d, this Lease is a so-called "triple net" l...e, pursuant to which Tenant will be responsible for its proportionate and allocated share of taxes, maintenance, insurance and other costs in operating the Premises during the Term. Tenant's share of such costs is referred to as **"Additional Rent."** The term **"Rent"** means the monthly base rent and all Additional Rent.

7. **Security Deposit; Payment.** As a condition to the commencement of the Term, Tenant will pay to Landlord (i) the monthly "gross" rent of $15,000 for the first month of the Term, and (ii) a Security Deposit of $15,000. All payments by Tenant to Landlord under the Lease will be made by wire transfer to a bank account of Landlord to be designated by written notice to Tenant.

8. **Property Taxes and Assessments.** Landlord is responsible for paying the property taxes and assessments ("taxes") against the Building and land area being used by Tenant, as they become due, subject to Landlord's right to collect back from Tenant during the Term Tenant's proportionate share of such amounts, as Additional Rent, commencing with the first Renewal Term. Taxes for the year in which the Lease terminates will be prorated and adjusted for any partial year. As used in this Lease, the term **"proportionate share"** of Additional Rent items that are attributable to the Building will be fixed at fifty percent (50%). The initial estimated amount payable by Tenant is: __50% of $3,833.33, equaling $1,916.67 per month__ (which is included in the "gross" rent amount under this Lease for the initial Term). Tenant's proportionate share of property taxes will be due on November 1st of each year, unless Tenant is paying monthly installments as referenced below.

Commencing with the first Renewal Term, Landlord may elect to require that Tenant shall pay to Landlord, on the fifteenth (15th) day of each month in advance, an amount equal to one twelfth (1/12) of Tenant's proportionate share of taxes to be paid for the year. The monthly payment for taxes may be adjusted by Landlord during the Term, based on Landlord's reasonable estimate of changes in the amount of annual property taxes and assessments to be paid. There will be an annual reconciliation and adjustment between the parties when the actual amount of taxes is determined. If the monthly estimated payments were less than Tenant's proportionate share of the actual taxes, Tenant will pay the deficiency to Landlord at the time Landlord submits an invoice therefor. If the monthly estimated payments were greater than the actual amount due, Landlord will credit the difference against the next monthly payments due from Tenant.

Tenant will pay any personal property taxes on Tenant's trade fixtures and personal property.

9. **Maintenance and Repair.** Tenant will maintain the Premises, and Landlord will maintain the Building, parking areas, accessways, landscaping and other common area portions of the Property ("**Common Areas**"), and the parties will otherwise perform their respective obligations in **Sections 2 and 4(a)** of the Lease. If any maintenance expenses are incurred by Landlord for the Building or Common Areas, and the work performed is not specific to the correction of a maintenance problem caused by a tenant within its tenant space, such maintenance expenses will be allocated proportionately to the tenant space in the Building as a whole, and Tenant will pay its proportionate share (i.e., 50%, if it is leasing one-half of the Building) of such maintenance expenses, as Additional Rent, commencing with the first Renewal Term. Maintenance charges for the Building and Common Areas are included in the "gross" rent amount under this Lease for the initial Term.

10. **Property Insurance.** Landlord will maintain property casualty insurance on the Building (but not any of Tenant's own trade fixtures, inventory and personal property), as Landlord determines to be appropriate. Tenant will reimburse Landlord for Tenant's allocated and proportionate share of the cost of Landlord's property insurance, as Additional Rent, commencing with the first Renewal Term. The initial estimated amount payable by Tenant is: __$433.34 per month__ (which is included in the "gross" rent amount under this Lease for the initial Term). Tenant will maintain such casualty insurance on Tenant's own trade fixtures, inventory and personal property, as Tenant determines to be appropriate.

11. **Liability Insurance; Indemnity** Tenant must provide Landlord with a certificate of commercial general liability insurance in the amount of at least $1,000,000 (combined single limit), as provided in **Section 11** of the Lease, naming Landlord as additional named insured and with a contractual liability endorsement covering the

Addendum to Lease - Stevens Ness
Business Lease Form 812
8/0227578.1 0052781-00013

Rider - 2

EXHIBIT ___J___
Page___/___ Of___//___

indemnification obligations refere..... d in this Lease. The certificate must have ...inimum 10-day written cancellation notice clause in favor of Landlord. **Failure to provide such insurance certificate may result in termination of this Lease by Landlord and/or Tenant's not being entitled to enter and continue to use the Premises.**

Tenant will defend, indemnify, and hold Landlord, and its agents and representatives, harmless from any claim, loss, or liability (including attorneys' fees incurred) arising out of or in connection with any use, entry or activity on the Premises or any injury or damage to the Premises or Building or to any person or property therein or thereon during the term of this Lease, whether or not caused or contributed to by any act or omission of Landlord, its agents or representatives.

**12.    Utilities; Telephone.** Except as otherwise provided below, Tenant will pay for all utilities used by Tenant in the Premises. For utilities provided to the Building that are not separately metered, Tenant will pay 100% of such utilities until the other portion of the Building is leased, and thereafter will pay its proportionate share (50%), unless otherwise reasonably allocated by Landlord, of such utilities. Tenant will arrange for its own trash removal and arrange for its own janitorial service, if any. Water and sewer and natural gas charges will be paid by Landlord unless and until the costs are separately metered or submetered.

The telephone service for the Building will be initially in the name of Tenant and paid by Tenant. If an additional tenant is added by Landlord to the Building, the added tenant will arrange for its own telephone line.

**13.    Alterations.** Any proposed alterations by Tenant to the Premises or Building will be subject to Landlord's prior written consent, as required by this Lease.

**14.    Tenant's Use.** Under **Section 2(a)** of the Lease, Tenant's intended and permitted use of the Premises is for the following: **office and warehouse use,** and no other use without Landlord's prior written consent. Tenant keep its hours of operation posted at the Premises. Tenant will have the right to use a reasonable number of parking spaces, which will be equitably allocated by Landlord to Tenant and other tenants of the Building from time to time, but will not occupy any parking spaces designated for customers.

**15.    Tenant's Work.** There is no work required to be performed by Landlord to ready the Premises for use by Tenant. Tenant will be responsible for moving to the Premises any of Tenant's furniture, fixtures and equipment ("FF&E") that Tenant wants to use within the Premises. The Premises will be modified by Tenant to accommodate its intended use, in accordance with this Lease, but any such work must meet Code requirements.

**16.    Rent Not Paid When Due; NSF Checks.** Rent will be received by Landlord without set-off, offset, abatement or deduction of any kind. Such payments will be made in advance to Landlord's address as stated below (or as Landlord may subsequently specify by written notice to Tenant). Any rent not paid within ten (10) days after it is due will be assessed a late charge equal to **Five percent (5%) of the overdue amount**. Tenant shall pay the late charge without the need for demand by Landlord, and will reimburse Landlord for reasonable attorneys' fees incurred by Landlord in connection with any overdue payment (if Landlord consults an attorney or takes other action to collect the amounts owed). Landlord may levy and collect a late charge and/or interest in addition to all other remedies available for Tenant's default. If any check is returned by Tenant's bank for insufficient funds ("NSF"), then the bank service charges resulting from the NSF check will be promptly paid by Tenant, in addition to the late charge.

**17.    Rights of Use; Rules.** Tenant will (a) reasonably co-operate on any security measures that Landlord may take from time to time, and (b) promptly comply with reasonable rules and regulations that Landlord may adopt from time to time in order to promote safety, order, cleanliness, operation of business, and good service to the Building and its tenants, so long as they are required of all tenants at Landlord's Property. Such rules will include (without limitation) the following: (i) there is NO SMOKING allowed in the Premises, Building or restrooms; and (ii) no portion of the Premises may be used for overnight sleeping.

**18.    Transfers.** Tenant shall not assign, mortgage, lien or encumber the Premises or Tenant's leasehold estate, or sublet any portion of the Premises, or license the use of any portion of the Premises, or otherwise transfer any

interest in the Premises (whether voluntary, involuntary, by operation of law or otherwise) (collectively, a "**transfer**"), without the prior written consent of Landlord pursuant to **Section 6** of the body of this Lease. Any attempted transfer without consent shall be null and void and, at the option of Landlord, will cause termination of this Lease. The giving of such consent in one instance shall not preclude the need for Tenant to obtain Landlord's consent to further transfers. If Tenant is permitted to make any transfer, Tenant shall not be relieved of its obligations, but shall remain primarily liable to Landlord for performance of all obligations.

19. **Methods for Notices.** Notices may be given by utilization of the method(s) in the Lease, or by registered mail, or by facsimile or other telecommunication device capable of transmitting or creating a written record, or personally. Notices are effective on receipt. A notice will also be deemed received if posted at or delivered to the Premises.

20. **Conduct of Business; Maintenance; Signage.** Tenant will cause its employees, customers and invitees on the Premises to conduct themselves in a good and orderly manner. Tenant will keep the interior of the Premises in good condition, repair and appearance. To identify Tenant's business, Tenant may maintain signage appropriate for the conduct of its business, subject to compliance with applicable sign codes and Landlord's prior written approval of the size, design, placement and other details of such signage.

21. **Default.** Tenant will not be in default under the Lease unless Tenant fails to pay rent or other charges within **FIVE (5) days** after receipt of written notice of nonpayment when due (which notice can be given within the 10-day grace period in the Lease and need not wait until the end of the 10-day period) or fails to perform other obligations under the Lease within **twenty (20) days** after receipt of written notice of nonperformance by Landlord, specifying in reasonable detail the nature of Tenant's default.

22. **General Provisions.** The following are added as Miscellaneous Provisions of the Lease:

   (a) **Surrender of Premises.** Upon expiration of the Term or earlier termination of this Lease, Tenant shall deliver all keys to Landlord and surrender the Premises in good condition, subject to reasonable wear and tear. Tenant shall remove all of its furnishings, furniture, and trade fixtures that remain the property of Tenant (and if Tenant has made any alterations, Landlord may require that Tenant remove them. **Tenant will restore any physical damage caused by such removal (including, without limitation, resurfacing or covering holes in the walls, floors or other parts of the Premises and any necessary repainting to put the Premises in the condition required by this Lease).** If Tenant fails to do so, such failure shall, at Landlord's option, be deemed an abandonment of the property and Landlord may retain the property and all rights of Tenant with respect to it shall cease or, by notice in writing given to Tenant within 20 days after removal was required, Landlord may elect to hold Tenant to its obligation of removal. If Landlord elects to require Tenant to remove, Landlord may effect a removal and place the property in public storage for Tenant's account. Tenant shall be liable to Landlord for the cost of removal, restoration, transportation to storage, and storage, with interest on all such expenses as provided in this Lease.

   (b) **Holdover.** If Tenant does not vacate the Premises at the time required, Landlord shall have the option to treat Tenant as a tenant from month to month, subject to all of the provisions of this Lease (except that the term will be month to month and the initial base rent will be 150 percent of the base rent then being paid by Tenant), or to eject Tenant from the Building and Premises and recover damages caused by wrongful holdover. Failure of Tenant to remove property or installations which Tenant is required to remove under **paragraph 20 (b)** above shall constitute a failure to vacate to which this paragraph shall apply.

   (c) **Security Deposit.** Tenant shall maintain with Landlord the security deposit as listed above. The deposit shall be held by Landlord to secure all payments and performances due from Tenant under this Lease. Landlord may commingle the deposit with its funds and will owe no interest on the deposit. Landlord may apply the deposit to the cost of performing any obligation which Tenant fails to perform within the time required by this Lease, but application by Landlord will not be the exclusive remedy for Tenant's default. If the deposit is applied by Landlord, Tenant shall pay the sum necessary to restore the deposit to its original amount on Landlord's demand. To the extent not applied by Landlord, the deposit shall be refunded to Tenant within 30 days after expiration of the Term.

Addendum to Lease - Stevens Ness
Business Lease Form 812
80227578.1 0052781-00013

Rider - 4

EXHIBIT J
Page 8 of 11

Case 14-63530-fra11   Doc 260   Filed 10/23/15

(d) **Address.** Tenant's addresses for notice purposes a. **Business Address: 3071 Schmidt Lane, Hubbard, OR 97032; and Personal Address: 1129 Belle Passi Rd., Woodburn, OR 97071.** Landlord's address for notice purposes and for payment of rent is: **R & R PROPERTY HOLDINGS, INC., Attention: Dwaine Odinson, CA, Controller, 7449 River Rd., Delta, British Columbia, CANADA V4G1B9.** Landlord's representative: **Dwaine Odinson. Telephone: (604) 946-0916, Facsimile: (604) 946-0783. Email: dwaineo@napsteel.com .**

(e) **Counterparts; Fax or PDF Transmission.** This Lease (Addendum) may be executed in separate counterpart signature pages with the same effect as if both parties had signed the same document. All counterparts shall be taken together and shall constitute a single Lease. Any counterparts that are signed and transmitted by facsimile machine or as an emailed PDF copy shall be treated as an original document. Each party hereby waives any defenses to the enforcement of the terms of this document if sent by facsimile or as an emailed PDF, based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").

IN WITNESS WHEREOF, the parties have executed this instrument as of the date first above written.

Tenant:

**LAURA LEE HAGENAUER** (successor-in-interest to, and formerly doing business as "VALLEY ROLLING LLC")

By _____

Landlord:

**R & R PROPERTY HOLDINGS, INC.,**
**a Washington corporation**

By: _____
Name: **Dwaine Odinson, CA**
Title: **Controller**

Addendum to Lease - Stevens Ness
Business Lease Form 812
80227578.1 0052781-00013

Rider - 5

EXHIBIT J
Page 4 Of 11

Case 14-63530-fra11   Doc 260   Filed 10/23/15



EXHIBIT I
Page 10 Of 11

Case 14-63530-fra11   Doc 260   Filed 10/23/15



DRAWING OF PROPERTY

RECORD OF
For: PBSL, LLC
LOCATION: THE SOUTHEAST QUARTER...
TOWNSHIP ... SOUTH, RANG...
MERIDIAN, MARION COUNTY,

SCALE: 1" = 60'
DATE: 10 FEBRUARY 2009
BY: MAGNESS LAND SURVEYING
PO BOX 1239
WILLAMINA, OREGON 97396
PHONE: 503-843-3404
CELL: 971-237-3413
E-MAIL: MAGNESS@WBCABLE.NET

VALLEY ROLLING

Scale: 1" = 60'
S  TRUE  N

Case 14-63530-fra11   Doc 260   Filed 10/23/15