UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

In Re: )
) Case No: 14-63530-fra11
LAURA LEE HAGENAUER, )
) ~~SECOND~~THIRD AMENDED
DISCLOSURE
Debtor. ) STATEMENT

## INTRODUCTION

This is the Amended Disclosure Statement in the Chapter 11 bankruptcy case of

Laura Lee Hagenauer ("Debtor"). The accompanying ~~Second~~Third Amended Plan of

Reorganization describes how all claims will be treated under the proposed plan. You should

read the ~~Second~~Third Amended Plan and this ~~Second~~Third Amended Disclosure Statement

carefully and discuss them with your attorney. If you do not have an attorney, you may wish to

consult one. The proposed distributions under the ~~Second~~Third Amended Plan are discussed on

pages 12 through 19 of this Amended Disclosure Statement.

## PURPOSE OF THIS DOCUMENT

This Amended Disclosure Statement describes: 1) the Debtor and "collapse" of

the prior entities, Valley Rolling Corporation and DeLaMMC, LLC, into Debtor just prior to the

1 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Petition Date; 2) significant events during the bankruptcy case; 3) how the ~~Second~~Third Amended Plan proposes to treat claims (*i.e.* what you will receive on your claim if the ~~Second~~Third Amended Plan is confirmed); 4) what factors the Bankruptcy Court will consider when deciding whether to confirm the ~~Second~~Third Amended Plan; and 5) why Debtor believes the ~~Second~~Third Amended Plan is feasible and how treatment of your claim compares to what you would receive in liquidation. Be sure to read the ~~Second~~Third Amended Plan and Amended Disclosure Statement. This Amended Disclosure Statement describes the ~~Second~~Third Amended Plan, but it is the ~~Second~~Third Amended Plan itself that if confirmed establishes your rights.

DEADLINES FOR VOTING AND OBJECTING: DATE OF ~~SECOND~~THIRD AMENDED PLAN CONFIRMATION HEARING

The court has not yet confirmed the ~~Second~~Third Amended Plan described in this ~~Second~~Third Amended Disclosure Statement. This section describes the procedures pursuant to which the ~~Second~~Third Amended Plan will or will not be confirmed. The time and place of the hearing at which the Court will determine whether to finally approve this ~~Second~~Third Amended Disclosure Statement will be set by the Court. The hearing on confirmation of the ~~Second~~Third Amended Plan will be set by the Court in a separate notice containing both a copy of the ~~Second~~Third Amended Disclosure Statement and a copy of the ~~Second~~Third Amended Plan which will be mailed to each creditor along with a ballot for voting.

IDENTITY OF PERSON TO CONTACT FOR MORE INFORMATION

If you want additional information about the ~~Second~~Third Amended Plan you should contact Ted A. Troutman, attorney for the Debtor, at 503-292-6788, and address, 5075 SW Griffith Dr, Ste 220, Beaverton, OR 97005.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

<p style="text-align:center">DESCRIPTION OF ~~SECOND~~THIRD AMENDED PLAN</p>

The accompanying ~~Second~~Third Amended Plan of Reorganization describes how all claims will be treated under the proposed plan.  In particular, if the ~~Second~~Third Amended Plan is confirmed, holders of general unsecured claims will receive a dividend of 100% of their allowed claims from operation of the Debtor's business as described below.

The ~~Second~~Third Amended Plan will be funded by the ongoing operation of Debtor's steel rolling facility, any recovery on avoidance claims under 11 USC §§ 547, 548 and 550 ("Avoidance Claims") and from the sale of real property.

The administrative claims will be paid in part on the Effective Date from an account set up in April of 2015 funded with approximately $18,000 per month through the Effective Date, with the rest to be paid from income from post-confirmation operations (the "Accumulated Administrative Account") and any proceeds from Avoidance Claims recoveries.  Currently the total unpaid attorney's fees for the Debtor are approximately $~~84,275~~117,230.  It is estimated an additional $35,000 will be incurred through confirmation.  Total Financial Advisor fees are estimated at $~~50,000.00~~60,000.00 through confirmation.  ~~Debtor will also have CPA fees for tax preparation estimated at $5000.~~  Debtor also is responsible for paying the attorney fees of the Creditors' Committee which are estimated to be $50,000.00, excluding fees incurred in pursuit of ~~A~~avoidance Claims~~actions~~ that the Court has authorized the Creditors' Committee to pursue.  Total professional fees incurred are estimated to be $~~250,000~~300,000 through confirmation.

There are $332,068.28 of claims filed as administrative claims pursuant to 11 U.S.C. § 503(b)(9) which provides that suppliers who ship goods within 20 days of the

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

bankruptcy have an administrative claim.  Unless agreed in writing, these claims must be paid on confirmation.  Debtor believes she will be able to enter into written agreements with these suppliers as she has continued to do business with all of them after the Chapter 11 was filed.

Part of the 503(b)(9) claims will be paid with a pro rata share of the Accumulated Administrative Account on the Effective Date.  The remainder of the claims will be paid over time with 1.8%1.5% surplus amount over each invoice for goods sold by such claimants to the Debtor post-confirmation.  If these claimants demanded payment on confirmation, Debtor would not be able to set forth a confirmable plan.  Both Cascadia, with a 503(b)(9) claim of $137,544.18 and West Coast Metals with a claim of $174,456.90,All of the administrative 503(b)(9) claims have orally agreed to the treatment.  In addition, Penske Truck Leasing Co. LP ("Penske") has an administrative claim for $25,976.76.  This claim will be paid $12,988.38 on the Effective Date plus 9 monthly payments of $1,443.15 starting 30 days after the Effective Date.

The proponent of the plan projects that if the SecondThird Amended Plan is confirmed Debtors' assets and liabilities will be as shown on the projected balance sheet attached as Exhibit F.

DESCRIPTION OF DEBTOR AND HER BUSINESSES

Debtor and her brother started Valley Rolling Corp. in May of 2003.  Effective December 31, 2006, Debtor purchased the interest of her brother for $800,000.  Debtor has 28 years of experience in the steel roofing and siding industry.

Prior to March of 2011, Valley Rolling Corp. leased a facility in Woodburn, Oregon.  In March of 2011, Valley Rolling Corp. moved from its old location at 310 Broadway St., Woodburn, Oregon to the new facility at 3071 Schmidt Lane NE, Hubbard, Oregon.  The

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

total square footage under cover is 82,650 which includes two warehouses attached by a breezeway.

Valley Rolling Corp. originally offered a product line for agricultural steel roofing and siding use. The company originally made one agricultural panel. Valley expanded the profile to two different agricultural panels and one commercial panel. Valley Rolling Corp. also sells trim products, accessories such as fasteners, poly-carbonate, pipe flashing, vapor barrier and sliding door track and hardware. DeLaMMC was formed on November 1, 2006 as an Oregon limited liability company. The Debtor and her husband, Dennis Hagenauer, were the managers, and the members consisted of the Debtor (35%), her husband (50%) and their three children, Matthew Hagenauer (5%), Mitchell Hagenauer (5%), and Cassie Hagenauer (5%). DeLaMMC was a holding company, whose assets consisted of the building and improvements located at 3071 Schmidt Lane NE, Hubbard Oregon, three forklifts, a Rollformer and a piece of equipment described by the Debtor as a rollformer addition. These assets were transferred to the Debtor on September 26, 2014, leaving DeLaMMC as merely a shell company. None of the members of the LLC received consideration in exchange for their interests in connection with the transfer.

ASSETS

The manufacturing facility is subject to combined secured debt of approximately $4,188,881. The creditors that are owed money on the buildings are KeyBank on a first mortgage in the approximate amount of $~~1,600,000~~1,787,432.28, current and past due, Marion County for property taxes of approximately $~~88,000~~145,000 (both real and personal), and U.S. Small Business Administration is owed approximately $860,448. In addition Oregon Business Development Corporation ("OBD") has a mortgage for approximately $~~660,000~~706,588 and

5 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Cascadia Metals has a mortgage of approximately $~~630,000~~634,357.  The building's value is insufficient to pay all asserted liens.  ~~Therefore, Cascadia Metals is partially secured with a secured claim of approximately $350,000.  The IRS asserted tax liens are entirely unsecured by the building.~~  There is a pending motion to sell the building free of the liens.  KeyBank will receive approximately $1,732,098 which is the balance due including fees and interest at the non-default interest rate.  The default interest is subordinated to the SBA lien pursuant to agreement.  The default amount is $65,333.74 through October 8, 2015.

Debtor has filed a motion and notice of the sale and a hearing is scheduled for November 4, 2015.  The sale notice is substantially as follows:

Laura Lee Hagenauer (the "**Debtor**"), has filed a motion (the "**Motion**") for authority to sell (the "**Sale**") the commercial real property and fixtures located at 3071 Schmidt Lane, Hubbard, Oregon (the "**Property**") to R&R Property Holdings, Inc. ("**R&R**") or a higher and better bidder, free and clear of all liens, claims, encumbrances and interests pursuant to 11 U.S.C. §§ 363(b) and (f); enter into a lease of a portion of the Property (the "**Property Lease**") pursuant to 11 U.S.C. § 363(b); and pay a 4% commission to Coldwell Banker Commercial of Salem, Oregon (the "**Broker**") upon the closing of the Sale of the Property pursuant to Bankruptcy Rule 2016(a) and Local Rule 2016-1(c)(2)(A) & (B).

A hearing on the Motion and any objections to the Motion will be held on November 4, 2015 at 10:00 a.m. (the "**Hearing**") and testimony will be offered, and received if admissible, in support of the Motion and a finding that the purchase of the Property by R&R is being made in good faith and is entitled to the protections afforded by 11 U.S.C. § 363(m).

6 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

1.    Debtor proposes to sell the Property free and clear of liens, claims, encumbrances and interests pursuant to 11 U.S.C. § 363(f)(2) and (f)(5) (and 11 U.S.C. § 363(f)(1), if applicable) and the terms of Standard Commercial Sale Agreement between the Debtor and R&R dated September 29, 2015 (the "*Sale Agreement*").  A copy of the Sale Agreement is attached to this Statement as exhibit I.  Debtor also proposes to enter into the Property Lease to lease back a portion of the Property for use in her business operations.  A copy of the Property Lease is attached to this Statement as exhibit J.

2.    R&R, the proposed buyer, is a Washington corporation and an affiliate of Cascadia Metals, Inc. ("*Cascadia*").  Cascadia is a primary vendor to the Debtor, one of the Debtor's largest unsecured and administrative creditors, and the holder of a lien against the Property.  If the sale is approved, R&R also will become the Debtor's landlord under the proposed Property Lease.  R&R's counsel is Brandy A. Sargent, Stoel Rives LLP, 900 S.W. Fifth Avenues, #2600, Portland, Oregon, 97204; Telephone:  503-294-9888; E-mail: brandy.sargent@stoel.com.

3.    The address of the Property is 3071 Schmidt Lane, Hubbard, Oregon.  The legal description of the Property is:

A tract of land in the Southeast Quarter of Section 33, Township 4 South, Range 1 West, Willamette Meridian, Marion County, Oregon, being a portion of that tract of land described by Warranty Deed from Gregory G. Berning to PBSL, LLC and recorded in Reel 2760, Page 114, Marion County Deed Records, more particularly described as follows:

Beginning at an iron bar that is on record as being North 86° 15' East 1,611.06 feet and South 31° 26' West 1,351.88 feet and North 58° 34' West 641.52 feet from the Northwest corner of the Ewing Purvine Donation Land Claim in Section 33, Township 4 South, Range 1 West of the Willamette Meridian in Marion County, Oregon, which is at an angle point of the Northerly margin of Schmidt Lane (CR 439, 40.00 foot wide) and also being the most Southerly corner of that tract of land deeded to S.W. WEAVER, by Deed

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

recorded in Volume 178, Page 461, Deed Records; thence North 41° 16' 23" East 402.16 feet to the Northwest corner of Parcel 1 of said PBSL, LLC deed (Paragraph 1); thence along the center of a ditch South 24° 17' 19" East 121.03 feet to an Iron pipe; thence South 49° 47' 19" East 110.55 feet to an iron rod; thence South 41° 35' 19" East 198.66 feet to an iron rod; thence South 58° 33' 19" East 137.23 feet to the Westerly margin of Relocated (1932) Highway 99E (40 feet from centerline); thence South 31° 19' 58" West 249.82 feet along the Westerly margin of said Highway 99E to its intersection with the North line of County Road No. 439; thence North 58° 53' 01" West 605.67 feet along the North right of way line of said Schmidt Lane (20 feet from centerline) to the point of beginning, in the City of Hubbard, Marion County, Oregon.

4.      A copy of the full property description or inventory may be examined or obtained by contacting counsel for the Debtor.

5.      The Property may be viewed by contacting the Debtor's counsel.

6.      Other than the Debtor, R&R and the Broker, there are no other parties to the transaction.

7.      Under the Sale Agreement, the gross sale price for the Property is $2,600,000. All of the liens on the Property exceed $4,469,734, of which Debtor believes a total of $2,050,033.08 need not be paid as secured claims because they have either consented or the Court can order the sale under Section 363(f)(5). KeyBank also seeks reimbursement of approximately $70,000 for fees and costs.  Total sales costs will includes a 4% commission to the Broker (*i.e.*, $104,000, assuming no change to the terms of the Sale) and other costs of closing, estimated to be approximately $6,299.00.  A preliminary list of closing costs to be satisfied by the Debtor may be obtained from the Debtor's counsel.  All tax consequences have been considered and no taxes will be owed as a result of the sale.  Absent a substantial overbid for the Property, the Sale will result in no net proceeds to the estate after payment of the Sale proceeds to satisfy valid liens on the Property (in the order of their priority) and fees, costs, and taxes payable in connection with the Sale.

8 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

8. The Sale is not of substantially all of the Debtor's assets. Debtor will continue to own and operate her business after the Sale. The terms of the Sale are:

(a) sale price of $2,600,000; (b) earnest money deposit of $25,000; (c) a contingency period of up to 45 days after the opening of escrow during which R&R will proceed to satisfy itself as to the condition of the Property, environmental matters, and other matters (d) a title review period of 15 days after receipt of a title report; (e) a contingency for Bankruptcy Court approval; and (f) a period of 15 days after satisfaction of contingencies for R&R to close the Sale. In the event that R&R is not the successful purchaser of the Property, the costs of any environmental assessment will be borne by the Debtor.

If R&R is the successful purchaser of the Property, it will lease a portion of the Property back to the Debtor pursuant to the Property Lease. In summary, the Property Lease would commence at the closing of the Sale and continue for an initial period of 12 full calendar months, and thereafter be a year-to-year lease. Either party can terminate the Lease on 90 days' notice at the end of the initial term or any renewal term. For the initial term, the monthly rent would be a "gross rental" of $15,000 per month, inclusive of monthly base rent of $12,650 and Debtor's proportionate share of property taxes (estimated at $1,916.67 per month) and property insurance costs (estimated at $433.34 per month). After the first year, unless the Property Lease is terminated, the rent becomes "triple net," and Debtor would pay her proportionate share of property taxes, property insurance and maintenance costs. Debtor is responsible for utilities that she uses. At the start of the Property Lease, Debtor would pay the first month's rent ($15,000) and a security deposit equal to $15,000 (which would be refundable at the end of the Property Lease, unless applied to cure a breach of the Lease).

9 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

9.      The Property has been publicly marketed since May 2015 and the offer received from R&R is the highest and best offer received after competitive bidding.  No further auction is proposed, but the Sale is expressly subject to overbid prior to the Hearing pursuant to an agreement on the same or better terms and conditions (apart from the purchase price) as the Sale Agreement, including, without limitation, the Property Lease.  Competing bids must be submitted to the Debtor no later than 4:00 p.m. on October 23, 2015.

10.     Based on a November 2014 appraisal of the Property for $3,800,000, the Property was initially listed for sale for $3,775,000.  In September 2015, Debtor received an offer of $2,300,000 for the Property and countered at $3,175,000.  In response, the offer was raised to $2,400,000.  Around the same time, R&R made its $2,600,000 offer for the Property, which the Debtor countered at $3,175,000.  R&R did not raise its offer, and the Broker has not received any other formal offers for the Property.[1]

11.     Debtor's primary secured creditor, KeyBank, National Association ("***KeyBank***"), previously filed a motion for relief from the automatic stay to begin the foreclosure process against the Property.  Pursuant to a stipulated order resolving that motion, the Property was listed for sale and, in the event the Property was not sold and the Debtor had not confirmed a plan of reorganization by October 1, 2015, KeyBank was to be allowed to pursue foreclosure.  Debtor believes that the proceeds of the Property that would be generated in a foreclosure would not exceed the amount to be received in the proposed Sale.  Additionally, the offer received from R&R is coupled with the Property Lease, which will allow the Debtor to lease a portion of the Property and avoid moving costs.

---

[1]     The Debtor also received an informal offer of $2,000,000, but the party making the informal offer never wrote-up a formal offer.

10 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

12.     The Debtor is proposing the sale in advance of confirmation of a plan because through the sale and leaseback debtor will be able to reduce her monthly expenses and propose a feasible plan.  If the sale is not allowed KeyBank could proceed with its foreclosure proceeding.

13.     If the sale is not approved on November 4th 2015, debtor is requesting that the sale be approved on confirmation of the Third Amended Plan

14.     Lienholders:  Based on filed proofs of claim, the following creditors claim liens on the Property (including security interests in fixtures, collectively, the "*Liens*"), in the following amounts and order of priority:

| Creditor | Lien Claim | Total Liens |
|---|---|---|
| Marion County Assessor's Office (Prop. Taxes) | $   131,680.15 | $   131,680.15 |
| KeyBank National Association | $1,622,645.00 | $1,754,325.15 |
| US Small Business Administration | $   860,448.55 | $2,614,773.70 |
| Oregon Business Development Corporation | $   706,588.97 | $3,321,362.67 |
| Cascadia Metals Inc. | $   634,357.58 | $3,955,720.25 |
| Internal Revenue Service – tax lien | $   514,014.53 | $4,469,734.78 |

15.     Other than costs of the Sale, no Liens are intended to be paid without further order of the Bankruptcy Court.  All of the Liens shall attach to the Sale proceeds in the same order of priority as they attached to the Property.  Any Sale proceeds remaining after paying the Liens and expenses, taxes, commissions, fees, costs or other charges as provided in the Motion shall be held in trust until the Court orders payment.  At this time, no such excess Sale proceeds are anticipated.

16.     The Court appointed the Broker on May 6, 2015.  Pursuant to that order, the Broker is proposed to be paid a 4% commission, which will be equal to $104,000 if the Sale to R&R is approved and closes

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

If the Court does not approve the sale at the November 4, 2015 hearing, Debtor is seeking approval of the sale as part of the Third Amended Plan on the identical terms as noticed above.

If the sale is approved, the only secured creditors that will be paid will be Marion County taxes, KeyBank approximately $1,734,432 (its secured debt minus default interest) and SBA a partial payment of approximately $581,097.24.  The liens of Oregon Business Development, Cascadia Metals and the IRS will be unsecured.

Debtor also owns jointly, with her husband, a home located at 1129 Belle Passi Rd., Woodburn, OR 97071 valued at $500,000.00.  The first mortgage on the property is $159,004 payable to Greentree Loan Servicing.  The lien of Oregon Business Development of $~~660,000~~706,588 is also secured by this property.  Oregon Business Development is secured by the equity for $350,000.

OPERATIONS IN BANKRUPTCY

Since the filing of the bankruptcy Debtor has had ~~an operating profit of over $98,176.00 after servicing of the secured debt and payment of $2,000 per month to the IRS and $4,000 per month to property taxes through March 2015.  After March the payments to secured debt and IRS were reduced by approximately $18,500 per month.  Debtor's Second Amended Plan calls for a cram down of the interest rate on the debt owed to KeyBank to a rate of 6.5% on the line of credit and 6.5% on the mortgage.~~ Sales of $6,801,307.00 through October 16, 2015 and income and expenses as set forth in the attached report (Exhibit D).  As of October 21, 2015 Debtor had total bank balances of $117,600.24.

EFFECT OF PRE-FILING DISSOLUTION OF

12 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Valley Rolling Corp. and DeLaMCC LLC

Debtor believes that there will be no tax consequence from the dissolution prior to filing this case of Valley Rolling Corp. and DeLaMCC LLC, since Valley Rolling was a Subchapter S corporation and all tax attributes passed through to Debtor and her Husband. DeLaMCC was an LLC and likewise all tax attributes passed through to Debtor, her husband and their children.

DISSOLUTION OF CORPORATIONS AND ASSUMPTION OF LIABILITIES AND ASSIGNMENT OF ASSETS PRIOR TO FILING

Before Debtor filed her Chapter 11 bankruptcy, she entered into agreements with Valley Rolling Mills Corporation and with the owner of the manufacturing facility DeLaMCC LLC to assume all the liabilities of both corporations and for an assignment of all of the assets of the corporations.  The execution of the assumption and assignment agreements occurred on September 26, 2014, two days before the Chapter 11 bankruptcy petition was filed.  Debtor was the majority owner of both the corporation and the LLC.  The minority owners included Debtor's husband and minor children.  All parties accepted the assignment and assumption agreements. The owners of the corporation and the LLC signed in favor of the assignment and assumption agreements.

The business facility at 3071 Schmidt Lane, Hubbard, OR 97032, was owned by DeLaMCC, LLC.  Debts secured by the business facility, which included a tax lien, exceeded the value of the asset.  All of the debt owed by DeLaMCC LLC was secured debt.  None of the creditors, which are set forth in the chart below, were harmed by the assignment and assumption

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

agreement. The creditors secured by the business property owned by DeLaMCC LLC are approximately as follows and are in the order of priority:

| | | |
|---|---|---|
| 1. | Marion County Assessor's Office – Property taxes | $ ~~86,425.00~~135,863.00 |
| 2. | KeyBank National Association | $~~1,600,000.00~~1,787,432.28 |
| 3. | US Small Business Administration | $ 860,448.00 |
| 4. | Oregon Business Development Corporation | $ ~~660,000.00~~706,588.00 |
| 5. | Cascadia Metals Inc. | $ ~~600,000.00~~634,357.00 |
| 6. | Internal Revenue Service – tax lien | $ 57,774.87 |
| 7. | Internal Revenue Service – tax lien | $ 332,859.48 |

In addition to the debts above secured by the real property, DeLaMCC, LLC also owed Valley Development Initiatives $228,326.09, secured by the business equipment. Because all of the creditors of DeLaMCC, LLC are secured, and their security continued after the assignment and assumption agreement, none of the creditors of DeLaMCC, LLC are better or worse off because of the assignment and assumption agreement and subsequent Chapter 11 filing by Debtor, Laura Lee Hagenauer.

<div align="center">CREDITORS OF VALLEY ROLLING CORPORATION</div>

The unsecured creditors of Valley Rolling Corporation would have received nothing if Valley Rolling Corporation had not assigned its assets to Debtor, Laura Lee Hagenauer. The only creditors of Valley Rolling Corporation that would have been paid from a liquidation of Valley Rolling by itself, would have been the secured creditors. These included:

| | | |
|---|---|---|
| 1. | Internal Revenue Service | $ 390,634.35 |
| 2. | Valley Development Initiatives secured by both | $ 228,326.00 |

14 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Both DeLaMCC, LLC and Valley Rolling

3.        KeyBank National Association                    $  549,625.89

            secured by accounts receivable.

4.        Internal Revenue Service – priority taxes     $   57,774.00

In addition, to the extent the tax liens were under secured, all but $136,423.00 would be considered priority taxes and would be paid ahead of any general unsecured creditors of Valley Rolling in a liquidation.

Because these secured creditors retained their liens and because the general unsecured creditors would have received nothing in a Chapter 7 liquidation of Valley Rolling, the unsecured creditors of Valley Rolling were no worse off by Debtor's Assumption and Assignment Agreement then they would have been if Valley Rolling was liquidated without the Assumption and Assignment Agreement.

EFFECT OF ASSUMPTION AND ASSIGNMENT ON DEBTOR'S INDIVIDUAL CREDITORS

If Debtor had been liquidated in a Chapter 7 without the Assumption and Assignment Agreement, her individual creditors are no worse off because of the Assumption and Assignment Agreement.  This is because Debtor had personally guaranteed the majority of the debts of both DeLaMCC LLC and Valley Rolling.  In a personal liquidation, the amount of debt owed by Debtor on guaranteed general unsecured debt equaled $524,444.00.  Upon liquidation of Debtor, all of her personal assets were fully encumbered or exempt or would have been paid to the IRS, since all of the taxes were a personal obligation, and therefore none of her creditors were harmed by the Assignment and Assumption Agreement.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

The major reason why Valley Rolling and DeLaMCC LLC assigned their property interests to Debtor and why she assumed the debt and then filed the Chapter 11, is because otherwise three separate bankruptcy attorneys and three separate bankruptcies would have been necessary. The cost of three separate filings would have been outside of what Debtor, Valley Rolling or DeLaMCC, LLC could afford and Debtor would have been liquidated by KeyBank and the assets of Valley Rolling and DeLaMCC, LLC would have been liquidated by KeyBank with anything left over taken by other secured creditors or the IRS.

<center>RETENTION OF JURISDICTION</center>

Nothwithstanding the entry of an order confirming the ~~Second~~Third Amended Plan, the Court shall retain jurisdiction of the Chapter 11 Case pursuant to and for the purposes set forth in Section 1127(b) and 1141-1146 of the Bankruptcy Code to enforce the provisions of the ~~Second~~Third Amended Plan and to ensure that the intent and purposes of the ~~Second~~Third Amended Plan are carried out and given effect. Without limiting the proceeding, the Court shall retain jurisdiction to classify claims or interests of any creditor, determine requests for payment of claims entitled to priority under section 507(a) of the Bankruptcy Code, avoid transfers or obligations to subordinate claims under chapter 5 of the Bankruptcy Code, approve the assumption, assignment, rejection of executory contracts or leases, resolve controversies and disputes regarding the interpretation or enforcement of the ~~Second~~Third Amended Plan, implement the provisions of the ~~Second~~Third Amended Plan and enter orders in aid of confirmation, approve settlements entered by the Debtor or Creditors' Committee on the Debtor's behalf, adjudicate adversary proceedings and contested matters pending or hereafter commenced in the Chapter 11 Case and enter a final decree closing the Chapter 11 Case.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

<center>AVOIDANCE CLAIMS~~ACTIONS~~</center>

Debtor shall retain any and all claims and causes of action whatsoever (whether known, unknown, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, or undisputed, and whether asserted or assertable directly, indirectly, or derivatively, at law in equity, or otherwise), including, but not limited to, all Avoidance Claims~~Actions~~, subject to the authority given by the bankruptcy court for the Creditors' Committee to pursue certain Avoidance Claims~~Actions~~. Notwithstanding the entry of an order confirming the ~~Second~~Third Amended Plan, so long as any members of the Creditors' Committee are willing to serve, the Creditors' Committee shall continue until it is dissolved by action of the members thereof or until the ~~Second~~Third Amended Plan is complete and all creditors have been paid in full, whichever occurs first. Neither the Creditors' Committee nor any of its past, present, or future members (or any of the respective past, present, or future officers, directors, employees, or agents of such members) shall have or incur any liability to any holder of a claim or equity interest or to any entity for any act or omission in connection with or arising out of the chapter 11 case, or the negotiations and pursuit of confirmation of the ~~Second~~Third Amended Plan, the consummation of the ~~Second~~Third Amended Plan, the pursuit of any Avoidance Claims~~Actions~~ the Creditors' Committee has been authorized to pursue, the administration of the ~~Second~~Third Amended Plan or the property to be distributed under the ~~Second~~Third Amended Plan.

Debtor believes she would have a possible avoidance action against her mother-in-law, Agnes Hagenauer, for money paid to her in the one year prior to filing by Valley Rolling Corp. Debtor had paid Agnes Hagenauer $21,189.58 during the one year prior to filing of the Chapter 11. The Bankruptcy Code provides that money paid to an insider within one year of

17 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

filing a bankruptcy can be recovered by the Debtor in possession or the Trustee for the benefit of the Bankruptcy Estate.  The payments to Agnes Hagenauer starting in the 60th month, ~~are a fair resolution because the majority of the other unsecured debt will be paid by the 60th month and her payments will not dilute the amount being paid to the other general unsecured creditors~~will only be paid if Agnes Hagenauer repays the $21,189.58 preference payments.  The repayment will be paid pro rata to the administrative claims.  The Debt to Agnes Hagenauer will not accrue interest during the first 60 months.  Interest will only begin after the payments start.  Debtor does not intend to pursue the action, but as a concession to the other unsecured creditors is separately classifying the claim and it will be paid starting on the 60th month, if and only if, Agnes Hagenauer has paid to the estate the preference amount of $21,189.58.

The Creditors' Committee also believes the Debtor may have ~~has~~ a preference/fraudulent transfer action against Bank of America for payments by Valley Rolling Corp. on two employee credit cards.  These cards were used by Valley Rolling to purchase product for Valley Rolling to manufacture.  The payments were made to Bank of America within the 90 days preceding the Petition Date, were made to a creditor of Valley Rolling because if the payments had not been made, Bank of America would have asserted an unjust enrichment claim against Valley Rolling and the payments allowed Bank of America to receive more than it would have received in a liquidation under chapter 7.  The payments made during the preference period to Bank of America total over $620,000.  Debtor is not going to pursue these claims but the Court has entered an order authorizing the Creditors' Committee to pursue such claims.

In addition the Creditors' Committee may ~~intends to~~ pursue a claim against unsecured creditor Cannonball for preferential payments made during the 90 days preceding the

18 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Petition Date on a judgment ~~settlement agreement~~ in the amount of $15,000. The payments to Cannonball as a Class 11 Claim will only be paid if Cannonball repays the $15,000 preference payments. ~~.~~

The Creditors' Committee may also pursue ~~is also pursuing~~ a preference claim against FORA Financial for payments of $1,168 per business day during the 90 days preceding the Petition Date totaling $58,430. FORA Financial's purported secured claim was actually entirely unsecured at the time the payments were made based upon the value of the personal property and the lien amounts superior to FORA Financial. The payments to FORA Financial as a Class 11 Claim holder will be paid, if and only if, FORA repays the $58,430 preference payments.

Debtor has no opinion as to the viability or the value of the Avoidance Claims ~~avoidance actions~~. Likewise, Debtor has no opinion as to the projected cost of recovery or the estimated time frame to complete litigation. The Creditors' Committee may, but is not obligated to, pursue any or all of the Avoidance Claims. The proceeds from any transfer recovered by the Creditors' Committee will be used first, to pay for the attorney fees and costs of the Avoidance Claims ~~preference payment~~ litigation, second, to pay administrative expenses that remain unfunded on the Effective Date of the Plan and finally, to pay to general unsecured creditors if there are any excess proceeds.

None of the proceeds of the Preference action litigation will be paid to Reorganized Debtor. If the Creditors Committee is unsuccessful in the litigation, costs of the litigation will be an administrative expense, which will be paid for by Debtor.

19 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Allowed professional fees incurred by the Creditors' Committee, including those incurred in pursuing or analyzing the Avoidance Claims pre-confirmation will be paid pro rata from the Accumulated Administrative Account on the Effective Date. The remaining balance owed and amounts incurred post-confirmation will be paid from any Avoidance Claims recoveries and from Debtor's income from operations and/or the other assets of Debtor if liquidated after the payment of allowed secured claims encumbering such assets. The professional person or agent seeking a payment from the Debtor shall submit an invoice to the Debtor, which (absent an objection by the Debtor) the Debtor shall promptly pay. Any objection which cannot be resolved by the parties shall be resolved by the Court. Creditors' Committee counsel may withdraw from representation in the Avoidance Claim actions if counsel is not getting paid on a timely basis.

Before any Avoidance Claims are commenced, the Creditors' Committee will present to Debtor, KeyBank and Cascadia the proposal to pursue the specific Avoidance Celaim together with the anticipated cost of pursuing such claim. Before the Committee is authorized to go forward, a majority of the above parties must approve the proposal.

REASONS FOR CHAPTER 11 BANKRUPTCY

The main reason for the Chapter 11 filing was the under capitalization of Valley Rolling Corp. and DeLaMCC when they built the new facility in Hubbard, OR. In addition the recession that started in 2007 and continued into 2012 contributed to the eventual insolvency of Valley Rolling and Debtor, Laura Hagenauer. In 2013, Valley Rolling, Inc. and DeLaMMC, LLC defaulted under their loan agreements with KeyBank. Following these defaults, KeyBank entered into forbearance agreements to allow the borrowers to refinance the debt. Under the

20 – SECOND THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

forbearance agreements, the KeyBank loans matured on March 31, 2014.  After waiting several additional months for Valley Rolling and DeLaMMC to secure the promised new financing, on August 1, 2014, KeyBank commenced an action in Marion County Circuit Court to collect the amounts due and owing.  On September 17, 2014, in violation of the state court injunction, Laura Hagenauer, the controlling person of Valley Rolling and DeLaMMC, transferred all of the assets and liabilities of the companies to herself, individually, in consideration of her agreement to assume all outstanding debt.

<center>SECONDTHIRD AMENDED PLAN AND FEASIBILITY</center>

The source of funds to be received for distribution to creditors will be from the ongoing operations of the business and any recoveries from Avoidance Claims.  Distributions will also be made to the secured creditors Marion County, KeyBank, and SBA, Oregon Development Corporation and Cascadia Metals from the sale or refinance of the Valley Rolling building located at 3071 Schmidt Ln NE Hubbard OR 97032.  There will still be a balance of approximately $300,000279,351 owed to Cascadia MetalsSBA after the sale.  None of the other secured creditors, including OBD owed $706,588 and Cascadia Metals owed $634,357 will be paid from the sale.

During the duration of the SecondThird Amended Plan, and as long as payments to Classes 1-12 and Class 15 17 remain unpaid, the Debtor shall not sell, lease, transfer, convey, assign, encumber or voluntarily lien any of Debtor's assets, unless (i) such sale, lease, transfer, conveyance, assignment, encumbrance or lien is related to a non-material asset of Debtor; (ii) the asset is replaced with an asset of equal or greater value within ten (10) days after the transaction; (iii) the encumbrance or lien is the result of a refinance of an existing obligation on more

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

favorable terms than the prior encumbrance or lien; or (iv) such sale, lease, transfer, conveyance or assignment is performed in the ordinary course of Debtor's business consistent with past practices, and will not have a material adverse effect on the business or financial condition of Debtor.

## DEBTOR'S BUDGET INFORMATION

Attached as Exhibit B are Debtor's cash flow projections, which do not include Debtor's monthly household expenses. Debtor's household expenses are listed on the attached Exhibit G and total $4,396.00 per month. Attached as Exhibit C are the monthly plan payments.

## DEFAULT

In the event the Debtor defaults in the performance of any of the obligations under the ~~Second~~Third Amended Plan, the holder of each affected claim may pursue such remedies as are available at law or in equity. An event of default occurring with respect to one claim shall not be an event of default with respect to any other claim. Nothing contained in the ~~Second~~Third Amended Plan shall limit the right of any creditor to reopen this case or move to convert the case to a liquidation under Chapter 7 of the United States Bankruptcy Code if cause exists for such relief.

## TAX CONSEQUENCES

The liquidation analysis shows the tax that will be owed upon sale of the building, even with the capital gains taxes that will be owed upon sale of the properties, Debtor's ~~Second~~Third Amended Plan is still feasible

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

None

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

## RISKS

Risks include that Debtor will be unable to meet cash flow projections and will then be unable to pay the payments called for under the ~~Second~~Third Amended Plan.  Another risk is that Debtor will be unable to sell the building at 3071 Schmidt Lane NE, Hubbard, Oregon for enough to pay the secured creditors scheduled to be paid from the sale.

If Debtor is unable to make the payments called for by the ~~Second~~Third Amended Plan, Debtor might have to convert the case to a case under Chapter 7 of the bankruptcy code and liquidate.

## VALUE OF ASSETS

The real property listed on attached Exhibit A was valued based upon the pending sale price and Debtor's opinion of value.

The value of inventory is based upon the cost of the inventory.

The value of the accounts receivable is based upon the book value of the receivables.  The value of equipment and other personal property is based upon Debtor's opinion of value.

## UNFUNDED 401(K) PLAN

The claim is based upon employee contributions that were withheld from the employees' paycheck, but never remitted to the 401(k) Plan, and unpaid employer contributions due from the required Safe Harbor provision within the 401(k) Plan.  From February, 2011 employees had money withheld from their pay to be forwarded to the 401(k) Plan.  The employees' contributions were instead used by the Debtor for other expenses and were not forwarded to the 401(k) Plan.  Additionally, the Employer failed to make 2011, 2012 and 2013

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

contributions to the 401(k) Plan that were required by the 401(k) Plan Document. EBSA has reviewed records produced by the Debtor, including withholding summaries, asset custodian records and employee paystubs.

After reconciling the records of the Debtor and the 401(k) Plan's accounts, the amount of $139,834.31 remains due and owing to the 401(k) Plan. This amount consists of $63,185.57 in employee contributions, $62,458 in employer contributions and $14,190.74 in interest accrued on unremitted employee contributions.

In discussions with the Department of Labor representative, Debtor's counsel was advised that the Department of Labor intended to vote on the Plan, but that could change if counsel for the Department of Labor advised otherwise.

## RETENTION OF PROPERTY

Debtor intends to retain all personal property. The real property at 3071 Schmidt Lane NE, Hubbard, Oregon will be immediately listed for sale at $3,775,000 and sold on or before February 1, 2016; if the real property is not sold by that timeframe, then KeyBank will be entitled to foreclose its lien against the real property. Debtor will either lease back a part of the facility or move to another location has a pending sale for $2,600,000.00 as set forth above.

COST OF MOVING IF NECESSARY AND ESTIMATED RENT PAYMENT

Based upon Debtor's discussions with the real estate broker, Debtor believes the total monthly rental payment for a new facility of 50,000 square feet will be $28,875.00. In addition, if Debtor is unable to rent at the current location, Debtor estimates the total moving costs to be $83,851.00. Debtor estimates that the time necessary to move and set up would be seven days. Debtor estimates the total loss in net revenue would be $20,000.

24 – SECOND THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

<p style="color:red; text-align:center">RENTAL COST</p>

<p style="color:red">Debtor as part of the sale to R & R is leasing back the building for $15,000 per month.</p>

## DISCUSSION OF CASH FLOWS

Attached cash flow projections, Exhibit B, show that in order for the ~~Second~~Third Amended Plan to be feasible there needs to be a net cash flow before plan payments and rent of approximately $~~60,000~~49,557.02 per month from Valley Rolling. Debtor's cash flows since the date of filing show that Debtor has had average net income from Valley Rolling of approximately $~~35,000~~42,000 per month before items to be paid through the ~~Second~~Third Amended Plan. See attached Exhibit C. ~~The cash flow projections include a payment provision for both back property taxes and current property taxes. See Exhibit B to this Amended Disclosure Statement.~~ The cash flow projections include a ~~5%~~3% increase per year in gross sales and a 1% - 3% increase in expenses. This is included in the projections to account for an improving economy and also to account for inflation. Before the recession in 2008, Debtor had annual sales of $9,592,273.66 in 2007. Last year, 2014, total sales were $7,540,136.00. If the cash flows are not met, Debtor will be unable to make the payments called for under the ~~Second~~Third Amended Plan of Reorganization and Debtor's reorganization may fail.

## FUNDS FOR PAYMENT OF ADMINISTRATIVE AND 503 CLAIMS

If Debtor does not have funds on hand sufficient to make the proposed payments to administrative and 503(b) claims, the Plan will not be confirmable. This will require Debtor to have not less than $~~72,000~~136,008 in its restricted account on the date of confirmation. The Debtor will notify the Bankruptcy Court, the U.S. Trustee, counsel for the Creditors' Committee,

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Cascadia Metals, Inc. and KeyBank as soon as practicable, but in any event not less than ten (10) days prior to the confirmation hearing if it does not appear that Debtor will have sufficient funds on hand to make the payment on the Effective Date.

<div align="center">ALTERNATIVES</div>

Alternatives to this ~~Second~~Third Amended Plan include dismissal of the case, conversion to a case under Chapter 7 or adoption of a different plan. If the case is dismissed, creditors may assert and enforce their claims against Debtor by any method allowed by law. Secured creditors may foreclose their security interest and creditors may obtain Judgment and levy on unencumbered assets.

If this case is converted to a case under Chapter 7, a trustee will be appointed to liquidate the Debtor's assets for the benefit of the estate. Costs of liquidation, secured claims (with respect to the specific collateral liquidated), administrative claims, priority tax claims, and Debtor's exemptions will be paid in full before any payment is made to unsecured creditors. Exhibit A shows the proponent's estimate of the possible results if the Debtor is liquidated in a Chapter 7 case, including the resultant amount available to pay unsecured claims.

The proponent believes that if the Debtor were liquidated in a Chapter 7 the amount available to pay general unsecured creditors would be 0%. Debtor is proposing to pay all unsecured claims plus 3.25% interest. Attached as Exhibit A is the liquidation analysis.

<div align="center">VOTING AND CONFIRMATION</div>

<u>Who May Vote</u>. Creditors are entitled to vote on confirmation of the ~~Second~~Third Amended Plan unless (i) the class is unimpaired (presumed to accept) or are to receive no distribution (presumed to reject); (ii) an objection has been filed to that creditor's

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

claim; or (iii) the claim is unclassified (required by law to be paid in full). A creditor whose claim has been objected to and who wishes to vote must move to have its claim allowed for voting purposes by filing a motion for such relief in time for that motion to be heard at or before the confirmation hearing. All classes of claims will be entitled to vote except the Unclassified Claims.

How to Vote. Fill out and return the attached ballot so that it is received by Debtor's counsel on or before (date will be set by the Court). Mail to Ted A. Troutman, 5075 SW Griffith Dr, #220, Beaverton, OR 97005.

Effect of Vote. A class of creditors accepts the ~~Second~~Third Amended Plan it if is accepted by a majority in number and two-thirds in dollar amount of creditors who cast ballots. Because this is an individual Chapter 11 the court may confirm the ~~Second~~Third Amended Plan even if only one class of creditors accepts the ~~Second~~Third Amended Plan.

Deadline for Voting to Accept or Reject the ~~Second~~Third Amended Plan. The Court will set a Confirmation Hearing date. Notice of that date will be mailed to each creditor. If you are entitled to vote whether to accept or reject the ~~Second~~Third Amended Plan, you will vote on the Ballot that we will mail to you along with the ~~Second~~Third Amended Plan. A sample copy of the Ballot is attached as Exhibit J. You must return the Ballot by the date set by the Court or it will not be counted. Debtor believes that all classes of creditors are entitled to vote except for unclassified claims. All creditors have a choice to vote for or against the ~~Second~~Third Amended Plan. The Court cannot confirm the ~~Second~~Third Amended Plan unless at least one class of Impaired Creditors accepts the ~~Second~~Third Amended Plan.

27 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Impairment of Claims. As noted above, the holder of an allowed claim may vote only if it is in a class that is impaired under the ~~Second~~Third Amended Plan. You will find this in Section 1124 of the Bankruptcy Code. A class is considered Impaired if the ~~Second~~Third Amended Plan alters the legal, equitable, or contractual rights of the members of that class. Debtor believes that all of the classes of creditors, other than administrative claims, and unclassified claims will be allowed to vote. **Even if you are not entitled to vote on the ~~Second~~Third Amended Plan, you have a right to object to the confirmation of the ~~Second~~Third Amended Plan and to object to the adequacy of the Amended Disclosure Statement.**

Treatment of non-accepting Classes. If one or more Impaired Classes reject the ~~Second~~Third Amended Plan, the Court may none the less confirm the ~~Second~~Third Amended Plan if the non-accepting classes are treated in the manner described by 1129(b) of the Code. The ~~Second~~Third Amended Plan that binds non-accepting classes is called a "cram down" plan. The Code allows the ~~Second~~Third Amended Plan to bind non-accepting classes of claims if it meets all the requirement for confirmation except the voting requirement of 1129(a)(8) of the code, it does not discriminate unfairly and is fair and equitable toward each impaired class that has not voted to accept the ~~Second~~Third Amended Plan. **You should consult your own attorney about how a "cram down" confirmation will affect your claim, as variations on this general rule are numerous and complex.**

Financial Information. Debtor intends to make the payments required under the ~~Second~~Third Amended Plan from cash available on the effective date and from future revenue from operation of Valley Rolling and from sale or refinance of the real property located at 3071

28 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Schmidt Ln NE, Hubbard, OR 97032.  The cash flow projection, Exhibit B, shows the ~~Second~~Third Amended Plan is feasible.

Operations in Chapter 11.  During the ~~9~~ 12 months since the petition date, Debtor has collected gross revenues of approximately $~~5,429,163~~6,801,307.  The net revenue for Debtor after adequate protection payments has been approximately $~~98,176~~137,976 through ~~July 31~~October 10, 2015.  Upon request, Debtor will provide copies of monthly operating reports filed with the Court.

Cash Available on effective Date.

(1)     Cash on hand as of ~~07/31/15~~10/21/15:  $~~80,395~~117,600.24

(2)     The total amount to be paid on the Effective Date:

$~~58,108.00~~154,559~~, plus approximately $72,000 in the Accrued Administrative Account to Allowed Administrative Claims, pro rata~~.

Liquidation Analysis.  General unsecured creditors would be paid $-0- in a Chapter 7 liquidation.  See attached Exhibit A.

Attached as Exhibit B is a cash flow analysis.

Attached as Exhibit C is a plan payment chart.

Attached as Exhibit D are historical profit and loss statements post-petition.

Attached as Exhibit E are historical profit and loss statements pre-petition.

Attached as Exhibit F is a current balance sheet and pro forma balance sheet.

Attached as Exhibit G is Debtor's personal monthly budget.

Attached as Exhibit H is a Sample Ballot for accepting or rejecting ~~Second~~Third Amended Plan.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

TREATMENT OF CLASSES

Class 1    Impaired Secured Claim of KeyBank secured by 3071 Schmidt Lane NE, Hubbard, OR 97032 in the approximate amount of $~~1,605,401.05~~1,787,432.28.  ~~The interest rate will be reduced to 6.5%.  The payments on the loan will be $14,730.00 per month until~~claim will be paid from the sale of the property at 3071 Schmidt Lane NE, Hubbard, OR 97032.  ~~The property will be immediately listed and will be sold on or before February 1, 2016.  If not sold by that date, the automatic stay or discharge injunction shall terminate with respect to KeyBank and KeyBank shall be relieved from the effect of any stay under the Bankruptcy Code and any other restriction on the enforcement of its lien against the property.  The Debtor shall make regular payments to KeyBank in the amount of $14,730 until the earlier of the sale of the property or February 1, 2016.~~Debtor expects the sale of the property for $2,600,000 will be approved at a hearing for approval to sell the property free of liens scheduled for November 4, 2015.  The additional approximately $55,333.74 owed to KeyBank for default interest will be subordinated to the claim of SBA and will become a Class 11 unsecured debt.

Class 2    Impaired Secured Claim of KeyBank secured by the accounts receivable, equipment and accounts of Debtor in the approximate balance of $~~562,363.00~~430,932.11.  The loan documents will be modified to reduce the interest rate to 6.5% per annum.  The loan will be modified to require monthly payments of $~~11,003.28~~8,431.68 for 60 months ~~upon~~ starting 30 days after the Effective Date of the ~~Second~~Third Amended Plan.  Any pre-petition default on the loan will be waived.

Class 3    Impaired Secured Claim of Valley Development Initiatives secured by the equipment formerly owned by Valley Rolling, Inc. and DeLaMCC, LLC.  The balance of the

30 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

loan is approximately $229,028.88. The loan documents will be modified to require monthly payments of $~~1,129.00~~2,542.69 ~~which represents~~with interest ~~only~~ at 6% per annum. These payments will start ~~on~~ 30 days after the Effective Date and continue for a period of ~~18~~120 months~~, at which time the loan will require monthly payments of $1,791.00 for a period of 42 months. At the end of 42 months the entire unpaid balance of principal and interest will be due. The balance due at the end of the 42 months will be $198,926.70 and can be paid out of Debtor's cash flow as set forth on attached Exhibit B~~.

Class 4    Impaired Claim of Oregon Business Development Initiatives secured by a second lien on Debtor's residence, a third lien on Debtor's building at 3071 Schmidt Lane NE, Hubbard, OR 97032, and a third lien on the personal property of Valley Rolling. Any pre-petition default on the loan will be waived. The loan is in the approximate amount of $~~660,000~~706,588.00. ~~The loan will be paid at $4,250 per month until the business property~~There is no equity in the building at 3071 Schmidt Lane NE, Hubbard OR 97032 to support the secured claim on the building.~~is sold, at which time the loan will be paid in full.~~ There is no equity in the personal property to support the secured claim. There is $350,000 in equity in Debtor's residence to support the lien. The balance of the lien in the amount of $356,588 will be paid as an unsecured claim pursuant to Class 11. The secured claim in the amount of $350,000 will be paid interest only at 4% with monthly payments of $1,166.67 for 45 months. The balance of $350,000 will then be re-amortized over 240 months at 4% interest and monthly payments of $2,120.93. The first payment will be due 30 days after the Effective Date.

Class 5    Impaired Secured Claim of US Small Business Administration of $860,448.55 secured by a third lien on the property at 3071 Schmidt Lane NE, Hubbard, OR

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

97032. ~~For a period of 12 months following the Effective Date of the Second Amended Plan, the monthly payments will be interest only with payments in the amount of $1,980.00.~~ The loan will be paid ~~in full~~approximately $581,097.24 upon the sale of the business property at 3071 Schmidt Lane NE, Hubbard, OR 97032. The balance of the loan will be paid as a Class 11 unsecured claim.

Class 6       Impaired Unsecured Inventory Related Claims of Current Suppliers.

These claimants are:

| | |
|---|---|
| ~~Cascadia Metals, Inc. (approximate)~~ | ~~$300,000.00~~ |
| RF Factor | 61,107.25 |
| Winrock – Superior Plus | 42,922.41 |
| Atlas Bolt & Screw | 8,109.88 |
| Champion Metal of Washington | 12,167.97 |
| TOTAL | $~~424,307.51~~124,307.51 |

These creditors will be paid the amount of any current invoice shipped after confirmation of the ~~Second~~Third Amended Plan plus an additional 1.5% of the invoice to apply toward the unpaid claim. These payments will continue until the claim is paid in full plus 3.25% interest. The payments will start 30 days after the Effective Date. If any of the claimants cease to be suppliers of Debtor, the balance left owing on the claim will be amortized with monthly payments for ~~72~~120 months with 3.25% interest.

Class 7       Impaired Unsecured Claim of Cascadia for balance of $634,357.58. This balance will be paid after the 503(b)(5) Claim of Cascadia has been paid in full. The balance

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

will be paid the amount of any current invoice shipped after confirmation of the Third Amended Plan plus 1.5% of the invoice.

Class 8       Unimpaired Secured Claim of GreenTree Home Mortgage in the amount of $159,004.44 secured by Debtors personal residence at 1129 Belle Passi Rd., Woodburn, OR 97071.  Debtor will continue to make the payments according to the terms of the mortgage.  At the time the case was filed, there was no arrearage on the GreenTree Home Mortgage.  Since the filing of the case, Debtor did become delinquent on the mortgage, however that delinquency has been cured.  Debtor will stay current on the GreenTree Home Mortgage loan.

Class 89       Impaired Secured Claim of Marion County secured by Debtor's real property at 3071 Schmidt Lane NE, Hubbard, OR 97032 in the approximate amount of $124,167. Debtor will pay $4,000 for the past due property tax each month and pay the current taxes as they come due in 3 monthly installments as allowed by the County.  The taxes will accrue interest at the statutory rate of 16%.The claim will be paid in full upon sale of the property.

Class 9       Impaired Secured Claim of Cascadia Metals Inc. in the amount of $350,000 secured by a fourth lien on Debtor's real property at 3071 Schmidt Lane NE, Hubbard, OR 97032.  Debtor will make no payments on this claim until the sale of the property.  Cascadia will receive all funds left after payment of the prior liens.  The balance left owing, estimated at $350,000, constitutes a general unsecured claim, a class 6 claim.

Class 10       Impaired Unsecured Claim of Chase Bank in the amount of $110,496.64. This claim is for Debtor's use of a personal credit card to fund the Valley Rolling operation.  The claim will be amortized over 120 months with interest at the rate of 3.25% per annum.  The first

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

~~payment will be due on the Effective Date in the amount of $1,079.76 with an equal monthly payment thereafter for a total of 120 months.~~

Class ~~11~~10    Impaired ~~Claim of~~ Unsecured Claim~~s~~ Under $1,000 will be paid 60 days after the Effective Date of the ~~Second~~Third Amended Plan without interest.  These claims are as follows:

| | |
|---|---|
| Primesource Building Products | $935.20 |
| Wells Fargo | 870.00 |
| Century Link | 773.29 |
| Pitney Bowes Purchase Power | 730.14 |
| Long Brothers Building Supply Inc. | 630.15 |
| AT&T | 610.74 |
| Pacific Marketing | 583.68 |
| J.J. Thayer Company | 569.73 |
| Pitney Bowes | 432.40 |
| Davison Auto Parts | 384.39 |
| Teletrac | 337.00 |
| Commercial Business Machines | 250.00 |
| Amerititle | 200.00 |
| G.W. Hardware | 199.19 |
| Industrial Welding Supply, Inc. | 165.69 |
| Oak Harbor Freight Lines, Inc. | 69.84 |
| Marion County Tax Collector | 42.99 |

34 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Northwest Natural Gas                                    13.16

Fastenal                                                      8.89

                        TOTAL              $7,806.48

Class ~~12~~11     Impaired Claim of Unsecured Creditors with claims over $1,000 that are
not Current Inventory Suppliers.  These claims total $~~467,559.71~~1,345,139.30 and will be
~~amortized over 84 months with 3.25% interest~~paid interest only payments for the first 45 months
starting  30 days after the Effective Date.  The total monthly payment amount will be
$~~6,230.83~~3,643.09.  After 45 months the payments will increase to amortize the debt over 120
months with total monthly payments of $14,243.08.  These creditors and monthly payments are
as follows:

| | Balance Owed | Interest Only Payment | After 45 Months |
|---|---|---|---|
| Marc Nelson Oil Products | $17,985.35 | $~~239.68~~ 48.71 | $   190.44 |
| Discover | 17,175.84 | ~~228.89~~ 46.52 | 181.87 |
| Mackey Porth & Unrein | 9,838.97 | ~~84.96~~ 26.65 | 104.18 |
| Toyota Lift Northwest | ~~6,375.00~~5,078.80 | ~~67.68~~ 13.76 | 53.78 |
| KeyBank (default interest) | 55,333.74 | 149.86 | 585.90 |
| SBA | 279,351.31 | 756.58 | 2,957.93 |
| FORA Financial [2] | 45,576.20 | 123.44 | 482.59 |
| Chase Bank | 110,496.69 | 299.26 | 1,170.00 |
| Oregon Business Development | 356,588.97 | 965.76 | 3,775.76 |

---

[2] But see Paragraph 2, Page 19 above.  Before FORA Financial can receive any distribution, it must pay back the
preference payments.

35 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

| | | | |
|---|---|---|---|
| Les Schwab | 2,901.89 | ~~38.67~~ 7.86 | 30.73 |
| MWI Components | 2,950.74 | ~~38.11~~ 7.99 | 31.24 |
| Mt. Angel Telephone | 2,492.44 | ~~33.22~~ 6.75 | 26.39 |
| National Manufacturing Co. | 2,014.98 | ~~26.85~~ 5.46 | 21.34 |
| Aramark Uniform Services | 1,927.19 | ~~25.68~~ 5.22 | 20.41 |
| Artis Metals Company, Inc. | 1,455.31 | ~~19.39~~ 3.94 | 15.41 |
| McMinnville Gas Inc. | 1,406.36 | ~~18.74~~ 3.81 | 14.89 |
| Portland General Electric | 1,332.90 | ~~17.76~~ 3.61 | 14.11 |
| Protec, Inc. Security, Fire & Video | 1,295.00 | ~~17.26~~ 3.51 | 13.71 |
| Cannonball [3] | 29,134.12 | ~~388.25~~78.90 | 308.49 |
| ISS West | 224,493.64 | ~~2,991.66~~608.00 | 2,377.06 |
| Euler Hermes | 48,414.04 | ~~645.18~~131.12 | 512.63 |
| Penske (Disputed) | 60,949.29 | ~~346.66~~165.07 | 645.36 |
| IRS General Unsecured | ~~14,254.31~~50,931.92 | ~~189.96~~110.86 | 433.41 |
| Associated Management Consultants (AMCI) 26,013.61 | | ~~346.66~~70.45 | 275.45 |
| TOTAL | $~~467,559.71~~1,345,139.30 | $~~6,230.83~~3,643.09 | $14,243.08 |

Class ~~13~~12   Impaired Unsecured Claim of Agnes Hagenauer in the amount of

$259,000.  This claim will be paid starting in the 60th month after confirmation with 3.25%

interest only if she has repaid to the Creditors' Committee, pursuant to Section 7 of the Third

Amended Plan, the preference payment of $21,189.58 she received.  Monthly payments starting

the 60th month after confirmation will be $4,682.72 per month until paid in full.  The claim of

---

[3] But see Paragraph 1, Page 19 above.  Before Cannonball receives any distributions, it must pay back the preference amounts.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Agnes Hagenauer in the amount of $259,000 will not accrue interest until after payments begin in the 60th month.

Class ~~14~~13 Impaired Unsecured Claim of Dennis Hagenauer in the amount of $57,957.36 for money advanced by Dennis Hagenauer to Valley Rolling on his personal credit lines and in cash. This claim will be paid ~~starting 60 months after the Effective Date~~ after Class 11 is paid in full with monthly payments of $1,047.87 for 60 months. Interest will accrue starting in the ~~60th~~ 165th month at 3.25% per annum.

Class ~~15~~14 Impaired Unsecured Claim of Employee Bruce Kahler in the amount of $59,309.47. This debt will be paid ~~in full with 3.25% interest starting on the Effective Date~~ after Class 11 is paid in full. Payments will be $1,072.32 per month for 60 months. Interest will accrue starting in the 165th month at 3.25% per annum.

Class ~~16~~15 Impaired Claim for Unfunded 401(k) Plan in the amount of $~~126,709.00~~139,834.31. This claim is for unfunded 401(k) contributions for employees of Valley Rolling Corp. including Debtor and her husband. $4,795.46 is priority debt and will be paid on the Effective Date. Payments on this claim will start January of 2018 in the amount of $3,500 per month with~~out~~ interest at 3% until paid in full.

Class ~~17~~16 Impaired Secured Claim of KeyBank secured by 3071 Schmidt Lane NE, Hubbard, OR 97032, which is the amount of KeyBank's indebtedness in Class 1 by which the default rate of interest exceeds the non-default rate of interest in KeyBank's claim, and any late fees, pre-payment penalties and other default charges included in KeyBank's claim, which are subordinate to the SBA's Class 5 claim, as provided in the Prior Lienholder Agreement between SBA as assignee and KeyBank, dated February 14, 2012 and recorded February 23, 2012 in

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Marion County, Oregon, recording number 3359 p 88.  These amounts will be paid from the sale

of 3071 Schmidt Lane NE after payment in full to SBA Class 5.  Any amount unpaid will be a

Class 11 General Unsecured claim.

Class ~~18~~17       Disputed Secured Claim of AMCI (Associated Management Consultants

Inc.) in the amount of $26,013.61.  Debtor asserts the claim is unsecured and intends to file an

objection to secured status of the claim.  If the Court determines the claim is secured, the claim

will be paid with five percent (5%) interest over sixty (60) months with monthly payments of

$490.91 until paid.  If the claim is determined by the Court to be unsecured, it will be paid as

part of Class ~~12~~ 11. ~~over eighty-four (84) months at three and one-quarter percent (3.25%)~~

~~interest and monthly payments of $346.66.~~

### TREATMENT OF UNCLASSIFIED CLAIMS

**Administrative Claims** allowed by the Court for professional fees of Debtor's

counsel, Debtor's financial consultant and Committee's Counsel shall be paid as follows: (1) a

pro rata share of the account established pursuant to the Stipulated Final Order For Use of Cash

Collateral (Doc. No. 153) at paragraph 10, (the "Accumulated Administrative Account") along

with the Allowed 503(b)(9) Claims as set forth below, upon the Effective Date; (2) a pro rata

share of any Avoidance Claims recoveries; (3) a pro rata share of monthly payments of

$~~3,000~~4,000 per month ~~from~~ starting 30 days after the Effective Date ~~for 12 months; (4) a pro~~

~~rata share of monthly payments of $3,500 per month for the next 12 months; and (5) a pro rata~~

~~share of monthly payments of $4,000 per month thereafter~~ until paid in full.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

~~**IRS Secured Claim** in the amount of $311,973.83 will be paid starting on the November 20, 2015 with monthly payments of $7,043.63 and interest at the rate of 3% per annum until paid in full.~~

**IRS Secured Claim for Amounts Due that Would Otherwise be General Unsecured Claim pursuant to Bankruptcy Code.** The IRS secured claims that, but for the security would otherwise be general unsecured claims can be paid over a longer period than sixty (60) months. ~~This~~ The claim ~~is~~ for penalty ~~in the amount of $136,423.00 and~~ is secured by Debtor's personal property valued at $109,745.00. It will be paid over 84 months with equal payments of $1,288 starting 30 days after the Effective Date. ~~$500 per month starting November 2015 through September 2017. Starting October 2017 the payments will increase to $1,000 per month through September 2018. Starting October of 2018 the payments will increase to $1,250 through September of 2019. Starting October 2019 the payments will increase to $1,500 per month through September of 2020. Starting October of 2020 the payments will increase to $2,500 per month and continue until paid in full.~~ Interest will accrue on the unpaid balance at 3% per annum.

**IRS Priority Claim** in the amount of $~~51,363.78~~363,337.83 will be paid starting ~~November~~ January 20, ~~2015~~2016 with monthly payments of $~~1,136.90~~8,730.48 and interest at three percent (3%) until paid in full.

**Oregon Department of Revenue Priority Claim.** Upon the Effective Date of the ~~Second~~Third Amended Plan, the unpaid balance of $~~47,287~~56,690 will be paid over ~~48~~45 months with monthly payments of $~~1,154.41~~1,462.34. The claim will be paid with interest of 8% per annum as required under § 511 of the bankruptcy code.

39 – ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

**Priority Tax Claim of California Board of Equalization** in the amount of $9,838.97 will be paid over ~~48~~ 45 months with interest at the statutory rate of 9% per annum. Monthly payments starting on the Effective Date of the ~~Second~~Third Amended Plan will be $~~244.84~~258.42.

**Priority Claim of the Oregon Employment Division** in the amount of $50,902.49 will be paid over ~~48~~ 45 months with the statutory interest rate of 8% per annum and monthly payments starting on the Effective Date of the ~~Second~~Third Amended Plan in the amount of $~~1,242.68~~1,313.05.

**503(b)(9) Claims.** There are filed 503(b)(9) administrative claims of $332,068.28. These claims are all from current suppliers including Cascadia Metals, Inc. which has filed a 503(b)(9) claim for $137,544.18, West Coast Metals for $174,456.90 and Atlas Bolt for $20,067.20. These claims will be paid ~~1.8%~~1.5% additional funds for each invoice for goods sold to Debtor. If the creditor ships goods invoiced at $100,000 they will be paid $100,000 plus ~~1.8%~~1.5% toward the 503(b)(3) claim which would equal an additional $1,800. This will continue until the claim, plus 3.25% interest, is paid in full. It is estimated that the amount of time required to pay the 503(b)(9) claims in full is 36 months from the Date of Confirmation as set forth on attached Exhibit B. Cascadia Metals and West Coast Metals have verbally agreed to the proposed treatment.

**Penske Administrative Claim** for post-petition charges incurred between September 29, 2014 and November 4, 2014 in the amount of $25,976.75. ~~Debtor has filed a claim dispute on this claim alleging the claim should be reduced to $4,607.37. Debtor will be required to pay on the Effective Date of the Plan, the full allowed claim of Penske, unless Penske~~

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

agrees in writing to be treated the same as the other administrative claims Debtor and Penske have agreed this claim will be paid $12,988.38 on the Effective Date, plus 9 monthly payments of $1,443.15 starting 30 days after the Effective Date.

DATED: August 18 October 23, 2015

/s/Laura Lee Hagenauer

Laura Lee Hagenauer

PRESENTED BY:

/s/Ted A. Troutman

Ted A. Troutman, OSB # 844470
Troutman Law Firm P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
503-292-6788 TEL
503-596-2371 FAX
tedtroutman@sbcglobal.net
Of Attorneys for Debtor

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

EXHIBIT LIST

EXHIBIT A – Liquidation Analysis

EXHIBIT B – Cash Flow Analysis

EXHIBIT C – Plan Payment Chart

EXHIBIT D – Historical Profit & Loss Statements Post-Petition

EXHIBIT E – Historical Profit & Loss Statements Pre-Petition

EXHIBIT F – Current Balance Sheet

EXHIBIT G – Personal Monthly Budget

EXHIBIT H – Sample Ballot for accepting or rejecting plan

EXHIBIT I – Sale Agreement

EXHIBIT J – Proposed Lease

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

# EXHIBIT A
## LIQUIDATION ANALYSIS
### Laura Lee Hagenauer
### Bankruptcy Case No. 14-63530-fra11


### Building and Land
### 3071 Schmidt Lane NE, Hubbard, OR 97032

| | |
|---|---|
| Value | $ ~~3,775,000.00~~2,600,000.00 |
| 1st lien – KeyBank | <1,605,401.00> |
| 2nd lien – SBA | <  811.075.00> |
| 3rd lien – Oregon Business Development | <  660,000.00> |
| 4th lien – Cascadia Metals | <  634,358.00> |
| Marion County Tax | <  124,000.00> |
| IRS liens | <  481,899.61> |
| Cost of Sale – 7% | <  266,000.00> |
| Trustee's Commission | <  136,500.00>* |
| Equity | < ~~944,233.01~~2,121,733.00> |
| Net to Estate | $   -0- |


### Debtor's Residence
### 1129 Belle Passi Rd., Woodburn, OR 97071
### 50% Interest

| | |
|---|---|
| Value | $ 250,000.00 |
| 1st lien – GreenTree (1/2) | <  79,502.00> |
| 2nd lien – Oregon Business Development ~~(paid by Sale of building on Schmidt Lane)~~ | ~~-0-~~<  660,000.00> |
| Trustee's Commission at 3% | <  7,500.00> |
| Cost of Sale – 7% | <  17,500.00> |
| Exemption | <  22,975.00> |
| Equity | $ 122,523.00 |
| IRS lien ($481,899.61) | <  122,523.00> |
| Net to Estate | $   -0- |

IRS lien remaining after house sale - $481,899.61 - $~~122,523.00~~-0- = $ ~~359,576.61~~481,899.61


### Whole Life Policy

| | |
|---|---|
| Value | $ 9,936.56 |
| IRS lien | <  9,936.56> |
| Net to Estate | $   -0- |

Remaining IRS lien - $~~359,576.61~~ 481,899.61 – $9,936.56 = $~~349,640.05~~471,963.05


### Household Goods

| | |
|---|---|
| Value | $ 6,000.00 |

IRS ~~line~~lien          <    6,000.00>
Net to Estate                           $  -0-

Remaining IRS lien - $~~349,640.05~~471,963.05 - $6,000.00 = $~~343,640.05~~465,963.05

### Books, Pictures, Home Décor

Value                  $    1,500.00
Exemption          <    1,500.00>
Net to Estate                           $  -0-

### Clothing and Shoes

Value                  $     500.00
Exemption          <     500.00>
Net to Estate                           $  -0-

### Jewelry

Value                  $    1,000.00
Exemption          <    1,000.00>
Net to Estate                           $  -0-

### Annuity

Value                  $   57,858.00
IRS lien             <   57,858.00>
Net to Estate                           $  -0-

Remaining IRS lien: $~~343,640.05~~465,963.05- $57,858.00 = $~~285,782.05~~408,105.05

### Valley Rolling Accounts Receivable

Value                  $  422,308.49
KeyBank lien        <  548,610.21>
Net to Estate                           $  -0-

Remaining KeyBank lien: $548,610.21 - $422,308.49 = $126,301.72

### 1988 Bounder Motorhome
### ½ interest

Value (1/2)            $    5,150.00
IRS lien             <    5,150.00>
Net to Estate                           $  -0-

Remaining IRS lien: $~~285,782.05~~408,105.05 - $5,150.00 = $~~280,632.05~~402,955.05

## 1997 Ford Expedition
## ½ interest

| | | |
|---|---|---|
| Value (1/2) | $ | 500.00 |
| Cost of Sale – 10% | < | 50.00> |
| Trustee's Commission – 3% | < | 15.00> |
| IRS lien | <u>< | 435.00></u> |
| Net to Estate | $ | -0- |

Remaining IRS lien: $~~280,632.05~~402,955.05 - $435.00 = $~~280,197.05~~402,520.05

## 2011 Ford F350
## ½ interest

| | | |
|---|---|---|
| Value (1/2) | $ | 17,000.00 |
| Cost of Sale – 10% | < | 1,700.00> |
| Trustee's Commission – 3% | < | 510.00> |
| Debtor's Exemption | < | 3,675.00> |
| IRS lien | <u>< | 11,115.00></u> |
| Net to Estate | $ | -0- |

Remaining IRS lien: $~~280,197.05~~402,520.05 - $11,115.00 = $~~269,082.05~~391,405.05

## Office Equipment

| | | |
|---|---|---|
| Value | $ | 49,180.27 |
| Cost of Sale – 10% | < | 4,918.03> |
| Trustee's Commission – 3% | < | 1,475.41> |
| IRS lien | <u>< | 42,786.83></u> |
| Net to Estate | $ | -0- |

Remaining IRS lien: $~~269,082.05~~381,405.05 - $42,786.83 = $~~226,295.22~~348,618.22

## Equipment

| | | |
|---|---|---|
| Value | $ | 500,000.00 |
| VDI lien | < | 229,028.88> |
| Cost of Sale – 10% | < | 50,000.00> |
| Balance of KeyBank lien | < | 126,301.72> |
| Trustee's Commission – 3% | < | 15,000.00> |
| IRS lien | <u>< | 79,669.40></u> |
| Net to Estate | $ | -0- |

Remaining IRS lien: $~~226,295.22~~348,618.22 - $79,669.40 = $~~146,625.82~~268,948.82

## Lawn Mower

| | | |
|---|---|---|
| Value | $ | 3,000.00 |
| Cost of Sale – 10% | < | 300.00> |
| Trustee's Commission – 3% | < | 90.00> |
| IRS lien | <u>< | 2,610.00></u> |
| Net to Estate | | $ -0- |

Remaining IRS lien: $~~146,625.82~~268,948.82 - $2,610.00 = $~~144,015.82~~266,338.82

## Shop Tools

| | | |
|---|---|---|
| Value | $ | 3,000.00 |
| Cost of Sale – 10% | < | 300.00> |
| Trustee's Commission – 3% | < | 90.00> |
| IRS lien | <u>< | 2,610.00></u> |
| Net to Estate | | $ -0- |

Remaining IRS lien: $~~144,015.82~~266,338.82 - $2,610.00 = $~~141,405.82~~263,728.82

## Inventory

| | | |
|---|---|---|
| Value | $ | 761,803.12 |
| Cost of Sale – 10% | < | 76,180.31> |
| Trustee's Commission – 3% | < | 22,854.09> |
| IRS lien | <u>< | ~~141,405.82~~263,728.82></u> |
| Net to Estate | | $~~521,362.90~~399,039.90 |

| | |
|---|---|
| Total Available before Priority and Administrative Costs | $~~521,362.90~~399,039.90 |
| Priority Taxes – ODR | < ~~47,287.10~~56,000.00> |
| Oregon Employment Department | < 50,902.00> |
| California Board of Equalization | < 9,839.00> |
| 503(b)(9) Claims** | <339,418.00> |
| Estimated Unpaid Administrative Expenses | <u><250,000.00></u> |
| **Balance Available to Unsecured Creditors** | **$ -0-** |
| | ========== |

*Trustee's Commission:  25% of first $5,000; 10% of $5,000 - $50,000; 5% of $50,000 - $1,000,000; 3% of anything over $1,000,000

Laura L. Hagenauer
dba Valley Rolling Corporation
Post Petition Operating Forecast
2015

| Description | % | YTD 09/30/15 Actual | OCT 2015 Forecast | NOV 2015 Forecast | DEC 2015 Forecast | YTD Total 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Material Sales | | 4,993,055 | 736,000 | 625,000 | 600,000 | 6,954,055 | 7,162,676 | 7,377,556 | 7,598,883 | 7,902,838 | 8,218,952 | 8,465,521 | 8,719,486 | 8,981,071 | 9,250,503 | 9,528,018 |
| Labor/Handling Charges | | 35,199 | 1,000 | 1,000 | 1,000 | 38,199 | 1,236 | 1,273 | 1,311 | 1,351 | 1,391 | 2,209 | 2,275 | 2,344 | 2,414 | 2,486 |
| Freight & Pkg Revenue | | 15,499 | 1,000 | 1,000 | 1,000 | 18,499 | 24,528 | 25,754 | 27,042 | 28,394 | 29,813 | 31,304 | 32,869 | 34,513 | 36,238 | 38,050 |
| Common Carrier Revenue | | 37,369 | 4,000 | 4,000 | 4,000 | 49,369 | 116,393 | 122,118 | 128,224 | 134,635 | 141,367 | 148,435 | 155,857 | 163,649 | 171,832 | 180,424 |
| Payment & Pricing Discounts Allowed | | (202,582) | (22,000) | (20,000) | (20,000) | (266,582) | (241,105) | (250,750) | (260,780) | (268,603) | (276,661) | (284,961) | (293,510) | (302,315) | (311,384) | (320,726) |
| Total Sales | 67.0% | 4,958,440 | 720,000 | 629,000 | 586,000 | 6,775,555 | 7,063,637 | 7,275,952 | 7,494,680 | 7,798,615 | 8,116,862 | 8,362,508 | 8,616,978 | 8,879,261 | 9,149,603 | 9,428,252 |
| **Cost of Sales** | 0.3% | | | | | | | | | | | | | | | |
| Materials | | 3,408,817 | 500,882 | 425,000 | 408,000 | 4,742,297 | 4,870,620 | 5,016,738 | 5,167,241 | 5,373,930 | 5,588,887 | 5,756,554 | 5,929,251 | 6,107,128 | 6,290,342 | 6,479,052 |
| Scrap | | (71) | | | | (71) | | | | | | | | | | |
| Freight In | | 3,142 | 350 | 350 | 350 | 4,192 | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,304 | 6,120 |
| Total Material Costs | | 3,411,888 | 500,810 | 425,350 | 408,350 | 4,746,418 | 4,876,740 | 5,022,858 | 5,173,361 | 5,380,050 | 5,595,007 | 5,762,674 | 5,935,371 | 6,113,248 | 6,296,646 | 6,485,172 |
| Gross Profit | | 1,446,552 | 219,170 | 183,650 | 177,650 | 2,029,037 | 2,186,897 | 2,253,093 | 2,321,320 | 2,418,564 | 2,519,855 | 2,599,834 | 2,681,607 | 2,766,013 | 2,852,957 | 2,943,080 |
| | | 29.8% | 30.4% | 30.3% | 30.5% | 29.9% | 31.0% | 31.0% | 31.0% | 31.0% | 31.2% | 31.2% | 31.2% | 31.2% | 31.2% | 31.2% |
| **Manufacturing Expenses** | | | | | | | | | | | | | | | | |
| Propane | | 4,343 | 405 | 460 | 539 | 5,747 | 5,751 | 5,923 | 6,101 | 6,284 | 6,472 | 6,582 | 6,780 | 6,983 | 7,193 | 7,409 |
| Wages/Labor | | 135,091 | 16,000 | 16,000 | 16,000 | 183,091 | 186,660 | 192,360 | 198,028 | 203,968 | 210,087 | 216,390 | 222,882 | 229,568 | 236,455 | 243,549 |
| Fringe Benefits | | 49,824 | 4,536 | 4,536 | 4,536 | 54,432 | 57,154 | 60,011 | 63,017 | 66,162 | 69,471 | 72,944 | 76,591 | 80,421 | 84,442 | 88,664 |
| Payroll Taxes | | 46,583 | 5,600 | 5,600 | 5,600 | 66,662 | 88,991 | 93,660 | 94,400 | 97,242 | 83,213 | 103,164 | 106,259 | 109,447 | 92,440 | 116,112 |
| Workers Comp | | 4,683 | 300 | 300 | 300 | 5,583 | 15,000 | 15,150 | 15,150 | 15,150 | 15,908 | 15,150 | 15,150 | 15,150 | 15,908 | 15,150 |
| Supplies | | 288 | 25 | 25 | 25 | 363 | 500 | 550 | 600 | 650 | 700 | 750 | 800 | 850 | 900 | 850 |
| Packaging | | 20,174 | 2,250 | 2,250 | 2,250 | 26,924 | 29,355 | 30,236 | 30,236 | 31,143 | 31,143 | 32,608 | 32,608 | 33,586 | 33,586 | 34,594 |
| Health & Safety | | 696 | 61 | 101 | 50 | 907 | 1,150 | 1,250 | 1,300 | 1,400 | 1,450 | 1,500 | 1,600 | 1,600 | 1,650 | 1,650 |
| Power & Electricity | | 12,074 | 1,326 | 1,284 | 1,157 | 15,841 | 14,515 | 14,950 | 15,399 | 15,861 | 16,337 | 16,910 | 17,910 | 19,001 | 19,571 | 18,650 |
| Water & Sewer | | 1,448 | 198 | 198 | 198 | 2,043 | 1,935 | 1,993 | 2,053 | 2,114 | 2,178 | 2,263 | 2,331 | 2,401 | 2,473 | 2,547 |
| Garbage | | 1,619 | 180 | 180 | 180 | 2,158 | 2,223 | 2,290 | 2,358 | 2,429 | 2,502 | 2,577 | 2,654 | 2,734 | 2,816 | 2,901 |
| Gas | | 1,600 | 175 | 175 | 175 | 2,125 | 2,052 | 2,113 | 2,176 | 2,242 | 2,309 | 2,196 | 2,262 | 2,330 | 2,399 | 2,471 |
| Maintenance | | 10,431 | 1,000 | 1,000 | 1,000 | 13,421 | 13,681 | 14,092 | 14,514 | 14,950 | 15,398 | 17,154 | 17,669 | 18,199 | 18,745 | 19,307 |
| Shop Tools | | 1,015 | 7 | 25 | 41 | 1,088 | 1,150 | 1,300 | 1,450 | 1,600 | 1,700 | 1,750 | 1,800 | 1,850 | 1,900 | 1,900 |
| Rent | | | | 15,000 | 15,000 | 30,000 | 180,000 | 209,004 | 209,004 | 209,004 | 209,004 | 209,004 | 209,004 | 209,004 | 209,004 | 209,004 |
| Misc. Mfg. Expense | | 1,088 | 125 | 125 | 125 | 1,463 | 500 | 600 | 600 | 600 | 600 | 700 | 800 | 900 | 1,000 | 1,100 |
| Insurance | | 35,625 | 3,700 | 3,700 | 3,700 | 46,725 | 40,447 | 41,970 | 41,970 | 43,229 | 43,229 | 45,225 | 45,225 | 46,581 | 46,581 | 47,979 |
| Property Taxes | | 23,662 | | | | 23,693 | | 24,000 | 24,000 | 24,000 | 24,000 | 25,200 | 25,200 | 25,200 | 25,200 | 25,200 |
| Total Manufacturing Expense | % of Sales | 344,544 | 35,888 | 50,959 | 50,875 | 482,266 | 641,362 | 709,351 | 722,360 | 738,028 | 738,718 | 773,168 | 788,113 | 805,856 | 802,214 | 849,546 |
| | | 7.1% | 5.0% | 8.4% | 8.7% | 7.1% | 9.1% | 9.7% | 9.6% | 9.5% | 9.1% | 9.2% | 9.1% | 9.1% | 8.8% | 8.9% |
| Total Cost of Sales | | 3,756,432 | 536,218 | 476,309 | 459,225 | 5,228,683 | 5,518,102 | 5,732,210 | 5,895,721 | 6,118,078 | 6,339,726 | 6,535,842 | 6,723,463 | 6,919,104 | 7,098,859 | 7,325,718 |
| | | 75.3% | 74.5% | 75.6% | 78.4% | 77.2% | 78.1% | 78.7% | 78.7% | 78.5% | 78.0% | 78.0% | 78.0% | 77.9% | 77.6% | 77.7% |
| Gross Profit | | 1,102,009 | 183,782 | 152,691 | 126,775 | 1,546,772 | 1,545,535 | 1,543,742 | 1,598,959 | 1,680,536 | 1,785,136 | 1,826,665 | 1,893,494 | 1,960,157 | 2,050,743 | 2,102,534 |
| | | 22.7% | 25.5% | 24.3% | 21.6% | 22.8% | 21.9% | 21.2% | 21.3% | 22.5% | 22.0% | 22.0% | 22.0% | 22.1% | 22.4% | 22.3% |
| **Selling Expense** | | | | | | | | | | | | | | | | |
| Wages & Salaries | | 75,520 | 8,000 | 8,000 | 8,000 | 99,520 | 103,509 | 104,555 | 107,691 | 110,922 | 114,250 | 117,677 | 121,208 | 124,844 | 128,589 | 132,447 |
| Fringe Benefits | | 25,622 | 3,416 | 3,416 | 3,416 | 35,871 | 43,045 | 45,198 | 47,457 | 49,830 | 52,322 | 54,782 | 48,071 | 50,474 | 52,998 | 55,648 |
| Advertising | | 5,570 | 625 | 625 | 625 | 7,445 | 7,500 | 7,650 | 7,803 | 7,959 | 8,118 | 8,281 | 8,446 | 26,000 | 27,000 | 27,000 |
| Travel - Car | | 9,376 | 750 | 900 | 500 | 11,526 | 13,401 | 13,803 | 14,217 | 14,643 | 15,082 | 14,642 | 15,081 | 15,533 | 15,999 | 16,479 |
| Meals & Entertainment | | 46 | 24 | 25 | | 95 | 389 | 400 | 412 | 425 | 437 | 472 | 486 | 501 | 516 | 531 |
| Travel - Hotel & Air | | 1,572 | 100 | 100 | 100 | 1,872 | 2,618 | 2,697 | 2,778 | 2,861 | 2,947 | 2,877 | 2,963 | 3,052 | 3,144 | 3,238 |
| Cellular Phone - Sales | | 3,100 | 340 | 340 | 340 | 4,120 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,800 | 3,800 | 3,820 | 3,830 |
| Total Selling Expense | | 120,806 | 13,256 | 13,406 | 12,981 | 160,449 | 172,062 | 177,902 | 183,959 | 190,241 | 196,757 | 193,530 | 200,055 | 224,204 | 232,046 | 239,143 |
| **Administrative Exps.** | | | | | | | | | | | | | | | | |
| Wages & Salaries | | 148,665 | 17,000 | 17,000 | 17,000 | 199,665 | 203,658 | 209,768 | 216,061 | 222,543 | 229,219 | 236,096 | 243,179 | 250,474 | 257,988 | 265,728 |
| Fringe Benefits | | 43,846 | 4,900 | 4,900 | 4,900 | 58,546 | 56,419 | 56,983 | 57,553 | 58,128 | 58,709 | 59,297 | 59,889 | 60,488 | 61,093 | 61,704 |
| Travel - Car | | 345 | | | 12 | 357 | | | | | | | | | | |
| Meals & Entertainment | | | | | | | | | | | | | | | | |
| Sales Commission | | | | | | | | | | | | | | | | |

Laura L. Hagemeyer
dba Valley Rolling Corporation
Post Petition Operating Forecast
2015

| Description | YTD 09/09/15 Actual | OCT 2015 Forecast | NOV 2015 Forecast | DEC 2015 Forecast | YTD Total | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Office Expenses** | | | | | | | | | | | | | | | |
| Misc. Expenses | 3,132 | 265 | 300 | 300 | 3,997 | 5,610 | 5,722 | 5,894 | 6,071 | 6,192 | 6,378 | 6,570 | 6,762 | 6,762 | 6,976 |
| Accounting Fees | 6,480 | 720 | 720 | 720 | 8,640 | 1,217 | 1,254 | 1,292 | 1,330 | 1,370 | 1,411 | 1,454 | 1,497 | 1,542 | 1,588 |
| Collection Expense | 5,254 | 600 | 600 | 600 | 7,054 | 2,791 | 2,875 | 2,961 | 3,050 | 3,141 | 3,235 | 3,333 | 3,433 | 3,535 | 3,642 |
| Com/Software Support/Data/Web | 1,988 | 224 | 224 | 224 | 2,659 | 8,899 | 9,166 | 9,441 | 9,724 | 10,016 | 10,317 | 10,626 | 10,945 | 11,273 | 11,611 |
| Telephone/Admin | 1,599 | 142 | 142 | 142 | 2,461 | 8,871 | 9,138 | 9,412 | 9,694 | 9,985 | 9,491 | 9,775 | 10,069 | 10,371 | 10,682 |
| Cellular Phone/Admin (Prod) | 2,766 | 168 | 138 | 750 | 3,654 | 4,062 | 4,183 | 4,309 | 4,438 | 4,571 | 4,504 | 4,639 | 4,778 | 4,931 | 5,069 |
| Postage | | | | | | 2,438 | 2,512 | 2,587 | 2,664 | 2,744 | 2,772 | 2,855 | 2,940 | 3,029 | 3,119 |
| Data Processing/Supplies | | | | | | 2,677 | 2,757 | 2,840 | 2,925 | 3,013 | 2,506 | 2,581 | 2,659 | 2,739 | 2,821 |
| Dues & Subscriptions | | | | | | 1,496 | 1,449 | 1,492 | 1,537 | 1,583 | 1,607 | 1,655 | 1,705 | 1,756 | 1,808 |
| Health/Safety/Emp. Incentive | | | | | | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Licenses/Permits | | | | | | 334 | 344 | 354 | 365 | 376 | 387 | 399 | 411 | 423 | 436 |
| Officer's Life Insurance | | | | | | 744 | 744 | 744 | 744 | 744 | | | | | |
| Service Contracts (Copier, Etc.) | 7,830 | 879 | 1,353 | | 9,587 | 4,861 | 4,861 | 4,861 | 4,861 | 4,861 | 4,861 | 4,861 | 4,861 | 4,861 | 5,006 |
| Lease/Copier | | | | | 1,353 | 1,677 | 1,779 | 1,833 | 1,888 | 1,944 | 2,003 | 2,063 | 2,125 | 2,188 |
| Security Monitoring | | 167 | 167 | | 167 | 1,482 | | | | | | | | | |
| Telephone Sys. Lease (E5100) | 4,445 | 494 | 494 | 494 | 5,927 | | | | | | | | | | |
| Outside Services | 6,071 | 675 | 675 | 675 | 8,096 | | | | | | | | | | |
| Total Administrative Exp. | 232,892 | 25,924 | 28,575 | 25,987 | 313,188 | 49,026 | 325,770 | 334,089 | 342,702 | 351,563 | 357,878 | 367,193 | 376,775 | 386,033 | 396,920 |
| | | | | | | | | | | | | | | | |
| **Delivery Expense** | | | | | | | | | | | | | | | |
| Wages/Labor | 83,999 | 10,000 | 10,000 | 10,000 | 113,999 | 116,280 | 119,768 | 123,361 | 127,062 | 130,874 | 134,800 | 138,844 | 143,010 | 147,300 | 151,719 |
| Fringe Benefits | 38,333 | 3,832 | 3,832 | 3,832 | 50,929 | 57,358 | 57,729 | 58,307 | 58,890 | 59,479 | 60,074 | 60,674 | 61,281 | 61,894 | 62,513 |
| Truck Driver Expense | 10,570 | 1,100 | 1,100 | 1,100 | 13,870 | 14,500 | 14,790 | 15,086 | 15,388 | 15,695 | 16,009 | 16,329 | 16,656 | 16,989 | 17,329 |
| Cellular Phone /Truck | 1,674 | 150 | 150 | 150 | 2,174 | 2,600 | 2,678 | 2,758 | 2,841 | 2,926 | 2,955 | 3,044 | 3,135 | 3,229 | 3,326 |
| Truck Expense | 1,024 | 100 | 100 | 100 | 1,324 | 1,870 | 1,926 | 1,983 | 2,043 | 2,104 | 2,210 | 2,277 | 2,345 | 2,415 | 2,488 |
| Truck Leasing | 3,435 | 337 | 337 | 337 | 4,446 | 4,165 | 4,290 | 4,419 | 4,552 | 4,688 | 4,829 | 4,974 | 5,123 | 5,277 | 5,435 |
| Truck Expense | 103,226 | 11,000 | 11,000 | 11,000 | 136,236 | 135,969 | 140,039 | 144,240 | 148,567 | 153,024 | 155,070 | 158,664 | 168,413 | 173,185 | 176,566 |
| Trailer Expense | 16,796 | 1,800 | 1,800 | 1,800 | 22,196 | 12,221 | 12,588 | 12,965 | 13,354 | 13,755 | 14,461 | 14,895 | 15,347 | 15,802 | 16,276 |
| Gas/Fuel | 68,756 | 7,000 | 7,000 | 7,000 | 89,756 | 96,000 | 97,920 | 100,858 | 103,883 | 107,000 | 109,140 | 112,414 | 115,786 | 119,260 | 122,838 |
| Gas/Fuel (Pickup) | 5,897 | 700 | 700 | 700 | 7,997 | 8,157 | 8,320 | 8,486 | 8,656 | 8,829 | 9,006 | 9,186 | 9,370 | 9,557 | 9,748 |
| Parking Expense | 1,966 | 200 | 200 | 175 | 2,541 | 821 | 821 | 847 | 873 | 897 | 902 | 929 | 956 | 985 | 1,015 |
| H/Ave & Fuel Tax (DOGT Fees) | 19,719 | 2,100 | 2,000 | 2,000 | 26,019 | 30,600 | 31,212 | 32,149 | 33,113 | 34,286 | 34,972 | 35,832 | 36,909 | 38,014 | 39,355 |
| Freight Expense (Outgoing) | 15,581 | 1,800 | 1,500 | 1,700 | 20,581 | 9,694 | 9,585 | 10,285 | 10,593 | 10,911 | 11,399 | 11,741 | 12,093 | 12,456 | 12,829 |
| Total Delivery Expense | 367,187 | 40,119 | 49,744 | 47,788 | 497,169 | 490,026 | 502,091 | 515,768 | 529,839 | 544,316 | 559,227 | 524,552 | 590,320 | 606,543 | 623,236 |
| **% of Sales** | 5.0% | 6.2% | 5.5% | 8.4% | 108.4% | 6.0% | 4.9% | 4.5% | 4.8% | 6.7% | 6.7% | 6.7% | 6.6% | 6.6% | 6.6% |
| | | | | | | | | | | | | | | | |
| **Net Income (Loss) from Operations** | 381,235 | 103,981 | 50,966 | 47,788 | 585,967 | 563,684 | 537,979 | 565,144 | 617,754 | 692,501 | 716,030 | 751,695 | 768,858 | 825,521 | 843,235 |
| | | | | | | | | | | | | | | | |
| **Other (Income) Exp.** | | | | | | | | | | | | | | | |
| Bank Charges | 6,048 | 500 | 500 | 500 | 7,548 | 6,180 | 6,365 | 6,556 | 6,753 | 6,956 | 7,254 | 7,471 | 7,696 | 7,926 | 8,164 |
| Discounts Earned | (470) | (142) | (142) | (142) | (896) | (1,416) | (1,459) | (1,503) | (1,548) | (1,594) | (1,406) | (1,448) | (1,491) | (1,536) | (1,582) |
| Interest Expense | 19,500 | | | 9,750 | 29,250 | | | | | | | | | | |
| Chapter 11 Quarterly Fees | | | | (2,900,000) | (2,900,000) | | | | | | | | | | |
| Other Income | | | | | | | | | | | | | | | |
| Total Other (Income) Expense | 25,078 | 358 | 358 | (2,479,892) | (2,454,099) | 4,764 | 4,906 | 5,054 | 5,205 | 5,361 | 5,848 | 6,024 | 6,205 | 6,391 | 6,582 |
| Net Income Before Plan Payments | 356,157 | 103,626 | 50,608 | 2,527,680 | 3,040,066 | 558,920 | 533,073 | 560,090 | 612,549 | 687,139 | 710,182 | 745,671 | 762,654 | 819,131 | 836,653 |
| | | | | | | | | | | | | | | | |
| **Plan Payments** | | | | | | | | | | | | | | | |
| Adequate Protection Payments | 207,431 | 19,909 | 19,909 | 19,909 | 2,490,000 | 231,333 | 131,692 | 131,692 | 131,692 | 131,692 | 47,376 | 30,512 | 30,512 | 30,512 | 30,512 |
| Secured Creditors | | | | | | 182,416 | 186,166 | 186,166 | 186,166 | 186,166 | 45,000 | 45,000 | 45,000 | 37,550 | |
| Priority Creditors | | | | | | 149,818 | 131,370 | 148,842 | 144,138 | 192,388 | 188,388 | 294,941 | 311,728 | 311,728 | 311,728 |
| Unsecured Non-Priority | | | | | | | | | | | | | | | |
| Total Plan Payments | 207,431 | 19,909 | 19,909 | 67,962 | 2,490,000 | 563,568 | 449,229 | 466,701 | 422,222 | 369,080 | 280,764 | 370,453 | 379,740 | 342,240 | 342,240 |
| | | | | | | | | | | | | | | | |
| **Net Income After Plan Payments** | 148,706 | 83,717 | 30,699 | 2,507,762 | 234,055 | (4,667) | 83,844 | 93,390 | 185,226 | 318,055 | 429,438 | 375,217 | 382,914 | 476,890 | 494,412 |
| | 3.1% | 11.6% | 5.0% | | 3.5% | -0.1% | 1.2% | 1.2% | 2.4% | 3.9% | 5.1% | 4.4% | 4.3% | 5.2% | 5.2% |

6,796,448

Laura L. Hagenauer
dba Valley Rolling Corporation
Post Petition Operating Forecast
2015

| Description | %% | YTD 09/30/15 Actual | OCT 2015 Forecast | NOV 2015 Forecast | DEC 2015 Forecast | YTD Total 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Wages & Salaries | | | | | | | | | | | | | | | | |
| Manufacturing Expenses | | 135,091 | 16,000 | 16,000 | 16,000 | 183,091 | 186,660 | 192,260 | 198,028 | 203,968 | 210,087 | 216,390 | 222,882 | 229,568 | 236,455 | 243,549 |
| Selling Expense | | 75,520 | 8,000 | 8,000 | 8,000 | 99,520 | 101,569 | 104,555 | 107,691 | 110,922 | 114,250 | 117,677 | 121,208 | 124,844 | 128,589 | 132,447 |
| Administrative Exps. | | 148,665 | 17,000 | 17,000 | 17,000 | 199,665 | 203,658 | 209,768 | 216,061 | 222,543 | 229,219 | 236,096 | 243,179 | 250,474 | 257,988 | 265,728 |
| Delivery Expenses | | 83,999 | 10,000 | 10,000 | 10,000 | 113,999 | 116,280 | 119,768 | 123,361 | 127,062 | 130,874 | 134,800 | 138,844 | 143,010 | 147,300 | 151,719 |
| Total Wages & Salaries | | 443,275 | 51,000 | 51,000 | 51,000 | 596,275 | 608,108 | 626,351 | 645,141 | 664,496 | 684,431 | 704,963 | 726,112 | 747,896 | 770,333 | 793,443 |
| %% of Sales | | 9.1% | 7.1% | 8.6% | 8.7% | 8.8% | 8.6% | 8.6% | 8.6% | 8.5% | 8.4% | 8.6% | 8.6% | 8.6% | 8.6% | 8.6% |
| Net Delivery Exp. | | 529,818 | 36,119 | 35,744 | 36,119 | 741,999 | 465,498 | 476,337 | 488,726 | 501,445 | 514,503 | 527,923 | 542,083 | 555,807 | 570,305 | 585,186 |
| Delivery COS %% | | 6.4% | 4.9% | 5.7% | 6.0% | 10.7% | 6.5% | 6.5% | 6.4% | 6.5% | 6.3% | 6.2% | 6.2% | 6.2% | 6.2% | 6.1% |

EXHIBIT B
Page 3 of 3

Laura L. Hagenauer
dba Valley Rolling Corporation
 Plan Payments
2015 to 2024

| Description | Total Owed | %% | SEP 2015 Forecast | OCT 2015 Forecast |
|---|---|---|---|---|
| **Secured Creditors:** | | | | |
| Key Bank - Mortgage | 1,605,401 | | 19,909 | 19,909 |
| Key Bank - LOC | 430,932 | | | - |
| IRS - Secured (Priority) | 109,745 | 6 mos 3% | 2,000 | |
| MWV-COG | 229,029 | | 1791 | - |
| SBA | 760,432 | | | - |
| OR. Bus. Development | 350,000 | | | - |
| Property Taxes | 124,167 | | - | - |
| | - | | 23,700 | 19,909 |
| **Priority Creditors:** | | | | |
| Oregon Employment Division | 50,902 | 45 Mo's | | - |
| Oregon Withholding | 56,690 | 45 Mo's | | - |
| IRS Priority | 363,378 | | | - |
| 503(b) 9 Claims | 332,068 | 1.50% | | - |
| Cal. BOE | 9,839 | 51 Mo's | | - |
| | | | - | - |
| **Unsecured Non-Priority:** | | | | |
| Post Petition CLASS "Inventory Related" | 124,307 | 1.50% | | - |
| Post Petiton Plan Payments Class - Over $1,001 | 1,345,139 | | | - |
| Post Petition Plan Class "under $1k" | 7,608 | 1 Pmt. | | |
| Agnes Hagenauer | 259,000 | 60 Mo's | | |
| Penske Admin Claim | 25,976 | | | |
| Dennis Hageouer | 57,957 | | | |
| Bruce Kahler | 59,309 | | | |
| Cascadia (Secured) | 637,000 | $3k/mo. | | |
| Administrative Expenses | 250,000 | | | |
| 401(k) Payments | 139,834 | Start Jan. 2018 | | |
| | | | - | - |
| | 7,328,715 | | | |
| Total Plan Payments | | | 23,700 | 19,909 |

Sale
Costs
Cash from Cl
Payoff: Key B


EXHIBIT _C_
Page _1_ Of _18_

| NOV 2015 Forecast | DEC 2015 Forecast | YTD Total 2015 | | JAN 2016 | FEB 2016 | MAR 2016 | APR 2016 |
|---|---|---|---|---|---|---|---|
| 19,909 | 1,605,401 | 1,824,400 | | | | - | - |
| - | - | - | | | | 8,432 | 8,432 |
| - | - | 18,000 | | - | 10,822 | 10,822 | 10,822 |
| - | - | 10,250 | | | 2,543 | 2,543 | 2,543 |
| - | 760,432 | 760,432 | | | | - | - |
| - | - | - | | - | - | - | - |
| - | 124,167 | 124,167 | | | | - | - |
| 19,909 | 2,490,000 | 2,737,249 | | - | 13,365 | 21,797 | 21,797 |
| - | - | - | | 1,313 | 1,313 | 1,313 | 1,313 |
| - | - | - | | 1,462 | 1,462 | 1,462 | 1,462 |
| - | - | - | | 8,730 | 8,730 | 8,730 | 8,730 |
| - | - | - | | | 3,750 | 3,750 | 3,750 |
| - | - | - | | 258 | 258 | 258 | 258 |
| - | - | - | | 11,764 | 15,514 | 15,514 | 15,514 |
| - | | - | | | 3,000 | 3,000 | 3,000 |
| - | | - | | | 3,948 | 3,948 | 3,948 |
| | | - | | | | 7,608 | |
| | | - | | | | | |
| | 12,986 | 12,986 | | | 1,444 | 1,444 | 1,444 |
| | | | | | - | - | - |
| | 54,976 | 54,976 | | | 4,000 | 4,000 | 4,000 |
| | | - | | 4,795 | | | |
| - | 67,962 | 67,962 | | 4,795 | 12,391 | 20,000 | 12,391 |
| 19,909 | 2,557,962 | 2,805,211 | | 16,559 | 41,270 | 57,310 | 49,702 |

|  |  |
|---|---|
|  | 2,600,000 |
|  | (110,000) |
| osing | 2,490,000 |
| ank | (1,605,401) |

EXHIBIT C
Page 2 Of 18

| MAY 2016 | JUN 2016 | JUL 2016 | AUG 2016 | SEP 2016 | OCT 2016 | NOV 2016 | DEC 2016 | YTD 2016 |
|---|---|---|---|---|---|---|---|---|
| - | | | | | | | | - |
| 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 84,317 |
| 10,822 | 10,822 | 10,822 | 10,822 | 10,822 | 10,822 | 10,822 | 10,822 | 119,047 |
| 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 27,970 |
| - | | | | | | | | - |
| - | | | | | | | | - |
| - | - | - | - | - | - | - | - | - |
| 21,797 | 21,797 | 21,797 | 21,797 | 21,797 | 21,797 | 21,797 | 21,797 | 231,333 |
| 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 15,757 |
| 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 17,548 |
| 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 104,760 |
| 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 41,250 |
| 258 | 258 | 258 | 258 | 258 | 258 | 258 | 258 | 3,101 |
| 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 182,416 |
| 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 33,000 |
| 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 43,423 |
| | | | | | | | | 7,608 |
| 1,444 | 1,444 | 1,444 | 1,444 | 1,444 | 1,444 | | | 12,992 |
| - | - | - | - | - | - | - | - | - |
| 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 44,000 |
| | | | | | | | | 4,795 |
| 12,391 | 12,391 | 12,391 | 12,391 | 12,391 | 12,391 | 10,948 | 10,948 | 145,818 |
| 49,702 | 49,702 | 49,702 | 49,702 | 49,702 | 49,702 | 48,258 | 48,258 | 559,568 |



| | JAN 2017 | FEB 2017 | MAR 2017 | APR 2017 | MAY 2017 | JUN 2017 | JUL 2017 | AUG 2017 |
|---|---|---|---|---|---|---|---|---|
| | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 |
| | - | - | - | - | - | - | - | - |
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| | - | - | - | - | - | - | - | - |
| | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 |
| | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 |
| | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 |
| | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | 258 | 258 | 258 | 258 | 258 | 258 | 258 | 258 |
| | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 |
| | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 |
| | - | - | - | - | - | - | - | - |
| | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| | 10,948 | 10,948 | 10,948 | 10,948 | 10,948 | 10,948 | 10,948 | 10,948 |
| | 37,436 | 37,436 | 37,436 | 37,436 | 37,436 | 37,436 | 37,436 | 37,436 |

EXHIBIT 
Page _4_ Of _18_

| | SEP 2017 | OCT 2017 | NOV 2017 | DEC 2017 | YTD 2017 | | JAN 2018 | FEB 2018 | MAR 2018 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | - | | | | |
| | 8,432 | 8,432 | 8,432 | 8,432 | 101,180 | | 8,432 | 8,432 | 8,432 |
| | - | - | - | - | - | | | | |
| | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 | | 2,543 | 2,543 | 2,543 |
| | | | | | - | | | | |
| | | | | | - | | | | |
| | - | - | - | - | - | | - | - | - |
| | 10,974 | 10,974 | 10,974 | 10,974 | 131,692 | | 10,974 | 10,974 | 10,974 |
| | | | | | | | | | |
| | 1,313 | 1,313 | 1,313 | 1,313 | 15,757 | | 1,313 | 1,313 | 1,313 |
| | 1,462 | 1,462 | 1,462 | 1,462 | 17,548 | | 1,462 | 1,462 | 1,462 |
| | 8,730 | 8,730 | 8,730 | 8,730 | 104,760 | | 8,730 | 8,730 | 8,730 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 45,000 | | 3,750 | 3,750 | 3,750 |
| | 258 | 258 | 258 | 258 | 3,101 | | 258 | 258 | 258 |
| | 15,514 | 15,514 | 15,514 | 15,514 | 186,166 | | 15,514 | 15,514 | 15,514 |
| | | | | | | | | | |
| | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 | | 3,000 | 3,000 | 3,000 |
| | 3,948 | 3,948 | 3,948 | 3,948 | 47,370 | | 3,948 | 3,948 | 3,948 |
| | | | | | - | | | | |
| | | | | | - | | | | |
| | | | | | - | | | | |
| | | - | - | - | - | | | - | - |
| | 4,000 | 4,000 | 4,000 | 4,000 | 48,000 | | 4,000 | 4,000 | 4,000 |
| | | | | | - | | 1,456 | 1,456 | 1,456 |
| | 10,948 | 10,948 | 10,948 | 10,948 | 131,370 | | 12,404 | 12,404 | 12,404 |
| | | | | | | | | | |
| | 37,436 | 37,436 | 37,436 | 37,436 | 449,229 | | 38,892 | 38,892 | 38,892 |

EXHIBIT _C_

Page ___5___ Of _18_

Case 14-63530-fra11    Doc 261    Filed 10/23/15

| APR 2018 | MAY 2018 | JUN 2018 | JUL 2018 | AUG 2018 | SEP 2018 | OCT 2018 | NOV 2018 | DEC 2018 |
|---|---|---|---|---|---|---|---|---|
| 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 |
| - | - | - | - | - | - | - | - | - |
| 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| - | - | - | - | - | - | - | - | - |
| 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 |
| 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 |
| 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 |
| 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 |
| 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| 258 | 258 | 258 | 258 | 258 | 258 | 258 | 258 | 258 |
| 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 |
| 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 |
| - | - | - | - | - | - | - | - | - |
| 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| 12,404 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 |
| 38,892 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 |


EXHIBIT C
Page 12 Of 18

| YTD 2018 | JAN 2019 | FEB 2019 | MAR 2019 | APR 2019 | MAY 2019 | JUN 2019 | JUL 2019 |
|---|---|---|---|---|---|---|---|
| - | | | | | | | |
| 101,180 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 |
| - | - | - | - | - | - | - | - |
| 30,512 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| - | | | | | | | |
| - | | | | | | | |
| - | - | - | - | - | - | - | - |
| 131,692 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 |
| | | | | | | | |
| 15,757 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 |
| 17,548 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 |
| 104,760 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 |
| 45,000 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| 3,101 | 258 | 258 | 258 | 258 | 258 | 258 | 258 |
| 186,166 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 |
| | | | | | | | |
| 36,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| 47,370 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 |
| - | | | | | | | |
| - | | | | | | | |
| - | - | - | - | - | - | - | - |
| 48,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| 17,472 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| 148,842 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 |
| | | | | | | | |
| 466,701 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 |



EXHIBIT _C_
Page _7_ Of _18_

| | AUG 2019 | SEP 2019 | OCT 2019 | NOV 2019 | DEC 2019 | YTD 2019 | | JAN 2020 | FEB 2020 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | - | | | |
| | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 101,180 | | 8,432 | 8,432 |
| | - | - | | | | - | | | |
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 | | 2,543 | 2,543 |
| | | | | | | - | | | |
| | | | | | | - | | | |
| | - | - | - | - | - | - | | - | - |
| | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 131,692 | | 10,974 | 10,974 |
| | 1,313 | 1,313 | | | | 11,817 | | | |
| | 1,462 | 1,462 | | | | 13,161 | | | |
| | 8,730 | 8,730 | | | | 78,570 | | | |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 45,000 | | 3,750 | 3,750 |
| | 258 | 258 | 258 | 258 | | 2,843 | | | |
| | 15,514 | 15,514 | 4,008 | 4,008 | 3,750 | 151,391 | | 3,750 | 3,750 |
| | | | | | | 21,000 | | | |
| | 3,948 | 3,948 | 3,948 | 3,948 | 14,243 | 57,666 | | 14,243 | 14,243 |
| | | | | | | - | | | |
| | | | | | | - | | | |
| | - | - | - | - | - | - | | - | - |
| | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 48,000 | | 4,000 | |
| | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 17,472 | | 1,456 | 1,456 |
| | 9,404 | 9,404 | 9,404 | 9,404 | 19,699 | 144,138 | | 19,699 | 15,699 |
| | 35,892 | 35,892 | 24,386 | 24,386 | 34,423 | 427,222 | | 34,423 | 30,423 |

EXHIBIT 
Page 8 Of 13

| | MAR 2020 | APR 2020 | MAY 2020 | JUN 2020 | JUL 2020 | AUG 2020 | SEP 2020 | OCT 2020 | NOV 2020 |
|---|---|---|---|---|---|---|---|---|---|
| | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 |
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| | - | - | - | - | - | - | - | - | - |
| | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 |
| | | | | | | | | - | - |
| | - | - | - | - | - | - | - | - | - |
| | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 |
| | 30,423 | 30,423 | 30,423 | 30,423 | 30,423 | 30,423 | 30,423 | 30,423 | 30,423 |



| | DEC 2020 | YTD 2020 | | JAN 2021 | FEB 2021 | MAR 2021 | APR 2021 | MAY 2021 | JUN 2021 |
|---|---|---|---|---|---|---|---|---|---|
| | | - | | | | | | | |
| | 8,432 | 101,180 | | 8,432 | 8,432 | | | | |
| | | - | | | | | | | |
| | 2,543 | 30,512 | | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| | | - | | | | | | | |
| | | - | | | | | | | |
| | - | - | | - | - | - | - | - | - |
| | 10,974 | 131,692 | | 10,974 | 10,974 | 2,543 | 2,543 | 2,543 | 2,543 |
| | | - | | | | | | | |
| | | - | | | | | | | |
| | | - | | | | | | | |
| | 3,750 | 45,000 | | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | | - | | | | | | | |
| | 3,750 | 45,000 | | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | | - | | | | | | | |
| | 14,243 | 170,916 | | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 |
| | - | - | | - | - | - | - | - | - |
| | | - | | | | | | | |
| | - | - | | - | - | - | - | - | - |
| | | 4,000 | | | | | | | |
| | 1,456 | 17,472 | | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| | 15,699 | 192,388 | | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 |
| | 30,423 | 369,080 | | 30,423 | 30,423 | 21,992 | 21,992 | 21,992 | 21,992 |

EXHIBIT C
Page 16 Of 18



| | JUL 2021 | AUG 2021 | SEP 2021 | OCT 2021 | NOV 2021 | DEC 2021 | YTD 2021 | | JAN 2022 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 16,863 | | |
| | | | | | | | - | | |
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 | | 2,543 |
| | | | | | | | - | | |
| | | | | | | | - | | |
| | - | - | - | - | - | - | - | | - |
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 47,376 | | 2,543 |
| | | | | | | | - | | |
| | | | | | | | - | | |
| | | | | | | | - | | |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 45,000 | | 3,750 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 45,000 | | 3,750 |
| | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 170,916 | | 14,243 |
| | - | - | - | - | - | - | - | | 4,683 |
| | | | | | | | - | | |
| | - | - | - | - | - | - | - | | - |
| | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 17,472 | | 1,456 |
| | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 188,388 | | 20,382 |
| | 21,992 | 21,992 | 21,992 | 21,992 | 21,992 | 21,992 | 280,764 | | 26,674 |

EXHIBIT _C_
Page _11_ Of _18_



| | FEB 2022 | MAR 2022 | APR 2022 | MAY 2022 | JUN 2022 | JUL 2022 | AUG 2022 | SEP 2022 | OCT 2022 |
|---|---|---|---|---|---|---|---|---|---|
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| | - | - | - | | | | | | |
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 |
| | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 |
| | | | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 |
| | | | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 |
| | - | - | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| | 20,382 | 20,382 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 |
| | 26,674 | 26,674 | 32,270 | 32,270 | 32,270 | 32,270 | 32,270 | 32,270 | 32,270 |

EXHIBIT C
Page 12 Of 18


| | NOV 2022 | DEC 2022 | YTD 2022 | | JAN 2023 | FEB 2023 | MAR 2023 | APR 2023 | MAY 2023 |
|---|---|---|---|---|---|---|---|---|---|
| | | | - | | | | | | |
| | 2,543 | 2,543 | 30,512 | | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| | | | - | | | | | | |
| | | | - | | | | | | |
| | 2,543 | 2,543 | 30,512 | | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| | | | - | | | | | | |
| | | | - | | | | | | |
| | 3,750 | 3,750 | 45,000 | | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | | | - | | | | | | |
| | 3,750 | 3,750 | 45,000 | | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | 14,243 | 14,243 | 170,916 | | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 |
| | 4,683 | 4,683 | 56,193 | | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 |
| | | | - | | | | | | |
| | 1,283 | 1,283 | 11,546 | | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 |
| | 1,313 | 1,313 | 11,815 | | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 |
| | 3,000 | 3,000 | 27,000 | | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| | 1,456 | 1,456 | 17,472 | | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| | 25,977 | 25,977 | 294,941 | | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 |
| | 32,270 | 32,270 | 370,453 | | 32,270 | 32,270 | 32,270 | 32,270 | 32,270 |

EXHIBIT C
Page 13 Of 18

Case 14-63530-fra11    Doc 261    Filed 10/23/15

| | JUN 2023 | JUL 2023 | AUG 2023 | SEP 2023 | OCT 2023 | NOV 2023 | DEC 2023 | YTD 2023 |
|---|---|---|---|---|---|---|---|---|
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 |
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | | | 37,500 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | - | - | 37,500 |
| | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 170,916 |
| | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 56,193 |
| | | | | | | | | - |
| | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 15,394 |
| | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 15,753 |
| | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 17,472 |
| | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 311,728 |
| | 32,270 | 32,270 | 32,270 | 32,270 | 32,270 | 28,520 | 28,520 | 379,740 |

EXHIBIT _C_
Page _14_ Of _18_

Case 14-63530-fra11    Doc 261    Filed 10/23/15

| | JAN 2024 | FEB 2024 | MAR 2024 | APR 2024 | MAY 2024 | JUN 2024 | JUL 2024 | AUG 2024 | SEP 2024 |
|---|---|---|---|---|---|---|---|---|---|
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| | - | - | - | - | - | - | - | - | - |
| | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 |
| | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 |
| | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 |
| | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 |
| | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 |
| | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 |



| | OCT 2024 | NOV 2024 | DEC 2024 | YTD 2024 | | JAN 2025 | FEB 2025 | MAR 2025 | APR 2025 |
|---|---|---|---|---|---|---|---|---|---|
| | 2,543 | 2,543 | 2,543 | 30,512 | | 2,543 | 2,543 | 2,543 | 2,543 |
| | 2,543 | 2,543 | 2,543 | 30,512 | | 2,543 | 2,543 | 2,543 | 2,543 |
| | - | - | - | - | | - | - | - | - |
| | 14,243 | 14,243 | 14,243 | 170,916 | | 14,243 | 14,243 | 14,243 | 14,243 |
| | 4,683 | 4,683 | 4,683 | 56,193 | | 4,683 | 4,683 | 4,683 | 4,683 |
| | | | | - | | | | | |
| | 1,283 | 1,283 | 1,283 | 15,394 | | 1,283 | 1,283 | 1,283 | 1,283 |
| | 1,313 | 1,313 | 1,313 | 15,753 | | 1,313 | 1,313 | 1,313 | 1,313 |
| | 3,000 | 3,000 | 3,000 | 36,000 | | 3,000 | 3,000 | 3,000 | 3,000 |
| | 1,456 | 1,456 | 1,456 | 17,472 | | 1,456 | 1,456 | 1,456 | 1,456 |
| | 25,977 | 25,977 | 25,977 | 311,728 | | 25,977 | 25,977 | 25,977 | 25,977 |
| | 28,520 | 28,520 | 28,520 | 342,240 | | 28,520 | 28,520 | 28,520 | 28,520 |

EXHIBIT 
Page 16 Of 18

| MAY 2025 | JUN 2025 | JUL 2025 | AUG 2025 | SEP 2025 | OCT 2025 | NOV 2025 | DEC 2025 | YTD 2025 |
|---|---|---|---|---|---|---|---|---|
| 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 |
| 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 |
| - | - | - | - | - | - | - | - | - |
| 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 170,916 |
| 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 56,193 |
|  |  |  |  |  |  |  |  | - |
| 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 15,394 |
| 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 15,753 |
| 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 17,472 |
| 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 311,728 |
| 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 342,240 |



| Total Paid To-Date | | |
| --- | --- | --- |
| 1,824,400 | | |
| 505,901 | | |
| 137,047 | | |
| 312,830 | | |
| 760,432 | | |
| - | | |
| 124,167 | | |
| | | |
| 59,087 | | |
| 65,805 | | |
| 392,850 | | |
| 348,750 | | |
| 12,146 | | |
| | | |
| 126,000 | | |
| 1,221,326 | | 123,813 |
| 7,608 | | |
| 224,771 | | |
| 25,978 | | |
| 57,728 | | |
| 59,075 | | |
| 135,000 | | 502,000 |
| 246,976 | 3,024 | |
| 144,571 | | |
| | | |
| 6,792,448 | | |

EXHIBIT _C_

Page _18_ Of _18_

Case 14-63530-fra11    Doc 261    Filed 10/23/15

EXHIBIT 1 of 4

Page 2 of 4

Laura L. Hagenmaier
dba Valley Rolling Corporation
Post Petition Operating Forecast
Week Ended 00-00-15

**Description**

Material Sales
Freight/Packing Charges
Freight & Fuel Revenue
Common Carrier Revenue
Machining Item-Category Discount
Discounts Allowed
Total Sales

**Cost of Sales**
Materials
Scrap
Freight(in)
Total Material Costs
Gross Profit (Materials)

**Manufacturing Expenses**
Propane
Wages-Factory
Fringe Benefits
Payroll Taxes
Workman's Comp
Supplies
Packaging
Health/Safety/Env
Power & Electricity
Water & Sewer
Gas
Garbage
Maintenance
Shop Tools
Insurance
Misc. Mfg. Expense
Property Taxes
Total Manufacturing Expenses

Total Cost of Sales
Gross Profit

**Selling Expenses**
Wages & Salaries
Fringe Benefits
Travel - Car
Meals & Entertainment
Office Expense
Misc. Expenses
Professional
Com/Software Support/Data/Web
Telephone
Cellular Phones (Fixed)
Postage
Donations/Awards/Supplies
Dues & Subscriptions
Marketing/Sales/Emp. Incentive
Licenses/Permits
Officer's Life Insurance
Lease on Equipment (Copier, Etc.)
Leased Vehicle
Security Monitoring
Vehicle Expense ($10-100)
Catalogs
Total Selling Expenses

**Administrative Expenses**
Wages & Salaries
Fringe Benefits
Travel - Car
Meals & Entertainment
Office Expense
Misc. Expenses
Professional
Total Administrative Expenses

EXHIBIT 4
Page 1 Of 4

Lara L. Magnuson
dba Valley Trucking Corporation
Post Petition Operating Forecast
Week Ended 10-10-15

**Delivery Expenses:**
- Wages/Labor
- Fringe Benefits
- Truck Driver Expense
- Cellular Phone /Truck
- Truck Expense
- Truck Tracking
- Truck Scale
- Trailer Expense
- Gas/Fuel
- Gas/Fuel (Pilot)
- Pallet Expense
- H/Ivry & Fuel Tax (IDOT Fees)
- Freight Expense (Outgoing)
- Total Delivery Expense

Net Income (Loss) from Operation

**Other (Income) Expenses:**
- Bank Charges
- Finance Charges
- Discounts Earned
- Interest Expense (See Below)
- Pre-Petition Expense
- Chapter 11 Quarterly Fees
- Vendor Rebate
- Adequate Protection Payments
- Total Other (Income) Expense

Net Income

**Total Wages & Salaries**
- Manufacturing Expenses
- Selling Expenses
- Administrative Expenses
- Delivery Expenses
- Total Wages & Salaries

Net Delivery Expense
Delivery COS %%

**Adequate Protection Payments**

Key Bank
- SBA Disc/mnc
- CW AR Escrow Management
- MMW/COG - VDI
- Internal Revenue Service
- Total Adequate Protection Payments

**Costs Incurred Above**
- Adequate Protection Payments
- Principal portion of payments
- Total Paid to Secured Creditors

Valley Rolling Corporation
Operating Forecast
2013

| Description | JAN 2013 Actual | FEB 2013 Actual | MAR 2013 Actual | APR 2013 Actual | MAY 2013 Actual | JUN 2013 Actual | JUL 2013 Actual | AUG 2013 Actual | SEP 2013 Actual | OCT 2013 Actual | NOV 2013 Actual | DEC 2013 Actual | YTD Total | YTD % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Material Sales | 508,327 | 428,129 | 459,899 | 613,232 | 610,124 | 744,365 | 650,590 | 734,325 | 847,033 | 756,417 | 592,790 | 540,919 | 7,486,149 | 101.2% |
| Labor/Handling Charges |  | 75 | 100 |  |  | 600 |  |  | 150 |  | 50 | 50 | 3,137 | 0.0% |
| Freight & Pkg. Revenue | 1,503 | 1,345 | 903 | 2,242 | 2,615 | 2,369 | 2,202 | 2,770 | 3,383 | 4,323 | 2,184 | 2,112 | 32,677 | 0.4% |
| Common Carrier Revenue | 4,156 | 4,636 | 8,797 | 12,224 | 9,489 | 10,111 | 4,851 | 10,764 | 4,103 | 6,728 | 9,266 | 11,623 | 96,749 | 1.3% |
| Multi-Bldg Item Category Discount | (787) | (377) | (428) | (184) | (331) | (171) | (348) | (385) | (420) | (42) | (42) | 4,987 | 1,138 | 0.0% |
| Discounts Allowed | (15,424) | (13,781) | (14,388) | (18,801) | (18,709) | (21,610) | (26,627) | (19,112) | (19,324) | (27,452) | (20,736) | (8,033) | (223,997) | -3.0% |
| **Total Sales** | 497,771 | 419,952 | 454,859 | 608,814 | 603,188 | 735,663 | 630,658 | 728,412 | 834,925 | 739,638 | 583,512 | 558,445 | 7,395,852 | 100.0% |
|  | 6.7% | 5.7% | 6.2% | 8.2% | 8.2% | 9.9% | 8.5% | 9.8% | 11.3% | 10.0% | 7.9% | 7.6% | 100.0% |  |
| **Cost of Sales** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Materials | 347,658 | 316,525 | 363,291 | 445,186 | 420,350 | 524,161 | 456,845 | 519,847 | 603,015 | 525,643 | 410,273 | 381,489 | 5,314,422 | 71.9% |
| Scrap | (433) |  | (940) | (898) |  | 2,024 | 2,274 |  | 1,178 | (682) |  | 559 | 3,082 | 0.0% |
| Freight In | (732) | 283 |  | 25 |  | (200) |  | (250) | 13,000 |  | 1,300 |  | 13,426 | 0.2% |
| **Total Material Costs** | 346,493 | 316,808 | 362,350 | 444,313 | 420,350 | 525,985 | 459,119 | 519,597 | 617,333 | 524,960 | 411,573 | 382,048 | 5,330,930 | 72.1% |
|  | 69.6% | 75.4% | 79.7% | 73.0% | 69.7% | 71.5% | 72.8% | 71.3% | 73.9% | 71.0% | 70.5% | 68.4% | 72.1% |  |
| **Delivery Expenses** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Wages/Labor | 14,578 | 15,188 | 23,026 | 20,076 | 19,307 | 24,906 | 17,524 | 22,491 | 20,593 | 20,440 | 20,830 | 14,431 | 233,388 | 3.2% |
|  |  |  |  |  |  |  |  |  |  |  | 500 | 500 | 500 | 0.0% |
| Fringe Benefits | 4,225 | 4,225 | 5,436 | 6,647 | 4,761 | 5,413 | 5,921 | 4,711 | 4,711 | 3,688 | 3,688 | 3,688 | 57,113 | 0.8% |
| Truck Driver Expense | 253 | 522 |  | 1,653 | 494 | 2,460 | 300 | 1,444 | 2,026 | 880 | 522 | 3,681 | 14,233 | 0.2% |
| Cellular Phone/Truck | 117 | 60 | 119 | 51 | 178 | 131 | 131 | 119 | 95 | 121 | 120 | 177 | 1,488 | 0.0% |
| Truck Expense | 16 | 121 | 463 |  |  | 129 | 59 | 80 | 55 | 1,290 |  | 569 | 2,834 | 0.0% |
| Truck Tracking | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 4,044 | 0.1% |
| Truck Lease | 8,436 | 11,442 | 10,557 | 8,436 | 10,733 | 13,339 | 11,053 | 8,505 | 10,582 | 10,345 | 12,585 | 7,255 | 123,267 | 1.7% |
| Trailer Expense | 123 | 443 | (21) | 193 | 337 | 3,454 | 4,114 | 2,767 | 222 | 1,292 | 2,275 | 49 | 14,910 | 0.2% |
| Gas/Fuel | 9,343 | 11,567 | 8,992 | 13,980 | 12,833 | 13,999 | 9,706 | 12,392 | 12,710 | 12,978 | 7,791 | 10,123 | 136,414 | 1.8% |
| Gas/Fuel (Pickup) | 1,060 | 1,065 | 243 | 473 | 652 | 1,352 | 876 | 1,037 | 1,859 | 2,620 | 1,921 | 4,081 | 17,239 | 0.2% |
| Pickup Expense | 973 | 393 | 11 | 277 | (133) | 24 | 51 | 14 | 818 | 617 | 29 |  | 3,081 | 0.0% |
| H/wy. & Fuel Tax (ODOT Fees) | 3,238 | 2,675 | 2,449 | 2,601 | 3,909 | 4,326 | 3,291 | 3,707 | 2,945 | 3,571 | 5,638 | 5,477 | 43,626 | 0.6% |
| Freight Expense (Outgoing) | 1,012 | 633 | 504 | 1,022 | 522 | 818 | 970 | 589 | 147 | 1,371 | 664 | 1,501 | 9,753 | 0.1% |
| **Total Delivery Expense** | 43,710 | 48,670 | 52,118 | 55,864 | 53,593 | 70,688 | 54,333 | 58,191 | 57,101 | 59,548 | 56,898 | 51,377 | 662,091 | 9.0% |
|  | 8.8% | 11.6% | 11.5% | 9.2% | 8.9% | 9.6% | 8.6% | 8.0% | 6.8% | 8.1% | 9.8% | 9.2% | 9.0% |  |
| **Manufacturing Expenses** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Propane | 99 | 523 | 189 | 561 | 519 | 390 | 416 | (22) | 802 | 450 | 950 | 418 | 5,293 | 0.1% |
| Wages/Labor | 9,148 | 10,081 | 13,518 | 9,755 | 17,091 | 12,408 | 13,138 | 18,380 | 16,678 | 18,565 | 18,093 | 20,012 | 176,867 | 2.4% |
| Fringe Benefits | 5,776 | 5,776 | 5,776 | 4,376 | 4,225 | 4,225 | 4,225 | 4,225 | 4,225 | 4,225 | 4,225 | 4,425 | 55,705 | 0.8% |
| Payroll Taxes | 4,794 | 5,198 | 6,069 | 5,355 | 6,745 | 7,542 | 5,368 | 6,644 | 5,983 | 6,126 | 5,918 | 4,990 | 70,731 | 1.0% |
| Workers Comp |  | 633 | 633 | 316 | 633 | 633 | 633 | 1,100 | 633 | 633 | 1,300 | 200 | 7,349 | 0.1% |
| Supplies | 3,488 | (437) | 1,904 | 2,254 | 1,288 | 665 | 3,498 | 3,612 | 454 | 2,889 | 2,807 | (1,120) | 21,302 | 0.3% |
| Packaging | 337 | 542 |  |  |  | 59 |  |  | 59 |  | 7 |  | 73 | 0.0% |
| Health & Safety | 1,032 | 1,058 | 1,030 | 1,016 | 1,044 | 1,156 | 1,098 | 1,270 | 1,136 | 1,204 | 1,114 | 1,062 | 13,220 | 0.3% |
| Power & Electricity | (294) | 98 | 120 | 76 | 95 |  |  |  |  | 84 | 125 | 236 | 1,369 | 0.0% |
| Water & Sewer | 297 |  | 120 | 120 |  | 899 | 180 | 180 | 180 | 180 | 180 | 180 | 13,220 | 0.2% |
| Garbage | (129) | 98 |  | (850) |  |  | (144) |  | 125 | 128 | 125 | 125 | 893 | 0.0% |
| Gas | 297 | 240 | 184 | 104 | 71 | 2 | 22 | 17 | 16 | 16 | 41 | 180 | 1,128 | 0.0% |
| Maintenance | (129) | 1,765 | 529 | 1,688 | 670 | 492 | 140 | 222 | 5 | 4,334 | 218 | 632 | 1,245 | 0.0% |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 10,565 | 0.1% |

**Valley Rolling Corporation**
**Operating Forecast**
**2013**

| Description | JAN 2013 Actual | FEB 2013 Actual | MAR 2013 Actual | APR 2013 Actual | MAY 2013 Actual | JUN 2013 Actual | JUL 2013 Actual | AUG 2013 Actual | SEP 2013 Actual | OCT 2013 Actual | NOV 2013 Actual | DEC 2013 Actual | YTD Total | YTD % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shop Tools | 17 | | 42 | | 147 | 18 | 171 | 117 | | 82 | 56 | 122 | 772 | 0.0% |
| Rent | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 300,000 | 4.1% |
| Misc. Mfg. Expense | 423 | 839 | 1,175 | 890 | 684 | 340 | 340 | 487 | 371 | (261) | 371 | 514 | 6,228 | 0.6% |
| Insurance | 4,626 | 4,626 | 4,626 | 9,280 | 3,311 | | | 4,099 | 4,291 | 3,480 | 3,576 | 3,302 | 41,906 | 0.6% |
| Property Taxes | | | | | | | | | 4,000 | 5,357 | 4,339 | 4,562 | 21,569 | 0.3% |
| Depreciation | 139 | 139 | 139 | 139 | 139 | 139 | 139 | 139 | 139 | 139 | 139 | 139 | 1,667 | 0.0% |
| **Total Manufacturing Expense** | 54,752 | 56,081 | 60,934 | 60,081 | 61,783 | 54,089 | 54,224 | 65,720 | 64,038 | 72,631 | 68,513 | 65,038 | 737,883 | 10.0% |
| | 11.0% | 13.4% | 13.4% | 9.9% | 10.2% | 7.4% | 8.6% | 9.0% | 7.7% | 9.8% | 11.7% | 11.6% | 10.0% | |
| **Total Cost of Goods Sold** | 444,955 | 421,558 | 475,402 | 560,258 | 535,725 | 650,762 | 567,676 | 643,540 | 738,472 | 657,140 | 536,984 | 498,463 | 6,730,904 | 91.0% |
| | 89.4% | 100.4% | 104.5% | 92.0% | 88.8% | 88.5% | 90.0% | 88.3% | 88.4% | 88.8% | 92.0% | 89.3% | 91.0% | |
| **Gross Profit** | 52,820 | (1,606) | (20,544) | 48,556 | 67,463 | 84,901 | 62,992 | 84,904 | 96,453 | 82,498 | 46,528 | 59,982 | 664,949 | 9.0% |
| | 10.6% | -0.4% | -4.5% | 8.0% | 11.2% | 11.5% | 10.0% | 11.7% | 11.6% | 11.2% | 8.0% | 10.7% | 9.0% | |
| **Selling Expense** | | | | | | | | | | | | | | |
| Fringe Benefits | | | | | | | | | | | | | | |
| Advertising | 370 | 298 | 2,800 | 623 | 3,441 | 2,480 | 2,446 | 508 | 1,178 | | 119 | 747 | 15,011 | 0.2% |
| Travel - Car | | 982 | 323 | 1,777 | 1,007 | 812 | 806 | 347 | 595 | 86 | 1,295 | 1,767 | 9,797 | 0.1% |
| Meals & Entertainment | | 99 | | 275 | 117 | 131 | 100 | | | | | 522 | 1,176 | 0.0% |
| Travel - Hotel & Air | | | | 96 | | | | | 26 | | | | 122 | 0.0% |
| Cellular Phone - Sales | 57 | | 29 | 24 | 48 | 12 | 12 | 12 | 12 | 12 | 32 | 12 | 242 | 0.0% |
| **Total Selling Expense** | 427 | 1,379 | 3,152 | 2,794 | 4,613 | 3,435 | 3,364 | 868 | 1,811 | 98 | 1,457 | 3,049 | 26,348 | 0.4% |
| | 0.1% | 0.3% | 0.7% | 0.5% | 0.8% | 0.5% | 0.5% | 0.1% | 0.2% | 0.0% | 0.2% | 0.5% | 0.4% | |
| **Administrative Exps.** | | | | | | | | | | | | | | |
| Wages & Salaries | 17,248 | 18,418 | 16,603 | 16,604 | 29,305 | 27,580 | 20,551 | 24,914 | 22,688 | 25,030 | 25,525 | 19,452 | 263,916 | 3.6% |
| Fringe Benefits | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 71,661 | 1.0% |
| Travel - Car | | | | | | | | | | | | | | 0.0% |
| Meals & Entertainment | | | | 54 | | 55 | | | | | | | 504 | 0.0% |
| Sales Commission | | | | | | | | | | 209 | | 185 | | 0.0% |
| Office Expenses | | | | 1,000 | | | | | | | | | 1,000 | 0.0% |
| Misc. Expenses | 641 | 319 | 81 | 1,017 | 709 | 984 | 729 | 624 | 1,759 | 1,943 | 129 | 933 | 9,867 | 0.1% |
| Accounting Fees | | | 600 | | | | | | 1,348 | | | | 600 | 0.0% |
| Legal Fees | | 3,000 | | 4,950 | | 505 | 4,550 | | | | | | 12,500 | 0.2% |
| Collection Expense | | | | | | 14 | | | | | | | 14 | 0.0% |
| Com/Software Support/Data/Web | | | | | | | | | | | 81 | 81 | 1,901 | 0.0% |
| Telephone/Admin | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 8,640 | 0.1% |
| Cellular Phone/Admin (Prod) | 666 | 637 | 666 | 654 | 691 | 672 | 668 | 689 | 703 | 712 | 721 | 699 | 8,179 | 0.1% |
| Postage | 252 | | 221 | 223 | 880 | 441 | 208 | 439 | 441 | 427 | 427 | 387 | 4,344 | 0.1% |
| Data Processing Supplies | 577 | | | 410 | 200 | 210 | 210 | 400 | 210 | 400 | 190 | 100 | 2,433 | 0.0% |
| Dues & Subscriptions | 136 | 135 | 136 | | | | 1,350 | | | | | 272 | 2,515 | 0.0% |
| | | 20 | | | | | | | | | | | | |
| Health/Safety/Emp. Incentive | 440 | | 725 | | (786) | | 330 | | 162 | 40 | 375 | 40 | 1,326 | 0.0% |
| Licenses/Permits | 467 | | | | 925 | | 479 | | 971 | | | 968 | 4,828 | 0.1% |
| Officers Life Insurance | | | | | 286 | | | | | 136 | | | 422 | 0.0% |
| Service Contracts (Copier, Etc.) | | | | | | 62 | 62 | 62 | 62 | 67 | 62 | 62 | 436 | 0.0% |

Valley Rolling Corporation
Operating Forecast
2013

| Description | JAN 2013 Actual | FEB 2013 Actual | MAR 2013 Actual | APR 2013 Actual | MAY 2013 Actual | JUN 2013 Actual | JUL 2013 Actual | AUG 2013 Actual | SEP 2013 Actual | OCT 2013 Actual | NOV 2013 Actual | DEC 2013 Actual | YTD Total | YTD % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lease/Copier | 870 | 870 | 870 | 870 | 870 | 870 | 870 | 870 | 870 | 870 | 870 | 485 | 10,055 | 0.1% |
| Security Monitoring | | 165 | | | | 965 | | 165 | | | 165 | 165 | 1,625 | 0.0% |
| Telephone Sys. Lease (ESI 100) | 494 | 996 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 6,428 | 0.1% |
| Outside Services | | 3,250 | 3,250 | 1,920 | 2,800 | 2,860 | 2,870 | 1,340 | 885 | 2,580 | 2,040 | 220 | 24,015 | 0.3% |
| Amortization Expense | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 2,316 | 0.0% |
| **Total Administrative Exps.** | 28,676 | 34,693 | 30,531 | 36,100 | 43,391 | 42,387 | 40,256 | 36,481 | 41,563 | 40,042 | 37,927 | 32,827 | 444,874 | 6.0% |
| Other (Income) Exp. | 5.8% | 8.3% | 6.7% | 5.9% | 7.2% | 5.8% | 6.4% | 5.0% | 5.0% | 5.4% | 6.5% | 5.9% | | 6.0% |
| Bad Debts | | | | | | | | | | | | | | |
| Bank Charges | | | | | | | | | | 11,485 | | | 11,485 | 0.2% |
| Finance Charges | 1,793 | 1,603 | 1,405 | 1,201 | 1,290 | 1,315 | 1,797 | 181 | 1,855 | 1,013 | 431 | 51 | 13,935 | 0.2% |
| Discounts Earned | 387 | 4,156 | 937 | 13,526 | 8,892 | 5,792 | 4,538 | 333 | 4,162 | 9,960 | 28 | 7,837 | 60,547 | 0.8% |
| Interest Expense | (11) | (35) | (36) | (70) | (22) | (23) | (14) | (46) | (83) | (227) | (149) | (20) | (734) | 0.0% |
| Commitment Fees | 4,365 | 2,124 | 1,924 | 6,276 | 1,931 | 19,836 | 2,213 | 4,770 | 3,643 | 4,779 | 4,766 | 4,516 | 61,144 | 0.8% |
| Vendor Rebate | | | | | | | | | | | | | | 0.0% |
| Interest Income | | (3,014) | | | | | | | | | | | (3,014) | 0.0% |
| Placeholder/(Suspense) | 450 | | (7,233) | | | | | | | | | | (0) | 0.0% |
| **Total Other (Income) Expense** | 6,985 | 6,782 | (3,003) | 20,934 | 12,092 | 26,921 | 8,533 | 5,238 | 9,576 | 27,011 | 5,075 | 12,384 | 143,364 | 0.0% |
| | 1.4% | 2.8% | -0.7% | 3.4% | 2.0% | 3.7% | 1.4% | 0.7% | 1.1% | 3.7% | 0.9% | 2.2% | 1.9% | |
| **Total S+G+A+O Expense** | 36,089 | 47,690 | 30,680 | 59,828 | 60,096 | 72,743 | 52,053 | 42,587 | 52,950 | 67,152 | 44,459 | 48,250 | 614,586 | 8.3% |
| | 7.2% | 11.4% | 6.7% | 9.8% | 10.0% | 9.9% | 8.3% | 5.8% | 6.3% | 9.1% | 7.6% | 8.6% | 8.3% | |
| **Net Income** | 16,732 | (49,296) | (51,223) | (11,221) | 7,367 | 12,159 | 10,939 | 42,317 | 43,503 | 15,346 | 2,069 | 11,722 | 50,363 | 0.7% |
| | 3.4% | -11.7% | -11.3% | -1.9% | 1.2% | 1.7% | 1.7% | 5.8% | 5.2% | 2.1% | 0.4% | 2.1% | 0.7% | |

Laura L. Hagenauer
dba Valley Rolling Corporation
_(Post Petition Operating Forecast_)
2014-2015

| _(Description _) | _(JAN_) 2014 (Actual_) | _(FEB_) 2014 (Actual_) | _(MAR_) 2014 (Actual_) | _(APR_) 2014 (Actual_) | _(MAY_) 2014 (Actual_) | _(JUN_) 2014 (Actual_) | _(JUL_) 2014 (Actual_) | _(AUG_) 2014 (Actual_) |
|---|---|---|---|---|---|---|---|---|
| _(Material Sales_) | 524,191 | 429,233 | 538,374 | 583,034 | 647,391 | 728,200 | 704,783 | 834,072 |
| _(Labor/Handling Charges_) | 75 | 100 | 195 | 200 | 25 | (150) | - | 15 |
| _(Freight & Pkg. Revenue_) | 1,903 | 4,298 | 1,465 | 1,870 | 2,125 | 1,792 | 1,230 | 1,801 |
| _(Common Carrier Revenue_) | 4,076 | 8,483 | 9,646 | 11,311 | 4,011 | 12,733 | 6,815 | 13,284 |
| _(Multi-Bldg Item Category Discount | - | - | - | (935) | (986) | - | - | - |
| _(Discounts Allowed_) | (11,388) | (10,315) | (16,146) | (11,679) | (26,120) | (27,196) | (34,006) | (32,416) |
| _(Total Sales_) | 518,856 | 431,798 | 533,334 | 583,701 | 626,446 | 715,379 | 678,820 | 816,756 |
| | | | | | | | | |
| _(Cost of Sales _) | 0.68 | 0.70 | 0.70 | 0.70 | 0.69 | 0.70 | 0.70 | 0.68 |
| _(Materials_) | 356,873 | 299,907 | 374,288 | 409,823 | 447,909 | 510,023 | 492,261 | 576,719 |
| _(Scrap_) | 651 | 577 | (2,403) | 1,961 | 1,880 | (34) | 135 | (866) |
| _(Freight In_) | 1,302 | 2,743 | 12 | 4,192 | - | 1,074 | - | 10 |
| _(Total Material Costs_) | 358,826 | 303,227 | 371,897 | 415,975 | 449,789 | 511,063 | 492,396 | 575,863 |
| _(Gross Profit_) | 160,030 | 128,570 | 161,437 | 167,726 | 176,656 | 204,316 | 186,424 | 240,893 |
| | 30.8% | 29.8% | 30.3% | 28.7% | 28.2% | 28.6% | 27.5% | 29.5% |
| | | | | | | | | |
| _(Manufacturing Expenses_) | | | | | | | | |
| _(Propane_) | 454 | 412 | 30 | 1,018 | 529 | 445 | 269 | 727 |
| _(Wages/Labor_) | 15,355 | 12,840 | 15,955 | 14,472 | 20,180 | 13,932 | 14,175 | 22,034 |
| _(Fringe Benefits_) | 4,485 | 4,485 | 4,485 | 4,485 | 4,485 | 4,485 | 4,485 | 4,485 |
| _(Payroll Taxes_) | 6,087 | 4,693 | 5,278 | 5,052 | 6,552 | 4,882 | 4,772 | 6,491 |
| _(Workers Comp_) | 1,500 | 7,510 | - | 3,730 | 3,083 | 2,940 | 2,227 | 2,500 |
| _(Supplies_) | 34 | - | 23 | - | 65 | - | - | - |
| _(Packaging_) | 5,949 | (5,725) | 5,574 | 2,748 | 308 | 3,509 | 1,148 | (1,051) |
| _(Health & Safety_) | 17 | 298 | 120 | 60 | 75 | - | - | - |
| _(Power & Electricity_) | 1,309 | 1,119 | 1,066 | 1,092 | 1,071 | 1,125 | 1,295 | 1,206 |
| _(Water & Sewer_) | 128 | 128 | 125 | 128 | 128 | 125 | 125 | 125 |
| _(Garbage_) | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 |
| _(Gas_) | 528 | 362 | 239 | 131 | 57 | 10 | 16 | 16 |
| _(Maintenance_) | 780 | 960 | 520 | 201 | 739 | 4,993 | 90 | 2,255 |
| _(Shop Tools_) | 149 | 121 | 35 | 142 | 113 | 35 | - | - |
| _(Misc. Mfg. Expense_) | 645 | 440 | 542 | 548 | 228 | 329 | 269 | 269 |
| _(Insurance_) | 3,297 | 2,582 | 2,582 | 2,339 | 2,600 | 2,023 | 2,600 | 2,582 |
| _(Property Taxes_) | 4,339 | 4,339 | 4,339 | 4,000 | 4,000 | 4,000 | 4,339 | 4,339 |
| _(Total Manufacturing Expense_) | 44,836 | 34,747 | 41,082 | 38,325 | 44,393 | 43,014 | 35,990 | 45,158 |
| _(%% of Sales_) | 8.6% | 8.0% | 7.7% | 6.6% | 7.1% | 6.0% | 5.3% | 5.5% |
| | | | | | | | | |
| _(Total Cost of Sales_) | 403,662 | 337,974 | 412,979 | 454,300 | 494,182 | 554,077 | 528,386 | 621,021 |
| | 77.8% | 78.3% | 77.4% | 77.8% | 78.9% | 77.5% | 77.8% | 76.0% |
| | | | | | | | | |
| _(Gross Profit_) | 115,194 | 93,823 | 120,355 | 129,401 | 132,264 | 161,302 | 150,434 | 195,736 |
| | 22.2% | 21.7% | 22.6% | 22.2% | 21.1% | 22.5% | 22.2% | 24.0% |
| _(Selling Expense_) | | | | | | | | |
| _(Wages & Salaries_) | | | | | | | | 4,349 |
| _(Fringe Benefits_) | - | - | - | - | - | - | - | - |
| _(Advertising_) | 810 | 2,502 | 1,424 | 4,982 | 641 | 936 | 4,963 | 884 |
| _(Travel - Car_) | 341 | 1,284 | 1,206 | 360 | 732 | 381 | 796 | 476 |
| _(Meals & Entertainment_) | - | - | 58 | 54 | 90 | - | - | 37 |
| _(Travel - Hotel & Air_) | 453 | - | 168 | 694 | 96 | - | - | 1,344 |
| _(Cellular Phone - Sales_) | 12 | 12 | 12 | 51 | 53 | 53 | 54 | 106 |

Laura L. Hagenauer
dba Valley Rolling Corporation
_(Post Petition Operating Forecast_)
2014-2015

| _(Description_) | (JAN_) 2014 (Actual_) | (FEB_) 2014 (Actual_) | (MAR_) 2014 (Actual_) | (APR_) 2014 (Actual_) | (MAY_) 2014 (Actual_) | (JUN_) 2014 (Actual_) | (JUL_) 2014 (Actual_) | (AUG_) 2014 (Actual_) |
|---|---|---|---|---|---|---|---|---|
| _(Total Selling Expense_) | 1,617 | 3,799 | 2,868 | 6,140 | 3,612 | 1,373 | 5,814 | 7,196 |
| | | | | | | | | |
| _(Administrative Expenses_) | | | | | | | | |
| _(Wages & Salaries_) | 20,083 | 16,579 | 21,351 | 23,451 | 27,706 | 21,180 | 22,444 | 24,007 |
| _(Fringe Benefits_) | 6,340 | 6,340 | 6,340 | 5,771 | 5,771 | 5,771 | 5,771 | 5,771 |
| _(Travel - Car_) | | | | | | | | |
| _(Meals & Entertainment_) | - | | - | - | 47 | 156 | - | - |
| _(Office Expenses_) | 275 | 697 | 598 | 1,134 | 1,146 | 2,077 | 4,186 | 1,882 |
| _(Misc Expenses_) | | | | | | | | |
| _(Professional_) | | 1,882 | 304 | | 5,726 | | | |
| _(Collection Expense_) | | | | | | 119 | | |
| _(Com/Software Support/Data/Web_ | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 |
| _(Telephone/Admin_) | 665 | 658 | 665 | 677 | 688 | 687 | 943 | 690 |
| _(Cellular Phone/Admin (Prod)_) | 387 | 440 | 260 | 209 | 385 | 385 | 758 | 397 |
| _(Postage_) | 268 | 10 | 268 | 156 | 156 | 156 | 156 | 156 |
| _(Data Processing Supplies_) | 1,350 | 235 | 325 | 376 | | | - | 332 |
| _(Dues & Subscriptions_) | 20 | 885 | 20 | - | 40 | 20 | - | 73 |
| _(Health/Safety/Emp. Incentive_) | | 496 | 1,257 | 874 | 580 | 789 | - | 2,375 |
| _(Licenses/Permits_) | | | | | 86 | | | 86 |
| _(Officer's Life Insurance_) | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 |
| _(Service Contracts (Copier, Etc.)_ | | | | | | | 3,508 | - |
| _(Lease/Copier_) | 870 | 870 | 870 | 870 | 870 | 870 | 870 | 870 |
| _(Security Monitoring_) | | | 565 | 965 | 165 | | | |
| _(Telephone Sys. Lease (ES-100)_) | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 494 |
| _(Outside Services_) | 520 | 890 | 120 | 2,000 | | 1,320 | 520 | 1,000 |
| _(Total Administrative Expenses_) | 32,054 | 31,258 | 33,720 | 34,759 | 44,642 | 34,807 | 40,431 | 38,916 |
| | | | | | | | | |
| _(Delivery Expenses_) | | | | | | | | |
| _(Wages/Labor_) | 11,342 | 11,926 | 9,907 | 9,787 | 11,836 | 11,273 | 10,051 | 14,426 |
| _(Fringe Benefits_) | 3,399 | 3,399 | 5,099 | 5,099 | 6,184 | 6,184 | 6,184 | 6,184 |
| _(Truck Driver Expense_) | 587 | 457 | 52 | 668 | 689 | 158 | 1,252 | 634 |
| _(Cellular Phone /Truck_) | 197 | 119 | 287 | 423 | 187 | 187 | 251 | 164 |
| _(Truck Expense_) | | 152 | 345 | 416 | | 162 | 410 | |
| _(Truck Tracking_) | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 337 |
| _(Truck Lease_) | 9,496 | 6,917 | 9,792 | 20,312 | 11,894 | 9,592 | 8,683 | 10,252 |
| _(Trailer Expense_) | 439 | 184 | 377 | 748 | 300 | 1,910 | 114 | 3,306 |
| _(Gas/Fuel_) | 8,088 | 7,867 | 13,912 | 11,739 | 10,915 | 10,425 | 14,931 | 12,358 |
| _(Gas/Fuel (Pickup)_) | 1,839 | 1,484 | 1,624 | 1,137 | 1,560 | 1,614 | 1,366 | 1,444 |
| _(Pickup Expense_) | 42 | 4 | 255 | 61 | 93 | | | |
| _(H/wy. & Fuel Tax (ODO) Fees_) | 801 | 949 | 2,292 | 4,096 | 3,420 | 2,950 | 3,140 | 4,160 |
| _(Freight Expense (Outgoing)_) | 496 | 504 | 727 | 1,105 | 1,173 | 411 | 973 | 857 |
| _(Total Delivery Expense_) | 43,063 | 34,300 | 45,056 | 45,928 | 48,590 | 45,203 | 47,694 | 54,122 |
| _(% of Sales_) | 8.3% | 7.0% | 8.4% | 7.9% | 7.8% | 6.3% | 7.0% | 6.6% |
| | | | | | | | | |
| _(Net Income (Loss) from Operations_) | 38,463 | 24,467 | 38,711 | 42,573 | 37,420 | 79,920 | 56,496 | 95,501 |
| | | | | | | | | |
| _(Other (Income) Exp_) | | | | | | | | |
| _(Bank Charges_) | 60 | 213 | 241 | 3,482 | 1,327 | 689 | 884 | 1,328 |
| _(Finance Charges_) | 2,079 | 332 | (404) | 941 | 140 | 96 | (252) | 223 |
| _(Discounts Earned_) | (167) | (76) | (12) | (77) | (71) | (107) | (154) | (116) |

EXHIBIT
Page 5 of 16


Laura L. Hagenauer
dba Valley Rolling Corporation
_(Post Petition Operating Forecast _)
2014-2015

| _(Description _) | _(JAN_) 2014 (Actual ) | _(FEB_) 2014 (Actual ) | _(MAR_) 2014 (Actual ) | _(APR_) 2014 (Actual ) | _(MAY_) 2014 (Actual ) | _(JUN_) 2014 (Actual ) | _(JUL_) 2014 (Actual ) | _(AUG_) 2014 (Actual ) |
|---|---|---|---|---|---|---|---|---|
| _(Interest Expense_) | 5,960 | 7,939 | 8,489 | 9,304 | 10,121 | 7,292 | 7,045 | 10,653 |
| _(Pre-Petition Interest_) | | | | | | | | |
| _(Chapter 11 Quarterly Fees_) | | | | | | | | |
| _(Vendor Rebate_) | | | (6,032) | | | | | |
| _(Adequate Protection Payments_) | | | | | | | | |
| _(Total Other (Income) Expense_) | 7,931 | 8,409 | 2,282 | 11,649 | 11,516 | 7,969 | 7,524 | 11,986 |
| | | | | | | | | |
| _(Net Income_) | 30,530 | 16,058 | 34,429 | 30,824 | 25,804 | 73,951 | 48,872 | 83,516 |
| | 5.9% | 3.7% | 6.8% | 5.3% | 4.1% | 10.1% | 7.2% | 10.2% |
| | | | | | | | | |
| _(Total Wages & Salaries _) | | | | | | | | |
| _(Manufacturing Expenses _) | 15,355 | 12,840 | 15,955 | 14,472 | 20,180 | 13,932 | 14,175 | 22,034 |
| _(Selling Expense _) | | | | | | | | 4,349 |
| _(Administrative Expenses _) | 20,083 | 16,579 | 21,351 | 21,452 | 27,706 | 21,180 | 22,444 | 24,007 |
| _(Delivery Expenses _) | 27,342 | 11,926 | 9,907 | 9,787 | 11,836 | 11,273 | 10,051 | 14,426 |
| _(Total Wages & Salaries _) | 52,780 | 41,346 | 47,213 | 45,711 | 59,722 | 46,385 | 46,670 | 64,817 |
| _(%% of Sales _) | 10.2% | 9.4% | 8.9% | 7.8% | 9.5% | 6.5% | 6.8% | 7.9% |
| _(P/R Tax as %% of Total labor _) | 13.5% | 13.4% | 12.2% | 11.1% | 11.0% | 10.5% | 10.2% | 10.0% |
| | | | | | | | | |
| _(Net Delivery Exp _) | 38,987 | 25,817 | 35,410 | 34,618 | 44,578 | 32,470 | 40,878 | 40,838 |
| _(Delivery COS %% _) | 7.6% | 6.6% | 6.6% | 5.9% | 6.9% | 4.5% | 5.8% | 4.9% |
| | | | | | | | | |
| _(YTD Delivery Exp _) | 38,987 | 64,804 | 100,214 | 134,832 | 179,411 | 211,881 | 252,759 | 293,597 |
| _(As %% of Sales _) | 7.51% | 6.82% | 6.75% | 6.52% | 6.66% | 6.21% | 6.18% | 5.99% |

_(Adequate Protection Payments: _)
_(Key Bank LOC _)
_(Mortgage _)
_(SBA Loan _)
_(OBDF _)
_(COG _)
_(IRS _)
_(Less Principal included _)
_(Total Adequate Protection Payments _)

Case 14-63530-fra11   Doc 261   Filed 10/23/15

Laura L. Hagenauer
dba Valley Rolling Corporation
Actual - Pro Forma Balance Sheets
Week Ended 10-10-15

| Description | Mo. End 1/31/2015 Actual | Mo. End 2/28/2015 Actual | Mo. End 07/31/15 Actual | Mo. End 08/31/15 Actual | Week 09/05/15 Actual | Week 09/12/15 Actual | Week 09/19/15 Actual | Week 09/26/15 Actual | Week 09/30/15 Actual | Week 10/10/15 Actual |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | |
| Cash | 19,012 | 13,541 | 16,565 | (491) | 3,901 | 10,001 | 57,328 | 17,363 | 5,737 | 25,126 |
| Admin Cash | | | 63,830 | 92,338 | 92,338 | 92,338 | 92,338 | 92,338 | 92,338 | 92,338 |
| Accounts Receivable- Post Pet. | 491,157 | 504,149 | 527,664 | 501,369 | 529,637 | 521,375 | 510,640 | 505,366 | 552,022 | 488,197 |
| Accounts Receivable- Pre-Pet. | 17,080 | 8,358 | 1,839 | 1,839 | 1,839 | 1,839 | 881 | 881 | 881 | 881 |
| Employee Advances | | | | | | | | | | |
| Prepaid Insurance | 10,931 | 10,931 | 10,931 | 10,931 | 10,931 | 10,931 | 10,931 | 10,931 | 10,931 | 10,931 |
| Other Prepaid Expenses | 55,989 | 52,775 | 52,775 | 52,775 | 52,775 | 52,775 | 52,775 | 52,775 | 52,775 | 52,775 |
| Total Inventories | 708,583 | 708,805 | 706,150 | 721,068 | 741,661 | 730,850 | 732,960 | 760,432 | 754,254 | 756,622 |
| Total Current Assets | 1,302,753 | 1,298,560 | 1,379,754 | 1,379,829 | 1,433,083 | 1,420,110 | 1,457,853 | 1,440,086 | 1,468,938 | 1,426,870 |
| Fixed Assets-Valley | 766,110 | 766,110 | 766,110 | 766,110 | 766,110 | 766,110 | 766,110 | 766,110 | 766,110 | 766,110 |
| Land & Buildings | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 |
| DeLammc Equipment | 251,661 | 251,661 | 251,661 | 251,661 | 251,661 | 251,661 | 251,661 | 251,661 | 251,661 | 251,661 |
| Assets - DeLammc | 917,858 | 917,858 | 917,858 | 917,858 | 917,858 | 917,858 | 917,858 | 917,858 | 917,858 | 917,858 |
| Less Accumulated Depreciation | (761,918) | (761,918) | (761,918) | (761,918) | (761,918) | (761,918) | (761,918) | (761,918) | (761,918) | (761,918) |
| Leasehold Improvements - Net | 1,166 | 1,166 | 1,166 | 1,166 | 1,166 | 1,166 | 1,166 | 1,166 | 1,166 | 1,166 |
| Admin Equip. - Net | 2,567 | 2,567 | 2,567 | 2,567 | 2,567 | 2,567 | 2,567 | 2,567 | 2,567 | 2,567 |
| Total Fixed Assets - Net | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 |
| Other Assets | | | | | | | | | | |
| Loan to Officer | 420,203 | 420,203 | 420,203 | 420,203 | 420,203 | 420,203 | 420,203 | 420,203 | 420,203 | 420,203 |
| Loan Fee - Net | 53,547 | 53,547 | 53,547 | 53,547 | 53,547 | 53,547 | 53,547 | 53,547 | 53,547 | 53,547 |
| Organizational Fees - Net | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 |
| Total Other Assets | 481,204 | 481,204 | 481,204 | 481,204 | 481,204 | 481,204 | 481,204 | 481,204 | 481,204 | 481,204 |
| TOTAL ASSETS | 6,736,401 | 6,732,208 | 6,813,402 | 6,813,477 | 6,866,731 | 6,853,758 | 6,891,501 | 6,873,734 | 6,902,586 | 6,860,518 |
| **LIABILITIES & EQUITY** | | | | | | | | | | |
| Accounts Payable- Post-Pet. | 8,038 | 8,224 | 28,475 | 9,152 | 49,219 | 42,263 | 66,031 | 35,458 | 49,019 | 6,614 |
| Key Bank Credit Line | | | | | | | | | | |
| New Credit Line | | | | | | | | | | |
| 401 (K) Payable | 126,709 | 126,709 | 126,709 | 126,709 | 126,709 | 126,709 | 126,709 | 126,709 | 126,709 | 126,709 |
| Sales Tax Payable | 2,759 | 3,623 | 3,441 | 4,729 | 5,063 | 6,187 | 6,187 | 6,221 | 6,294 | 6,896 |

Laura L. Hagenauer
dba Valley Rolling Corporation
Actual - Pro Forma Balance Sheets
Week Ended 10-10-15

(698)

| Description | Mo. End 1/31/2015 Actual | Mo. End 2/28/2015 Actual | Mo. End 07/31/15 Actual | Mo. End 08/31/15 Actual | Week 09/05/15 Actual | Week 09/12/15 Actual | Week 09/19/15 Actual | Week 09/26/15 Actual | Week 09/30/15 Actual | Week 10/10/15 Actual |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Current Liabilities | 137,505 | 138,556 | 158,625 | 140,589 | 180,991 | 175,158 | 198,927 | 168,387 | 182,022 | 140,218 |
| | | | | | | | | | | |
| Key Bank | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 |
| OR. Business Development | 242,680 | 238,600 | 234,520 | 234,520 | 234,520 | 234,520 | 234,520 | 234,520 | 234,520 | 234,520 |
| FOR A Financial | 43,239 | 43,239 | 43,239 | 43,239 | 43,239 | 43,239 | 43,239 | 43,239 | 43,239 | 43,239 |
| Pre-Pet. Unsecured A/P DeLammc | 302,042 | 302,042 | 302,042 | 302,042 | 302,042 | 302,042 | 302,042 | 302,042 | 302,042 | 302,042 |
| MWVCOG - VDI | 225,685 | 225,012 | 221,796 | 221,102 | 221,102 | 220,404 | 220,404 | 220,404 | 220,404 | 220,404 |
| SBA DeLammc | 846,309 | 844,418 | 836,678 | 836,678 | 836,678 | 836,678 | 836,678 | 836,678 | 836,678 | 836,678 |
| Pre-Pet. Unsecured Credit Cards | 163,193 | 163,193 | 163,193 | 163,193 | 163,193 | 163,193 | 163,193 | 163,193 | 163,193 | 163,193 |
| Cascadia Payable DeLammc | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| Accounts Payable- Pre-Pet. | 652,095 | 652,095 | 652,095 | 652,095 | 652,095 | 652,095 | 652,095 | 652,095 | 652,095 | 652,095 |
| Internal Revenue Service | 418,789 | 418,789 | 418,789 | 418,789 | 418,789 | 418,789 | 418,789 | 418,789 | 418,789 | 418,789 |
| Oregon Excise Tax | | | | | | | | | | |
| | | | | | | | | | | |
| Total Long Term Debt | 5,598,778 | 5,592,133 | 5,577,098 | 5,576,404 | 5,576,404 | 5,575,706 | 5,575,706 | 5,575,706 | 5,575,706 | 5,575,706 |
| Total Liabilities | 5,736,283 | 5,730,689 | 5,735,723 | 5,716,993 | 5,757,395 | 5,750,864 | 5,774,633 | 5,744,093 | 5,757,728 | 5,715,924 |
| | | | | | | | | | | |
| Common Stock | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Paid-In Capital - Valley | 237,000 | 237,000 | 237,000 | 237,000 | 237,000 | 237,000 | 237,000 | 237,000 | 237,000 | 237,000 |
| Paid-In Capital - DeLammc | 163,782 | 163,782 | 163,782 | 163,782 | 163,782 | 163,782 | 163,782 | 163,782 | 163,782 | 163,782 |
| Sub-S Distribution | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) |
| Retained Earnings at 09-28-14 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 |
| YTD Net Income (Loss) | 139,815 | 139,815 | 139,815 | 139,815 | 139,815 | 139,815 | 139,815 | 139,815 | 139,815 | 139,815 |
| Post Petition Earnings | 5,512 | 6,913 | 83,074 | 101,879 | 114,730 | 108,288 | 122,263 | 135,035 | 150,252 | 149,988 |
| Total Equity | 1,000,118 | 1,001,519 | 1,077,679 | 1,096,485 | 1,109,336 | 1,102,894 | 1,116,868 | 1,129,640 | 1,144,858 | 1,144,593 |
| TOTAL LIABILITIES & EQUITY | 6,736,401 | 6,732,208 | 6,813,402 | 6,813,477 | 6,866,731 | 6,853,758 | 6,891,501 | 6,873,734 | 6,902,586 | 6,860,518 |
| | | | | | | | | | | |
| Check | | | | | | | | | | |
| | | | | | | | | | | |
| Beginning A/C Receivable | 485,210 | 538,699 | 532,928 | 552,492 | 503,208 | 531,476 | 523,214 | 511,520 | 506,247 | 552,903 |
| Plus Sales - Net | 93,868 | 149,826 | 140,687 | 138,388 | 108,069 | 166,890 | 110,355 | 155,365 | 112,891 | 653,570 |
| Less Cash Receipts | (70,840) | (176,018) | (144,112) | (187,672) | (79,801) | (175,152) | (122,049) | (160,639) | (66,235) | (717,396) |
| Ending A/C Rec. | 508,238 | 512,507 | 529,503 | 503,208 | 531,476 | 523,214 | 511,520 | 506,247 | 552,903 | 489,077 |
| | | | | | | | | | | |
| Beginning Inventory | 699,679 | 688,333 | 696,149 | 719,776 | 721,068 | 741,661 | 730,850 | 732,960 | 760,432 | 754,254 |

Laura L. Hagenauer
dba Valley Rolling Corporation
Actual - Pro Forma Balance Sheets
Week Ended 10-10-15

| Description | Mo. End 1/31/2015 Actual | Mo. End 2/28/2015 Actual | Mo. End 07/31/15 Actual | Mo. End 08/31/15 Actual | Week 09/05/15 Actual | Week 09/12/15 Actual | Week 09/19/15 Actual | Week 09/26/15 Actual | Week 09/30/15 Actual | Week 10/10/15 Actual |
|---|---|---|---|---|---|---|---|---|---|---|
| Purchases | 74,041 | 119,652 | (73,966) | (95,785) | (55,760) | (135,711) | (79,543) | (81,226) | (73,421) | (456,480) |
| Material COS | (65,137) | (99,180) | 83,967 | 97,078 | 76,353 | 124,901 | 81,653 | 108,698 | 67,244 | 458,848 |
| Ending Inventory | 708,583 | 708,805 | 706,150 | 721,068 | 741,661 | 730,850 | 732,960 | 760,432 | 754,254 | 756,622 |
| | | | | | | | | | | |
| Beginning A/C Payable | 12,217 | 36,754 | 35,620 | (2,888) | 9,152 | 49,219 | 42,263 | 66,031 | 35,458 | 49,019 |
| Total Expenses (Excl COS) | 5,567 | 48,120 | 31,268 | 40,179 | 18,757 | 47,324 | 14,048 | 33,891 | 9,915 | 123,934 |
| Payments on Non-Debt Liability. | (9,746) | (76,651) | (38,412) | (28,140) | 21,311 | (54,280) | 9,721 | (64,464) | 3,647 | (166,339) |
| Ending A/C Payable | 8,038 | 8,224 | 28,475 | 9,152 | 49,219 | 42,263 | 66,031 | 35,458 | 49,019 | 6,614 |
| | | | | | | | | | | |
| Net Income (Loss) | 13,414 | 17,151 | 5,341 | (16,494) | 12,851 | (6,442) | 13,974 | 12,772 | 15,217 | (264) |
| Petty Cash (Increase) Decrease | - | - | - | - | - | - | - | - | - | - |
| A/R (Increase) Decrease | (23,027) | 26,192 | 3,425 | 49,284 | (28,268) | 8,262 | 11,694 | 5,274 | (46,656) | 63,826 |
| Inventory (Increase) Decrease | (8,904) | (20,472) | (10,001) | (1,292) | (20,593) | 10,811 | (2,110) | (27,472) | 6,178 | (2,368) |
| Other Current Assets (Incr) Decr | - | - | - | - | - | - | - | - | - | - |
| Fixed Assets (Incr) Decr | - | - | - | - | - | - | - | - | - | - |
| Other Assets (Incr) Decr | - | - | 205 | - | - | - | - | - | - | - |
| Increase (Decrease) in A/P & Liab. | (3,992) | (28,343) | (7,023) | 12,450 | 40,402 | (5,833) | 23,769 | (30,540) | 13,635 | (41,804) |
| Increase (Decrease) Pre-Pet. LTD | - | - | - | - | - | (698) | - | - | - | - |
| Increase(Decrease) in DeLammc Pd in Cap. | | | | | | | | | | |
| (Decrease) in Sub S. Distrib. | | | | | | | | | | |
| Beginning Cash Balance | 41,522 | 19,013 | 88,449 | 47,900 | 91,847 | 96,239 | 102,339 | 149,667 | 109,701 | 98,075 |
| Ending Cash Balance | 19,013 | 13,541 | 80,395 | 91,847 | 96,239 | 102,339 | 149,667 | 109,701 | 98,075 | 117,464 |
| | | | | | | | | | | |
| Cash Incr (Decr) During Period. | (22,510) | (20,131) | (8,054) | 43,947 | 4,392 | 6,100 | 47,327 | (39,966) | (11,626) | 19,389 |

Fill in this information to identify your case:

Debtor 1 __Laura Lee Hagenauer__
First Name    Middle Name    Last Name

Debtor 2 _____
(Spouse, if filing) First Name    Middle Name    Last Name

United States Bankruptcy Court for the: District of Oregon

Case number __14-63530-fra11_____
(if known)

Check if this is:

☐ An amended filing

☐ A supplement showing post-petition chapter 13 expenses as of the following date:
_____
MM / DD / YYYY

☐ A separate filing for Debtor 2 because Debtor 2 maintains a separate household

Official Form 6J

# Schedule J: Your Expenses

12/13

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach another sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

## Part 1:  Describe Your Household

1. Is this a joint case?

☑ No. Go to line 2.
☐ Yes. Does Debtor 2 live in a separate household?

  ☐ No
  ☐ Yes. Debtor 2 must file a separate Schedule J.

2. Do you have dependents?

Do not list Debtor 1 and Debtor 2.

Do not state the dependents' names.

☐ No
☑ Yes. Fill out this information for each dependent..........

| Dependent's relationship to Debtor 1 or Debtor 2 | Dependent's age | Does dependent live with you? |
|---|---|---|
| __Daughter__ | __18__ | ☐ No ☑ Yes |
| _____ | _____ | ☐ No ☐ Yes |
| _____ | _____ | ☐ No ☐ Yes |
| _____ | _____ | ☐ No ☐ Yes |
| _____ | _____ | ☐ No ☐ Yes |

3. Do your expenses include expenses of people other than yourself and your dependents?

☑ No
☐ Yes

## Part 2:  Estimate Your Ongoing Monthly Expenses

Estimate your expenses as of your bankruptcy filing date unless you are using this form as a supplement in a Chapter 13 case to report expenses as of a date after the bankruptcy is filed. If this is a supplemental Schedule J, check the box at the top of the form and fill in the applicable date.

Include expenses paid for with non-cash government assistance if you know the value of such assistance and have included it on Schedule I: Your Income (Official Form 6I.)

Your expenses

4. The rental or home ownership expenses for your residence. Include first mortgage payments and any rent for the ground or lot.

4. $ __1,967.00__

If not included in line 4:

| | | | |
|---|---|---|---|
| 4a | Real estate taxes | 4a. | $ __0.00__ |
| 4b | Property, homeowner's, or renter's insurance | 4b | $ __0.00__ |
| 4c | Home maintenance, repair, and upkeep expenses | 4c | $ __225.00__ |
| 4d | Homeowner's association or condominium dues | 4d | $ __0.00__ |

Official Form 6J                Schedule J: Your Expenses                page 1

EXHIBIT __G__
Page __1__ of __3__

Debtor 1 __Laura Lee Hagenauer__
First Name    Middle Name    Last Name

Case number *if known* __14-63530-fra11__

|  |  | Your expenses |
|---|---|---|
| 5 Additional mortgage payments for your residence, such as home equity loans | 5 | $ 0.00 |
| 6 Utilities: | | |
| 6a. Electricity, heat, natural gas | 6a | $ 148.00 |
| 6b. Water, sewer, garbage collection | 6b | $ 0.00 |
| 6c. Telephone, cell phone, Internet, satellite, and cable services | 6c | $ 251.00 |
| 6d. Other. Specify: _____ | 6d | $ 0.00 |
| 7 Food and housekeeping supplies | 7. | $ 260.00 |
| 8 Childcare and children's education costs | 8 | $ 0.00 |
| 9 Clothing, laundry, and dry cleaning | 9 | $ 50.00 |
| 10. Personal care products and services | 10. | $ 95.00 |
| 11 Medical and dental expenses | 11 | $ 300.00 |
| 12 Transportation. Include gas, maintenance, bus or train fare. Do not include car payments. | 12. | $ 500.00 |
| 13 Entertainment, clubs, recreation, newspapers, magazines, and books | 13 | $ 200.00 |
| 14 Charitable contributions and religious donations | 14 | $ 100.00 |
| 15 Insurance. Do not include insurance deducted from your pay or included in lines 4 or 20. | | |
| 15a. Life insurance | 15a | $ 0.00 |
| 15b. Health insurance | 15b | $ 0.00 |
| 15c. Vehicle insurance | 15c. | $ 300.00 |
| 15d. Other insurance. Specify: _____ | 15d. | $ 0.00 |
| 16 Taxes. Do not include taxes deducted from your pay or included in lines 4 or 20. Specify: _____ | 16. | $ 0.00 |
| 17 Installment or lease payments: | | |
| 17a. Car payments for Vehicle 1 | 17a | $ 0.00 |
| 17b. Car payments for Vehicle 2 | 17b | $ 0.00 |
| 17c. Other. Specify:_____ | 17c. | $ 0.00 |
| 17d. Other. Specify:_____ | 17d. | $ 0.00 |
| 18 Your payments of alimony, maintenance, and support that you did not report as deducted from your pay on line 5, *Schedule I, Your Income* (Official Form 6I). | 18 | $ 0.00 |
| 19 Other payments you make to support others who do not live with you. Specify:_____ | 19 | $ 0.00 |
| 20 Other real property expenses not included in lines 4 or 5 of this form or on *Schedule I: Your Income*. | | |
| 20a. Mortgages on other property | 20a | $ 0.00 |
| 20b. Real estate taxes | 20b | $ 0.00 |
| 20c. Property, homeowner's, or renter's insurance | 20c. | $ 0.00 |
| 20d. Maintenance, repair, and upkeep expenses | 20d | $ 0.00 |
| 20e. Homeowner's association or condominium dues | 20e | $ 0.00 |

Official Form 6J                    Schedule J: Your Expenses

EXHIBIT G page 2
Page 2 Of 3

Debtor 1    **Laura Lee Hagenauer**
First Name    Middle Name    Last Name

Case number (if known) **14-63530-fra11**

21. **Other**. Specify. _____     21. +$ ___**0.00**___

22. **Your monthly expenses.** Add lines 4 through 21.
    The result is your monthly expenses.     22. $ ___**4,396.00**___

23. **Calculate your monthly net income.**

    23a. Copy line 12 (*your combined monthly income*) from *Schedule I*.     23a. $ ___**4,745.00**___

    23b. Copy your monthly expenses from line 22 above.     23b. –$ ___**4,396.00**___

    23c. Subtract your monthly expenses from your monthly income.
    The result is your *monthly net income*.     23c. $ ___**349.00**___

24. **Do you expect an increase or decrease in your expenses within the year after you file this form?**

    For example, do you expect to finish paying for your car loan within the year or do you expect your
    mortgage payment to increase or decrease because of a modification to the terms of your mortgage?

    ☐ No.

    ☑ Yes.    **Car payment paid in full after November 2014. Payment amount for October and November is $1,135.00**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF OREGON

In Re:             )

                     )     Case No. 14-63530-fra11

LAURA LEE HAGENAUER     )

                     )     VOTING BALLOT FOR ACCEPTING

        Debtor.        )     OR REJECTING DEBTORS' PLAN

Filed By: _____ on: _____

                  Creditor                               Date

Designated Class Number: _____

       The Plan referred to in this Ballot can be confirmed by the Court and thereby made binding on you if it is accepted by the holders of two-thirds in total dollar amount and more than one-half in number of claims in each class voting on the Plan. If the requisite acceptances are not obtained, the Court may confirm the Plan if it finds that the Plan accords fair and equitable treatment to the class rejecting it. You must complete and return this Ballot for your vote to count. Only those Ballots actually received by the voting deadline will be counted as either accepting or rejecting the Plan.

       **You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. If you hold claims or equity interests in more than one class, you will receive a Ballot for each class in which you are entitled to vote.**

       The undersigned: (check one box)

       ☐ ACCEPTS THE PLAN        ☐ REJECTS THE PLAN

       The Debtor's Plan of Reorganization.

Dated: _____

Print or type name: _____

Signature: _____

Title (if corporation or partnership) _____

Address: _____

Return this Ballot on or before the date specified by the Court in the order accompanying the Plan and Disclosure Statement to:

Ted A. Troutman
Troutman Law Firm, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005

**THIS FORM DOES NOT CONSTITUTE A PROOF OF CLAIM AND MUST NOT BE USED TO FILE A CLAIM OR TO INCREASE ANY AMOUNT LISTED IN THE DEBTOR'S SCHEDULES.**

Exhibit H

_____September 16___, 2015

FOR VALUE RECEIVED, and in consideration of the mutual promises contained in this **SALE AGREEMENT** (the "Agreement"), the undersigned **LAURA LEE HAGENAUER** ("Seller") agrees to sell, and the undersigned **R & R PROPERTY HOLDINGS, INC., a Washington corporation** ("Purchaser") agrees to purchase, subject to the conditions stated in this Agreement, the following property, situated in the State of Oregon ("Title Company") to-wit: **the buildings, the cranes and other improvements on the property that are used in connection with the building, and land located at 3071 Schmidt Lane NE, Hubbard, OR 97032, as more particularly described in the attached Exhibit A** (collectively, the "Property"), on the following terms and conditions:

**1. PURCHASE PRICE.** The purchase price ("Purchase Price") for the Property shall be **TWO MILLION SIX HUNDRED THOUSAND AND 00/100THS DOLLARS ($2,600,000.00 )**. The terms of such purchase shall be: **all cash at Closing.** This Agreement is not subject to (or conditioned upon) the need for Purchaser to obtain any financing on the Property.

**2. DEPOSIT AND ESCROW.** Purchaser will deposit in escrow an earnest money deposit in the amount of **TWENTY-FIVE THOUSAND DOLLARS ($25,000.00)** (the "Deposit"), within three business days after the Opening of Escrow . The escrow agent ("Escrow Agent") will be a branch office of a title company in Oregon ("Title Company") mutually acceptable to Seller and Purchaser. The earnest money deposit (the "Deposit") will be refunded to Purchaser if Purchaser terminates this Agreement during the Contingency Period described below. If this Agreement is not so terminated, the Deposit will become a forfeitable earnest money deposit and will be applied to the Purchase Price due at closing. This Agreement will constitute the parties' instructions to Escrow Agent; *provided,* that if Escrow Agent requires separate or additional instructions or information from the parties, the parties will reasonably and promptly execute such instructions and/or provide such information. The date on which Escrow Agent notifies the parties that it has received an executed copy or counterpart copy of this Agreement is the "Opening of Escrow."

**3. CONTINGENCY PERIOD AND APPROVAL BY PURCHASER.** The review and contingency period ("Contingency Period") for Purchaser to satisfy itself concerning inspections, investigations or other "due diligence" reviews of the Property will be as follows: **the Contingency Period will start on the date of this Agreement and will expire and terminate upon the date that is forty-five (45) days after the date of Opening of Escrow, within which Purchaser shall satisfy itself as to the following: (1) the physical condition of the Property including physical condition, zoning and use, (2) the environmental condition of the Property, including receipt of a "phase I" environmental assessment of the Property (as provided below), (3) all relevant business documents pertaining to the Property, including (without limitation) any existing reports or information in Seller's possession concerning the environmental condition of the Property, any surveys, any notices of violation in Seller's possession that pertain to the Property, any other studies or notices pertaining to the Property, and copies of any other written information in Seller's possession pertaining to the condition, use, operation or ownership of the Property that Purchaser may reasonably require, and (4) any other studies or matters that Purchaser chooses to review and that are pertinent to the Property.** During the Contingency Period, Purchaser may terminate the Agreement in its discretion, if Purchase determines that the contingencies are not satisfied. If it does so, any deposit made by Purchaser shall be refunded.

After mutual execution of this Agreement, the parties will order a "phase I" environmental assessment (the "Phase I Assessment") of the Property from an environmental consulting firm acceptable to Purchaser, which will be addressed jointly to Seller and Purchaser. Purchaser will pay for the cost of the Phase I Assessment at Closing (as provided below) or if the transaction fails to close solely because of Purchaser's default or refusal to close the purchase of the Property after removal of contingencies (and, otherwise, the cost of the Phase I Assessment will be paid by Seller or any overbidder who becomes the final purchaser of the Property pursuant to a Final Order, as defined and described below).

**4. TITLE REVIEW AND APPROVAL.** Upon mutual execution of this Agreement, Seller will furnish to Purchaser a preliminary title report showing the status of title to the Property, along with a legible copy of the exceptions to title shown in the title report. Purchaser will have fifteen (15) days after receipt of the title report to notify Seller as to any matter shown on the title report to which Purchaser objects. Any matter shown on the title report that Purchaser does not disapprove within such 15-day period will be deemed conclusively approved by Purchaser ("Permitted Exceptions"). Seller may, but will not be required to, elect to cure any disapproved title matter or notify Purchaser that Seller elects not to cure. If Seller elects to cure a disapproved title matter, Seller will have until Closing to cure the matter. If Seller elects not to cure or is unable to cure a disapproved title matter, Seller may so notify Purchaser, and Purchaser will have five (5) days after receipt of such notice to elect to waive any objection to the previously disapproved title matter, and if not so waived, this Agreement shall terminate. At Closing, an owner's title insurance policy will be issued to Purchaser, in form reasonably acceptable to Purchaser, insuring that Purchaser holds good and merchantable fee title to the Property, subject only to the Permitted Exceptions and any other exception specifically approved by Purchaser.

**5. BANKRUPTCY COURT APPROVAL.** The parties acknowledge that Seller is the subject of that certain bankruptcy case, Case No. 14-63530-FRA11 (the "**Bankruptcy Case**"), which is pending in the United States Bankruptcy Court for the District of Oregon (the "**Bankruptcy Court**"). The parties further acknowledge that the transactions described in this Agreement are subject to the approval of the Bankruptcy Court and cannot be consummated without such approval. Seller shall file a motion with the Bankruptcy Court seeking the entry of an order (the "**Approval Order**") authorizing Seller to enter into this Agreement and consummate the transactions described herein. Purchaser shall use commercially reasonable efforts to cooperate with Seller in the filing of the motion for the Approval Order. The parties' obligations under this Agreement are conditioned upon the Approval Order becomes a Final Order. "**Final Order**" means that (i) the Approval Order has been entered in the Bankruptcy Case, and (ii) the period in which the Approval Order is subject to any rights of appeal, certiorari proceeding, or other proceeding for review or rehearing has ended, or if any appeal, certiorari proceeding or other review or rehearing occurs), has ended and the Approval Order is not subject to further rights of legal challenge.

**6. CLOSING.** The escrow shall be closed (the "Closing") on a date mutually acceptable to the parties ("Closing Date"), within fifteen (15) days after the date on which the conditions to Closing set forth above are satisfied. At Closing, the following will take place: (a) Seller will convey the Property to Purchaser pursuant to a good and sufficient, statutory warranty deed ("Deed") and bill of sale (the form of which will be approved by the parties within the Contingency Period); (b) the Title Company will commit to issue to Purchaser an owner's policy of title insurance, in the amount of the Purchase Price and subject to no liens or encumbrances, other than the Permitted Exceptions and any other exception specifically approved by Purchaser in its review of title; and (c) Purchaser will pay the Purchase Price to Seller.

FORM - Purchase and Sale Agreement (Oregon)
79982533.1 0200079-00001

E x I

EXHIBIT I
Page___1___ Of___5___

Case 14-63530-fra11   Doc 261   Filed 10/23/15

Current property taxes shall be prorated as of the Closing Date (such property taxes, if not yet assessed, to be deemed equal to those for the last preceding year, subject to a post-Closing adjustment when the actual amount of property taxes becomes known). Seller and Purchaser shall equally divide the escrow fee, if the parties choose to close this transaction in escrow with the title company. The cost of the owner's policy of title insurance to be issued to Purchaser in the amount of the Purchase Price will be paid by Seller. Seller will be responsible for causing the Property to be released from the Bankruptcy Case and any liens on the Property, other than current property taxes. Purchaser will pay the recording fee for the Deed and the cost of its "due diligence" investigations. Each party will pay its own legal and consulting fees.

If any post-Closing reconciliation or adjustment is required between the parties pursuant to this Agreement (because of an adjustment or prorate that is done on an estimated basis, or otherwise), the parties will reasonably co-operate with each other to provide the information needed for such reconciliation and adjustment, and will promptly do the reconciliation and adjustment when the information is available to do so. If any other closing costs not specifically provided for herein are due at closing of this transaction, each party shall pay such closing costs as are normally and customarily the responsibility of such party. This paragraph 6 shall survive the Closing for all purposes.

### 7. UNTIL CLOSING; SELLER'S COOPERATION.

From the date of this Agreement until the Closing Date, Seller will continue to cause the Property to be maintained in substantially the same manner and condition which now exists, and will not further mortgage or further encumber its interest in the Property. Seller will cooperate in executing any documents and doing such other things as Purchaser may reasonably request in connection with Purchaser's due diligence activities; provided, that such actions will be at no out-of-pocket expense to Seller, and neither Seller nor the Property will be bound if Purchaser does not close the purchase of the Property.

### 8. CONDEMNATION.

If, prior to Closing, any part of the Property is condemned or appropriated by public authority or any party exercising the right of eminent domain, or is threatened thereby, then this Agreement shall, at the election of Purchaser, become null and void. In the event Purchaser elects not to terminate this Agreement, the purchase price shall be reduced by the amount of the Seller's award pertaining to the Property. Seller will promptly notify Purchaser as to the commencement of any such action known to Seller or any communication from a condemning authority that a condemnation or appropriation is contemplated, and will cooperate with Purchaser prior to Closing in the response to or defense of such actions in order to maximize the award.

### 9. NOTICES.

All notices given pursuant to this Agreement shall be in writing and shall either be (i) mailed by first class mail, postage prepaid, certified or registered with return receipt requested, (ii) delivered in person or by nationally recognized overnight courier, or (iii) sent by facsimile or as a PDF attachment to an email, if the party has specified a facsimile number or email address to use for notice purposes. Notices shall be effective when received (or deemed received by the party). Any notice transmitted by overnight courier service or by certified mail shall be deemed received as of the date of delivery to the address of the party, as confirmed by the overnight courier or as shown on the certified mail return receipt. Any such notice transmitted by facsimile shall be deemed received 12 hours after being telecopied and receipt has been confirmed either electronically or otherwise. Notice given to a party in any manner not specified above shall be effective only if and when received by the addressee as demonstrated by objective evidence in the possession of the sender. The address of each party to this Agreement for purposes of notice are as set forth below their signatures. A copy of any notice to either party will be sent to the party's legal counsel, as the party may designate. Each party may change its address for notice by giving not less than ten (10) days' prior notice of such change to the other party in the manner set forth above. Delivery of the copy of any notice to the places to which copies are to be sent is not a precondition to the effectiveness of the notice between the parties themselves.

For the purpose of this Agreement, the term "receipt" shall include the earlier of any of the following: (i) the date of actual receipt of the notice by the office of the person or entity pursuant to this Agreement, whether or not any named individual at such address receives the notice, or (ii) in the case of refusal to accept delivery or inability to deliver the notice because of the recipient's failure to maintain an address at which notices can be delivered, then the earlier of (A) the date of the attempted delivery or refusal to accept delivery, or (B) the date of receipt of notice of refusal or notice of non-delivery by the sending party.

### 10. REPRESENTATIONS AND WARRANTIES.

Seller warrants and represents to Purchaser as follows: (1) to Seller's knowledge, the Property is not in violation of any zoning, land-use, environmental, public health, or safety laws; (2) to Seller's knowledge, the Property, buildings and improvements (including any HVAC, plumbing, life-safety and other installed building systems and cranes) are in good and working condition and free of any known defects; (3) Seller is not aware of any pending or threatened litigation affecting the Property; (4) Seller is not aware of any pending or threatened condemnation proceedings or change in zoning affecting the Property; and (5) this Agreement has been, and all the documents to be delivered by Seller to Purchaser at Closing will be, duly authorized, executed and delivered by Seller, are or will be legal, valid, and binding obligations of Seller, will be sufficient to convey title to the Property, are or will be enforceable in accordance with their respective terms, and do not and will not at Closing violate any provisions of any agreement to which Seller is a party or by which the Property is bound.

Seller represents that, to Seller's knowledge, (a) there are no known hazardous substances on, under, in or about the Property in violation of any applicable environmental laws; (b) there have been no known spills, releases, discharges or disposal of any hazardous substances that have occurred or are presently occurring on or onto the Property or off the Property as a result of any construction on or operation and use of the Property; (c) there are no known underground storage tanks located on or immediately adjacent to the Property; or (d) there is no known contamination in the ground water on, under or about the Property. The term "hazardous substances" does not include cleaning materials, landscape fertilizer and other products and materials ("Permitted Materials") typically used in the ordinary course of maintaining and operating a commercial property similar to the Property (provided such Permitted Materials are in ordinary quantities and have been used in accordance with applicable environmental laws).

As used in the Agreement, the terms "known" or "knowledge" (or similar terms) means the actual, conscious knowledge of facts by Seller (and does not include "constructive" knowledge or imply any particular duty of investigation of facts not actually known by Seller). Seller's representations and warranties are made as of the Effective Date and will be deemed to be re-made as of the Closing Date. This paragraph 10 shall survive the Closing Date and be fully enforceable thereafter; provided, that Seller will not be deemed in breach of the representations or warranties in this Agreement or be liable to Purchaser for any claimed misrepresentation in this Agreement after the Closing Date on a representation made to Seller's knowledge unless Seller had actual knowledge on the Closing Date that the representation or warranty was false and failed to provide promptly the Discovery Notice (as defined and set forth

below) to disclose to Purchaser the matter, occurrence or condition that was discovered by or made known to Seller which made the representation or warranty false.

If, prior to the Closing, Seller obtains actual knowledge of a matter, occurrence or condition that would cause any representation made by Seller in this Agreement to be misleading or inaccurate, then (i) Seller will promptly notify Purchaser ("Discovery Notice") of the fact discovered by or made known to that would cause such any such representation to be misleading or inaccurate, and (ii) Purchaser will have the option to terminate this Agreement within five (5) days after receipt of such Discovery Notice if the matter, occurrence or event that was disclosed might adversely affect the value of the Property or Purchaser's ability to use the Property after the Closing Date. If Purchaser terminates this Agreement pursuant to this paragraph, the Deposit will be refunded to Purchaser, and neither party will have any further obligation to the other party under this Agreement (whether or not such events occur during or after the end of any contingency period provided in this Agreement).

## 11. REMEDIES; COSTS AND ATTORNEYS' FEES.

**11.1** *Seller's Default.* Seller shall be deemed to be in default under this Agreement if Seller fails, for any reason other than Purchaser's default under this Agreement, to meet, comply with, or perform any covenant, agreement, or obligation required on its part within the time limits and in the manner required in this Agreement, or a material breach shall have occurred of any representation or warranty made by Seller ("Seller's Default"). In the event of Seller's Default, Purchaser shall be entitled to exercise all remedies available under applicable law for breach of contract, including (without limitation) specific performance, and collection of damages and costs and attorneys' fees in connection with enforcement of this Agreement, and other sums allowed by law.

**11.2** *Purchaser's Default and Failure to Close.* If Purchaser defaults and fails to close the purchase, and neither party has exercised any right to terminate or rescind this Agreement as provided herein, the Deposit shall be retained by Seller as liquidated damages. PURCHASER AND SELLER ACKNOWLEDGE AND AGREE THAT SELLER'S DAMAGES IN THE EVENT OF BREACH BY PURCHASER WOULD BE EXTREMELY DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT THE DEPOSIT AMOUNT IS THE PARTIES' BEST ESTIMATE OF THE DAMAGES SELLER WOULD SUFFER IN THE EVENT THIS TRANSACTION FAILS TO CLOSE BY REASON OF PURCHASER'S BREACH OF THIS AGREEMENT, AND THAT SUCH ESTIMATE IS REASONABLE COMPENSATION UNDER THE CIRCUMSTANCES EXISTING ON THE EFFECTIVE DATE OF THIS AGREEMENT AND THE EXCLUSIVE REMEDY FOR PURCHASER'S DEFAULT, SINCE THE PRECISE AMOUNT OF SUCH COMPENSATION WOULD BE DIFFICULT TO DETERMINE. In addition, Purchaser will pay the cost of the Phase I Assessment, as provided in Section 3.

The foregoing is accepted and agreed to:

Initials of: _____   _____
                  Seller              Purchaser

If this transaction fails to close for any reason other than Purchaser's default, Purchaser will be entitled to a refund of the Deposit upon demand.

## 12. GENERAL PROVISIONS. (a) *Time of Essence.* TIME IS OF THE ESSENCE of each and every provision of this Agreement.
(a) *Brokers.* Each party will defend, indemnify and hold the other party harmless from any claim, loss or liability made or imposed by any party claiming a commission or fee in connection with this transaction and arising out of its own conduct. Seller has used ALEX RHOTEN/TIFFANY JONES of COLDWELL BANKER COMMERCIAL MWRE, LLC on this transaction.
(b) *Prior Agreements.* This document is the entire, final and complete agreement of the parties with respect to this transaction, and supersedes and replaces all written and oral agreements previously made or existing between the parties or their representatives with respect to the Option.
(c) *Counterparts; PDF and Facsimile Transmissions.* This Agreement may be executed simultaneously or in separate counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties to this Agreement may execute the Agreement by signing counterpart signature pages. Signatures transmitted by telecopy or as emailed PDF copies shall be binding as originals, and each party hereby waive any defenses to the enforcement of the terms of this Agreement or any document sent by emailed PDF, based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").
(d) *Invalidity of Provisions.* In the event any provision of this Agreement is declared invalid or is unenforceable for any reason, such provision shall be deleted from the Agreement and shall not invalidate any other provision contained in the Agreement.
(e) *Governing Law.* This Agreement affects property located in the State of OREGON, and this Agreement will be interpreted and enforced in accordance with the laws of the State of Oregon.
(f) *Waiver.* Failure of either party at any time to require performance of any provision of this Agreement shall not limit the party's right to enforce the provision. Waiver of any breach of any provision shall not be a waiver of any succeeding breach of the provision or a waiver of the provision itself or any other provision.
(g) *Legal Effect.* THIS IS A LEGALLY BINDING CONTRACT. ALL PARTIES SHOULD SEEK ADVICE OF COUNSEL BEFORE SIGNING.
(h) *Saturday, Sunday and Legal Holidays.* If the time for performance of any of the terms, conditions and provisions of this Agreement shall fall on a Saturday, Sunday or legal holiday, then the time of such performance shall be extended to the next business day thereafter. As used in this Agreement, the expression (i) "business day" means every day other than a nonbusiness day, and (ii) "nonbusiness day" means a Saturday, Sunday or legal holiday in the State of Oregon. In any case where a payment is due, an act is to be performed, a notice is to be delivered or a period expires under this Agreement on a non-business day, such occurrence shall be deferred until the next succeeding business day.
(i) *Assignment and Succession.* This Agreement shall be binding upon and inure to the benefit of the parties, and their respective heirs, personal representatives, successors, and assigns, but Purchaser shall not assign or otherwise transfer any interest without the prior written consent of Seller, which may be given (or withheld) in Seller's commercially reasonable judgment. Without the need for such consent, Purchaser may assign its rights under this Agreement at any time to any person or entity that is affiliated with or under common control with Purchaser or Purchaser's principals or affiliates and may cause the title to be taken in the name of a nominee or third party at Closing, but no such action will constitute a release of Purchaser's liability under this Agreement.
(j) *Oregon Statutory Notice.* THE PROPERTY DESCRIBED IN THIS INSTRUMENT MAY NOT BE WITHIN A FIRE PROTECTION DISTRICT PROTECTING STRUCTURES. THE PROPERTY IS SUBJECT TO LAND USE LAWS AND REGULATIONS THAT, IN FARM OR FOREST ZONES, MAY NOT AUTHORIZE CONSTRUCTION OR SITING OF A RESIDENCE AND THAT LIMIT LAWSUITS AGAINST FARMING OR FOREST PRACTICES AS DEFINED IN ORS 30.930 IN ALL ZONES. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER ORS 195.300, 195.301, AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON

EXHIBIT _1_
Page _3_ Of _5_

LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.  BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY THAT THE UNIT OF LAND BEING TRANSFERRED IS A LAWFULLY ESTABLISHED LOT OR PARCEL, AS DEFINED IN ORS 92.010 OR 215.010, TO VERIFY THE APPROVED USES OF THE LOT OR PARCEL, TO VERIFY THE EXISTENCE OF FIRE PROTECTION FOR STRUCTURES AND THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the dates shown below.

Dated: _9 29-15_, 2015

SELLER: **LAURA LEE HAGENAUER**

By _____
Name:

Dated: _Sept 16_, 2015

PURCHASER: **R & R PROPERTY HOLDINGS, INC.**,
a Washington corporation

By _____
Name: Dwaine Odinson, CA
Title: Controller

Address for Notices to Seller:
To be provided by Seller

Address for Notices to Purchaser:
**R & R PROPERTY HOLDINGS, INC.**
Attention: Dwaine Odinson, CA
Controller
7449 River Rd.
Delta, British Columbia
CANADA V4G1B9

Telephone: (604) 946-0916
Facsimile: (604) 946-0783
Email: dwaineo@napsteel.com

# EXHIBIT A

## DESCRIPTION OF PROPERTY

The Property is known also known as: 041W33DC, Tax Lot 400, Marion County, Oregon; Tax Assessor's Parcel No. R11578. The legal description of the Property is set forth below or attached to this Exhibit A (or, if not, then the parties will use the legal description as it appears in the preliminary title commitment referred to in this Agreement, and will reasonably approve and attach it as soon as available).

The Property includes, without limitation, the land, the manufacturing building and coil storage building located thereon ("Building(s)"), the cranes used in connection with the operation of the Building(s), and the chain link fence at the perimeter of the Property boundary lines, and other improvements that are located on the land and/or that are in or a part of the Building(s).

FORM - Purchase and Sale Agreement (Oregon)
79982533.1 0200079-00001

EXHIBIT I
Page 5 Of 5

Case 14-63530-fra11    Doc 261    Filed 10/23/15

*THIS INDENTURE OF LEASE, entered into this* .......................................... *day of* ...................................................,
*between* .........................................................................................................................................................................
......................................... R & R PROPERTY HOLDINGS, INC., a Washington corporation ......................................
.........................................................................................................................................................................................
*hereinafter called the lessor, and* ..............................................................................................................................
......................................................... LAURA LEE HAGENAUER .............................................................................
.........................................................................................................................................................................................
......................................................................................................................, *hereinafter called the lessee,*

   **WITNESSETH:** *In consideration of the covenants herein, the lessor hereby leases unto the lessee those
certain premises, as is, situated in the City of* ... Hubbard ......................., *County of* ... Marion ....................... *and State
of* .........................................., *hereinafter called the premises, described as follows:*


   See attached ADDENDUM, incorporated into this Lease by this reference.


   *To Have and to Hold the premises commencing with the* .............. *day of* See attached Addendum .........,
*and ending at midnight on the* .............. *day of* ..........................., ......., *for a rental of $*.................
*for the whole term, which lessee agrees to pay, at* Landlord's address under this Lease .................................
*City of* ..........................., *State of* ...................., *at the following times and in the following amounts, to-wit:*

            SEE ATTACHED ADDENDUM


   *In consideration of the leasing of the premises and of the mutual agreements herein contained, the parties
agree as follows:*

EXHIBIT J
Page 1 Of 11

**LESSEE'S ACCEPTANCE OF LEASE** (1) The lessee accepts the letting and agrees to pay to the order of the lessor the monthly rentals above stated for the full term of this lease, in advance, at the times and in the manner aforesaid.

**USE OF PREMISES** (2a) The lessee shall use the premises during the term of this lease for the conduct of the following business:

<div align="center">See Addendum</div>

and for no other purpose whatsoever without lessor's written consent.

(2b) The lessee will not make any unlawful, improper or offensive use of the premises; the lessee will not suffer any strip or waste thereof; the lessee will not permit any objectionable noise or odor to escape or to be emitted from the premises or do anything or permit anything to be done upon or about the premises in any way tending to create a nuisance; the lessee will not sell or permit to be sold any product, substance or service upon or about the premises, excepting such as lessee may be licensed by law to sell and as may be herein expressly permitted.

(2c) The lessee will not allow the premises at any time to fall into such a state of repair or disorder as to increase the fire hazard thereon; the lessee will not install any power machinery on the premises except under the supervision and with written consent of the lessor; the lessee will not store gasoline or other highly combustible materials on the premises at any time; the lessee will not use the premises in such a way or for such a purpose that the fire insurance rate on the improvements on the premises is thereby increased or that would prevent the lessor from taking advantage of any rulings of any agency of the state in which the premises are situated, or which would allow the lessor to obtain reduced premium rates for long term fire insurance policies.

(2d) The lessee shall comply at lessee's own expense with all laws and regulations of any municipal, county, state, federal or other public authority respecting the use of the premises. These include, without limitation, all laws, regulations and ordinances pertaining to air and water quality, Hazardous Materials as herein defined, waste disposal, air emissions, and other environmental matters. As used herein, Hazardous Material means any hazardous or toxic substance, material, or waste, including but not limited to those substances, materials, and waste listed in the U.S. Department of Transportation Hazardous Materials Table or by the U.S. Environmental Protection Agency as hazardous substances and amendments thereto, petroleum products, or such other substances, materials, and waste that are or become regulated under any applicable local, state, or federal law.

(2e) The lessee shall regularly occupy and use the premises for the conduct of lessee's business, and shall not abandon or vacate the premises for more than ten days without written approval of lessor.

(2f) Lessee shall not cause or permit any Hazardous Material to be brought upon, kept or used in or about the premises by lessee, its agents, employees, contractors, or invitees without the prior written consent of lessor, which consent will not be unreasonably withheld so long as lessee demonstrates to lessor's reasonable satisfaction that such Hazardous Material is necessary or useful to lessee's business and will be used, kept, and stored in a manner that will comply at all times with all laws regulating any such Hazardous Material so brought upon or used or kept on or about the premises.

**UTILITIES** (3) The lessee shall pay for all heat, light, water, power, and other services or utilities used in the premises during the term of this lease.

**REPAIRS AND IMPROVEMENTS** (4a) The lessor shall not be required to make any repairs, alterations, additions or improvements to or upon the premises during the term of this lease, except only those hereinafter specifically provided for; the lessee hereby agrees to maintain and keep the premises, including all interior and exterior walls and doors, heating, ventilating and cooling systems, interior wiring, plumbing and drain pipes to sewers or septic tank, in good order and repair during the entire term of this lease, at lessee's own cost and expense, and to replace all glass which may be broken or damaged during the term hereof in the windows and doors of the premises with glass of as good or better quality as that now in use; it is further agreed that the lessee will make no alterations, additions or improvements to or upon the premises without the written consent of the lessor first being obtained.

(4b) The lessor agrees to make all necessary structural repairs to the building, including exterior walls, foundation, roof, gutters and downspouts, and the abutting sidewalks. The lessor reserves and at any and all times shall have the right to alter, repair or improve the building of which the premises are a part, or to add thereto, and for that purpose at any time may erect scaffolding and all other necessary structures about and upon the premises and lessor and lessor's representatives, contractors and workers for that purpose may enter in or about the premises with such materials as lessor may deem necessary therefor, and lessee waives any claim to damages, including loss of business resulting therefrom.

**LESSOR'S RIGHT OF ENTRY** (5) It shall be lawful for the lessor, the lessor's agents and representatives, at any reasonable time to enter into or upon the premises for the purpose of examining into the condition thereof, or for any other lawful purpose.

**RIGHT OF ASSIGNMENT** (6) The lessee will not assign, transfer, pledge, hypothecate, surrender or dispose of this lease, or any interest herein, sublet, or permit any other person or persons whomsoever to occupy the premises without the written consent of the lessor being first obtained in writing; this lease is personal to lessee; lessee's interests, in whole or in part, cannot be sold, assigned, transferred, seized or taken by operation at law, or under or by virtue of any execution or legal process, attachment or proceedings instituted against the lessee, or under or by virtue of any bankruptcy or insolvency proceedings had in regard to the lessee, or in any other manner, except as above mentioned.

**LIENS** (7) The lessee will not permit any lien of any kind, type or description to be placed or imposed upon the improvements in which the premises are situated, or any part thereof, or the land on which they stand.

**ICE, SNOW, DEBRIS** (8) If the premises are located at street level, then at all times lessee shall keep the sidewalks in front of the premises free and clear of ice, snow, rubbish, debris and obstruction; and if the lessee occupies the entire building, the lessee will not permit rubbish, debris, ice or snow to accumulate on the roof of the building so as to stop up or obstruct gutters or downspouts or cause damage to the roof, and will save harmless and protect the lessor against any injury whether to lessor or to lessor's property or to any other person or property caused by lessee's failure in that regard.

**OVERLOADING OF FLOORS** (9) The lessee will not overload the floors of the premises in such a way as to cause any undue or serious stress or strain upon the building in which the premises are located, or any part thereof, and the lessor shall have the right, at any time, to call upon any competent engineer or architect whom the lessor may choose, to decide whether or not the floors of the premises, or any part thereof, are being overloaded so as to cause any undue or serious stress or strain on the building, or any part thereof, and the decision of the engineer or architect shall be final and binding upon the lessee; and in the event that it is the opinion of the engineer or architect that the stress or strain is such as to endanger or injure the building, or any part thereof, then and in that event the lessee agrees immediately to relieve the stress or strain, either by reinforcing the building or by lightening the load which causes such stress or strain, in a manner satisfactory to the lessor.

**ADVERTISING SIGNS** (10) The lessee will not use the outside walls of the premises, or allow signs or devices of any kind to be attached thereto or suspended therefrom, for advertising or displaying the name or business of the lessee or for any purpose whatsoever without the written consent of the lessor; however, the lessee may make use of the windows of the premises to display lessee's name and business when the workmanship of such signs shall be of good quality and permanent nature; provided further that the lessee may not suspend or place within said windows or paint thereon any banners, signs, sign-boards or other devices in violation of the intent and meaning of this section.

**LIABILITY INSURANCE**

(11) At all times during the term hereof, the lessee will, at the lessee's own expense, keep in effect and deliver to the lessor liability insurance policies in form, and with an insurer, satisfactory to the lessor. Such policies shall insure both the lessor and the lessee against all liability for damage to persons or property in, upon, or about the premises. The amount of such insurance shall be not less than $_____ for injury to one person, not less than $_____ for injuries to all persons arising out of any single incident, and not less than $_____ for damage to property, or a combined single limit of not less than $ 1,000,000.00 _____. It shall be the responsibility of lessor to purchase casualty insurance with extended coverage so as to insure any structure on the premises against damage caused by fire or the effects of fire (smoke, heat, means of extinguishment, etc.), or any other means of loss. It shall be the responsibility of the lessee to insure all of the lessee's belongings upon the premises, of whatsoever nature, against the same. With respect to these policies, lessee shall cause the lessor to be named as an additional insured party. Lessee agrees to and shall indemnify and hold lessor harmless against any and all claims and demands arising from the negligence of the lessee, lessee's officers, agents, invitees and/or employees, as well as those arising from lessee's failure to comply with any covenant of this lease on lessee's part to be performed, and shall at lessee's own expense defend the lessor against any and all suits or actions arising out of such negligence, actual or alleged, and all appeals therefrom and shall satisfy and discharge any judgment which may be awarded against lessor in any such suit or action.

**FIXTURES**

(12) All partitions, plumbing, electrical wiring, additions to or improvements upon the premises, whether installed by the lessor or lessee, shall be and become a part of the building in which the premises are located as soon as installed and the property of the lessor unless otherwise herein provided.

**LIGHT AND AIR**

(13) This lease does not grant any rights of access to light and air over the premises or any adjacent property.

**DAMAGE BY CASUALTY, FIRE AND DUTY TO REPAIR**

(14) In the event of the destruction of the improvements in which the premises are located by fire or other casualty, either party hereto may terminate this lease as of the date of fire or casualty, provided, however, that in the event of damage to the improvements by fire or other casualty to the extent of 30 per cent or more of the sound value thereof, the lessor may or may not elect to repair the same; written notice of lessor's election shall be given lessee within fifteen days after the occurrence of the damage; if notice is not so given, lessor conclusively shall be deemed to have elected not to repair; in the event lessor elects not to repair, then and in that event this lease shall terminate with the date of the damage; but if the improvements in which the premises are located be but partially destroyed and the damage so occasioned shall not amount to the extent indicated above, or if greater than said extent and lessor elects to repair, as aforesaid, then the lessor shall repair the same with all convenient speed and shall have the right to take possession of and occupy, to the exclusion of the lessee, all or any part thereof in order to make the necessary repairs, and the lessee hereby agrees to vacate upon request, all or any part thereof which the lessor may require for the purpose of making necessary repairs, and for the period of time between the day of such damage and until such repairs have been substantially completed there shall be such an abatement of rent as the nature of the injury or damage and its interference with the occupancy of the premises by the lessee shall warrant; however, if the premises be but slightly injured and the damage so occasioned shall not cause any material interference with the occupation of the premises by lessee, then there shall be no abatement of rent and the lessor shall repair the damage with all convenient speed.

**WAIVER OF SUBROGATION RIGHTS**

(15) Neither the lessor nor the lessee shall be liable to the other for loss arising out of damage to or destruction of the premises, or the building or improvement of which the premises are a part or with which they are connected, or the contents of any thereof, when such loss is caused by any of the perils which are or could be included within or insured against by a standard form of fire insurance with extended coverage, including sprinkler leakage insurance, if any. All such claims for any and all loss, however caused, hereby are waived. Such absence of liability shall exist whether or not the damage or destruction is caused by the negligence of either lessor or lessee or by any of their respective agents, servants or employees. It is the intention and agreement of the lessor and the lessee that the rentals reserved by this lease have been fixed in contemplation that both parties shall fully provide their own insurance protection at their own expense, and that both parties shall look to their respective insurance carriers for reimbursement of any such loss, and further, that the insurance carriers involved shall not be entitled to subrogation under any circumstances against any party to this lease. Neither the lessor nor the lessee shall have any interest or claim in the other's insurance policy or policies, or the proceeds thereof, unless specifically covered therein as a joint assured.

**EMINENT DOMAIN**

(16) In case of the condemnation or purchase of all or any substantial part of the premises by any public or private corporation with the power of condemnation this lease may be terminated, effective on the date possession is taken, by either party hereto on written notice to the other and in that case the lessee shall not be liable for any rent after the termination date. Lessee shall not be entitled to and hereby expressly waives any right to any part of the condemnation award or purchase price.

**FOR SALE AND FOR RENT SIGNS**

(17) During the period of 30 days prior to the date above fixed for the termination of this lease, the lessor herein may post on the premises or in the windows thereof signs of moderate size notifying the public that the premises are "for sale" or "for lease."

**DELIVERING UP PREMISES ON TERMINATION**

(18) At the expiration of the lease term or upon any sooner termination thereof, the lessee will quit and deliver up the premises and all future erections or additions to or upon the same, broom-clean, to the lessor or those having lessor's estate in the premises, peaceably, quietly, and in as good order and condition, reasonable use and wear thereof, damage by fire, unavoidable casualty and the elements alone excepted, as the same are now in or hereafter may be put in by the lessor.

**ADDITIONAL COVENANTS OR EXCEPTIONS**

(19)

SEE ATTACHED ADDENDUM

PROVIDED, ALWAYS, and these presents are upon these conditions, that (1) if the lessee shall be in arrears in the payment of rent for a period of ten days after the same becomes due, or (2) if the lessee shall fail or neglect to perform or observe any of the covenants and agreements contained herein on lessee's part to be done, kept, performed and observed and such default shall continue for ten days or more after written notice of such failure or neglect shall be given to lessee, or (3) if the lessee shall be declared bankrupt or insolvent according to law, or (4) if any assignment of lessee's property shall be made for the benefit of creditors, or (5) if on the expiration of this lease lessee fails to surrender possession of the premises, the lessor or those having lessor's estate in the premises, may terminate this lease and, lawfully, at lessor's option immediately or at any time thereafter, without demand or notice, enter into and upon the premises and every part thereof and repossess the same, and expel lessee and those claiming by, through and under lessee and remove lessee's effects at lessee's expense, forcibly if necessary and store the same, all without being deemed guilty of trespass and without prejudice to any remedy which otherwise might be used for arrears of rent or preceding breach of covenant.

In the event any re-entry by lessor, lessor may lease or relet the premises in whole or in part to any tenant or tenants who may be satisfactory to lessor, for any duration, and for the best rent, terms and conditions as lessor may reasonably obtain. Lessor shall apply the rent received from any such tenant first to the cost of retaking and reletting the premises, including remodeling required to obtain any such tenant, and then to any arrears of rent and future rent payable under this lease and any other damages to which lessor may be entitled hereunder.

Any property which lessee leaves on the premises after abandonment or expiration of the lease, or for more than ten days after any termination of the lease by landlord, shall be deemed to have been abandoned, and lessor may remove and sell the property at public or private sale as lessor sees fit, without being liable for any prosecution therefor or for damages by reason thereof, and the net proceeds of any such sale shall be applied toward the expenses of landlord and rent as aforesaid, and the balance of such amounts, if any, shall be held for and paid to the lessee.

In the event the lessee for any reason shall hold over after the expiration of this lease, such holding over shall not be deemed to operate as a renewal or extension of this lease, but shall only create a tenancy at sufferance which may be terminated at will at any time by the lessor.

In case suit or action is instituted to enforce compliance with any of the terms, covenants or conditions of this lease, or to collect the rental which may become due hereunder, or any portion thereof, the losing party agrees to pay the prevailing party's reasonable attorney fees incurred throughout such proceeding, including at trial, on appeal, and for post-judgment collection. The lessee agrees to pay and discharge all lessor's costs and expenses, including lessor's reasonable attorney's fees that shall arise from enforcing any provision or covenants of this lease even though no suit or action is instituted.

Should the lessee be or become the debtor in any bankruptcy proceeding, voluntarily, involuntarily or otherwise, either during the period this lease is in effect or while there exists any outstanding obligation of the lessee created by this lease in favor of the lessor, the lessee agrees to pay the lessor's reasonable attorney fees and costs which the lessor may incur as the result of lessor's participation in such bankruptcy proceedings. It is understood and agreed by both parties that applicable federal bankruptcy law or rules of procedure may affect, alter, reduce or nullify the attorney fee and cost awards mentioned in the preceding sentence.

Any waiver by the lessor of any breach of any covenant herein contained to be kept and performed by the lessee shall not be deemed or considered as a continuing waiver, and shall not operate to bar or prevent the lessor from declaring a forfeiture for any succeeding breach, either of the same condition or covenant or otherwise.

Any notice required by the terms of this lease to be given by one party hereto to the other or desired so to be given, shall be sufficient if in writing, contained in a sealed envelope, and sent first class mail, with postage fully prepaid, and if intended for the lessor herein, then if addressed to the lessor at ............... SEE ADDENDUM

lessee at ___Tenant's address or the leased premises___ ............... and if intended for the lessee, then if addressed to the notice shall be deemed conclusively to have been delivered to the addressee forty-eight hours after the deposit thereof in the U.S. Mail.

All rights, remedies and liabilities herein given to or imposed upon either of the parties hereto shall extend to, inure to the benefit of and bind, as the circumstances may require, the heirs, successors, personal representatives and so far as this lease is assignable by the terms hereof, to the assigns of such parties. ............... Any such

In construing this lease, it is understood that the lessor or the lessee may be more than one person; that if the context so requires, the singular pronoun shall be taken to mean and include the plural, and that generally all grammatical changes shall be made, assumed and implied to make the provisions hereof apply equally to corporations and to individuals.

*IN WITNESS WHEREOF*, the parties have executed this lease on the day and year first hereinabove written, any corporation signature being by authority of its Board of Directors.

LANDLORD:                                          TENANT:

R & R PROPERTY HOLDINGS, INC.,                     LAURA LEE HAGENAUER

a Washington corporation

Signature on attached ADDENDUM                     Signature on attached ADDENDUM

The publisher strongly recommends that both the lessor and the lessee become familiar with the Americans with Disabilities Act of 1990, Public Laws 101-336. The Act may impose certain duties and responsibilities upon either or both parties to this lease. These duties and responsibilities may include but not be limited to the removal of certain architectural barriers and ensuring that disabled persons are not denied the opportunity to benefit from the same goods and services as those available to persons without disabilities. Under the Act, prohibition against discrimination applies to any person who is the owner, operator, lessor, or lessee of a place of public accommodation.

EXHIBIT 1
Page 4 Of 11

# ADDENDUM TO LEASE

DATED:     As of October ___, 2015

BETWEEN:   **R & R PROPERTY HOLDINGS, INC.,**
           **a Washington corporation**
                                                    "Lessor" or "Landlord"

AND:       **LAURA LEE HAGENAUER (successor-in-interest to, and**
           **formerly doing business as, "VALLEY ROLLING LLC")**
                                                    "Lessee" or "Tenant"

This Addendum to Lease ("**Addendum**") and the attached Business Lease [Stevens Ness Form No. 812] by Landlord (with this Addendum, the "**Lease**") are executed to document the terms of the lease between the parties for the following premises ("**Premises**"): approximately **27,500 square feet of space, including office space,** in the building ("**Building**") located at **3071 Schmidt Lane NE, Hubbard, Oregon 97032,** as more particularly described on the attachments to this Lease, subject to the provisions of this Addendum. The Building is located on a larger parcel of property shown on the drawing attached to this Lease as the "**Valley Rolling**" property, known as **Tax Lot 400, Marion County, Oregon** (the "**Property**").

This Addendum hereby amends, supplements and is incorporated into the Lease, as follows:

1.     **Bankruptcy Case; Closing of Purchase.** The parties acknowledge that the Property is the subject of the bankruptcy case, Case No. 14-63530-FRA11 (the "**Bankruptcy Case**"), which is pending in the United States Bankruptcy Court for the District of Oregon (the "**Bankruptcy Court**") and an executory Sale Agreement, dated as of September 16, 2015 ("**Sale Agreement**"), under which Landlord would purchase the Property and lease the Premises back to Tenant. This Lease is subject to the closing of the purchase of the Property pursuant to the Sale Agreement (the "**Closing**").

2.     **Commencement Date.** Possession will be deemed delivered to Tenant at Closing, which will be the commencement of the Lease term ("**Commencement Date**"). Rent will commence as of the Commencement Date.

3.     **Future Demising of Office Space into Two Spaces.** Initially, the Premises includes use of the entire office space within the Building, which contains approximately 4,276 square feet. However, Landlord will have the right and option to demise separately (and lease or occupy for any office-warehouse purpose) up to one-half of such office space (the "**Separate Office Space**"), so long as Landlord provides to Tenant additional warehouse space in the Building with a gross square footage equal to the area of the Separate Office Space taken from the Premises.

4.     **Year-to-Year Lease Term.** The initial Lease term (the "**Term**") will commence on the Commencement Date and continue until the last day of the calendar month in which the first anniversary of the Commencement Date occurs (the "**Renewal Date**") , at which time this Lease will be automatically renewed for an additional period of twelve (12) calendar months (a "**Renewal Term**"), and thereafter on each anniversary of the first Renewal Date will be automatically renewed for additional period(s) of twelve (12) calendar months each, <u>unless and until</u> either party notifies the other party at least ninety (90) days before a Renewal Date that the party is electing to terminate this Lease at the end of the current Term, immediately before such renewal.

5.     **Base Rent.** The regular monthly base rent amount will be $\underline{\$12,650.00}$. The monthly base rent will be due as of the fifteenth (15th) day of each month. Rent for any partial month will be prorated on the basis of a 30-day month. Rent is payable in advance. During the initial term of this Lease (ending on the first Renewal Date), the monthly base rent is included in the gross rent amount of $15,000 per month, and thereafter will be paid as part of the "triple net" Lease rental, as provided in Section 6.

6.     **Gross Lease for First Year; Triple Net Lease Thereafter.** For the initial Term of this Lease ending on the first Renewal Date, Tenant will pay a "gross" rent of $15,000 per month, including the monthly base rent amount and all other amounts to be reimbursed to Landlord for property taxes, insurance and maintenance. Thereafter,

Addendum to Lease - Stevens Ness
Business Lease Form 812
80227578.1 0052781-00013

Rider - 1

EXHIBIT ___J___
Page___5___ Of _11_

Case 14-63530-fra11     Doc 261     Filed 10/23/15

if the Lease is renewed and exten...d, this Lease is a so-called "triple net" l...e, pursuant to which Tenant will be responsible for its proportionate and allocated share of taxes, maintenance, insurance and other costs in operating the Premises during the Term. Tenant's share of such costs is referred to as **"Additional Rent."** The term **"Rent"** means the monthly base rent and all Additional Rent.

7. **Security Deposit; Payment.** As a condition to the commencement of the Term, Tenant will pay to Landlord (i) the monthly "gross" rent of $15,000 for the first month of the Term, and (ii) a Security Deposit of $15,000. All payments by Tenant to Landlord under the Lease will be made by wire transfer to a bank account of Landlord to be designated by written notice to Tenant.

8. **Property Taxes and Assessments.** Landlord is responsible for paying the property taxes and assessments ("taxes") against the Building and land area being used by Tenant, as they become due, subject to Landlord's right to collect back from Tenant during the Term Tenant's proportionate share of such amounts, as Additional Rent, commencing with the first Renewal Term. Taxes for the year in which the Lease terminates will be prorated and adjusted for any partial year. As used in this Lease, the term **"proportionate share"** of Additional Rent items that are attributable to the Building will be fixed at fifty percent (50%). The initial estimated amount payable by Tenant is: **50% of $3,833.33, equaling $1,916.67 per month** (which is included in the "gross" rent amount under this Lease for the initial Term). Tenant's proportionate share of property taxes will be due on November 1st of each year, unless Tenant is paying monthly installments as referenced below.

Commencing with the first Renewal Term, Landlord may elect to require that Tenant shall pay to Landlord, on the fifteenth (15th) day of each month in advance, an amount equal to one twelfth (1/12) of Tenant's proportionate share of taxes to be paid for the year. The monthly payment for taxes may be adjusted by Landlord during the Term, based on Landlord's reasonable estimate of changes in the amount of annual property taxes and assessments to be paid. There will be an annual reconciliation and adjustment between the parties when the actual amount of taxes is determined. If the monthly estimated payments were less than Tenant's proportionate share of the actual taxes, Tenant will pay the deficiency to Landlord at the time Landlord submits an invoice therefor. If the monthly estimated payments were greater than the actual amount due, Landlord will credit the difference against the next monthly payments due from Tenant.

Tenant will pay any personal property taxes on Tenant's trade fixtures and personal property.

9. **Maintenance and Repair.** Tenant will maintain the Premises, and Landlord will maintain the Building, parking areas, accessways, landscaping and other common area portions of the Property ("**Common Areas**"), and the parties will otherwise perform their respective obligations in **Sections 2 and 4(a)** of the Lease. If any maintenance expenses are incurred by Landlord for the Building or Common Areas, and the work performed is not specific to the correction of a maintenance problem caused by a tenant within its tenant space, such maintenance expenses will be allocated proportionately to the tenant space in the Building as a whole, and Tenant will pay its proportionate share (i.e., 50%, if it is leasing one-half of the Building) of such maintenance expenses, as Additional Rent, commencing with the first Renewal Term. Maintenance charges for the Building and Common Areas are included in the "gross" rent amount under this Lease for the initial Term.

10. **Property Insurance.** Landlord will maintain property casualty insurance on the Building (but not any of Tenant's own trade fixtures, inventory and personal property), as Landlord determines to be appropriate. Tenant will reimburse Landlord for Tenant's allocated and proportionate share of the cost of Landlord's property insurance, as Additional Rent, commencing with the first Renewal Term. The initial estimated amount payable by Tenant is: **$433.34 per month** (which is included in the "gross" rent amount under this Lease for the initial Term). Tenant will maintain such casualty insurance on Tenant's own trade fixtures, inventory and personal property, as Tenant determines to be appropriate.

11. **Liability Insurance; Indemnity** Tenant must provide Landlord with a certificate of commercial general liability insurance in the amount of at least $1,000,000 (combined single limit), as provided in **Section 11** of the Lease, naming Landlord as additional named insured and with a contractual liability endorsement covering the

indemnification obligations referen... ...d in this Lease. The certificate must have ...inimum 10-day written cancellation notice clause in favor of Landlord. Failure to provide such insurance certificate may result in termination of this Lease by Landlord and/or Tenant's not being entitled to enter and continue to use the Premises.

Tenant will defend, indemnify, and hold Landlord, and its agents and representatives, harmless from any claim, loss, or liability (including attorneys' fees incurred) arising out of or in connection with any use, entry or activity on the Premises or any injury or damage to the Premises or Building or to any person or property therein or thereon during the term of this Lease, whether or not caused or contributed by any act or omission of Landlord, its agents or representatives.

**12.** **Utilities; Telephone.** Except as otherwise provided below, Tenant will pay for all utilities used by Tenant in the Premises. For utilities provided to the Building that are not separately metered, Tenant will pay 100% of such utilities until the other portion of the Building is leased, and thereafter will pay its proportionate share (50%), unless otherwise reasonably allocated by Landlord, of such utilities. Tenant will arrange for its own trash removal and arrange for its own janitorial service, if any. Water and sewer and natural gas charges will be paid by Landlord unless and until the costs are separately metered or submetered.

The telephone service for the Building will be initially in the name of Tenant and paid by Tenant. If an additional tenant is added by Landlord to the Building, the added tenant will arrange for its own telephone line.

**13.** **Alterations.** Any proposed alterations by Tenant to the Premises or Building will be subject to Landlord's prior written consent, as required by this Lease.

**14.** **Tenant's Use.** Under **Section 2(a)** of the Lease, Tenant's intended and permitted use of the Premises is for the following: **office and warehouse use**, and no other use without Landlord's prior written consent. Tenant keep its hours of operation posted at the Premises. Tenant will have the right to use a reasonable number of parking spaces, which will be equitably allocated by Landlord to Tenant and other tenants of the Building from time to time, but will not occupy any parking spaces designated for customers.

**15.** **Tenant's Work.** There is no work required to be performed by Landlord to ready the Premises for use by Tenant. Tenant will be responsible for moving to the Premises any of Tenant's furniture, fixtures and equipment ("FF&E") that Tenant wants to use within the Premises. The Premises will be modified by Tenant to accommodate its intended use, in accordance with this Lease, but any such work must meet Code requirements.

**16.** **Rent Not Paid When Due; NSF Checks.** Rent will be received by Landlord without set-off, offset, abatement or deduction of any kind. Such payments will be made in advance to Landlord's address as stated below (or as Landlord may subsequently specify by written notice to Tenant). Any rent not paid within ten (10) days after it is due will be assessed a late charge equal to **Five percent (5%) of the overdue amount**. Tenant shall pay the late charge without the need for demand by Landlord, and will reimburse Landlord for reasonable attorneys' fees incurred by Landlord in connection with any overdue payment (if Landlord consults an attorney or takes other action to collect the amounts owed). Landlord may levy and collect a late charge and/or interest in addition to all other remedies available for Tenant's default. If any check is returned by Tenant's bank for insufficient funds ("NSF"), then the bank service charges resulting from the NSF check will be promptly paid by Tenant, in addition to the late charge.

**17.** **Rights of Use; Rules.** Tenant will (a) reasonably co-operate on any security measures that Landlord may take from time to time, and (b) promptly comply with reasonable rules and regulations that Landlord may adopt from time to time in order to promote safety, order, cleanliness, operation of business, and good service to the Building and its tenants, so long as they are required of all tenants at Landlord's Property. Such rules will include (without limitation) the following: (i) there is NO SMOKING allowed in the Premises, Building or restrooms; and (ii) no portion of the Premises may be used for overnight sleeping.

**18.** **Transfers.** Tenant shall not assign, mortgage, lien or encumber the Premises or Tenant's leasehold estate, or sublet any portion of the Premises, or license the use of any portion of the Premises, or otherwise transfer any

EXHIBIT _J_
Page _7_ Of _11_

interest in the Premises (whether voluntary, involuntary, by operation of law or otherwise) (collectively, a **"transfer"**), without the prior written consent of Landlord pursuant to **Section 6** of the body of this Lease. Any attempted transfer without consent shall be null and void and, at the option of Landlord, will cause termination of this Lease. The giving of such consent in one instance shall not preclude the need for Tenant to obtain Landlord's consent to further transfers. If Tenant is permitted to make any transfer, Tenant shall not be relieved of its obligations, but shall remain primarily liable to Landlord for performance of all obligations.

19. **Methods for Notices**. Notices may be given by utilization of the method(s) in the Lease, or by registered mail, or by facsimile or other telecommunication device capable of transmitting or creating a written record, or personally. Notices are effective on receipt. A notice will also be deemed received if posted at or delivered to the Premises.

20. **Conduct of Business; Maintenance; Signage**. Tenant will cause its employees, customers and invitees on the Premises to conduct themselves in a good and orderly manner. Tenant will keep the interior of the Premises in good condition, repair and appearance. To identify Tenant's business, Tenant may maintain signage appropriate for the conduct of its business, subject to compliance with applicable sign codes and Landlord's prior written approval of the size, design, placement and other details of such signage.

21. **Default**. Tenant will not be in default under the Lease unless Tenant fails to pay rent or other charges within **FIVE (5) days** after receipt of written notice of nonpayment when due (which notice can be given within the 10-day grace period in the Lease and need not wait until the end of the 10-day period) or fails to perform other obligations under the Lease within **twenty (20) days** after receipt of written notice of nonperformance by Landlord, specifying in reasonable detail the nature of Tenant's default.

22. **General Provisions**. The following are added as Miscellaneous Provisions of the Lease:

(a) **Surrender of Premises**. Upon expiration of the Term or earlier termination of this Lease, Tenant shall deliver all keys to Landlord and surrender the Premises in good condition, subject to reasonable wear and tear. Tenant shall remove all of its furnishings, furniture, and trade fixtures that remain the property of Tenant (and if Tenant has made any alterations, Landlord may require that Tenant remove them. **Tenant will restore any physical damage caused by such removal (including, without limitation, resurfacing or covering holes in the walls, floors or other parts of the Premises and any necessary repainting to put the Premises in the condition required by this Lease)**. If Tenant fails to do so, such failure shall, at Landlord's option, be deemed an abandonment of the property and Landlord may retain the property and all rights of Tenant with respect to it shall cease or, by notice in writing given to Tenant within 20 days after removal was required, Landlord may elect to hold Tenant to its obligation of removal. If Landlord elects to require Tenant to remove, Landlord may effect a removal and place the property in public storage for Tenant's account. Tenant shall be liable to Landlord for the cost of removal, restoration, transportation to storage, and storage, with interest on all such expenses as provided in this Lease.

(b) **Holdover**. If Tenant does not vacate the Premises at the time required, Landlord shall have the option to treat Tenant as a tenant from month to month, subject to all of the provisions of this Lease (except that the term will be month to month and the initial base rent will be 150 percent of the base rent then being paid by Tenant), or to eject Tenant from the Building and Premises and recover damages caused by wrongful holdover. Failure of Tenant to remove property or installations which Tenant is required to remove under **paragraph 20 (b)** above shall constitute a failure to vacate to which this paragraph shall apply.

(c) **Security Deposit**. Tenant shall maintain with Landlord the security deposit as listed above. The deposit shall be held by Landlord to secure all payments and performances due from Tenant under this Lease. Landlord may commingle the deposit with its funds and will owe no interest on the deposit. Landlord may apply the deposit to the cost of performing any obligation which Tenant fails to perform within the time required by this Lease, but application by Landlord will not be the exclusive remedy for Tenant's default. If the deposit is applied by Landlord, Tenant shall pay the sum necessary to restore the deposit to its original amount on Landlord's demand. To the extent not applied by Landlord, the deposit shall be refunded to Tenant within 30 days after expiration of the Term.

(d)    **Address.** Tenant's addresses for notice purposes a. **Business Address: 3071 Schmidt Lane, Hubbard, OR 97032; and Personal Address: 1129 Belle Passi Rd., Woodburn, OR 97071.** Landlord's address for notice purposes and for payment of rent is: **R & R PROPERTY HOLDINGS, INC., Attention: Dwaine Odinson, CA, Controller, 7449 River Rd., Delta, British Columbia, CANADA V4G1B9.** Landlord's representative: **Dwaine Odinson. Telephone: (604) 946-0916, Facsimile: (604) 946-0783. Email: dwaineo@napsteel.com .**

(e)    **Counterparts; Fax or PDF Transmission.** This Lease (Addendum) may be executed in separate counterpart signature pages with the same effect as if both parties had signed the same document. All counterparts shall be taken together and shall constitute a single Lease. Any counterparts that are signed and transmitted by facsimile machine or as an emailed PDF copy shall be treated as an original document. Each party hereby waives any defenses to the enforcement of the terms of this document if sent by facsimile or as an emailed PDF, based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").

IN WITNESS WHEREOF, the parties have executed this instrument as of the date first above written.

Tenant:                                          Landlord:

**LAURA LEE HAGENAUER** (successor-in-interest to, and    **R & R PROPERTY HOLDINGS, INC.,**
formerly doing business as "VALLEY ROLLING LLC")          **a Washington corporation**

By _____              By: _____
                                                Name: **Dwaine Odinson, CA**
                                                Title: **Controller**

EXHIBIT _J_
Page _4_ of _11_

# DRAWING OF PREMISES AND BUILDING



12,500 sqft  NONE LEASE  R+R

6" of 18" PROTECTION
CURB AGAINST
BUILDING STEEL WALL

22' DRIVEWAY

27,500 sq ft
to Include Office
Valley Rolling

NONE
LEASED
Space  R+R

30' RIPARIAN SETBACK

TOTAL SQ. FT 57,500

EXHIBIT I
Page 10 of 11

Case 14-63530-fra11   Doc 261   Filed 10/23/15



# DRAWING OF PROPERTY

RECORD OF PBSL, LLC

For: PBSL, LLC

LOCATION: THE SOUTHEAST QUARTER, TOWNSHIP, SOUTH RANGE, MERIDIAN, MARION COUNTY,

SCALE: 1" = 60'
DATE: 10 FEBRUARY 2009
BY: MAGNESS LAND SURVEYING
PO BOX 1239
WILLAMINA, OREGON 97396
PHONE: 503-237-3404
CELL: 971-237-3413
E-MAIL: MAGNESS@WBCABLE.NET

VALLEY ROLLING

Scale: 1"=60'
TRUE N

JOB# 149

EXHIBIT J
Page 11 Of 11

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| In Re: | ) | |
|---|---|---|
| | ) | Case No: 14-63530-fra11 |
| LAURA LEE HAGENAUER, | ) | |
| | ) | THIRD AMENDED DISCLOSURE |
| Debtor. | ) | STATEMENT |

## INTRODUCTION

This is the Amended Disclosure Statement in the Chapter 11 bankruptcy case of

Laura Lee Hagenauer ("Debtor"). The accompanying Third Amended Plan of Reorganization

describes how all claims will be treated under the proposed plan. You should read the Third

Amended Plan and this Third Amended Disclosure Statement carefully and discuss them with

your attorney. If you do not have an attorney, you may wish to consult one. The proposed

distributions under the Third Amended Plan are discussed on pages 12 through 19 of this

Amended Disclosure Statement.

## PURPOSE OF THIS DOCUMENT

This Amended Disclosure Statement describes: 1) the Debtor and "collapse" of

the prior entities, Valley Rolling Corporation and DeLaMMC, LLC, into Debtor just prior to the

Petition Date; 2) significant events during the bankruptcy case; 3) how the Third Amended Plan

1 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

proposes to treat claims (*i.e.* what you will receive on your claim if the Third Amended Plan is confirmed); 4) what factors the Bankruptcy Court will consider when deciding whether to confirm the Third Amended Plan; and 5) why Debtor believes the Third Amended Plan is feasible and how treatment of your claim compares to what you would receive in liquidation. Be sure to read the Third Amended Plan and Amended Disclosure Statement. This Amended Disclosure Statement describes the Third Amended Plan, but it is the Third Amended Plan itself that if confirmed establishes your rights.

DEADLINES FOR VOTING AND OBJECTING: DATE OF THIRD AMENDED PLAN CONFIRMATION HEARING

The court has not yet confirmed the Third Amended Plan described in this Third Amended Disclosure Statement. This section describes the procedures pursuant to which the Third Amended Plan will or will not be confirmed. The time and place of the hearing at which the Court will determine whether to finally approve this Third Amended Disclosure Statement will be set by the Court. The hearing on confirmation of the Third Amended Plan will be set by the Court in a separate notice containing both a copy of the Third Amended Disclosure Statement and a copy of the Third Amended Plan which will be mailed to each creditor along with a ballot for voting.

IDENTITY OF PERSON TO CONTACT FOR MORE INFORMATION

If you want additional information about the Third Amended Plan you should contact Ted A. Troutman, attorney for the Debtor, at 503-292-6788, and address, 5075 SW Griffith Dr, Ste 220, Beaverton, OR 97005.

2 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

DESCRIPTION OF THIRD AMENDED PLAN

The accompanying Third Amended Plan of Reorganization describes how all claims will be treated under the proposed plan. In particular, if the Third Amended Plan is confirmed, holders of general unsecured claims will receive a dividend of 100% of their allowed claims from operation of the Debtor's business as described below.

The Third Amended Plan will be funded by the ongoing operation of Debtor's steel rolling facility, any recovery on avoidance claims under 11 USC §§ 547, 548 and 550 ("Avoidance Claims") and from the sale of real property.

The administrative claims will be paid in part on the Effective Date from an account set up in April of 2015 funded with approximately $18,000 per month through the Effective Date, with the rest to be paid from income from post-confirmation operations (the "Accumulated Administrative Account") and any proceeds from Avoidance Claims recoveries. Currently the total unpaid attorney's fees for the Debtor are approximately $117,230. It is estimated an additional $35,000 will be incurred through confirmation. Total Financial Advisor fees are estimated at $60,000.00 through confirmation. Debtor also is responsible for paying the attorney fees of the Creditors' Committee which are estimated to be $50,000.00, excluding fees incurred in pursuit of Avoidance Claims that the Court has authorized the Creditors' Committee to pursue. Total professional fees incurred are estimated to be $300,000 through confirmation.

There are $332,068.28 of claims filed as administrative claims pursuant to 11 U.S.C. § 503(b)(9) which provides that suppliers who ship goods within 20 days of the bankruptcy have an administrative claim. Unless agreed in writing, these claims must be paid on confirmation. Debtor believes she will be able to enter into written agreements with these

3 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

suppliers as she has continued to do business with all of them after the Chapter 11 was filed.

Part of the 503(b)(9) claims will be paid with a pro rata share of the Accumulated Administrative

Account on the Effective Date. The remainder of the claims will be paid over time with 1.5%

surplus amount over each invoice for goods sold by such claimants to the Debtor post-

confirmation. If these claimants demanded payment on confirmation, Debtor would not be able

to set forth a confirmable plan. All of the administrative 503(b)(9) claims have orally agreed to

the treatment. In addition, Penske Truck Leasing Co. LP ("Penske") has an administrative claim

for $25,976.76. This claim will be paid $12,988.38 on the Effective Date plus 9 monthly

payments of $1,443.15 starting 30 days after the Effective Date.

The proponent of the plan projects that if the Third Amended Plan is confirmed

Debtors' assets and liabilities will be as shown on the projected balance sheet attached as Exhibit

F.

## DESCRIPTION OF DEBTOR AND HER BUSINESSES

Debtor and her brother started Valley Rolling Corp. in May of 2003. Effective

December 31, 2006, Debtor purchased the interest of her brother for $800,000. Debtor has 28

years of experience in the steel roofing and siding industry.

Prior to March of 2011, Valley Rolling Corp. leased a facility in Woodburn,

Oregon. In March of 2011, Valley Rolling Corp. moved from its old location at 310 Broadway

St., Woodburn, Oregon to the new facility at 3071 Schmidt Lane NE, Hubbard, Oregon. The

total square footage under cover is 82,650 which includes two warehouses attached by a

breezeway.

Valley Rolling Corp. originally offered a product line for agricultural steel roofing

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

and siding use. The company originally made one agricultural panel. Valley expanded the profile to two different agricultural panels and one commercial panel. Valley Rolling Corp. also sells trim products, accessories such as fasteners, poly-carbonate, pipe flashing, vapor barrier and sliding door track and hardware. DeLaMMC was formed on November 1, 2006 as an Oregon limited liability company. The Debtor and her husband, Dennis Hagenauer, were the managers, and the members consisted of the Debtor (35%), her husband (50%) and their three children, Matthew Hagenauer (5%), Mitchell Hagenauer (5%), and Cassie Hagenauer (5%). DeLaMMC was a holding company, whose assets consisted of the building and improvements located at 3071 Schmidt Lane NE, Hubbard Oregon, three forklifts, a Rollformer and a piece of equipment described by the Debtor as a rollformer addition. These assets were transferred to the Debtor on September 26, 2014, leaving DeLaMMC as merely a shell company. None of the members of the LLC received consideration in exchange for their interests in connection with the transfer.

## ASSETS

The manufacturing facility is subject to combined secured debt of approximately $4,188,881. The creditors that are owed money on the buildings are KeyBank on a first mortgage in the approximate amount of $1,787,432.28, current and past due, Marion County for property taxes of approximately $145,000 (both real and personal), and U.S. Small Business Administration is owed approximately $860,448. In addition Oregon Business Development Corporation ("OBD") has a mortgage for approximately $706,588 and Cascadia Metals has a mortgage of approximately $634,357. The building's value is insufficient to pay all asserted liens. There is a pending motion to sell the building free of the liens. KeyBank will receive approximately $1,732,098 which is the balance due including fees and interest at the non-default

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

interest rate. The default interest is subordinated to the SBA lien pursuant to agreement. The default amount is $65,333.74 through October 8, 2015.

Debtor has filed a motion and notice of the sale and a hearing is scheduled for November 4, 2015. The sale notice is substantially as follows:

Laura Lee Hagenauer (the "*Debtor*"), has filed a motion (the "*Motion*") for authority to sell (the "*Sale*") the commercial real property and fixtures located at 3071 Schmidt Lane, Hubbard, Oregon (the "*Property*") to R&R Property Holdings, Inc. ("*R&R*") or a higher and better bidder, free and clear of all liens, claims, encumbrances and interests pursuant to 11 U.S.C. §§ 363(b) and (f); enter into a lease of a portion of the Property (the "*Property Lease*") pursuant to 11 U.S.C. § 363(b); and pay a 4% commission to Coldwell Banker Commercial of Salem, Oregon (the "*Broker*") upon the closing of the Sale of the Property pursuant to Bankruptcy Rule 2016(a) and Local Rule 2016-1(c)(2)(A) & (B).

A hearing on the Motion and any objections to the Motion will be held on November 4, 2015 at 10:00 a.m. (the "*Hearing*") and testimony will be offered, and received if admissible, in support of the Motion and a finding that the purchase of the Property by R&R is being made in good faith and is entitled to the protections afforded by 11 U.S.C. § 363(m).

1. Debtor proposes to sell the Property free and clear of liens, claims, encumbrances and interests pursuant to 11 U.S.C. § 363(f)(2) and (f)(5) (and 11 U.S.C. § 363(f)(1), if applicable) and the terms of Standard Commercial Sale Agreement between the Debtor and R&R dated September 29, 2015 (the "*Sale Agreement*"). A copy of the Sale Agreement is attached to this Statement as exhibit I. Debtor also proposes to enter into the Property Lease to lease back a

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

portion of the Property for use in her business operations.  A copy of the Property Lease is attached to this Statement as exhibit J.

2.     R&R, the proposed buyer, is a Washington corporation and an affiliate of Cascadia Metals, Inc. ("*Cascadia*").  Cascadia is a primary vendor to the Debtor, one of the Debtor's largest unsecured and administrative creditors, and the holder of a lien against the Property.  If the sale is approved, R&R also will become the Debtor's landlord under the proposed Property Lease.  R&R's counsel is Brandy A. Sargent, Stoel Rives LLP, 900 S.W. Fifth Avenues, #2600, Portland, Oregon, 97204;  Telephone:  503-294-9888;  E-mail: brandy.sargent@stoel.com.

3.     The address of the Property is 3071 Schmidt Lane, Hubbard, Oregon.  The legal description of the Property is:

A tract of land in the Southeast Quarter of Section 33, Township 4 South, Range 1 West, Willamette Meridian, Marion County, Oregon, being a portion of that tract of land described by Warranty Deed from Gregory G. Berning to PBSL, LLC and recorded in Reel 2760, Page 114, Marion County Deed Records, more particularly described as follows:

Beginning at an iron bar that is on record as being North 86° 15' East 1,611.06 feet and South 31° 26' West 1,351.88 feet and North 58° 34' West 641.52 feet from the Northwest corner of the Ewing Purvine Donation Land Claim in Section 33, Township 4 South, Range 1 West of the Willamette Meridian in Marion County, Oregon, which is at an angle point of the Northerly margin of Schmidt Lane (CR 439, 40.00 foot wide) and also being the most Southerly corner of that tract of land deeded to S.W. WEAVER, by Deed recorded in Volume 178, Page 461, Deed Records; thence North 41° 16' 23" East 402.16 feet to the Northwest corner of Parcel 1 of said PBSL, LLC deed (Paragraph 1); thence along the center of a ditch South 24° 17' 19" East 121.03 feet to an Iron pipe; thence South 49° 47' 19" East 110.55 feet to an iron rod; thence South 41° 35' 19" East 198.66 feet to an iron rod; thence South 58° 33' 19" East 137.23 feet to the Westerly margin of Relocated (1932) Highway 99E (40 feet from centerline); thence South 31° 19' 58" West 249.82 feet along the Westerly margin of said Highway 99E to its intersection with the North line of County Road No. 439; thence North 58° 53' 01" West 605.67 feet along the North right of way line of said Schmidt Lane (20 feet from centerline) to the point of beginning, in the City of Hubbard, Marion County, Oregon.

7 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

4.      A copy of the full property description or inventory may be examined or obtained by contacting counsel for the Debtor.

5.      The Property may be viewed by contacting the Debtor's counsel.

6.      Other than the Debtor, R&R and the Broker, there are no other parties to the transaction.

7.      Under the Sale Agreement, the gross sale price for the Property is $2,600,000. All of the liens on the Property exceed $4,469,734, of which Debtor believes a total of $2,050,033.08 need not be paid as secured claims because they have either consented or the Court can order the sale under Section 363(f)(5). KeyBank also seeks reimbursement of approximately $70,000 for fees and costs. Total sales costs will includes a 4% commission to the Broker (*i.e.,* $104,000, assuming no change to the terms of the Sale) and other costs of closing, estimated to be approximately $6,299.00. A preliminary list of closing costs to be satisfied by the Debtor may be obtained from the Debtor's counsel. All tax consequences have been considered and no taxes will be owed as a result of the sale. Absent a substantial overbid for the Property, the Sale will result in no net proceeds to the estate after payment of the Sale proceeds to satisfy valid liens on the Property (in the order of their priority) and fees, costs, and taxes payable in connection with the Sale.

8.      The Sale is not of substantially all of the Debtor's assets. Debtor will continue to own and operate her business after the Sale. The terms of the Sale are:

(a) sale price of $2,600,000; (b) earnest money deposit of $25,000; (c) a contingency period of up to 45 days after the opening of escrow during which R&R will proceed to satisfy itself as to the condition of the Property, environmental matters, and other matters (d) a title review period

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

of 15 days after receipt of a title report; (e) a contingency for Bankruptcy Court approval; and (f) a period of 15 days after satisfaction of contingencies for R&R to close the Sale. In the event that R&R is not the successful purchaser of the Property, the costs of any environmental assessment will be borne by the Debtor.

If R&R is the successful purchaser of the Property, it will lease a portion of the Property back to the Debtor pursuant to the Property Lease. In summary, the Property Lease would commence at the closing of the Sale and continue for an initial period of 12 full calendar months, and thereafter be a year-to-year lease. Either party can terminate the Lease on 90 days' notice at the end of the initial term or any renewal term. For the initial term, the monthly rent would be a "gross rental" of $15,000 per month, inclusive of monthly base rent of $12,650 and Debtor's proportionate share of property taxes (estimated at $1,916.67 per month) and property insurance costs (estimated at $433.34 per month). After the first year, unless the Property Lease is terminated, the rent becomes "triple net," and Debtor would pay her proportionate share of property taxes, property insurance and maintenance costs. Debtor is responsible for utilities that she uses. At the start of the Property Lease, Debtor would pay the first month's rent ($15,000) and a security deposit equal to $15,000 (which would be refundable at the end of the Property Lease, unless applied to cure a breach of the Lease).

9.     The Property has been publicly marketed since May 2015 and the offer received from R&R is the highest and best offer received after competitive bidding. No further auction is proposed, but the Sale is expressly subject to overbid prior to the Hearing pursuant to an agreement on the same or better terms and conditions (apart from the purchase price) as the Sale

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Agreement, including, without limitation, the Property Lease. Competing bids must be submitted to the Debtor no later than 4:00 p.m. on October 23, 2015.

10. Based on a November 2014 appraisal of the Property for $3,800,000, the Property was initially listed for sale for $3,775,000. In September 2015, Debtor received an offer of $2,300,000 for the Property and countered at $3,175,000. In response, the offer was raised to $2,400,000. Around the same time, R&R made its $2,600,000 offer for the Property, which the Debtor countered at $3,175,000. R&R did not raise its offer, and the Broker has not received any other formal offers for the Property.[1]

11. Debtor's primary secured creditor, KeyBank, National Association ("*KeyBank*"), previously filed a motion for relief from the automatic stay to begin the foreclosure process against the Property. Pursuant to a stipulated order resolving that motion, the Property was listed for sale and, in the event the Property was not sold and the Debtor had not confirmed a plan of reorganization by October 1, 2015, KeyBank was to be allowed to pursue foreclosure. Debtor believes that the proceeds of the Property that would be generated in a foreclosure would not exceed the amount to be received in the proposed Sale. Additionally, the offer received from R&R is coupled with the Property Lease, which will allow the Debtor to lease a portion of the Property and avoid moving costs.

12. The Debtor is proposing the sale in advance of confirmation of a plan because through the sale and leaseback debtor will be able to reduce her monthly expenses and propose a feasible plan. If the sale is not allowed KeyBank could proceed with its foreclosure proceeding.

---

[1] The Debtor also received an informal offer of $2,000,000, but the party making the informal offer never wrote-up a formal offer.

10 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

13.    If the sale is not approved on November 4th 2015, debtor is requesting that the sale be approved on confirmation of the Third Amended Plan

14.    Lienholders:  Based on filed proofs of claim, the following creditors claim liens on the Property (including security interests in fixtures, collectively, the "***Liens***"), in the following amounts and order of priority:

| Creditor | Lien Claim | Total Liens |
|---|---|---|
| Marion County Assessor's Office (Prop. Taxes) | $  131,680.15 | $  131,680.15 |
| KeyBank National Association | $1,622,645.00 | $1,754,325.15 |
| US Small Business Administration | $  860,448.55 | $2,614,773.70 |
| Oregon Business Development Corporation | $  706,588.97 | $3,321,362.67 |
| Cascadia Metals Inc. | $  634,357.58 | $3,955,720.25 |
| Internal Revenue Service – tax lien | $  514,014.53 | $4,469,734.78 |

15.    Other than costs of the Sale, no Liens are intended to be paid without further order of the Bankruptcy Court.  All of the Liens shall attach to the Sale proceeds in the same order of priority as they attached to the Property.  Any Sale proceeds remaining after paying the Liens and expenses, taxes, commissions, fees, costs or other charges as provided in the Motion shall be held in trust until the Court orders payment.  At this time, no such excess Sale proceeds are anticipated.

16.    The Court appointed the Broker on May 6, 2015.  Pursuant to that order, the Broker is proposed to be paid a 4% commission, which will be equal to $104,000 if the Sale to R&R is approved and closes

If the Court does not approve the sale at the November 4, 2015 hearing, Debtor is seeking approval of the sale as part of the Third Amended Plan on the identical terms as noticed above.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

If the sale is approved, the only secured creditors that will be paid will be Marion County taxes, KeyBank approximately $1,734,432 (its secured debt minus default interest) and SBA a partial payment of approximately $581,097.24. The liens of Oregon Business Development, Cascadia Metals and the IRS will be unsecured.

Debtor also owns jointly, with her husband, a home located at 1129 Belle Passi Rd., Woodburn, OR 97071 valued at $500,000.00. The first mortgage on the property is $159,004 payable to Greentree Loan Servicing. The lien of Oregon Business Development of $706,588 is also secured by this property. Oregon Business Development is secured by the equity for $350,000.

## OPERATIONS IN BANKRUPTCY

Since the filing of the bankruptcy Debtor has had Sales of $6,801,307.00 through October 16, 2015 and income and expenses as set forth in the attached report (Exhibit D). As of October 21, 2015 Debtor had total bank balances of $117,600.24.

## EFFECT OF PRE-FILING DISSOLUTION OF
## Valley Rolling Corp. and DeLaMCC LLC

Debtor believes that there will be no tax consequence from the dissolution prior to filing this case of Valley Rolling Corp. and DeLaMCC LLC, since Valley Rolling was a Subchapter S corporation and all tax attributes passed through to Debtor and her Husband. DeLaMCC was an LLC and likewise all tax attributes passed through to Debtor, her husband and their children.

## DISSOLUTION OF CORPORATIONS AND ASSUMPTION OF LIABILITIES AND
## ASSIGNMENT OF ASSETS PRIOR TO FILING

12 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Before Debtor filed her Chapter 11 bankruptcy, she entered into agreements with Valley Rolling Mills Corporation and with the owner of the manufacturing facility DeLaMCC LLC to assume all the liabilities of both corporations and for an assignment of all of the assets of the corporations. The execution of the assumption and assignment agreements occurred on September 26, 2014, two days before the Chapter 11 bankruptcy petition was filed. Debtor was the majority owner of both the corporation and the LLC. The minority owners included Debtor's husband and minor children. All parties accepted the assignment and assumption agreements. The owners of the corporation and the LLC signed in favor of the assignment and assumption agreements.

The business facility at 3071 Schmidt Lane, Hubbard, OR 97032, was owned by DeLaMCC, LLC. Debts secured by the business facility, which included a tax lien, exceeded the value of the asset. All of the debt owed by DeLaMCC LLC was secured debt. None of the creditors, which are set forth in the chart below, were harmed by the assignment and assumption agreement. The creditors secured by the business property owned by DeLaMCC LLC are approximately as follows and are in the order of priority:

| | | |
|---|---|---|
| 1. | Marion County Assessor's Office – Property taxes | $ 135,863.00 |
| 2. | KeyBank National Association | $1,787,432.28 |
| 3. | US Small Business Administration | $ 860,448.00 |
| 4. | Oregon Business Development Corporation | $ 706,588.00 |
| 5. | Cascadia Metals Inc. | $ 634,357.00 |
| 6. | Internal Revenue Service – tax lien | $ 57,774.87 |
| 7. | Internal Revenue Service – tax lien | $ 332,859.48 |

13 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

In addition to the debts above secured by the real property, DeLaMCC, LLC also owed Valley Development Initiatives $228,326.09, secured by the business equipment. Because all of the creditors of DeLaMCC, LLC are secured, and their security continued after the assignment and assumption agreement, none of the creditors of DeLaMCC, LLC are better or worse off because of the assignment and assumption agreement and subsequent Chapter 11 filing by Debtor, Laura Lee Hagenauer.

<div align="center">CREDITORS OF VALLEY ROLLING CORPORATION</div>

The unsecured creditors of Valley Rolling Corporation would have received nothing if Valley Rolling Corporation had not assigned its assets to Debtor, Laura Lee Hagenauer. The only creditors of Valley Rolling Corporation that would have been paid from a liquidation of Valley Rolling by itself, would have been the secured creditors. These included:

1. Internal Revenue Service $ 390,634.35

2. Valley Development Initiatives secured by both $ 228,326.00
   Both DeLaMCC, LLC and Valley Rolling

3. KeyBank National Association $ 549,625.89
   secured by accounts receivable.

4. Internal Revenue Service – priority taxes $ 57,774.00

In addition, to the extent the tax liens were under secured, all but $136,423.00 would be considered priority taxes and would be paid ahead of any general unsecured creditors of Valley Rolling in a liquidation.

Because these secured creditors retained their liens and because the general unsecured creditors would have received nothing in a Chapter 7 liquidation of Valley Rolling,

14 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

the unsecured creditors of Valley Rolling were no worse off by Debtor's Assumption and Assignment Agreement then they would have been if Valley Rolling was liquidated without the Assumption and Assignment Agreement.

<p style="text-align:center">EFFECT OF ASSUMPTION AND ASSIGNMENT ON DEBTOR'S INDIVIDUAL<br>CREDITORS</p>

If Debtor had been liquidated in a Chapter 7 without the Assumption and Assignment Agreement, her individual creditors are no worse off because of the Assumption and Assignment Agreement. This is because Debtor had personally guaranteed the majority of the debts of both DeLaMCC LLC and Valley Rolling. In a personal liquidation, the amount of debt owed by Debtor on guaranteed general unsecured debt equaled $524,444.00. Upon liquidation of Debtor, all of her personal assets were fully encumbered or exempt or would have been paid to the IRS, since all of the taxes were a personal obligation, and therefore none of her creditors were harmed by the Assignment and Assumption Agreement.

The major reason why Valley Rolling and DeLaMCC LLC assigned their property interests to Debtor and why she assumed the debt and then filed the Chapter 11, is because otherwise three separate bankruptcy attorneys and three separate bankruptcies would have been necessary. The cost of three separate filings would have been outside of what Debtor, Valley Rolling or DeLaMCC, LLC could afford and Debtor would have been liquidated by KeyBank and the assets of Valley Rolling and DeLaMCC, LLC would have been liquidated by KeyBank with anything left over taken by other secured creditors or the IRS.

<p style="text-align:center">RETENTION OF JURISDICTION</p>

Nothwithstanding the entry of an order confirming the Third Amended Plan, the

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Court shall retain jurisdiction of the Chapter 11 Case pursuant to and for the purposes set forth in Section 1127(b) and 1141-1146 of the Bankruptcy Code to enforce the provisions of the Third Amended Plan and to ensure that the intent and purposes of the Third Amended Plan are carried out and given effect. Without limiting the proceeding, the Court shall retain jurisdiction to classify claims or interests of any creditor, determine requests for payment of claims entitled to priority under section 507(a) of the Bankruptcy Code, avoid transfers or obligations to subordinate claims under chapter 5 of the Bankruptcy Code, approve the assumption, assignment, rejection of executory contracts or leases, resolve controversies and disputes regarding the interpretation or enforcement of the Third Amended Plan, implement the provisions of the Third Amended Plan and enter orders in aid of confirmation, approve settlements entered by the Debtor or Creditors' Committee on the Debtor's behalf, adjudicate adversary proceedings and contested matters pending or hereafter commenced in the Chapter 11 Case and enter a final decree closing the Chapter 11 Case.

<div align="center">AVOIDANCE CLAIMS</div>

Debtor shall retain any and all claims and causes of action whatsoever (whether known, unknown, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, or undisputed, and whether asserted or assertable directly, indirectly, or derivatively, at law in equity, or otherwise), including, but not limited to, all Avoidance Claims, subject to the authority given by the bankruptcy court for the Creditors' Committee to pursue certain Avoidance Claims. Notwithstanding the entry of an order confirming the Third Amended Plan, so long as any members of the Creditors' Committee are willing to serve, the Creditors' Committee shall continue until it is dissolved by action of the members thereof or until the Third Amended Plan is

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

complete and all creditors have been paid in full, whichever occurs first. Neither the Creditors' Committee nor any of its past, present, or future members (or any of the respective past, present, or future officers, directors, employees, or agents of such members) shall have or incur any liability to any holder of a claim or equity interest or to any entity for any act or omission in connection with or arising out of the chapter 11 case, or the negotiations and pursuit of confirmation of the Third Amended Plan, the consummation of the Third Amended Plan, the pursuit of any Avoidance Claims the Creditors' Committee has been authorized to pursue, the administration of the Third Amended Plan or the property to be distributed under the Third Amended Plan.

Debtor believes she would have a possible avoidance action against her mother-in-law, Agnes Hagenauer, for money paid to her in the one year prior to filing by Valley Rolling Corp. Debtor had paid Agnes Hagenauer $21,189.58 during the one year prior to filing of the Chapter 11. The Bankruptcy Code provides that money paid to an insider within one year of filing a bankruptcy can be recovered by the Debtor in possession or the Trustee for the benefit of the Bankruptcy Estate. The payments to Agnes Hagenauer starting in the 60th month will only be paid if Agnes Hagenauer repays the $21,189.58 preference payments. The repayment will be paid prorata to the administrative claims. The Debt to Agnes Hagenauer will not accrue interest during the first 60 months. Interest will only begin after the payments start. Debtor does not intend to pursue the action, but as a concession to the other unsecured creditors is separately classifying the claim and it will be paid starting on the 60th month, if and only if, Agnes Hagenauer has paid to the estate the preference amount of $21,189.58.

The Creditors' Committee also believes the Debtor may have a

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

preference/fraudulent transfer action against Bank of America for payments by Valley Rolling Corp. on two employee credit cards. These cards were used by Valley Rolling to purchase product for Valley Rolling to manufacture. The payments were made to Bank of America within the 90 days preceding the Petition Date, were made to a creditor of Valley Rolling because if the payments had not been made, Bank of America would have asserted an unjust enrichment claim against Valley Rolling and the payments allowed Bank of America to receive more than it would have received in a liquidation under chapter 7. The payments made during the preference period to Bank of America total over $620,000. Debtor is not going to pursue these claims but the Court has entered an order authorizing the Creditors' Committee to pursue such claims.

In addition the Creditors' Committee may pursue a claim against unsecured creditor Cannonball for preferential payments made during the 90 days preceding the Petition Date on a judgment in the amount of $15,000. The payments to Cannonball as a Class 11 Claim will only be paid if Cannonball repays the $15,000 preference payments.

The Creditors' Committee may also pursue a preference claim against FORA Financial for payments of $1,168 per business day during the 90 days preceding the Petition Date totaling $58,430. FORA Financial's purported secured claim was actually entirely unsecured at the time the payments were made based upon the value of the personal property and the lien amounts superior to FORA Financial. The payments to FORA Financial as a Class 11 Claim holder will be paid, if and only if, FORA repays the $58,430 preference payments.

Debtor has no opinion as to the viability or the value of the Avoidance Claims. Likewise, Debtor has no opinion as to the projected cost of recovery or the estimated time frame to complete litigation. The Creditors' Committee may, but is not obligated to, pursue any or all

18 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

of the Avoidance Claims. The proceeds from any transfer recovered by the Creditors'
Committee will be used first, to pay for the attorney fees and costs of the Avoidance Claims
litigation, second, to pay administrative expenses that remain unfunded on the Effective Date of
the Plan and finally, to pay to general unsecured creditors if there are any excess proceeds.

None of the proceeds of the Preference action litigation will be paid to
Reorganized Debtor. If the Creditors Committee is unsuccessful in the litigation, costs of the
litigation will be an administrative expense, which will be paid for by Debtor.

Allowed professional fees incurred by the Creditors' Committee, including those
incurred in pursuing or analyzing the Avoidance Claims pre-confirmation will be paid pro rata
from the Accumulated Administrative Account on the Effective Date. The remaining balance
owed and amounts incurred post-confirmation will be paid from any Avoidance Claims
recoveries and from Debtor's income from operations and/or the other assets of Debtor if
liquidated after the payment of allowed secured claims encumbering such assets. The
professional person or agent seeking a payment from the Debtor shall submit an invoice to the
Debtor, which (absent an objection by the Debtor) the Debtor shall promptly pay. Any objection
which cannot be resolved by the parties shall be resolved by the Court. Creditors' Committee
counsel may withdraw from representation in the Avoidance Claim actions if counsel is not
getting paid on a timely basis.

Before any Avoidance Claims are commenced, the Creditors' Committee will
present to Debtor, KeyBank and Cascadia the proposal to pursue the specific Avoidance Claim
together with the anticipated cost of pursuing such claim. Before the Committee is authorized to
go forward, a majority of the above parties must approve the proposal.

19 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

# REASONS FOR CHAPTER 11 BANKRUPTCY

The main reason for the Chapter 11 filing was the under capitalization of Valley Rolling Corp. and DeLaMCC when they built the new facility in Hubbard, OR. In addition the recession that started in 2007 and continued into 2012 contributed to the eventual insolvency of Valley Rolling and Debtor, Laura Hagenauer.  In 2013, Valley Rolling, Inc. and DeLaMMC, LLC defaulted under their loan agreements with KeyBank.  Following these defaults, KeyBank entered into forbearance agreements to allow the borrowers to refinance the debt.  Under the forbearance agreements, the KeyBank loans matured on March 31, 2014.  After waiting several additional months for Valley Rolling and DeLaMMC to secure the promised new financing, on August 1, 2014, KeyBank commenced an action in Marion County Circuit Court to collect the amounts due and owing.  On September 17, 2014, in violation of the state court injunction, Laura Hagenauer, the controlling person of Valley Rolling and DeLaMMC, transferred all of the assets and liabilities of the companies to herself, individually, in consideration of her agreement to assume all outstanding debt.

# THIRD AMENDED PLAN AND FEASIBILITY

The source of funds to be received for distribution to creditors will be from the ongoing operations of the business and any recoveries from Avoidance Claims.  Distributions will also be made to the secured creditors Marion County, KeyBank, and SBA from the sale of the Valley Rolling building located at 3071 Schmidt Ln NE Hubbard OR 97032.  There will still be a balance of approximately $279,351 owed to SBA after the sale.  None of the other secured creditors, including OBD owed $706,588 and Cascadia Metals owed $634,357 will be paid from the sale.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

During the duration of the Third Amended Plan, and as long as payments to Classes 1- 17 remain unpaid, the Debtor shall not sell, lease, transfer, convey, assign, encumber or voluntarily lien any of Debtor's assets, unless (i) such sale, lease, transfer, conveyance, assignment, encumbrance or lien is related to a non-material asset of Debtor; (ii) the asset is replaced with an asset of equal or greater value within ten (10) days after the transaction; (iii) the encumbrance or lien is the result of a refinance of an existing obligation on more favorable terms than the prior encumbrance or lien; or (iv) such sale, lease, transfer, conveyance or assignment is performed in the ordinary course of Debtor's business consistent with past practices, and will not have a material adverse effect on the business or financial condition of Debtor.

## DEBTOR'S BUDGET INFORMATION

Attached as Exhibit B are Debtor's cash flow projections, which do not include Debtor's monthly household expenses. Debtor's household expenses are listed on the attached Exhibit G and total $4,396.00 per month. Attached as Exhibit C are the monthly plan payments.

## DEFAULT

In the event the Debtor defaults in the performance of any of the obligations under the Third Amended Plan, the holder of each affected claim may pursue such remedies as are available at law or in equity. An event of default occurring with respect to one claim shall not be an event of default with respect to any other claim. Nothing contained in the Third Amended Plan shall limit the right of any creditor to reopen this case or move to convert the case to a liquidation under Chapter 7 of the United States Bankruptcy Code if cause exists for such relief.

## TAX CONSEQUENCES

The liquidation analysis shows the tax that will be owed upon sale of the building,

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

even with the capital gains taxes that will be owed upon sale of the properties, Debtor's Third

Amended Plan is still feasible

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

None

## RISKS

Risks include that Debtor will be unable to meet cash flow projections and will

then be unable to pay the payments called for under the Third Amended Plan. Another risk is

that Debtor will be unable to sell the building at 3071 Schmidt Lane NE, Hubbard, Oregon for

enough to pay the secured creditors scheduled to be paid from the sale.

If Debtor is unable to make the payments called for by the Third Amended Plan,

Debtor might have to convert the case to a case under Chapter 7 of the bankruptcy code and

liquidate.

## VALUE OF ASSETS

The real property listed on attached Exhibit A was valued based upon the pending sale price and

Debtor's opinion of value.

The value of inventory is based upon the cost of the inventory.

The value of the accounts receivable is based upon the book value of the

receivables. The value of equipment and other personal property is based upon Debtor's opinion

of value.

## UNFUNDED 401(K) PLAN

The claim is based upon employee contributions that were withheld from the

employees' paycheck, but never remitted to the 401(k) Plan, and unpaid employer contributions

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

due from the required Safe Harbor provision within the 401(k) Plan. From February, 2011 employees had money withheld from their pay to be forwarded to the 401(k) Plan. The employees' contributions were instead used by the Debtor for other expenses and were not forwarded to the 401(k) Plan. Additionally, the Employer failed to make 2011, 2012 and 2013 contributions to the 401(k) Plan that were required by the 401(k) Plan Document. EBSA has reviewed records produced by the Debtor, including withholding summaries, asset custodian records and employee paystubs.

After reconciling the records of the Debtor and 401(k) Plan accounts, the amount of $139,834.31 remains due and owing to the Plan. This amount consists of $63,185.57 in employee contributions, $62,458 in employer contributions and $14,190.74 in interest accrued on unremitted employee contributions.

In discussions with the Department of Labor representative, Debtor's counsel was advised that the Department of Labor intended to vote on the Plan but that could change if counsel for the Department of Labor advised otherwise.

## RETENTION OF PROPERTY

Debtor intends to retain all personal property. The real property at 3071 Schmidt Lane NE, Hubbard, Oregon has a pending sale for $2,600,000.00 as set forth above.

## RENTAL COST

Debtor as part of the sale to R & R is leasing back the building for $15,000 per month.

## DISCUSSION OF CASH FLOWS

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Attached cash flow projections, Exhibit B, show that in order for the Third Amended Plan to be feasible there needs to be a net cash flow before plan payments and rent of approximately $49,557.02 per month from Valley Rolling.  Debtor's cash flows since the date of filing show that Debtor has had average net income from Valley Rolling of approximately $42,000 per month before items to be paid through the Third Amended Plan.  See attached Exhibit C.  The cash flow projections include a 3%increase per year in gross sales and a 1% - 3% increase in expenses.  This is included in the projections to account for an improving economy and also to account for inflation.  Before the recession in 2008, Debtor had annual sales of $9,592,273.66 in 2007.  Last year, 2014, total sales were $7,540,136.00.  If the cash flows are not met, Debtor will be unable to make the payments called for under the Third Amended Plan of Reorganization and Debtor's reorganization may fail.

### FUNDS FOR PAYMENT OF ADMINISTRATIVE AND 503 CLAIMS

If Debtor does not have funds on hand sufficient to make the proposed payments to administrative and 503(b) claims, the Plan will not be confirmable.  This will require Debtor to have not less than $136,008 in its restricted account on the date of confirmation.  The Debtor will notify the Bankruptcy Court, the U.S. Trustee, counsel for the Creditors' Committee, Cascadia Metals, Inc. and KeyBank as soon as practicable, but in any event not less than ten (10) days prior to the confirmation hearing if it does not appear that Debtor will have sufficient funds on hand to make the payment on the Effective Date.

### ALTERNATIVES

Alternatives to this Third Amended Plan include dismissal of the case, conversion to a case under Chapter 7 or adoption of a different plan.  If the case is dismissed, creditors may

24 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

assert and enforce their claims against Debtor by any method allowed by law. Secured creditors may foreclose their security interest and creditors may obtain Judgment and levy on unencumbered assets.

If this case is converted to a case under Chapter 7, a trustee will be appointed to liquidate the Debtor's assets for the benefit of the estate. Costs of liquidation, secured claims (with respect to the specific collateral liquidated), administrative claims, priority tax claims, and Debtor's exemptions will be paid in full before any payment is made to unsecured creditors. Exhibit A shows the proponent's estimate of the possible results if the Debtor is liquidated in a Chapter 7 case, including the resultant amount available to pay unsecured claims.

The proponent believes that if the Debtor were liquidated in a Chapter 7 the amount available to pay general unsecured creditors would be 0%. Debtor is proposing to pay all unsecured claims plus 3.25% interest. Attached as Exhibit A is the liquidation analysis.

## VOTING AND CONFIRMATION

<u>Who May Vote</u>. Creditors are entitled to vote on confirmation of the Third Amended Plan unless (i) the class is unimpaired (presumed to accept) or are to receive no distribution (presumed to reject); (ii) an objection has been filed to that creditor's claim; or (iii) the claim is unclassified (required by law to be paid in full). A creditor whose claim has been objected to and who wishes to vote must move to have its claim allowed for voting purposes by filing a motion for such relief in time for that motion to be heard at or before the confirmation hearing. All classes of claims will be entitled to vote except the Unclassified Claims.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

How to Vote.  Fill out and return the attached ballot so that it is received by

Debtor's counsel on or before (date will be set by the Court).  Mail to Ted A. Troutman, 5075

SW Griffith Dr, #220, Beaverton, OR 97005.

Effect of Vote.  A class of creditors accepts the Third Amended Plan it if is

accepted by a majority in number and two-thirds in dollar amount of creditors who cast ballots.

Because this is an individual Chapter 11 the court may confirm the Third Amended Plan even if

only one class of creditors accepts the Third Amended Plan.

Deadline for Voting to Accept or Reject the Third Amended Plan.  The Court will

set a Confirmation Hearing date.  Notice of that date will be mailed to each creditor.  If you are

entitled to vote whether to accept or reject the Third Amended Plan, you will vote on the Ballot

that we will mail to you along with the Third Amended Plan.  A sample copy of the Ballot is

attached as Exhibit J.  You must return the Ballot by the date set by the Court or it will not be

counted.  Debtor believes that all classes of creditors are entitled to vote except for unclassified

claims.  All creditors have a choice to vote for or against the Third Amended Plan.  The Court

cannot confirm the Third Amended Plan unless at least one class of Impaired Creditors accepts

the Third Amended Plan.

Impairment of Claims.  As noted above, the holder of an allowed claim may vote

only if it is in a class that is impaired under the Third Amended Plan.  You will find this in

Section 1124 of the Bankruptcy Code.  A class is considered Impaired if the Third Amended

Plan alters the legal, equitable, or contractual rights of the members of that class.  Debtor

believes that all of the classes of creditors, other than administrative claims, and unclassified

claims will be allowed to vote.  **Even if you are not entitled to vote on the Third Amended**

26 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

**Plan, you have a right to object to the confirmation of the Third Amended Plan and to object to the adequacy of the Amended Disclosure Statement.**

<u>Treatment of non-accepting Classes</u>.  If one or more Impaired Classes reject the Third Amended Plan, the Court may none the less confirm the Third Amended Plan if the non-accepting classes are treated in the manner described by 1129(b) of the Code.  The Third Amended Plan that binds non-accepting classes is called a "cram down" plan.  The Code allows the Third Amended Plan to bind non-accepting classes of claims if it meets all the requirement for confirmation except the voting requirement of 1129(a)(8) of the code, it does not discriminate unfairly and is fair and equitable toward each impaired class that has not voted to accept the Third Amended Plan.  **You should consult your own attorney about how a "cram down" confirmation will affect your claim, as variations on this general rule are numerous and complex.**

<u>Financial Information</u>.  Debtor intends to make the payments required under the Third Amended Plan from cash available on the effective date and from future revenue from operation of Valley Rolling and from sale or refinance of the real property located at 3071 Schmidt Ln NE, Hubbard, OR 97032.  The cash flow projection, Exhibit B, shows the Third Amended Plan is feasible.

<u>Operations in Chapter 11</u>.  During the 12 months since the petition date, Debtor has collected gross revenues of approximately $6,801,307.  The net revenue for Debtor after adequate protection payments has been approximately $137,976 through October 10, 2015.  Upon request, Debtor will provide copies of monthly operating reports filed with the Court.

<u>Cash Available on effective Date</u>.

27 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

(1)     Cash on hand as of 10/21/15:  $117,600.24

(2)     The total amount to be paid on the Effective Date:  $154,559.

Liquidation Analysis.  General unsecured creditors would be paid $-0- in a

Chapter 7 liquidation.  See attached Exhibit A.

Attached as Exhibit B is a cash flow analysis.

Attached as Exhibit C is a plan payment chart.

Attached as Exhibit D are historical profit and loss statements post-petition.

Attached as Exhibit E are historical profit and loss statements pre-petition.

Attached as Exhibit F is a current balance sheet and pro forma balance sheet.

Attached as Exhibit G is Debtor's personal monthly budget.

Attached as Exhibit H is a Sample Ballot for accepting or rejecting Third

Amended Plan.

## TREATMENT OF CLASSES

Class 1     Impaired Secured Claim of KeyBank secured by 3071 Schmidt Lane NE,

Hubbard, OR 97032 in the approximate amount of $1,787,432.28.  claim will be paid from the

sale of the property at 3071 Schmidt Lane NE, Hubbard, OR 97032.  Debtor expects the sale of

the property for $2,600,000 will be approved at a hearing for approval to sell the property free of

liens scheduled for November 4, 2015.  The additional approximately $55,333.74 owed to

KeyBank for default interest will be subordinated to the claim of SBA and will become a Class

11 unsecured debt.

Class 2     Impaired Secured Claim of KeyBank secured by the accounts receivable,

equipment and accounts of Debtor in the approximate balance of $430,932.11.  The loan

28 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

documents will be modified to reduce the interest rate to 6.5% per annum. The loan will be modified to require monthly payments of $8,431.68 for 60 months starting 30 days after the Effective Date of the Third Amended Plan. Any pre-petition default on the loan will be waived.

Class 3        Impaired Secured Claim of Valley Development Initiatives secured by the equipment formerly owned by Valley Rolling, Inc. and DeLaMCC, LLC. The balance of the loan is approximately $229,028.88. The loan documents will be modified to require monthly payments of $2,542.69 with interest at 6% per annum. These payments will start 30 days after the Effective Date and continue for a period of 120 months.

Class 4        Impaired Claim of Oregon Business Development Initiatives secured by a second lien on Debtor's residence, a third lien on Debtor's building at 3071 Schmidt Lane NE, Hubbard, OR 97032, and a third lien on the personal property of Valley Rolling. Any pre-petition default on the loan will be waived. The loan is in the approximate amount of $706,588.00. There is no equity in the building at 3071 Schmidt Lane NE, Hubbard OR 97032 to support the secured claim on the building. There is no equity in the personal property to support the secured claim. There is $350,000 in equity in Debtor's residence to support the lien. The balance of the lien in the amount of $356,588 will be paid as an unsecured claim pursuant to Class 11. The secured claim in the amount of $350,000 will be paid interest only at 4% with monthly payments of $1,166.67 for 45 months. The balance of $350,000 will then be re-amortized over 240 months at 4% interest and monthly payments of $2,120.93. The first payment will be due 30 days after the Effective Date.

Class 5        Impaired Secured Claim of US Small Business Administration of $860,448.55 secured by a third lien on the property at 3071 Schmidt Lane NE, Hubbard, OR

29 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

97032. The loan will be paid approximately $581,097.24 upon the sale of the business property at 3071 Schmidt Lane NE, Hubbard, OR 97032. The balance of the loan will be paid as a Class 11 unsecured claim.

    <u>Class 6</u>        <u>Impaired Unsecured Inventory Related Claims of Current Suppliers</u>.

These claimants are:

| | |
|---|---|
| RF Factor | 61,107.25 |
| Winrock – Superior Plus | 42,922.41 |
| Atlas Bolt & Screw | 8,109.88 |
| Champion Metal of Washington | 12,167.97 |
| TOTAL | $124,307.51 |

    These creditors will be paid the amount of any current invoice shipped after confirmation of the Third Amended Plan plus an additional 1.5% of the invoice to apply toward the unpaid claim. These payments will continue until the claim is paid in full plus 3.25% interest. The payments will start 30 days after the Effective Date. If any of the claimants cease to be suppliers of Debtor, the balance left owing on the claim will be amortized with monthly payments for 120 months with 3.25% interest.

    <u>Class 7</u>    Impaired Unsecured Claim of Cascadia for balance of $634,357.58. This balance will be paid after the 503(b)(5) Claim of Cascadia has been paid in full. The balance will be paid the amount of any current invoice shipped after confirmation of the Third Amended Plan plus 1.5% of the invoice.

    <u>Class 8</u>    <u>Unimpaired Secured Claim of GreenTree Home Mortgage</u> in the amount of $159,004.44 secured by Debtors personal residence at 1129 Belle Passi Rd., Woodburn, OR

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

97071. Debtor will continue to make the payments according to the terms of the mortgage. At the time the case was filed, there was no arrearage on the GreenTree Home Mortgage. Since the filing of the case, Debtor did become delinquent on the mortgage, however that delinquency has been cured. Debtor will stay current on the GreenTree Home Mortgage loan.

    Class 9        Impaired Secured Claim of Marion County secured by Debtor's real property at 3071 Schmidt Lane NE, Hubbard, OR 97032 in the approximate amount of $124,167. The claim will be paid in full upon sale of the property.

    Class 10       Impaired Unsecured Claims Under $1,000 will be paid 60 days after the Effective Date of the Third Amended Plan without interest. These claims are as follows:

| | |
|---|---|
| Primesource Building Products | $935.20 |
| Wells Fargo | 870.00 |
| Century Link | 773.29 |
| Pitney Bowes Purchase Power | 730.14 |
| Long Brothers Building Supply Inc. | 630.15 |
| AT&T | 610.74 |
| Pacific Marketing | 583.68 |
| J.J. Thayer Company | 569.73 |
| Pitney Bowes | 432.40 |
| Davison Auto Parts | 384.39 |
| Teletrac | 337.00 |
| Commercial Business Machines | 250.00 |
| Amerititle | 200.00 |

31 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

| | |
|---|---:|
| G.W. Hardware | 199.19 |
| Industrial Welding Supply, Inc. | 165.69 |
| Oak Harbor Freight Lines, Inc. | 69.84 |
| Marion County Tax Collector | 42.99 |
| Northwest Natural Gas | 13.16 |
| Fastenal | 8.89 |
| TOTAL | $7,806.48 |

Class 11    Impaired Claim of Unsecured Creditors with claims over $1,000 that are not Current Inventory Suppliers. These claims total $1,345,139.30 and will be paid interest only payments for the first 45 months starting 30 days after the Effective Date. The total monthly payment amount will be $3,643.09. After 45 months the payments will increase to amortize the debt over 120 months with total monthly payments of $14,243.08. These creditors and monthly payments are as follows:

| | Balance Owed | Interest Only Payment | After 45 Months |
|---|---:|---:|---:|
| Marc Nelson Oil Products | $17,985.35 | $ 48.71 | $ 190.44 |
| Discover | 17,175.84 | 46.52 | 181.87 |
| Mackey Porth & Unrein | 9,838.97 | 26.65 | 104.18 |
| Toyota Lift Northwest | 5,078.80 | 13.76 | 53.78 |
| KeyBank (default interest) | 55,333.74 | 149.86 | 585.90 |
| SBA | 279,351.31 | 756.58 | 2,957.93 |

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

| | | | |
|---|---|---|---|
| FORA Financial [2] | 45,576.20 | 123.44 | 482.59 |
| Chase Bank | 110,496.69 | 299.26 | 1,170.00 |
| Oregon Business Development | 356,588.97 | 965.76 | 3,775.76 |
| Les Schwab | 2,901.89 | 7.86 | 30.73 |
| MWI Components | 2,950.74 | 7.99 | 31.24 |
| Mt. Angel Telephone | 2,492.44 | 6.75 | 26.39 |
| National Manufacturing Co. | 2,014.98 | 5.46 | 21.34 |
| Aramark Uniform Services | 1,927.19 | 5.22 | 20.41 |
| Artis Metals Company, Inc. | 1,455.31 | 3.94 | 15.41 |
| McMinnville Gas Inc. | 1,406.36 | 3.81 | 14.89 |
| Portland General Electric | 1,332.90 | 3.61 | 14.11 |
| Protec, Inc. Security, Fire & Video | 1,295.00 | 3.51 | 13.71 |
| Cannonball [3] | 29,134.12 | 78.90 | 308.49 |
| ISS West | 224,493.64 | 608.00 | 2,377.06 |
| Euler Hermes | 48,414.04 | 131.12 | 512.63 |
| Penske (Disputed) | 60,949.29 | 165.07 | 645.36 |
| IRS General Unsecured | 50,931.92 | 110.86 | 433.41 |
| Associated Management Consultants (AMCI) | 26,013.61 | 70.45 | 275.45 |
| TOTAL | $1,345,139.30 | $3,643.09 | $14,243.08 |

---

[2] But see Paragraph 3, Page 18 above. Before FORA Financial can receive any distribution, it must pay back the preference payments.
[3] But see Paragraph 2, Page 18 above. Before Cannonball receives any distributions, it must pay back the preference amounts.

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

Class 12        Impaired Unsecured Claim of Agnes Hagenauer in the amount of $259,000. This claim will be paid starting in the 60th month after confirmation with 3.25% interest only if she has repaid to the Creditors' Committee, pursuant to Section 7 of the Third Amended Plan, the preference payment of $21,189.58 she received. Monthly payments starting the 60th month after confirmation will be $4,682.72 per month until paid in full. The claim of Agnes Hagenauer in the amount of $259,000 will not accrue interest until after payments begin in the 60th month.

Class 13        Impaired Unsecured Claim of Dennis Hagenauer in the amount of $57,957.36 for money advanced by Dennis Hagenauer to Valley Rolling on his personal credit lines and in cash. This claim will be paid after Class 11 is paid in full with monthly payments of $1,047.87 for 60 months. Interest will accrue starting in the 165th month at 3.25% per annum.

Class 14        Impaired Unsecured Claim of Employee Bruce Kahler in the amount of $59,309.47. This debt will be paid after Class 11 is paid in full. Payments will be $1,072.32 per month for 60 months. Interest will accrue starting in the 165th month at 3.25% per annum.

Class 15        Impaired Claim for Unfunded 401(k) Plan in the amount of $139,834.31. This claim is for unfunded 401(k) contributions for employees of Valley Rolling Corp. including Debtor and her husband. $4,795.46 is priority debt and will be paid on the Effective Date. Payments on this claim will start January of 2018 in the amount of $3,500 per month with interest at 3% until paid in full.

Class 16        Impaired Secured Claim of KeyBank secured by 3071 Schmidt Lane NE, Hubbard, OR 97032, which is the amount of KeyBank's indebtedness in Class 1 by which the default rate of interest exceeds the non-default rate of interest in KeyBank's claim, and any late

34 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

fees, pre-payment penalties and other default charges included in KeyBank's claim, which are subordinate to the SBA's Class 5 claim, as provided in the Prior Lienholder Agreement between SBA as assignee and KeyBank, dated February 14, 2012 and recorded February 23, 2012 in Marion County, Oregon, recording number 3359 p 88. These amounts will be paid from the sale of 3071 Schmidt Lane NE after payment in full to SBA Class 5. Any amount unpaid will be a Class 11 General Unsecured claim.

       <u>Class 17</u>       <u>Disputed Secured Claim of AMCI (Associated Management Consultants Inc.)</u> in the amount of $26,013.61. Debtor asserts the claim is unsecured and intends to file an objection to secured status of the claim. If the Court determines the claim is secured, the claim will be paid with five percent (5%) interest over sixty (60) months with monthly payments of $490.91 until paid. If the claim is determined by the Court to be unsecured, it will be paid as part of Class 11.

<center>TREATMENT OF UNCLASSIFIED CLAIMS</center>

       **Administrative Claims** allowed by the Court for professional fees of Debtor's counsel, Debtor's financial consultant and Committee's Counsel shall be paid as follows: (1) a pro rata share of the account established pursuant to the Stipulated Final Order For Use of Cash Collateral (Doc. No. 153) at paragraph 10, (the "Accumulated Administrative Account") along with the Allowed 503(b)(9) Claims as set forth below, upon the Effective Date; (2) a pro rata share of any Avoidance Claims recoveries; (3) a pro rata share of monthly payments of $4,000 per month starting 30 days after the Effective Date until paid in full.

       **IRS Secured Claim for Amounts Due that Would Otherwise be General Unsecured Claim pursuant to Bankruptcy Code.** The IRS secured claims that, but for the

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

security would otherwise be general unsecured claims can be paid over a longer period than sixty (60) months.  The claim  for penalty is secured by Debtor's personal property valued at $109,745.00.  It will be paid over 84 months with equal payments of $1,288 starting 30 days after the Effective Date. Interest will accrue on the unpaid balance at 3% per annum.

**IRS Priority Claim** in the amount of $363,337.83 will be paid starting January 20, 2016 with monthly payments of $8,730.48 and interest at three percent (3%) until paid in full.

**Oregon Department of Revenue Priority Claim**.  Upon the Effective Date of the Third Amended Plan, the unpaid balance of $56,690 will be paid over 45 months with monthly payments of $1,462.34.  The claim will be paid with interest of 8% per annum as required under § 511 of the bankruptcy code.

**Priority Tax Claim of California Board of Equalization** in the amount of $9,838.97 will be paid over 45 months with interest at the statutory rate of 9% per annum. Monthly payments starting on the Effective Date of the Third Amended Plan will be $258.42.

**Priority Claim of the Oregon Employment Division** in the amount of $50,902.49 will be paid over 45 months with the statutory interest rate of 8% per annum and monthly payments starting on the Effective Date of the Third Amended Plan in the amount of $1,313.05.

**503(b)(9) Claims.**  There are filed 503(b)(9) administrative claims of $332,068.28.  These claims are all from current suppliers including Cascadia Metals, Inc. which has filed a 503(b)(9) claim for $137,544.18, West Coast Metals for $174,456.90 and Atlas Bolt for $20,067.20.  These claims will be paid 1.5% additional funds for each invoice for goods sold

36 – THIRD AMENDED DISCLOSURE STATEMENT

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

to Debtor. If the creditor ships goods invoiced at $100,000 they will be paid $100,000 plus 1.5%

toward the 503(b)(3) claim which would equal an additional $1,800. This will continue until the

claim, plus 3.25% interest, is paid in full. It is estimated that the amount of time required to pay

the 503(b)(9) claims in full is 36 months from the Date of Confirmation as set forth on attached

Exhibit B. Cascadia Metals and West Coast Metals have verbally agreed to the proposed

treatment.

**Penske Administrative Claim** for post-petition charges incurred between

September 29, 2014 and November 4, 2014 in the amount of $25,976.75. Debtor and Penske

have agreed this claim will be paid $12,988.38 on the Effective Date, plus 9 monthly payments

of $1,443.15 starting 30 days after the Effective Date.

DATED: October 23, 2015

*/s/Laura Lee Hagenauer*
Laura Lee Hagenauer

PRESENTED BY:

*/s/Ted A. Troutman*

Ted A. Troutman, OSB # 844470
Troutman Law Firm P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
503-292-6788 TEL
503-596-2371 FAX
tedtroutman@sbcglobal.net
Of Attorneys for Debtor

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

EXHIBIT LIST

EXHIBIT A – Liquidation Analysis

EXHIBIT B – Cash Flow Analysis

EXHIBIT C – Plan Payment Chart

EXHIBIT D – Historical Profit & Loss Statements Post-Petition

EXHIBIT E – Historical Profit & Loss Statements Pre-Petition

EXHIBIT F – Current Balance Sheet

EXHIBIT G – Personal Monthly Budget

EXHIBIT H – Sample Ballot for accepting or rejecting plan

EXHIBIT I – Sale Agreement

EXHIBIT J – Proposed Lease

Ted A. Troutman
TROUTMAN LAW FIRM, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005
(503) 292-6788 TEL (503) 596-2371 FAX
tedtroutman@sbcglobal.net

# EXHIBIT A
## LIQUIDATION ANALYSIS
Laura Lee Hagenauer
Bankruptcy Case No. 14-63530-fra11

### Building and Land
3071 Schmidt Lane NE, Hubbard, OR 97032

| | | |
|---|---|---|
| Value | $2,600,000.00 | |
| 1st lien – KeyBank | <1,605,401.00> | |
| 2nd lien – SBA | <  811.075.00> | |
| 3rd lien – Oregon Business Development | <  660,000.00> | |
| 4th lien – Cascadia Metals | <  634,358.00> | |
| Marion County Tax | <  124,000.00> | |
| IRS liens | <  481,899.61> | |
| Cost of Sale – 7% | <  266,000.00> | |
| Trustee's Commission | <  136,500.00>* | |
| Equity | <  2,121,733.00> | |
| Net to Estate | | $   -0- |

### Debtor's Residence
1129 Belle Passi Rd., Woodburn, OR 97071
50% Interest

| | | |
|---|---|---|
| Value | $  250,000.00 | |
| 1st lien – GreenTree (1/2) | <    79,502.00> | |
| 2nd lien – Oregon Business Development | <  660,000.00> | |
| Trustee's Commission at 3% | <      7,500.00> | |
| Cost of Sale – 7% | <    17,500.00> | |
| Exemption | <    22,975.00> | |
| Equity | $  122,523.00 | |
| IRS lien ($481,899.61) | <  122,523.00> | |
| Net to Estate | | $   -0- |

IRS lien remaining after house sale - $481,899.61 - $-0- = $   481,899.61

### Whole Life Policy

| | | |
|---|---|---|
| Value | $     9,936.56 | |
| IRS lien | <      9,936.56> | |
| Net to Estate | | $   -0- |

Remaining IRS lien - $481,899.61– $9,936.56 = $471,963.05

### Household Goods

| | | |
|---|---|---|
| Value | $     6,000.00 | |
| IRS lien | <       6,000.00> | |

Net to Estate                                          $   -0-

Remaining IRS lien - $471,963.05 - $6,000.00 = $465,963.05

### Books, Pictures, Home Décor

| | | |
|---|---|---|
| Value | $   1,500.00 | |
| Exemption | <    1,500.00> | |
| Net to Estate | | $   -0- |

### Clothing and Shoes

| | | |
|---|---|---|
| Value | $     500.00 | |
| Exemption | <     500.00> | |
| Net to Estate | | $   -0- |

### Jewelry

| | | |
|---|---|---|
| Value | $   1,000.00 | |
| Exemption | <    1,000.00> | |
| Net to Estate | | $   -0- |

### Annuity

| | | |
|---|---|---|
| Value | $  57,858.00 | |
| IRS lien | <   57,858.00> | |
| Net to Estate | | $   -0- |

Remaining IRS lien: $465,963.05- $57,858.00 = $408,105.05

### Valley Rolling Accounts Receivable

| | | |
|---|---|---|
| Value | $  422,308.49 | |
| KeyBank lien | <   548,610.21> | |
| Net to Estate | | $   -0- |

Remaining KeyBank lien: $548,610.21 - $422,308.49 = $126,301.72

### 1988 Bounder Motorhome
### ½ interest

| | | |
|---|---|---|
| Value (1/2) | $     5,150.00 | |
| IRS lien | <    5,150.00> | |
| Net to Estate | | $   -0- |

Remaining IRS lien: $408,105.05 - $5,150.00 = $402,955,05

### 1997 Ford Expedition
### ½ interest

| | | |
|---|---|---|
| Value (1/2) | $ 500.00 | |
| Cost of Sale – 10% | < 50.00> | |
| Trustee's Commission – 3% | < 15.00> | |
| IRS lien | < 435.00> | |
| Net to Estate | | $ -0- |

Remaining IRS lien: $402,955.05 - $435.00 = $402,520.05

### 2011 Ford F350
### ½ interest

| | | |
|---|---|---|
| Value (1/2) | $ 17,000.00 | |
| Cost of Sale – 10% | < 1,700.00> | |
| Trustee's Commission – 3% | < 510.00> | |
| Debtor's Exemption | < 3,675.00> | |
| IRS lien | < 11,115.00> | |
| Net to Estate | | $ -0- |

Remaining IRS lien: $402,520.05 - $11,115.00 = $391,405.05

### Office Equipment

| | | |
|---|---|---|
| Value | $ 49,180.27 | |
| Cost of Sale – 10% | < 4,918.03> | |
| Trustee's Commission – 3% | < 1,475.41> | |
| IRS lien | < 42,786.83> | |
| Net to Estate | | $ -0- |

Remaining IRS lien: $381,405.05 - $42,786.83 = $348,618.22

### Equipment

| | | |
|---|---|---|
| Value | $ 500,000.00 | |
| VDI lien | < 229,028.88> | |
| Cost of Sale – 10% | < 50,000.00> | |
| Balance of KeyBank lien | < 126,301.72> | |
| Trustee's Commission – 3% | < 15,000.00> | |
| IRS lien | < 79,669.40> | |
| Net to Estate | | $ -0- |

Remaining IRS lien: $348,618.22 - $79,669.40 = $268,948.82

### Lawn Mower

| | | |
|---|---|---|
| Value | $ 3,000.00 | |
| Cost of Sale – 10% | < 300.00> | |
| Trustee's Commission – 3% | < 90.00> | |
| IRS lien | < 2,610.00> | |
| Net to Estate | | $ -0- |

Remaining IRS lien: $268,948.82 - $2,610.00 = $266,338.82

### Shop Tools

| | | |
|---|---|---|
| Value | $ 3,000.00 | |
| Cost of Sale – 10% | < 300.00> | |
| Trustee's Commission – 3% | < 90.00> | |
| IRS lien | < 2,610.00> | |
| Net to Estate | | $ -0- |

Remaining IRS lien: $266,338.82 - $2,610.00 = $263,728.82

### Inventory

| | | |
|---|---|---|
| Value | $ 761,803.12 | |
| Cost of Sale – 10% | < 76,180.31> | |
| Trustee's Commission – 3% | < 22,854.09> | |
| IRS lien | < 263,728.82> | |
| Net to Estate | | $399,039.90 |

| | |
|---|---|
| Total Available before Priority and Administrative Costs | $399,039.90 |
| Priority Taxes – ODR | < 56,000.00> |
| Oregon Employment Department | < 50,902.00> |
| California Board of Equalization | < 9,839.00> |
| 503(b)(9) Claims** | <339,418.00> |
| Estimated Unpaid Administrative Expenses | <250,000.00> |
| **Balance Available to Unsecured Creditors** | **$ -0-** |

*Trustee's Commission:  25% of first $5,000; 10% of $5,000 - $50,000; 5% of $50,000 - $1,000,000; 3% of anything over $1,000,000

Laura L. Hagenauer
dba Valley Rolling Corporation
Post Petition Operating Forecast
2015

| Description | % | YTD 09/30/15 Actual | OCT 2015 Forecast | NOV 2015 Forecast | DEC 2015 Forecast | YTD Total 2015 | % | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Material Sales** | | 4,993,055 | 735,000 | 625,000 | 600,000 | 6,954,055 | | 7,162,676 | 7,377,556 | 7,598,883 | 7,902,838 | 8,218,952 | 8,465,521 | 8,719,486 | 8,981,071 | 9,250,503 | 9,528,018 |
| Labor/Handling Charges | | 15,199 | 1,000 | 1,000 | 1,000 | 18,199 | | 1,236 | 1,273 | 1,311 | 1,351 | 1,391 | 2,209 | 2,275 | 2,344 | 2,414 | 2,486 |
| Freight & Pkg Revenue | | 15,490 | 1,000 | 1,000 | 1,000 | 18,490 | | 24,528 | 26,754 | 27,042 | 28,394 | 29,813 | 31,304 | 32,869 | 34,513 | 36,238 | 38,050 |
| Common Carrier Revenue | | 37,369 | 4,000 | 4,000 | 4,000 | 49,369 | | 116,393 | 122,118 | 128,224 | 134,635 | 141,367 | 148,435 | 155,857 | 163,649 | 171,832 | 180,424 |
| Payment & Pricing Discounts Allowed | | (202,582) | (22,000) | (22,000) | (20,000) | (266,582) | | (241,105) | (250,730) | (260,780) | (268,603) | (276,661) | (284,961) | (293,510) | (302,315) | (311,384) | (320,726) |
| **Total Sales** | 67.0% | 4,858,440 | 720,000 | 609,000 | 586,000 | 6,773,531 | | 7,063,637 | 7,275,952 | 7,494,680 | 7,798,615 | 8,114,862 | 8,362,508 | 8,616,978 | 8,879,261 | 9,149,603 | 9,428,252 |
| | | 29.8% | 30.4% | 35.2% | 29.9% | | 31.2% | 31.2% | 31.2% | 31.0% | 31.0% | 31.2% | 31.2% | 31.1% | 31.2% | 31.2% | 31.2% |
| **Cost of Sales** | | | | | | | | | | | | | | | | | |
| Materials | | 3,408,817 | 500,882 | 425,000 | 408,000 | 4,742,297 | | 4,870,620 | 5,016,738 | 5,167,241 | 5,373,930 | 5,588,887 | 5,756,554 | 5,929,251 | 6,107,128 | 6,290,342 | 6,479,052 |
| Scrap | 0.3% | (71) | | | | (71) | | | | | | | | | | | |
| Freight In | | 3,142 | 350 | 350 | 350 | 4,192 | | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,304 | 6,120 |
| Total Material Costs | | 3,411,888 | 500,832 | 425,350 | 408,350 | 4,746,418 | | 4,876,740 | 5,022,858 | 5,173,361 | 5,380,050 | 5,595,007 | 5,762,674 | 5,935,371 | 6,113,248 | 6,296,646 | 6,485,172 |
| Gross Profit | | 1,446,552 | 219,170 | 183,650 | 177,650 | 2,029,037 | | 2,186,897 | 2,253,093 | 2,321,320 | 2,418,564 | 2,519,855 | 2,599,834 | 2,681,607 | 2,766,013 | 2,852,957 | 2,943,080 |
| | | 29.8% | 30.4% | 35.2% | 29.9% | | 31.2% | 31.2% | 31.2% | 31.0% | 31.0% | 31.2% | 31.2% | 31.1% | 31.2% | 31.2% | 31.2% |
| **Manufacturing Expenses** | | | | | | | | | | | | | | | | | |
| Propane | | 4,343 | 405 | 460 | 539 | 5,747 | | 5,751 | 5,923 | 6,101 | 6,284 | 6,472 | 6,582 | 6,780 | 6,983 | 7,193 | 7,409 |
| Wages/Labor | | 135,091 | 16,000 | 16,000 | 16,000 | 183,091 | | 186,660 | 192,260 | 198,028 | 203,968 | 210,087 | 216,390 | 222,882 | 229,568 | 236,455 | 243,549 |
| Fringe Benefits | | 40,824 | 4,536 | 4,536 | 4,536 | 54,432 | | 57,154 | 60,011 | 63,017 | 66,168 | 69,477 | 72,984 | 76,591 | 80,421 | 84,442 | 88,664 |
| Payroll Taxes | | 66,991 | 5,600 | 5,600 | 5,600 | 86,991 | | 88,991 | 91,244 | 94,401 | 97,242 | 100,364 | 103,164 | 106,253 | 109,047 | 112,490 | 116,112 |
| Workers Comp | | 4,683 | 300 | 300 | 300 | 5,583 | | 15,000 | 15,156 | 15,156 | 15,156 | 15,156 | 15,508 | 15,550 | 15,550 | 15,908 | 15,350 |
| Supplies | | 288 | 25 | 25 | 25 | 363 | | 500 | 550 | 600 | 650 | 700 | 750 | 800 | 850 | 850 | 850 |
| Packaging | | 20,174 | 2,250 | 2,250 | 2,250 | 26,924 | | 29,355 | 30,236 | 30,236 | 31,143 | 31,143 | 32,608 | 32,608 | 33,586 | 33,586 | 34,594 |
| Health & Safety | | 696 | 61 | 101 | 50 | 907 | | 1,150 | 1,250 | 1,300 | 1,400 | 1,450 | 1,500 | 1,500 | 1,600 | 1,650 | 1,650 |
| Power & Electricity | | 12,074 | 1,326 | 1,284 | 1,157 | 15,841 | | 14,515 | 14,950 | 15,399 | 15,861 | 16,337 | 16,910 | 17,410 | 18,447 | 19,011 | 19,521 |
| Water & Sewer | | 1,448 | 198 | 198 | 198 | 2,043 | | 1,935 | 1,993 | 2,053 | 2,114 | 2,178 | 2,263 | 2,331 | 2,401 | 2,473 | 2,547 |
| Garbage | | 1,619 | 180 | 180 | 180 | 2,158 | | 2,223 | 2,290 | 2,358 | 2,429 | 2,502 | 2,577 | 2,654 | 2,734 | 2,816 | 2,901 |
| Gas | | 1,600 | 175 | 175 | 175 | 2,125 | | 2,052 | 2,113 | 2,176 | 2,242 | 2,309 | 2,196 | 2,262 | 2,330 | 2,399 | 2,471 |
| Maintenance | | 10,421 | 1,000 | 1,000 | 1,000 | 13,421 | | 13,681 | 14,092 | 14,514 | 14,950 | 15,398 | 17,154 | 17,669 | 18,199 | 18,745 | 19,307 |
| Small Tools | | 1,015 | 7 | 25 | 41 | 1,088 | | 1,150 | 1,300 | 1,450 | 1,600 | 1,600 | 1,700 | 1,750 | 1,850 | 1,900 | 1,390 |
| Rent | | 35,625 | 15,000 | 15,000 | 15,000 | 30,000 | | 180,000 | 209,004 | 209,004 | 209,004 | 209,004 | 209,004 | 209,004 | 209,004 | 209,004 | 209,004 |
| Misc. Mfg. Expense | | 1,088 | 125 | 125 | 125 | 1,463 | | 500 | 600 | 600 | 600 | 600 | 700 | 800 | 900 | 1,000 | 1,100 |
| Insurance | | 35,625 | 3,700 | 3,700 | 3,700 | 46,725 | | 40,747 | 41,970 | 41,970 | 43,229 | 43,229 | 45,225 | 45,225 | 46,581 | 46,581 | 47,979 |
| Property Taxes | | 23,692 | | | 3,700 | 25,200 | | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 25,200 | 25,200 | 25,200 | 25,200 | 25,200 |
| Total Manufacturing Expense | | 344,544 | 35,386 | 50,959 | 50,875 | 482,266 | | 641,362 | 709,351 | 722,360 | 738,028 | 734,318 | 773,168 | 788,113 | 805,856 | 802,214 | 830,546 |
| | % of Sales | 7.1% | 5.0% | 8.4% | 8.7% | | 7.1% | 9.1% | 9.7% | 9.6% | 9.5% | 9.1% | 9.2% | 9.1% | 9.1% | 8.8% | 8.9% |
| **Total Cost of Sales** | | 3,756,432 | 536,218 | 476,309 | 459,225 | 5,228,683 | | 5,518,102 | 5,732,130 | 5,895,721 | 6,118,078 | 6,329,726 | 6,535,842 | 6,723,463 | 6,919,104 | 7,098,859 | 7,315,718 |
| | | 77.3% | 74.5% | 78.4% | 78.4% | | 77.2% | 78.1% | 78.8% | 78.7% | 78.5% | 78.0% | 78.0% | 78.0% | 77.9% | 77.6% | 77.6% |
| **Gross Profit** | | 1,102,009 | 183,782 | 132,691 | 126,775 | 1,546,772 | | 1,545,535 | 1,543,742 | 1,598,959 | 1,680,536 | 1,785,136 | 1,826,665 | 1,893,494 | 1,960,157 | 2,050,743 | 2,112,534 |
| | % of Sales | 22.7% | 25.5% | 21.6% | 21.6% | | 22.8% | 21.9% | 21.2% | 21.3% | 21.5% | 22.0% | 21.8% | 22.0% | 22.1% | 22.4% | 22.4% |
| **Selling Expense** | | | | | | | | | | | | | | | | | |
| Wages & Salaries | | 75,520 | 8,000 | 8,000 | 8,000 | 99,520 | | 103,509 | 104,555 | 107,691 | 110,922 | 114,250 | 117,677 | 121,208 | 124,844 | 128,589 | 132,447 |
| Fringe Benefits | | 25,622 | 3,416 | 3,416 | 3,416 | 35,871 | | 43,045 | 45,198 | 47,457 | 49,830 | 52,322 | 54,782 | 48,071 | 50,474 | 52,998 | 55,648 |
| Advertising | | 5,570 | 625 | 625 | 625 | 7,445 | | 7,500 | 7,650 | 7,803 | 7,959 | 8,118 | 8,281 | 8,446 | 26,000 | 27,000 | 27,000 |
| Travel - Car | | 9,376 | 750 | 900 | 500 | 11,526 | | 13,401 | 13,803 | 14,217 | 14,643 | 15,082 | 14,642 | 15,081 | 15,533 | 15,999 | 16,479 |
| Meals & Entertainment | | 46 | 24 | 25 | 25 | 95 | | 389 | 400 | 412 | 425 | 425 | 437 | 486 | 501 | 516 | 531 |
| Travel - Hotel & Air | | 1,572 | 100 | 100 | 100 | 1,872 | | 2,619 | 2,697 | 2,861 | 2,861 | 2,861 | 2,877 | 2,963 | 3,052 | 3,144 | 3,238 |
| Cellular Phone - Sales | | 3,100 | 340 | 340 | 340 | 4,120 | | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,800 | 3,800 | 3,800 | 3,820 | 3,830 |
| Total Selling Expense | | 120,806 | 13,256 | 13,406 | 12,981 | 160,449 | | 172,062 | 177,902 | 183,959 | 190,241 | 196,757 | 193,530 | 200,055 | 224,204 | 232,046 | 239,143 |
| **Administrative Exps.** | | | | | | | | | | | | | | | | | |
| Wages & Salaries | | 148,665 | 17,000 | 17,000 | 17,000 | 199,665 | | 203,658 | 209,768 | 216,061 | 222,543 | 229,219 | 236,096 | 243,179 | 250,474 | 257,988 | 265,728 |
| Fringe Benefits | | 43,846 | 4,900 | 4,900 | 4,900 | 58,546 | | 56,419 | 56,983 | 57,553 | 58,128 | 58,709 | 59,297 | 59,889 | 60,488 | 61,093 | 61,704 |
| Travel - Car | | 345 | | | 12 | 357 | | | | | | | | | | | |
| Meals & Entertainment | | | | | | | | | | | | | | | | | |
| Sales Commission | | | | | | | | | | | | | | | | | |

Laura L. Hagenauer
dba Valley Rolling Corporation
Post Petition Operating Forecast
2015

| Description | % | YTD 09/30/15 Actuals | OCT 2015 Forecast | NOV 2015 Forecast | DEC 2015 Forecast | YTD Total 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Office Expenses** | | | | | | | | | | | | | | | | |
| Misc. Expenses | | 3,132 | 265 | 300 | 300 | 3,997 | 6,100 | 5,610 | 5,722 | 5,894 | 6,071 | 6,192 | 6,378 | 6,570 | 6,767 | 6,970 |
| Accounting Fees | | | | 985 | | 985 | 1,217 | 1,254 | 1,292 | 1,330 | 1,370 | 1,411 | 1,454 | 1,497 | 1,542 | 1,588 |
| Collection Expense | | | | | | | 2,791 | 2,875 | 2,961 | 3,050 | 3,141 | 3,235 | 3,333 | 3,434 | 3,535 | 3,642 |
| Comp/Software Support/Data/Web | | 6,480 | 720 | 720 | 720 | 8,640 | 8,899 | 9,166 | 9,441 | 9,724 | 10,016 | 10,317 | 10,626 | 10,945 | 11,273 | 11,611 |
| Telephone/Admin | | 5,254 | 600 | 600 | 600 | 7,094 | 8,871 | 9,138 | 9,412 | 9,694 | 9,985 | 9,491 | 9,775 | 10,069 | 10,371 | 10,682 |
| Cellular Phone/Admin (Prod) | | 1,988 | 224 | 224 | 224 | 2,659 | 4,062 | 4,183 | 4,309 | 4,438 | 4,571 | 4,504 | 4,639 | 4,778 | 4,921 | 5,069 |
| Postage | | 1,599 | 142 | 142 | 212 | 2,461 | 2,438 | 2,512 | 2,587 | 2,664 | 2,744 | 2,772 | 2,855 | 2,940 | 3,029 | 3,119 |
| Data Processing/Supplies | | 2,766 | 138 | 138 | 750 | 3,654 | 2,677 | 2,757 | 2,840 | 2,925 | 3,013 | 2,506 | 2,581 | 2,659 | 2,739 | 2,821 |
| Dues & Subscriptions | | | | | | | 1,496 | 1,449 | 1,492 | 1,537 | 1,583 | 1,607 | 1,655 | 1,705 | 1,756 | 1,808 |
| Health/Safety/Emp. Incentive | | | | | | | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Licenses/Permits | | | | | | | 334 | 344 | 354 | 365 | 376 | 387 | 399 | 411 | 423 | 436 |
| Office/Life Insurance | | | | | | | 744 | 744 | 744 | 744 | 744 | | | | | |
| Service Contracts (Copier, Etc.) | | | | | | 1,353 | 4,861 | 4,861 | 4,861 | 4,861 | 4,861 | 4,861 | 4,861 | 4,861 | 4,861 | 5,006 |
| Lease/Copier | | 7,830 | 879 | 879 | | 9,587 | | | | | | | | | | |
| Security Monitoring | | | 167 | 167 | 167 | 167 | 1,677 | 1,779 | 1,833 | 1,888 | 1,944 | 2,003 | 2,063 | 2,125 | 2,188 | |
| Telephone Sys. Lease (ES4 100) | | 4,445 | 494 | 494 | 494 | 5,927 | 1,482 | | | | | | | | | |
| Outside Services | | 6,071 | 675 | 675 | 675 | 8,096 | 9,126 | 9,400 | 9,682 | 9,972 | 10,271 | 10,259 | 10,567 | 10,884 | 11,211 | 11,547 |
| Total Administrative Exp. | | 232,892 | 25,924 | 28,575 | 25,867 | 313,188 | 919,763 | 325,770 | 334,089 | 342,702 | 351,563 | 357,878 | 367,193 | 376,775 | 386,033 | 396,920 |
| **Delivery Expense** | | | | | | | | | | | | | | | | |
| Wages/Labor | | 83,999 | 10,000 | 10,000 | 10,000 | 113,999 | 116,280 | 119,768 | 123,361 | 127,062 | 130,874 | 134,800 | 138,844 | 143,010 | 147,300 | 151,719 |
| Fringe Benefits | | 38,333 | 3,832 | 3,832 | 3,832 | 49,829 | 57,358 | 57,729 | 58,397 | 58,990 | 59,679 | 60,074 | 60,676 | 61,281 | 61,894 | 62,513 |
| Truck Driver Expense | | 10,570 | 1,100 | 1,100 | 1,100 | 13,870 | 14,500 | 14,790 | 15,086 | 15,388 | 15,695 | 16,009 | 16,329 | 16,656 | 16,989 | 17,329 |
| Cellular Phone /Truck | | 1,674 | 150 | 175 | 175 | 2,174 | 2,600 | 2,678 | 2,758 | 2,841 | 2,926 | 2,955 | 3,044 | 3,135 | 3,229 | 3,326 |
| Truck Expense | | 1,024 | 100 | 100 | 100 | 1,324 | 1,870 | 1,926 | 1,983 | 2,043 | 2,104 | 2,210 | 2,277 | 2,345 | 2,415 | 2,488 |
| Truck Leasing | | 3,435 | 337 | 337 | 337 | 4,446 | 4,165 | 4,290 | 4,419 | 4,552 | 4,688 | 4,829 | 4,974 | 5,123 | 5,277 | 5,435 |
| Truck Lease | | 103,236 | 11,000 | 11,000 | 11,000 | 136,236 | 135,969 | 140,039 | 144,240 | 148,567 | 153,024 | 155,000 | 158,654 | 168,413 | 173,385 | 178,566 |
| Trailer Expense | | 16,796 | 1,800 | 1,800 | 1,800 | 22,196 | 12,221 | 12,588 | 12,965 | 13,354 | 13,755 | 14,461 | 14,895 | 15,342 | 15,802 | 16,276 |
| Gas/Fuel | | 68,756 | 7,000 | 7,000 | 7,000 | 89,756 | 96,000 | 97,920 | 100,858 | 103,883 | 107,000 | 109,140 | 112,414 | 115,786 | 119,260 | 122,838 |
| Gas/Fuel (Pickup) | | 5,897 | 700 | 700 | 700 | 7,997 | 8,157 | 8,320 | 8,486 | 8,656 | 8,829 | 9,006 | 9,186 | 9,370 | 9,557 | 9,748 |
| Parking Expense | | 1,866 | 200 | 200 | 175 | 2,541 | 821 | 846 | 871 | 897 | 924 | 902 | 929 | 956 | 985 | 1,015 |
| H/Fuel & Fuel Tax (DDOT Fees) | | 19,719 | 2,100 | 2,000 | 2,000 | 26,019 | 30,400 | 31,212 | 32,148 | 33,113 | 34,106 | 34,788 | 35,832 | 36,907 | 38,014 | 39,155 |
| Freight Expense (Outgoing) | | 15,581 | 1,800 | 1,500 | 1,700 | 20,581 | 9,664 | 9,585 | 10,285 | 10,593 | 10,911 | 11,399 | 11,741 | 12,093 | 12,456 | 12,829 |
| Total Delivery Expense | | 367,187 | 40,119 | 39,744 | 40,119 | 487,169 | 490,026 | 502,091 | 515,768 | 529,839 | 544,316 | 559,227 | 574,552 | 590,320 | 606,543 | 623,236 |
| **% of Sales** | | 5.0% | 6.2% | 5.5% | 8.6% | 108.4% | 6.8% | 6.5% | 6.5% | 6.8% | 6.7% | 6.7% | 6.7% | 6.6% | 6.6% | 6.6% |
| Net Income (Loss) from Operations | | 381,215 | 103,983 | 50,966 | 47,788 | 585,967 | 563,684 | 537,979 | 565,144 | 617,754 | 692,501 | 716,030 | 751,695 | 768,858 | 825,521 | 843,235 |
| **Other (Income) Exp.** | | | | | | | | | | | | | | | | |
| Bank Charges | | 6,048 | 500 | 500 | 500 | 7,548 | 6,180 | 6,365 | 6,556 | 6,753 | 6,956 | 7,254 | 7,471 | 7,696 | 7,926 | 8,164 |
| Discounts Earned | | (470) | (142) | (142) | (142) | (896) | (1,416) | (1,459) | (1,503) | (1,548) | (1,594) | (1,406) | (1,448) | (1,491) | (1,536) | (1,582) |
| Interest Expense | | 19,500 | | | 9,750 | 29,250 | | | | | | | | | | |
| Chapter 11 Quarterly Fees | | | | | (2,400,000) | (2,400,000) | | | | | | | | | | |
| Other Income | | | | | | | 4,764 | 4,906 | 5,054 | 5,205 | 5,361 | 5,848 | 6,024 | 6,205 | 6,391 | 6,582 |
| Total Other (Income) Expense | | 25,078 | 358 | 358 | (2,479,892) | (2,454,099) | 558,920 | 531,073 | 560,096 | 612,549 | 687,139 | 710,182 | 745,671 | 762,654 | 819,131 | 836,053 |
| Net Income Before Plan Payments | | 356,137 | 103,626 | 50,608 | 2,527,680 | 3,040,066 | | | | | | | | | | |
| **Plan Payments** | | | | | | | | | | | | | | | | |
| Adequate Protection Payments | | 207,431 | 19,909 | 19,909 | 2,490,000 | 2,737,249 | 231,333 | 131,692 | 131,692 | 131,692 | 131,692 | 47,376 | 30,512 | 30,512 | 30,512 | 30,512 |
| Secured Creditors | | | | | | | 182,416 | 186,166 | 186,166 | 155,391 | 45,000 | 45,000 | 45,000 | 37,550 | | |
| Priority Creditors | | | | | | | 149,818 | 131,370 | 148,842 | 144,138 | 192,388 | 188,388 | 294,941 | 311,728 | 311,728 | 311,728 |
| Unsecured Non-Priority | | | | 9,750 | | 29,250 | | | | | | | | | | |
| Total Plan Payments | | 207,431 | 19,909 | 19,909 | 2,557,962 | 2,805,211 | 563,568 | 449,229 | 466,701 | 422,222 | 369,080 | 280,764 | 370,453 | 379,740 | 342,240 | 342,240 |
| **Net Income After Plan Payments** | | 148,706 | 83,717 | 30,699 | (30,282) | 234,855 | (4,647) | 83,844 | 93,396 | 185,226 | 318,059 | 429,438 | 375,217 | 382,914 | 476,890 | 494,411 |
| | | 3.1% | 11.6% | 5.0% | 5.2% | 3.5% | -0.1% | 1.2% | 1.7% | 2.4% | 3.9% | 5.1% | 4.4% | 4.3% | 5.2% | 5.3% |
| | | | | | | | | | | | | | | | | 6,796,448 |

Laura L. Hagemauer
dba Valley Rolling Corporation
Post Petition Operating Forecast
2015

| Description | %% | YTD 09/30/15 Actual | OCT 2015 Forecast | NOV 2015 Forecast | DEC 2015 Forecast | YTD Total 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Wages & Salaries | | | | | | | | | | | | | | | | |
| Manufacturing Expenses | | 135,093 | 16,000 | 16,000 | 16,000 | 183,093 | 186,660 | 192,260 | 198,028 | 203,968 | 210,087 | 216,390 | 222,882 | 229,568 | 236,455 | 243,549 |
| Selling Expense | | 75,520 | 8,000 | 8,000 | 8,000 | 99,520 | 101,509 | 104,555 | 107,691 | 110,922 | 114,250 | 117,677 | 121,208 | 124,844 | 128,589 | 132,447 |
| Administrative Exps. | | 148,665 | 17,000 | 17,000 | 17,000 | 199,665 | 203,658 | 209,768 | 216,061 | 222,543 | 229,219 | 236,096 | 243,179 | 250,474 | 257,988 | 265,728 |
| Delivery Expenses | | 83,999 | 10,000 | 10,000 | 10,000 | 113,999 | 116,280 | 119,768 | 123,361 | 127,062 | 130,874 | 134,800 | 138,844 | 143,010 | 147,300 | 151,719 |
| Total Wages & Salaries | | 443,275 | 51,000 | 51,000 | 51,000 | 596,275 | 608,108 | 626,351 | 645,141 | 664,496 | 684,431 | 704,963 | 726,112 | 747,896 | 770,333 | 793,443 |
| % of Sales | | 9.1% | 7.1% | 8.6% | 8.7% | 8.2% | 8.6% | 8.6% | 8.6% | 8.5% | 8.4% | 8.4% | 8.4% | 8.4% | 8.4% | 8.4% |
| Net Delivery Exp. | | 529,818 | 36,119 | 35,744 | 36,119 | 741,999 | 465,498 | 476,337 | 488,726 | 501,445 | 514,503 | 527,923 | 541,683 | 555,807 | 570,305 | 585,186 |
| Delivery COS %% | | 6.6% | 4.9% | 5.7% | 6.0% | 10.7% | 6.5% | 6.5% | 6.4% | 6.3% | 6.3% | 6.2% | 6.2% | 6.2% | 6.2% | 6.1% |

EXHIBIT B
Page 3 Of 3

Laura L. Hagenauer
dba Valley Rolling Corporation
 Plan Payments
2015 to 2024

| Description | Total Owed | %% | SEP 2015 Forecast | OCT 2015 Forecast |
|---|---|---|---|---|
| **Secured Creditors:** | | | | |
| Key Bank - Mortgage | 1,605,401 | | 19,909 | 19,909 |
| Key Bank - LOC | 430,932 | | | - |
| IRS - Secured (Priority) | 109,745 | 6 mos 3% | 2,000 | |
| MWV-COG | 229,029 | | 1791 | - |
| SBA | 760,432 | | | - |
| OR. Bus. Development | 350,000 | | | - |
| Property Taxes | 124,167 | | - | - |
| | - | | 23,700 | 19,909 |
| **Priority Creditors:** | | | | |
| Oregon Employment Division | 50,902 | 45 Mo's | | - |
| Oregon Withholding | 56,690 | 45 Mo's | | - |
| IRS Priority | 363,378 | | | - |
| 503(b) 9 Claims | 332,068 | 1.50% | | - |
| Cal. BOE | 9,839 | 51 Mo's | | - |
| | | | - | - |
| **Unsecured Non-Priority:** | | | | |
| Post Petition CLASS "Inventory Related" | 124,307 | 1.50% | | - |
| Post Petiton Plan Payments Class - Over $1,001 | 1,345,139 | | | - |
| Post Petition Plan Class "under $1k" | 7,608 | 1 Pmt. | | |
| Agnes Hagenauer | 259,000 | 60 Mo's | | |
| Penske Admin Claim | 25,976 | | | |
| Dennis Hageouer | 57,957 | | | |
| Bruce Kahler | 59,309 | | | |
| Cascadia (Secured) | 637,000 | $3k/mo. | | |
| Administrative Expenses | 250,000 | | | |
| 401(k) Payments | 139,834 | Start Jan. 2018 | | |
| | | | - | - |
| | 7,328,715 | | | |
| Total Plan Payments | | | 23,700 | 19,909 |

Sale
Costs
Cash from Cl
Payoff: Key B

EXHIBIT _C_
Page___1___Of_18_

| NOV 2015 Forecast | DEC 2015 Forecast | YTD Total 2015 | | JAN 2016 | FEB 2016 | MAR 2016 | APR 2016 |
|---|---|---|---|---|---|---|---|
| 19,909 | 1,605,401 | 1,824,400 | | | | - | - |
| - | - | - | | | | 8,432 | 8,432 |
| - | - | 18,000 | | - | 10,822 | 10,822 | 10,822 |
| - | - | 10,250 | | | 2,543 | 2,543 | 2,543 |
| - | 760,432 | 760,432 | | | | - | - |
| - | - | - | | - | - | - | - |
| - | 124,167 | 124,167 | | | | - | - |
| 19,909 | 2,490,000 | 2,737,249 | | - | 13,365 | 21,797 | 21,797 |
| - | | - | | 1,313 | 1,313 | 1,313 | 1,313 |
| - | - | - | | 1,462 | 1,462 | 1,462 | 1,462 |
| - | - | - | | 8,730 | 8,730 | 8,730 | 8,730 |
| - | | - | | | 3,750 | 3,750 | 3,750 |
| - | | - | | 258 | 258 | 258 | 258 |
| - | - | - | | 11,764 | 15,514 | 15,514 | 15,514 |
| - | | - | | | 3,000 | 3,000 | 3,000 |
| - | | - | | | 3,948 | 3,948 | 3,948 |
| | | - | | | | 7,608 | |
| | | - | | | | | |
| | 12,986 | 12,986 | | | 1,444 | 1,444 | 1,444 |
| | | | | | - | - | - |
| | 54,976 | 54,976 | | | 4,000 | 4,000 | 4,000 |
| | | - | | 4,795 | | | |
| - | 67,962 | 67,962 | | 4,795 | 12,391 | 20,000 | 12,391 |
| 19,909 | 2,557,962 | 2,805,211 | | 16,559 | 41,270 | 57,310 | 49,702 |

| | |
|---|---|
| | 2,600,000 |
| | (110,000) |
| osing | 2,490,000 |
| ank | (1,605,401) |

EXHIBIT C
Page 2 Of 13

| MAY 2016 | JUN 2016 | JUL 2016 | AUG 2016 | SEP 2016 | OCT 2016 | NOV 2016 | DEC 2016 | YTD 2016 |
|---|---|---|---|---|---|---|---|---|
| - | | | | | | | | - |
| 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 84,317 |
| 10,822 | 10,822 | 10,822 | 10,822 | 10,822 | 10,822 | 10,822 | 10,822 | 119,047 |
| 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 27,970 |
| - | | | | | | | | - |
| - | | | | | | | | - |
| - | - | - | - | - | - | - | - | - |
| 21,797 | 21,797 | 21,797 | 21,797 | 21,797 | 21,797 | 21,797 | 21,797 | 231,333 |
| 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 15,757 |
| 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 17,548 |
| 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 104,760 |
| 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 41,250 |
| 258 | 258 | 258 | 258 | 258 | 258 | 258 | 258 | 3,101 |
| 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 182,416 |
| 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 33,000 |
| 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 43,423 |
| | | | | | | | | 7,608 |
| 1,444 | 1,444 | 1,444 | 1,444 | 1,444 | 1,444 | | | 12,992 |
| - | - | - | - | - | - | - | - | - |
| 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 44,000 |
| | | | | | | | | 4,795 |
| 12,391 | 12,391 | 12,391 | 12,391 | 12,391 | 12,391 | 10,948 | 10,948 | 145,818 |
| 49,702 | 49,702 | 49,702 | 49,702 | 49,702 | 49,702 | 48,258 | 48,258 | 559,568 |



|  | JAN 2017 | FEB 2017 | MAR 2017 | APR 2017 | MAY 2017 | JUN 2017 | JUL 2017 | AUG 2017 |
|---|---|---|---|---|---|---|---|---|
|  | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 |
|  | - | - | - | - | - | - | - | - |
|  | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
|  | - | - | - | - | - | - | - | - |
|  | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 |
|  | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 |
|  | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 |
|  | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 |
|  | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
|  | 258 | 258 | 258 | 258 | 258 | 258 | 258 | 258 |
|  | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 |
|  | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
|  | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 |
|  | - | - | - | - | - | - | - | - |
|  | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
|  | 10,948 | 10,948 | 10,948 | 10,948 | 10,948 | 10,948 | 10,948 | 10,948 |
|  | 37,436 | 37,436 | 37,436 | 37,436 | 37,436 | 37,436 | 37,436 | 37,436 |

EXHIBIT 
Page 4 Of 18

| | SEP 2017 | OCT 2017 | NOV 2017 | DEC 2017 | YTD 2017 | | JAN 2018 | FEB 2018 | MAR 2018 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | - | | | | |
| | 8,432 | 8,432 | 8,432 | 8,432 | 101,180 | | 8,432 | 8,432 | 8,432 |
| | - | - | - | - | - | | | | |
| | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 | | 2,543 | 2,543 | 2,543 |
| | | | | | - | | | | |
| | | | | | - | | | | |
| | - | - | - | - | - | | - | - | - |
| | 10,974 | 10,974 | 10,974 | 10,974 | 131,692 | | 10,974 | 10,974 | 10,974 |
| | | | | | | | | | |
| | 1,313 | 1,313 | 1,313 | 1,313 | 15,757 | | 1,313 | 1,313 | 1,313 |
| | 1,462 | 1,462 | 1,462 | 1,462 | 17,548 | | 1,462 | 1,462 | 1,462 |
| | 8,730 | 8,730 | 8,730 | 8,730 | 104,760 | | 8,730 | 8,730 | 8,730 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 45,000 | | 3,750 | 3,750 | 3,750 |
| | 258 | 258 | 258 | 258 | 3,101 | | 258 | 258 | 258 |
| | 15,514 | 15,514 | 15,514 | 15,514 | 186,166 | | 15,514 | 15,514 | 15,514 |
| | | | | | | | | | |
| | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 | | 3,000 | 3,000 | 3,000 |
| | 3,948 | 3,948 | 3,948 | 3,948 | 47,370 | | 3,948 | 3,948 | 3,948 |
| | | | | | - | | | | |
| | | | | | - | | | | |
| | | | | | - | | | | |
| | | - | - | - | - | | | - | - |
| | 4,000 | 4,000 | 4,000 | 4,000 | 48,000 | | 4,000 | 4,000 | 4,000 |
| | | | | | - | | 1,456 | 1,456 | 1,456 |
| | 10,948 | 10,948 | 10,948 | 10,948 | 131,370 | | 12,404 | 12,404 | 12,404 |
| | | | | | | | | | |
| | 37,436 | 37,436 | 37,436 | 37,436 | 449,229 | | 38,892 | 38,892 | 38,892 |

EXHIBIT _C_

Page _5_ Of _18_

Case 14-63530-fra11    Doc 261    Filed 10/23/15

| | APR 2018 | MAY 2018 | JUN 2018 | JUL 2018 | AUG 2018 | SEP 2018 | OCT 2018 | NOV 2018 | DEC 2018 |
|---|---|---|---|---|---|---|---|---|---|
| | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 |
| | - | - | - | - | - | - | - | - | - |
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| | - | - | - | - | - | - | - | - | - |
| | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 |
| | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 |
| | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 |
| | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | 258 | 258 | 258 | 258 | 258 | 258 | 258 | 258 | 258 |
| | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 |
| | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 |
| | - | - | - | - | - | - | - | - | - |
| | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 |
| | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 |

EXHIBIT 
Page _____ Of _18_

| YTD 2018 | JAN 2019 | FEB 2019 | MAR 2019 | APR 2019 | MAY 2019 | JUN 2019 | JUL 2019 |
|---|---|---|---|---|---|---|---|
| - | | | | | | | |
| 101,180 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 |
| - | - | - | - | - | - | - | - |
| 30,512 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| - | | | | | | | |
| - | | | | | | | |
| - | - | - | - | - | - | - | - |
| 131,692 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 |
| | | | | | | | |
| 15,757 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 |
| 17,548 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 | 1,462 |
| 104,760 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 | 8,730 |
| 45,000 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| 3,101 | 258 | 258 | 258 | 258 | 258 | 258 | 258 |
| 186,166 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 | 15,514 |
| | | | | | | | |
| 36,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| 47,370 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 | 3,948 |
| - | | | | | | | |
| - | | | | | | | |
| | | | | | | | |
| - | - | - | - | - | - | - | - |
| 48,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| 17,472 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| 148,842 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 | 12,404 |
| | | | | | | | |
| 466,701 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 | 38,892 |

EXHIBIT _C_
Page __7__ Of _18_



| AUG 2019 | SEP 2019 | OCT 2019 | NOV 2019 | DEC 2019 | YTD 2019 | JAN 2020 | FEB 2020 |
|---|---|---|---|---|---|---|---|
| | | | | | - | | |
| 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 101,180 | 8,432 | 8,432 |
| - | - | | | | - | | |
| 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 | 2,543 | 2,543 |
| | | | | | - | | |
| | | | | | - | | |
| - | - | - | - | - | - | - | - |
| 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 131,692 | 10,974 | 10,974 |
| 1,313 | 1,313 | | | | 11,817 | | |
| 1,462 | 1,462 | | | | 13,161 | | |
| 8,730 | 8,730 | | | | 78,570 | | |
| 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 45,000 | 3,750 | 3,750 |
| 258 | 258 | 258 | 258 | | 2,843 | | |
| 15,514 | 15,514 | 4,008 | 4,008 | 3,750 | 151,391 | 3,750 | 3,750 |
| | | | | | 21,000 | | |
| 3,948 | 3,948 | 3,948 | 3,948 | 14,243 | 57,666 | 14,243 | 14,243 |
| | | | | | - | | |
| | | | | | - | | |
| - | - | - | - | - | - | - | - |
| 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 48,000 | 4,000 | |
| 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 17,472 | 1,456 | 1,456 |
| 9,404 | 9,404 | 9,404 | 9,404 | 19,699 | 144,138 | 19,699 | 15,699 |
| 35,892 | 35,892 | 24,386 | 24,386 | 34,423 | 427,222 | 34,423 | 30,423 |

EXHIBIT 
Page 8 Of 13

| MAR 2020 | APR 2020 | MAY 2020 | JUN 2020 | JUL 2020 | AUG 2020 | SEP 2020 | OCT 2020 | NOV 2020 |
|---|---|---|---|---|---|---|---|---|
| 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 | 8,432 |
| 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| - | - | - | - | - | - | - | - | - |
| 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 | 10,974 |
| 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 |
| | | | | | | | - | - |
| - | - | - | - | - | - | - | - | - |
| 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 |
| 30,423 | 30,423 | 30,423 | 30,423 | 30,423 | 30,423 | 30,423 | 30,423 | 30,423 |



| DEC 2020 | YTD 2020 | | JAN 2021 | FEB 2021 | MAR 2021 | APR 2021 | MAY 2021 | JUN 2021 |
|---|---|---|---|---|---|---|---|---|
| | - | | | | | | | |
| 8,432 | 101,180 | | 8,432 | 8,432 | | | | |
| | - | | | | | | | |
| 2,543 | 30,512 | | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| | - | | | | | | | |
| | - | | | | | | | |
| - | - | | - | - | - | - | - | - |
| 10,974 | 131,692 | | 10,974 | 10,974 | 2,543 | 2,543 | 2,543 | 2,543 |
| | - | | | | | | | |
| | - | | | | | | | |
| | - | | | | | | | |
| 3,750 | 45,000 | | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | - | | | | | | | |
| 3,750 | 45,000 | | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | - | | | | | | | |
| 14,243 | 170,916 | | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 |
| - | - | | - | - | - | - | - | - |
| | - | | | | | | | |
| - | - | | - | - | - | - | - | - |
| | 4,000 | | | | | | | |
| 1,456 | 17,472 | | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| 15,699 | 192,388 | | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 |
| 30,423 | 369,080 | | 30,423 | 30,423 | 21,992 | 21,992 | 21,992 | 21,992 |

EXHIBIT C
Page 16 Of 18

Case 14-63530-fra11    Doc 261    Filed 10/23/15



| | JUL 2021 | AUG 2021 | SEP 2021 | OCT 2021 | NOV 2021 | DEC 2021 | YTD 2021 | | JAN 2022 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 16,863 | | |
| | | | | | | | - | | |
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 | | 2,543 |
| | | | | | | | - | | |
| | | | | | | | - | | |
| | - | - | - | - | - | - | - | | - |
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 47,376 | | 2,543 |
| | | | | | | | - | | |
| | | | | | | | - | | |
| | | | | | | | - | | |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 45,000 | | 3,750 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 45,000 | | 3,750 |
| | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 170,916 | | 14,243 |
| | - | - | - | - | - | - | - | | 4,683 |
| | | | | | | | - | | |
| | - | - | - | - | - | - | - | | - |
| | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 17,472 | | 1,456 |
| | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 15,699 | 188,388 | | 20,382 |
| | 21,992 | 21,992 | 21,992 | 21,992 | 21,992 | 21,992 | 280,764 | | 26,674 |



| FEB 2022 | MAR 2022 | APR 2022 | MAY 2022 | JUN 2022 | JUL 2022 | AUG 2022 | SEP 2022 | OCT 2022 |
|---|---|---|---|---|---|---|---|---|
| 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| - | - | - | | | | | | |
| 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 |
| 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 |
| | | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 |
| | | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 |
| - | - | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| 20,382 | 20,382 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 |
| 26,674 | 26,674 | 32,270 | 32,270 | 32,270 | 32,270 | 32,270 | 32,270 | 32,270 |



| | NOV 2022 | DEC 2022 | YTD 2022 | | JAN 2023 | FEB 2023 | MAR 2023 | APR 2023 | MAY 2023 |
|---|---|---|---|---|---|---|---|---|---|
| | | | - | | | | | | |
| | | | - | | | | | | |
| | 2,543 | 2,543 | 30,512 | | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| | | | - | | | | | | |
| | | | - | | | | | | |
| | 2,543 | 2,543 | 30,512 | | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| | | | - | | | | | | |
| | | | - | | | | | | |
| | 3,750 | 3,750 | 45,000 | | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | | | - | | | | | | |
| | 3,750 | 3,750 | 45,000 | | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| | 14,243 | 14,243 | 170,916 | | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 |
| | 4,683 | 4,683 | 56,193 | | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 |
| | | | - | | | | | | |
| | 1,283 | 1,283 | 11,546 | | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 |
| | 1,313 | 1,313 | 11,815 | | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 |
| | 3,000 | 3,000 | 27,000 | | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| | 1,456 | 1,456 | 17,472 | | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| | 25,977 | 25,977 | 294,941 | | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 |
| | 32,270 | 32,270 | 370,453 | | 32,270 | 32,270 | 32,270 | 32,270 | 32,270 |

EXHIBIT C
Page 13 Of 18

Case 14-63530-fra11    Doc 261    Filed 10/23/15

| | JUN 2023 | JUL 2023 | AUG 2023 | SEP 2023 | OCT 2023 | NOV 2023 | DEC 2023 | YTD 2023 |
|---|---|---|---|---|---|---|---|---|
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 |
| | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | | | 37,500 |
| | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | - | - | 37,500 |
| | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 170,916 |
| | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 56,193 |
| | | | | | | | | - |
| | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 15,394 |
| | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 15,753 |
| | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 17,472 |
| | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 311,728 |
| | 32,270 | 32,270 | 32,270 | 32,270 | 32,270 | 28,520 | 28,520 | 379,740 |

EXHIBIT _C_
Page _14_ Of _18_

| JAN 2024 | FEB 2024 | MAR 2024 | APR 2024 | MAY 2024 | JUN 2024 | JUL 2024 | AUG 2024 | SEP 2024 |
|---|---|---|---|---|---|---|---|---|
| 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 |
| - | - | - | - | - | - | - | - | - |
| 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 |
| 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 |
| 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 |
| 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 |
| 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 |
| 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 |



| | OCT 2024 | NOV 2024 | DEC 2024 | YTD 2024 | | JAN 2025 | FEB 2025 | MAR 2025 | APR 2025 |
|---|---|---|---|---|---|---|---|---|---|
| | 2,543 | 2,543 | 2,543 | 30,512 | | 2,543 | 2,543 | 2,543 | 2,543 |
| | 2,543 | 2,543 | 2,543 | 30,512 | | 2,543 | 2,543 | 2,543 | 2,543 |
| | - | - | - | - | | - | - | - | - |
| | 14,243 | 14,243 | 14,243 | 170,916 | | 14,243 | 14,243 | 14,243 | 14,243 |
| | 4,683 | 4,683 | 4,683 | 56,193 | | 4,683 | 4,683 | 4,683 | 4,683 |
| | | | | - | | | | | |
| | 1,283 | 1,283 | 1,283 | 15,394 | | 1,283 | 1,283 | 1,283 | 1,283 |
| | 1,313 | 1,313 | 1,313 | 15,753 | | 1,313 | 1,313 | 1,313 | 1,313 |
| | 3,000 | 3,000 | 3,000 | 36,000 | | 3,000 | 3,000 | 3,000 | 3,000 |
| | 1,456 | 1,456 | 1,456 | 17,472 | | 1,456 | 1,456 | 1,456 | 1,456 |
| | 25,977 | 25,977 | 25,977 | 311,728 | | 25,977 | 25,977 | 25,977 | 25,977 |
| | 28,520 | 28,520 | 28,520 | 342,240 | | 28,520 | 28,520 | 28,520 | 28,520 |

EXHIBIT 
Page _16_ Of _18_

| MAY 2025 | JUN 2025 | JUL 2025 | AUG 2025 | SEP 2025 | OCT 2025 | NOV 2025 | DEC 2025 | YTD 2025 |
|---|---|---|---|---|---|---|---|---|
| 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 |
| 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 2,543 | 30,512 |
| - | - | - | - | - | - | - | - | - |
| 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 14,243 | 170,916 |
| 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 4,683 | 56,193 |
| | | | | | | | | - |
| 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 15,394 |
| 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 1,313 | 15,753 |
| 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 | 17,472 |
| 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 25,977 | 311,728 |
| 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 28,520 | 342,240 |



| Total Paid To-Date | | |
|---|---|---|
| 1,824,400 | | |
| 505,901 | | |
| 137,047 | | |
| 312,830 | | |
| 760,432 | | |
| - | | |
| 124,167 | | |
| | | |
| 59,087 | | |
| 65,805 | | |
| 392,850 | | |
| 348,750 | | |
| 12,146 | | |
| | | |
| 126,000 | | |
| 1,221,326 | | 123,813 |
| 7,608 | | |
| 224,771 | | |
| 25,978 | | |
| 57,728 | | |
| 59,075 | | |
| 135,000 | | 502,000 |
| 246,976 | 3,024 | |
| 144,571 | | |
| | | |
| 6,792,448 | | |

EXHIBIT _C_
Page _18_ Of _18_

EXHIBIT 1

Page 2 of 4

Laura L. Hagemann
dba Valley Rolling Corporation
Post Petition Operating Forecast
Weeks Ended 10-09-15

| Description | Oct 2014 Actual | Variance (Dollars) | OCT 2014 11/29/14 to 11/29/14 | 11/16/14 11/23/14 | 11/16/14 11/23/14 | Variance (Dollars) | Nov 2014 Forecast | Variance (Dollars) | NOV 2014 Forecast | Week 12/06/14 | Week 12/13/14 | Week 12/20/14 | Week 12/27/14 | Variance (Dollars) | Dec 2014 Actual | Week 12/31/14 | Week 12/31/14 | January Actual | Variance (Dollars) | DEC 2014 10/30/15 | July Actual | August Actual | September Actual | Week 10/30/15 | Week Actual | Variance (Dollars) | October Forecast | Variance (Dollars) | Partition Total 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Material Sales

Cost of Sales

Manufacturing Expenses

Total Manufacturing Expenses

Total Cost of Sales

Gross Profit

Selling Expenses

Total Selling Expenses

Administrative Expenses

Total Administrative Expenses

Laura L. Hagerman
dba Valley Rolling Corporation
Post Petition Operating Forecast
Week Ended 10-10-15

**Description**

Delivery Expenses:
- Wages/Labor
- Fringe Benefits
- Truck Driver Expense
- Cellular Phone / Truck
- Truck Expense
- Truck Tracking
- Truck Tolls
- Trailer Expense
- Gas/Diesel
- Gas/Fuel (Pickup)
- Pickup Expense
- H'way & Fuel Tax (IDOT Fees)
- Freight Expense (Outgoing)

Total Delivery Expense

Net Income (Loss) from Operation

Other (Income) Expenses:
- Bank Charges
- Finance Charges
- Discounts (Earned)
- Interest Expense (See Below)
- Pre-Petition Interest
- Chapter 11 Quarterly Fees
- Vendor Rebate
- Adequate Protection Payments

Total Other (Income) Expense

Net Income

Total Wages & Salaries:
- Manufacturing Expenses
- Selling Expenses
- Administrative Expenses
- Delivery Expenses

Total Wages & Salaries

Net Delivery Expense
Delivery COS %

Adequate Protection Payments
Key Bank
- SBA (DscLmmv)
- OH ADJ Impairment
- MWVCDG - VDI
- Internal Revenue Service

Total Adequate Protection Payments

Costs Included Above
- Adequate Protection Payments
- Principal portion of payments

Total Paid to Secured Creditors

EXHIBIT 4
Page of 4

Valley Rolling Corporation
Operating Forecast
2013

| Description | JAN 2013 Actual | FEB 2013 Actual | MAR 2013 Actual | APR 2013 Actual | MAY 2013 Actual | JUN 2013 Actual | JUL 2013 Actual | AUG 2013 Actual | SEP 2013 Actual | OCT 2013 Actual | NOV 2013 Actual | DEC 2013 Actual | YTD Total | YTD % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Material Sales | 508,327 | 428,129 | 459,899 | 613,232 | 610,124 | 744,365 | 650,590 | 734,325 | 847,033 | 756,417 | 592,790 | 540,919 | 7,486,149 | 101.2% |
| Labor/Handling Charges | | 75 | 100 | | 600 | | | 50 | 150 | | 50 | 50 | 3,137 | 0.0% |
| Freight & Pkg. Revenue | 1,503 | 1,345 | 903 | 2,242 | 2,615 | 2,369 | 2,202 | 2,770 | 3,383 | 4,323 | 2,184 | 6,837 | 32,667 | 0.4% |
| Common Carrier Revenue | 4,156 | 4,636 | 8,797 | 12,224 | 9,489 | 10,111 | 4,851 | 10,764 | 4,103 | 6,728 | 9,266 | 11,623 | 96,749 | 1.3% |
| Multi-Bldg Item Category Discount | (787) | (377) | (428) | (184) | (331) | (171) | (348) | (385) | (420) | | (42) | (42) | 1,138 | 0.0% |
| Discounts Allowed | (15,424) | (13,781) | (14,388) | (18,801) | (18,709) | (21,610) | (26,627) | (19,112) | (19,324) | (27,452) | (20,736) | (8,033) | (223,997) | -3.0% |
| **Total Sales** | 497,771 | 419,952 | 454,859 | 608,814 | 603,188 | 735,663 | 630,658 | 728,412 | 834,925 | 739,638 | 583,512 | 558,445 | 7,395,852 | 100.0% |
| | 6.7% | 5.7% | 6.2% | 8.2% | 8.2% | 9.9% | 8.5% | 9.8% | 11.3% | 10.0% | 7.9% | 7.6% | | 100.0% |
| **Cost of Sales** | | | | | | | | | | | | | | |
| Materials | 347,658 | 316,525 | 363,291 | 445,186 | 420,350 | 524,161 | 456,845 | 519,847 | 603,015 | 525,643 | 410,273 | 381,489 | 5,314,422 | 71.9% |
| Scrap | (433) | 283 | (940) | (898) | | 2,024 | 2,274 | (250) | 1,178 | (682) | | 559 | 3,082 | 0.0% |
| Freight In | (732) | | 25 | | | (200) | | | 13,000 | | 1,300 | | 13,426 | 0.2% |
| **Total Material Costs** | 346,493 | 316,808 | 362,350 | 444,313 | 420,350 | 525,985 | 459,119 | 519,597 | 617,333 | 524,960 | 411,573 | 382,048 | 5,330,930 | 72.1% |
| | 69.6% | 75.4% | 79.7% | 73.0% | 69.7% | 71.5% | 72.8% | 71.3% | 73.9% | 71.0% | 70.5% | 68.4% | | 72.1% |
| **Delivery Expenses** | | | | | | | | | | | | | | |
| Wages/Labor | 14,578 | 15,188 | 23,026 | 20,076 | 19,307 | 24,906 | 17,524 | 22,491 | 20,593 | 20,440 | 20,830 | 14,431 | 233,388 | 3.2% |
| Fringe Benefits | | | | | | | | | | | 500 | | 500 | 0.0% |
| Independent Contractor/Driver | 4,225 | 4,225 | 5,436 | 6,647 | 4,761 | 5,413 | 5,921 | 4,711 | 4,711 | 3,688 | 3,688 | 3,688 | 57,113 | 0.8% |
| Truck Driver Expense | 253 | 522 | | 1,653 | 494 | 2,460 | 300 | 1,444 | 2,026 | 880 | 522 | 3,681 | 14,233 | 0.2% |
| Cellular Phone /Truck | 117 | 60 | 119 | 51 | 178 | 131 | 131 | 119 | 95 | 121 | 120 | 177 | 1,488 | 0.0% |
| Truck Expense | 16 | 121 | 463 | 51 | | 129 | 59 | 80 | | 1,290 | | 569 | 2,834 | 0.0% |
| Truck Tracking | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 4,044 | 0.1% |
| Truck Lease | 8,436 | 11,442 | 10,557 | 8,436 | 10,733 | 13,339 | 11,053 | 8,505 | 10,582 | 10,345 | 12,585 | 7,255 | 123,267 | 1.7% |
| Trailer Expense | 123 | 443 | (21) | 193 | 337 | 3,454 | 4,114 | 2,767 | 222 | 1,292 | 2,275 | 49 | 14,910 | 0.2% |
| Gas/Fuel | 9,343 | 11,567 | 8,992 | 13,980 | 12,833 | 13,999 | 9,706 | 12,392 | 12,710 | 12,978 | 7,791 | 10,123 | 136,414 | 1.8% |
| Gas/Fuel (Pickup) | 1,060 | 1,065 | 243 | 473 | 652 | 1,352 | 876 | 1,037 | 1,859 | 2,620 | 1,921 | 4,081 | 17,239 | 0.2% |
| Pickup Expense | 973 | 393 | 11 | 277 | (133) | 24 | 51 | 14 | 818 | 617 | 29 | | 3,081 | 0.0% |
| H/wy. & Fuel Tax (ODOT Fees) | 3,238 | 2,675 | 2,449 | 2,601 | 3,909 | 4,326 | 3,291 | 3,707 | 2,945 | 3,571 | 5,638 | 5,477 | 43,626 | 0.6% |
| Freight Expense (Outgoing) | 1,012 | 633 | 504 | 1,022 | 522 | 818 | 970 | 589 | 147 | 1,371 | 664 | 1,501 | 9,753 | 0.1% |
| **Total Delivery Expense** | 43,710 | 48,670 | 52,118 | 55,864 | 53,593 | 70,688 | 54,333 | 58,191 | 57,101 | 59,548 | 56,898 | 51,377 | 662,091 | 9.0% |
| | 8.8% | 11.6% | 11.5% | 9.2% | 8.9% | 9.6% | 8.6% | 8.0% | 6.8% | 8.1% | 9.8% | 9.2% | | 9.0% |
| **Manufacturing Expenses** | | | | | | | | | | | | | | |
| Propane | 99 | 523 | 189 | 561 | 519 | 390 | 416 | (22) | 802 | 450 | 950 | 418 | 5,293 | 0.1% |
| Wages/Labor | 9,148 | 10,081 | 13,518 | 9,755 | 17,091 | 12,408 | 13,138 | 18,380 | 16,678 | 18,565 | 18,093 | 20,012 | 176,867 | 2.4% |
| Fringe Benefits | 5,776 | 5,776 | 5,776 | 4,376 | 4,225 | 4,225 | 4,225 | 4,225 | 4,225 | 4,225 | 4,225 | 4,425 | 55,705 | 0.8% |
| Payroll Taxes | 4,794 | 5,198 | 6,069 | 5,355 | 6,745 | 7,542 | 5,368 | 6,644 | 5,983 | 6,126 | 5,918 | 4,990 | 70,731 | 1.0% |
| Workers Comp | | 633 | 633 | 316 | 633 | 633 | 633 | 1,100 | 633 | 633 | 1,300 | 200 | 7,349 | 0.1% |
| Supplies | 3,488 | (437) | 1,904 | 2,254 | 1,288 | 665 | 3,498 | 3,612 | 454 | 2,889 | 2,807 | (1,120) | 21,302 | 0.3% |
| Packaging | 337 | 542 | | 76 | 95 | 59 | | | | | 7 | 7 | 1,369 | 0.0% |
| Health & Safety | 1,032 | 1,058 | 1,030 | 1,016 | 1,044 | 1,156 | 1,098 | 1,270 | 1,136 | 1,204 | 1,114 | 1,062 | 13,220 | 0.2% |
| Power & Electricity | (294) | 98 | 120 | 120 | 71 | 120 | 84 | | | | 235 | 73 | 893 | 0.0% |
| Water & Sewer | | | | 850 | | 899 | 250 | | | | 125 | | 1,128 | 0.0% |
| Garbage | 297 | 240 | 184 | 104 | 71 | | 180 | 180 | 180 | 128 | 125 | 125 | 1,245 | 0.0% |
| Gas | (129) | 184 | | | | 2 | 22 | 17 | 16 | 180 | 41 | 236 | | 0.0% |
| Maintenance | | 1,765 | 529 | 1,688 | 670 | 492 | 140 | 222 | 5 | 4,334 | 218 | 632 | 10,565 | 0.0% |

Valley Rolling Corporation  
Operating Forecast  
2013

| Description | JAN 2013 Actual | FEB 2013 Actual | MAR 2013 Actual | APR 2013 Actual | MAY 2013 Actual | JUN 2013 Actual | JUL 2013 Actual | AUG 2013 Actual | SEP 2013 Actual | OCT 2013 Actual | NOV 2013 Actual | DEC 2013 Actual | YTD Total | YTD % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shop Tools | 17 | | 42 | 18 | 147 | 18 | 171 | 117 | | 82 | 56 | 122 | 772 | 0.0% |
| Rent | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 300,000 | 4.1% |
| Misc. Mfg. Expense | 423 | 839 | 1,175 | 890 | 684 | 340 | 340 | 487 | 371 | (261) | 514 | 514 | 6,228 | 0.6% |
| Insurance | 4,626 | 4,626 | 4,626 | 9,280 | | | | 4,099 | 4,291 | 3,480 | 3,576 | 3,302 | 41,906 | 0.6% |
| Property Taxes | | | | | 3,311 | | | | 4,000 | 5,357 | 4,339 | 4,562 | 21,569 | 0.3% |
| Depreciation | 139 | 139 | 139 | 139 | 139 | 139 | 139 | 139 | 139 | 139 | 139 | 139 | 1,667 | 0.0% |
| **Total Manufacturing Expense** | 54,752 | 56,081 | 60,934 | 60,081 | 61,783 | 54,089 | 54,224 | 65,720 | 64,038 | 72,631 | 68,513 | 65,038 | 737,883 | 10.0% |
| | 11.0% | 13.4% | 13.4% | 9.9% | 10.2% | 7.4% | 8.6% | 9.0% | 7.7% | 9.8% | 11.7% | 11.6% | | 10.0% |
| **Total Cost of Goods Sold** | 444,955 | 421,558 | 475,402 | 560,258 | 535,725 | 650,762 | 567,676 | 643,560 | 738,472 | 657,140 | 536,984 | 498,463 | 6,730,904 | 91.0% |
| | 89.4% | 100.4% | 104.5% | 92.0% | 88.8% | 88.5% | 90.0% | 88.3% | 88.4% | 88.8% | 92.0% | 89.3% | | 91.0% |
| **Gross Profit** | 52,820 | (1,606) | (20,544) | 48,556 | 67,463 | 84,901 | 62,992 | 84,904 | 96,453 | 82,498 | 46,528 | 59,982 | 664,949 | 9.0% |
| | 10.6% | -0.4% | -4.5% | 8.0% | 11.2% | 11.5% | 10.0% | 11.7% | 11.6% | 11.2% | 8.0% | 10.7% | | 9.0% |
| **Selling Expense** | | | | | | | | | | | | | | |
| Advertising | 370 | 298 | 2,800 | 623 | 3,441 | 2,480 | 2,446 | 508 | 1,178 | | 119 | 747 | 15,011 | 0.2% |
| Travel - Car | | 982 | 323 | 1,777 | 1,007 | 812 | 806 | 347 | 595 | 86 | 1,295 | 1,767 | 9,797 | 0.1% |
| Meals & Entertainment | | 99 | | 275 | 117 | 131 | | | | | 32 | 522 | 1,176 | 0.0% |
| Travel - Hotel & Air | | | | 96 | | | | | 26 | | | | 122 | 0.0% |
| Cellular Phone - Sales | 57 | | 29 | 24 | 48 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 242 | 0.0% |
| **Total Selling Expense** | 427 | 1,379 | 3,152 | 2,794 | 4,613 | 3,435 | 3,264 | 868 | 1,811 | 98 | 1,457 | 3,049 | 26,348 | 0.4% |
| | 0.1% | 0.3% | 0.7% | 0.5% | 0.8% | 0.5% | 0.5% | 0.1% | 0.2% | 0.0% | 0.2% | 0.5% | | 0.4% |
| **Administrative Exps.** | | | | | | | | | | | | | | 0.0% |
| Wages & Salaries | 17,248 | 18,418 | 16,603 | 16,604 | 29,305 | 27,580 | 20,551 | 24,914 | 22,688 | 25,030 | 25,525 | 19,452 | 263,916 | 3.6% |
| Fringe Benefits | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 5,972 | 71,661 | 1.0% |
| Travel - Car | | | | | | | | | | | | | 14 | 0.0% |
| Meals & Entertainment | | | | | | | | | | | | | | 0.0% |
| Sales Commission | | | | 54 | | 55 | | | | | 209 | 185 | 504 | 0.0% |
| Office Expenses | | | | 1,000 | | | | | | | | | 1,000 | 0.0% |
| Misc. Expenses | 641 | 319 | 81 | 1,017 | 709 | 984 | 729 | 624 | 1,759 | 1,943 | 129 | 933 | 9,867 | 0.1% |
| Accounting Fees | | | 600 | | | | | | | | | | 600 | 0.0% |
| Legal Fees | | 3,000 | | 4,950 | | | 4,550 | | | | | | 12,500 | 0.2% |
| Collection Expense | | | | | (33) | 505 | | | 1,348 | | | | 1,901 | 0.0% |
| Com/Software Support/Data/Web | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 8,640 | 0.1% |
| Telephone/Admin | 666 | 637 | 666 | 654 | 691 | 672 | 668 | 689 | 703 | 712 | 721 | 699 | 8,179 | 0.1% |
| Cellular Phone/Admin (Prod) | 252 | | 221 | 223 | 880 | 441 | 208 | 439 | 441 | 427 | 427 | 387 | 4,344 | 0.1% |
| Postage | 577 | | | 410 | 200 | | 210 | | 210 | 400 | 190 | 272 | 2,433 | 0.0% |
| Data Processing Supplies | 136 | 135 | 136 | | | | 1,350 | | 136 | 464 | | 100 | 2,515 | 0.0% |
| Dues & Subscriptions | 440 | 20 | | | (786) | | 479 | | 162 | | | | 1,326 | 0.0% |
| Health/Safety/Emp. Incentive | 467 | 725 | | | 925 | | 330 | | 971 | 40 | 375 | 968 | 4,828 | 0.1% |
| Licenses/Permits | | | | | 286 | | | | | 136 | | | 422 | 0.0% |
| Officers Life Insurance | | | | | | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 436 | 0.0% |
| Service Contracts (Copier, Etc.) | | | | | | | | | 2,048 | | | | | 0.0% |

**Valley Rolling Corporation**
**Operating Forecast**
**2013**

| Description | JAN 2013 Actual | FEB 2013 Actual | MAR 2013 Actual | APR 2013 Actual | MAY 2013 Actual | JUN 2013 Actual | JUL 2013 Actual | AUG 2013 Actual | SEP 2013 Actual | OCT 2013 Actual | NOV 2013 Actual | DEC 2013 Actual | YTD Total | YTD % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lease/Copier | 870 | 870 | 870 | 870 | 870 | 870 | 870 | 870 | 870 | 870 | 870 | 485 | 10,055 | 0.1% |
| Security Monitoring | | | | | | 965 | | 165 | | | | 165 | 1,625 | 0.0% |
| Telephone Sys. Lease (ESI 100) | 494 | 996 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 6,428 | 0.1% |
| Outside Services | | 3,250 | 3,250 | 1,920 | 2,800 | 2,860 | 2,870 | 1,340 | 885 | 2,580 | 2,040 | 220 | 24,015 | 0.3% |
| Amortization Expense | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 2,316 | 0.0% |
| **Total Administrative Exps.** | 28,676 | 34,693 | 30,531 | 36,100 | 43,391 | 42,387 | 40,256 | 36,481 | 41,563 | 40,042 | 37,927 | 32,827 | 444,874 | 6.0% |
| *(% of Revenue)* | 5.8% | 8.3% | 6.7% | 5.9% | 7.2% | 5.8% | 6.4% | 5.0% | 5.0% | 5.4% | 6.5% | 5.9% | | 6.0% |
| **Other (Income) Exp.** | | | | | | | | | | | | | | |
| Bad Debts | | | | | | | | | | | | | | |
| Bank Charges | | | | | | | | | | 11,485 | | | 11,485 | 0.2% |
| Finance Charges | 1,793 | 1,603 | 1,405 | 1,201 | 1,290 | 1,315 | 1,797 | 181 | 1,855 | 1,013 | 431 | 51 | 13,935 | 0.2% |
| Discounts Earned | 387 | 4,156 | 937 | 13,526 | 8,892 | 5,792 | 4,538 | 333 | 4,162 | 9,960 | 28 | 7,837 | 60,547 | 0.8% |
| Interest Expense | (11) | (35) | (36) | (70) | (22) | (23) | (14) | (46) | (83) | (227) | (149) | (20) | (734) | 0.0% |
| Commitment Fees | 4,365 | 2,124 | 1,924 | 6,276 | 1,931 | 19,836 | 2,213 | 4,770 | 3,643 | 4,779 | 4,766 | 4,516 | 61,144 | 0.8% |
| Vendor Rebate | | | | | | | | | | | | | | 0.0% |
| Interest Income | | (3,014) | | | | | | (0) | | | | | (3,014) | 0.0% |
| Placeholder/(Suspense) | 450 | | (7,233) | | | | | | | | | | (0) | 0.0% |
| **Total Other (Income) Expense** | 6,985 | 6,782 | (3,003) | 20,934 | 12,092 | 26,921 | 8,533 | 5,238 | 9,576 | 27,011 | 5,075 | 12,384 | 143,364 | 1.9% |
| *(% of Revenue)* | 1.4% | 2.8% | -0.7% | 3.4% | 2.0% | 3.7% | 1.4% | 0.7% | 1.1% | 3.7% | 0.9% | 2.2% | | 1.9% |
| **Total S+G+A+O Expense** | 36,089 | 47,690 | 30,680 | 59,828 | 60,096 | 72,743 | 52,053 | 42,587 | 52,950 | 67,152 | 44,459 | 48,250 | 614,586 | 8.3% |
| *(% of Revenue)* | 7.2% | 11.4% | 6.7% | 9.8% | 10.0% | 9.9% | 8.3% | 5.8% | 6.3% | 9.1% | 7.6% | 8.6% | | 8.3% |
| **Net Income** | 16,732 | (49,296) | (51,223) | (11,221) | 7,367 | 12,159 | 10,939 | 42,317 | 43,503 | 15,346 | 2,069 | 11,722 | 50,363 | 0.7% |
| *(% of Revenue)* | 3.4% | -11.7% | -11.3% | -1.9% | 1.2% | 1.7% | 1.7% | 5.8% | 5.2% | 2.1% | 0.4% | 2.1% | | 0.7% |

Laura L. Hagenauer
dba Valley Rolling Corporation
_[Post Petition Operating Forecast_]
2014-2015

| _[Description _] | _[JAN_] 2014 [Actual_] | _[FEB_] 2014 [Actual_] | _[MAR_] 2014 [Actual_] | _[APR_] 2014 [Actual_] | _[MAY_] 2014 [Actual_] | _[JUN_] 2014 [Actual_] | _[JUL_] 2014 [Actual_] | _[AUG_] 2014 [Actual_] |
|---|---|---|---|---|---|---|---|---|
| _[Material Sales_] | 524,191 | 429,233 | 538,174 | 583,034 | 647,391 | 728,200 | 704,783 | 834,072 |
| _[Labor/Handling Charges_] | 75 | 100 | 195 | 200 | 25 | (150) | - | 15 |
| _[Freight & Pkg. Revenue_] | 1,903 | 4,298 | 1,465 | 1,870 | 2,125 | 1,792 | 1,230 | 1,801 |
| _[Common Carrier Revenue_] | 4,076 | 8,483 | 9,646 | 11,311 | 4,011 | 12,733 | 6,815 | 13,284 |
| _[Multi-Bldg Item Category Discount] | - | - | - | (935) | (986) | - | - | - |
| _[Discounts Allowed_] | (11,388) | (10,315) | (16,146) | (11,679) | (26,120) | (27,196) | (34,006) | (32,416) |
| _[Total Sales_] | 518,856 | 431,798 | 533,334 | 583,701 | 626,446 | 715,379 | 678,820 | 816,756 |
| | | | | | | | | |
| _[Cost of Sales_] | 0.68 | 0.70 | 0.70 | 0.70 | 0.69 | 0.70 | 0.70 | 0.69 |
| _[Materials_] | 356,873 | 299,907 | 374,288 | 409,823 | 447,909 | 510,023 | 492,261 | 576,719 |
| _[Scrap_] | 651 | 577 | (2,403) | 1,961 | 1,880 | (34) | 135 | (866) |
| _[Freight In_] | 1,302 | 2,743 | 12 | 4,192 | - | 1,074 | - | 10 |
| _[Total Material Costs_] | 358,826 | 303,227 | 371,897 | 415,975 | 449,789 | 511,063 | 492,396 | 575,863 |
| _[Gross Profit_] | 160,030 | 128,570 | 161,437 | 167,726 | 176,656 | 204,316 | 186,424 | 240,893 |
| | 30.8% | 29.8% | 30.3% | 28.7% | 28.2% | 28.6% | 27.5% | 29.5% |
| | | | | | | | | |
| _[Manufacturing Expenses_] | | | | | | | | |
| _[Propane_] | 454 | 412 | 30 | 1,018 | 529 | 445 | 269 | 727 |
| _[Wages/Labor_] | 15,355 | 12,840 | 15,955 | 14,472 | 20,180 | 13,932 | 14,175 | 22,034 |
| _[Fringe Benefits_] | 4,485 | 4,485 | 4,485 | 4,485 | 4,485 | 4,485 | 4,485 | 4,485 |
| _[Payroll Taxes_] | 6,087 | 4,693 | 5,278 | 5,052 | 6,552 | 4,882 | 4,772 | 6,491 |
| _[Workers Comp_] | 1,500 | 7,510 | - | 3,730 | 3,083 | 2,940 | 2,227 | 2,500 |
| _[Supplies_] | 34 | - | 23 | - | 65 | - | - | - |
| _[Packaging_] | 5,949 | (5,725) | 5,574 | 2,748 | 308 | 3,509 | 1,148 | (1,051) |
| _[Health & Safety_] | 17 | 298 | 120 | 60 | 75 | - | - | - |
| _[Power & Electricity_] | 1,309 | 1,119 | 1,066 | 1,092 | 1,071 | 1,125 | 1,295 | 1,206 |
| _[Water & Sewer_] | 128 | 128 | 125 | 128 | 128 | 125 | 125 | 125 |
| _[Garbage_] | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 |
| _[Gas_] | 528 | 362 | 239 | 131 | 57 | 10 | 16 | 16 |
| _[Maintenance_] | 760 | 960 | 520 | 201 | 739 | 4,993 | 90 | 2,255 |
| _[Shop Tools_] | 149 | 125 | 35 | 142 | 113 | 35 | - | - |
| _[Misc Mfg. Expense_] | 645 | 440 | 542 | 548 | 228 | 329 | 269 | 269 |
| _[Insurance_] | 3,297 | 2,582 | 2,582 | 2,339 | 2,600 | 2,023 | 2,600 | 2,582 |
| _[Property Taxes_] | 4,335 | 4,339 | 4,339 | 4,000 | 4,000 | 4,000 | 4,339 | 4,339 |
| _[Total Manufacturing Expense_] | 44,836 | 34,747 | 41,082 | 38,325 | 44,393 | 43,014 | 35,990 | 45,158 |
| _[%% of Sales_] | 8.6% | 8.0% | 7.7% | 6.6% | 7.1% | 6.0% | 5.3% | 5.5% |
| | | | | | | | | |
| _[Total Cost of Sales_] | 403,662 | 337,974 | 412,979 | 454,300 | 494,182 | 554,077 | 528,386 | 621,021 |
| | 77.8% | 78.3% | 77.4% | 77.8% | 78.9% | 77.5% | 77.8% | 76.0% |
| | | | | | | | | |
| _[Gross Profit_] | 115,194 | 93,823 | 120,355 | 129,401 | 132,264 | 161,302 | 150,434 | 195,736 |
| | 22.2% | 21.7% | 22.6% | 22.2% | 21.1% | 22.5% | 22.2% | 24.0% |
| _[Selling Expense_] | | | | | | | | |
| _[Wages & Salaries_] | | | | | | | | 4,349 |
| _[Fringe Benefits_] | | | | | | | | - |
| _[Advertising_] | 810 | 2,502 | 1,424 | 4,982 | 641 | 939 | 4,963 | 884 |
| _[Travel - Car_] | 341 | 1,284 | 1,206 | 360 | 732 | 381 | 796 | 476 |
| _[Meals & Entertainment_] | - | - | 58 | 54 | 90 | - | - | 37 |
| _[Travel - Hotel & Air_] | 453 | - | 168 | 694 | 96 | - | - | 1,344 |
| _[Cellular Phone - Sales_] | 12 | 12 | 12 | 51 | 53 | 53 | 54 | 106 |

Laura L. Hagenauer
dba Valley Rolling Corporation
_(Post Petition Operating Forecast_)
2014-2015

| _(Description_) | _(JAN_) 2014 (Actual_) | _(FEB_) 2014 (Actual_) | _(MAR_) 2014 (Actual_) | _(APR_) 2014 (Actual_) | _(MAY_) 2014 (Actual_) | _(JUN_) 2014 (Actual_) | _(JUL_) 2014 (Actual_) | _(AUG_) 2014 (Actual_) |
|---|---|---|---|---|---|---|---|---|
| _(Total Selling Expense_) | 1,617 | 3,799 | 2,868 | 6,140 | 3,612 | 1,373 | 5,814 | 7,196 |
| _(Administrative Expenses_) | | | | | | | | |
| _(Wages & Salaries_) | 20,083 | 16,579 | 21,351 | 21,451 | 27,706 | 21,180 | 22,444 | 24,007 |
| _(Fringe Benefits_) | 6,340 | 6,340 | 6,340 | 5,771 | 5,771 | 5,771 | 5,771 | 5,771 |
| _(Travel - Car_) | | | | | | | | |
| _(Meals & Entertainment_) | - | - | - | - | 47 | 156 | - | - |
| _(Office Expenses_) | 275 | 697 | 598 | 1,134 | 1,146 | 2,077 | 4,186 | 1,882 |
| _(Misc Expenses_) | | | | | | | | |
| _(Professional_) | - | 1,882 | 304 | - | 5,726 | - | - | - |
| _(Collection Expense_) | | | | | | 119 | | |
| _(Com/Software Support/Data/Web_) | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 |
| _(Telephone/Admin_) | 665 | 658 | 665 | 677 | 688 | 687 | 943 | 690 |
| _(Cellular Phone/Admin (Prod)_) | 387 | 440 | 260 | 209 | 385 | 385 | 758 | 397 |
| _(Postage_) | 268 | 10 | 268 | 156 | 156 | 156 | 156 | 156 |
| _(Data Processing Supplies_) | 1,350 | 235 | 325 | 376 | | | | |
| _(Dues & Subscriptions_) | 20 | 885 | 20 | - | 40 | 20 | - | 73 |
| _(Health/Safety/Emp. Incentive_) | | 496 | 1,257 | 874 | 580 | 789 | - | 2,375 |
| _(Licenses/Permits_) | | | | | 86 | | | 86 |
| _(Officer's Life Insurance_) | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 |
| _(Service Contracts (Copier, Etc)_) | | | | | | | 3,508 | |
| _(Lease/Copier_) | 870 | 870 | 870 | 870 | 870 | 870 | 870 | 870 |
| _(Security Monitoring_) | | | 565 | 965 | 165 | | | |
| _(Telephone Sys. Lease (ES-100)_) | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 494 |
| _(Outside Services_) | 520 | 890 | 120 | 2,000 | | 1,320 | 520 | 1,000 |
| _(Total Administrative Expenses_) | 32,054 | 31,258 | 33,720 | 34,759 | 44,642 | 34,807 | 40,431 | 38,916 |
| _(Delivery Expenses_) | | | | | | | | |
| _(Wages/Labor_) | 37,342 | 11,926 | 9,907 | 9,787 | 11,836 | 11,273 | 10,051 | 14,426 |
| _(Fringe Benefits_) | 3,399 | 3,399 | 5,099 | 5,099 | 6,184 | 6,184 | 6,184 | 6,184 |
| _(Truck Driver Expense_) | 587 | 457 | 52 | 868 | 689 | 158 | 1,252 | 634 |
| _(Cellular Phone /Truck_) | 197 | 119 | 287 | 423 | 187 | 187 | 251 | 164 |
| _(Truck Expense_) | | 152 | 345 | 416 | | 162 | 410 | |
| _(Truck Tracking_) | 337 | 337 | 337 | 337 | 337 | 337 | 337 | 337 |
| _(Truck Lease_) | 9,496 | 6,917 | 9,792 | 10,312 | 11,894 | 9,592 | 8,683 | 10,252 |
| _(Trailer Expense_) | 439 | 184 | 377 | 748 | 300 | 1,920 | 114 | 3,306 |
| _(Gas/Fuel_) | 8,088 | 7,867 | 13,912 | 11,739 | 10,916 | 10,425 | 14,931 | 12,358 |
| _(Gas/Fuel (Pickup)_) | 1,839 | 1,484 | 1,624 | 1,137 | 1,560 | 1,614 | 1,368 | 1,444 |
| _(Pickup Expense_) | 42 | 4 | 255 | 61 | 93 | | | |
| _(H/wy. & Fuel Tax (ODO) Fees_) | 801 | 949 | 2,292 | 4,096 | 3,420 | 2,950 | 3,140 | 4,160 |
| _(Freight Expense (Outgoing)_) | 496 | 504 | 727 | 1,105 | 1,173 | 411 | 973 | 857 |
| _(Total Delivery Expense_) | 43,063 | 34,300 | 45,056 | 45,928 | 48,590 | 45,203 | 47,694 | 54,122 |
| _(% of Sales_) | 8.3% | 7.0% | 8.4% | 7.9% | 7.8% | 6.7% | 7.0% | 6.6% |
| _(Net Income (Loss) from Operations_) | 38,463 | 24,467 | 38,711 | 42,573 | 37,420 | 79,920 | 56,496 | 95,501 |
| _(Other (Income) Exp_) | | | | | | | | |
| _(Bank Charges_) | 60 | 213 | 241 | 3,482 | 1,327 | 689 | 884 | 1,328 |
| _(Finance Charges_) | 2,079 | 332 | (404) | 941 | 140 | 96 | (252) | 223 |
| _(Discounts Earned_) | (167) | (76) | (12) | (77) | (71) | (107) | (154) | (116) |



EXHIBIT
Page 5 of 16

Laura L. Hagenauer
dba Valley Rolling Corporation
_(Post Petition Operating Forecast_)
2014-2015

| _(Description _) | _(JAN_) 2014 (Actual ) | _(FEB_) 2014 (Actual ) | _(MAR_) 2014 (Actual ) | _(APR_) 2014 (Actual ) | _(MAY_) 2014 (Actual ) | _(JUN_) 2014 (Actual ) | _(JUL_) 2014 (Actual ) | _(AUG_) 2014 (Actual ) |
|---|---|---|---|---|---|---|---|---|
| _(Interest Expense_) | 5,960 | 7,939 | 8,489 | 9,304 | 10,121 | 7,292 | 7,045 | 10,653 |
| _(Pre-Petition Interest_) | | | | | | | | |
| _(Chapter 11 Quarterly Fees_) | | | | | | | | |
| _(Vendor Rebate_) | . | . | (6,032) | . | . | . | . | . |
| _(Adequate Protection Payments_) | | | | | | | | |
| _(Total Other (Income) Expense_) | 7,931 | 8,409 | 2,282 | 11,649 | 11,516 | 7,969 | 7,524 | 11,986 |
| | | | | | | | | |
| _(Net Income_) | 30,530 | 16,058 | 34,429 | 30,824 | 25,804 | 71,951 | 48,872 | 83,516 |
| | 5.9% | 3.7% | 6.8% | 5.3% | 4.1% | 10.1% | 7.2% | 10.2% |
| | | | | | | | | |
| _(Total Wages & Salaries_) | | | | | | | | |
| _(Manufacturing Expenses_) | 15,355 | 12,840 | 15,955 | 14,472 | 20,180 | 13,932 | 14,175 | 22,034 |
| _(Selling Expense_) | . | . | . | . | . | . | . | 4,349 |
| _(Administrative Expenses_) | 20,083 | 16,579 | 21,353 | 21,452 | 27,706 | 21,180 | 22,444 | 24,007 |
| _(Delivery Expenses_) | 27,342 | 11,926 | 9,907 | 9,787 | 11,836 | 11,273 | 10,051 | 14,426 |
| _(Total Wages & Salaries_) | 52,780 | 41,346 | 47,213 | 45,711 | 59,722 | 46,385 | 46,670 | 64,817 |
| _(%% of Sales_) | 10.2% | 9.6% | 8.9% | 7.8% | 9.5% | 6.5% | 6.9% | 7.9% |
| _(P/R Tax as %% of Total labor_) | 13.5% | 13.4% | 12.2% | 11.1% | 11.0% | 10.5% | 10.2% | 10.0% |
| | | | | | | | | |
| _(Net Delivery Exp _) | 38,987 | 25,817 | 35,410 | 34,618 | 44,578 | 32,470 | 40,878 | 40,838 |
| _(Delivery COS %% ) | 7.6% | 6.0% | 6.6% | 5.9% | 6.9% | 4.5% | 5.8% | 4.9% |
| | | | | | | | | |
| _(YTD Delivery Exp _) | 38,987 | 64,804 | 100,214 | 134,832 | 179,411 | 211,881 | 252,759 | 293,597 |
| _(As %% of Sales _) | 7.51% | 6.82% | 6.75% | 6.52% | 6.66% | 6.21% | 6.18% | 5.99% |

_(Adequate Protection Payments:  _)
_(Key Bank LOC _)
_(Mortgage _)
_(SBA Loan_)
_(OBDF _)
_(COG _)
_(IRS _)
_(Less Principal included _)
_(Total Adequate Protection Payments_)

Laura L. Hagenauer
dba Valley Rolling Corporation
Actual - Pro Forma Balance Sheets
Week Ended 10-10-15

| Description | Mo. End 1/31/2015 Actual | Mo. End 2/28/2015 Actual | Mo. End 07/31/15 Actual | Mo. End 08/31/15 Actual | Week 09/05/15 Actual | Week 09/12/15 Actual | Week 09/19/15 Actual | Week 09/26/15 Actual | Week 09/30/15 Actual | Week 10/10/15 Actual |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | |
| Cash | 19,012 | 13,541 | 16,565 | (491) | 3,901 | 10,001 | 57,328 | 17,363 | 5,737 | 25,126 |
| Admin Cash | | | 63,830 | 92,338 | 92,338 | 92,338 | 92,338 | 92,338 | 92,338 | 92,338 |
| Accounts Receivable- Post Pet. | 491,157 | 504,149 | 527,664 | 501,369 | 529,637 | 521,375 | 510,640 | 505,366 | 552,022 | 488,197 |
| Accounts Receivable- Pre-Pet. | 17,080 | 8,358 | 1,839 | 1,839 | 1,839 | 1,839 | 881 | 881 | 881 | 881 |
| Employee Advances | | | | | | | | | | |
| Prepaid Insurance | 10,931 | 10,931 | 10,931 | 10,931 | 10,931 | 10,931 | 10,931 | 10,931 | 10,931 | 10,931 |
| Other Prepaid Expenses | 55,989 | 52,775 | 52,775 | 52,775 | 52,775 | 52,775 | 52,775 | 52,775 | 52,775 | 52,775 |
| Total Inventories | 708,583 | 708,805 | 706,150 | 721,068 | 741,661 | 730,850 | 732,960 | 760,432 | 754,254 | 756,622 |
| Total Current Assets | 1,302,753 | 1,298,560 | 1,379,754 | 1,379,829 | 1,433,083 | 1,420,110 | 1,457,853 | 1,440,086 | 1,468,938 | 1,426,870 |
| Fixed Assets-Valley | 766,110 | 766,110 | 766,110 | 766,110 | 766,110 | 766,110 | 766,110 | 766,110 | 766,110 | 766,110 |
| Land & Buildings | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 | 3,775,000 |
| DeLammc Equipment | 251,661 | 251,661 | 251,661 | 251,661 | 251,661 | 251,661 | 251,661 | 251,661 | 251,661 | 251,661 |
| Assets - DeLammc | 917,858 | 917,858 | 917,858 | 917,858 | 917,858 | 917,858 | 917,858 | 917,858 | 917,858 | 917,858 |
| Less Accumulated Depreciation | (761,918) | (761,918) | (761,918) | (761,918) | (761,918) | (761,918) | (761,918) | (761,918) | (761,918) | (761,918) |
| Leasehold Improvements - Net | 1,166 | 1,166 | 1,166 | 1,166 | 1,166 | 1,166 | 1,166 | 1,166 | 1,166 | 1,166 |
| Admin Equip. - Net | 2,567 | 2,567 | 2,567 | 2,567 | 2,567 | 2,567 | 2,567 | 2,567 | 2,567 | 2,567 |
| Total Fixed Assets - Net | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 | 4,952,444 |
| Other Assets | | | | | | | | | | |
| Loan to Officer | 420,203 | 420,203 | 420,203 | 420,203 | 420,203 | 420,203 | 420,203 | 420,203 | 420,203 | 420,203 |
| Loan Fee - Net | 53,547 | 53,547 | 53,547 | 53,547 | 53,547 | 53,547 | 53,547 | 53,547 | 53,547 | 53,547 |
| Organizational Fees - Net | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 | 7,454 |
| Total Other Assets | 481,204 | 481,204 | 481,204 | 481,204 | 481,204 | 481,204 | 481,204 | 481,204 | 481,204 | 481,204 |
| **TOTAL ASSETS** | 6,736,401 | 6,732,208 | 6,813,402 | 6,813,477 | 6,866,731 | 6,853,758 | 6,891,501 | 6,873,734 | 6,902,586 | 6,860,518 |
| **LIABILITIES & EQUITY** | | | | | | | | | | |
| Accounts Payable- Post-Pet. | 8,038 | 8,224 | 28,475 | 9,152 | 49,219 | 42,263 | 66,031 | 35,458 | 49,019 | 6,614 |
| Key Bank Credit Line | | | | | | | | | | |
| New Credit Line | | | | | | | | | | |
| 401 (K) Payable | 126,709 | 126,709 | 126,709 | 126,709 | 126,709 | 126,709 | 126,709 | 126,709 | 126,709 | 126,709 |
| Sales Tax Payable | 2,759 | 3,623 | 3,441 | 4,729 | 5,063 | 6,187 | 6,187 | 6,221 | 6,294 | 6,896 |

(698)

| Description | Mo. End 1/31/2015 Actual | Mo. End 2/28/2015 Actual | Mo. End 07/31/15 Actual | Mo. End 08/31/15 Actual | Week 09/05/15 Actual | Week 09/12/15 Actual | Week 09/19/15 Actual | Week 09/26/15 Actual | Week 09/30/15 Actual | Week 10/10/15 Actual |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Current Liabilities | 137,505 | 138,556 | 158,625 | 140,589 | 180,991 | 175,158 | 198,927 | 168,387 | 182,022 | 140,218 |
| | | | | | | | | | | |
| Key Bank | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 | 2,104,747 |
| OR. Business Development | 242,680 | 238,600 | 234,520 | 234,520 | 234,520 | 234,520 | 234,520 | 234,520 | 234,520 | 234,520 |
| FOR A Financial | 43,239 | 43,239 | 43,239 | 43,239 | 43,239 | 43,239 | 43,239 | 43,239 | 43,239 | 43,239 |
| Pre-Pet. Unsecured A/P DeLammc | 302,042 | 302,042 | 302,042 | 302,042 | 302,042 | 302,042 | 302,042 | 302,042 | 302,042 | 302,042 |
| MWVCOG - VDI | 225,685 | 225,012 | 221,796 | 221,102 | 221,102 | 220,404 | 220,404 | 220,404 | 220,404 | 220,404 |
| SBA DeLammc | 846,309 | 844,418 | 836,678 | 836,678 | 836,678 | 836,678 | 836,678 | 836,678 | 836,678 | 836,678 |
| Pre-Pet. Unsecured Credit Cards | 163,193 | 163,193 | 163,193 | 163,193 | 163,193 | 163,193 | 163,193 | 163,193 | 163,193 | 163,193 |
| Cascadia Payable DeLammc | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| Accounts Payable- Pre-Pet. | 652,095 | 652,095 | 652,095 | 652,095 | 652,095 | 652,095 | 652,095 | 652,095 | 652,095 | 652,095 |
| Internal Revenue Service | 418,789 | 418,789 | 418,789 | 418,789 | 418,789 | 418,789 | 418,789 | 418,789 | 418,789 | 418,789 |
| Oregon Excise Tax | | | | | | | | | | |
| | | | | | | | | | | |
| Total Long Term Debt | 5,598,778 | 5,592,133 | 5,577,098 | 5,576,404 | 5,576,404 | 5,575,706 | 5,575,706 | 5,575,706 | 5,575,706 | 5,575,706 |
| Total Liabilities | 5,736,283 | 5,730,689 | 5,735,723 | 5,716,993 | 5,757,395 | 5,750,864 | 5,774,633 | 5,744,093 | 5,757,728 | 5,715,924 |
| | | | | | | | | | | |
| Common Stock | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Paid-In Capital - Valley | 237,000 | 237,000 | 237,000 | 237,000 | 237,000 | 237,000 | 237,000 | 237,000 | 237,000 | 237,000 |
| Paid-In Capital - DeLammc | 163,782 | 163,782 | 163,782 | 163,782 | 163,782 | 163,782 | 163,782 | 163,782 | 163,782 | 163,782 |
| Sub-S Distribution | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) | (1,529,552) |
| Retained Earnings at 09-28-14 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 | 1,963,561 |
| YTD Net Income (Loss) | 139,815 | 139,815 | 139,815 | 139,815 | 139,815 | 139,815 | 139,815 | 139,815 | 139,815 | 139,815 |
| Post Petition Earnings | 5,512 | 6,913 | 83,074 | 101,879 | 114,730 | 108,288 | 122,263 | 135,035 | 150,252 | 149,988 |
| Total Equity | 1,000,118 | 1,001,519 | 1,077,679 | 1,096,485 | 1,109,336 | 1,102,894 | 1,116,868 | 1,129,640 | 1,144,858 | 1,144,593 |
| **TOTAL LIABILITIES & EQUITY** | 6,736,401 | 6,732,208 | 6,813,402 | 6,813,477 | 6,866,731 | 6,853,758 | 6,891,501 | 6,873,734 | 6,902,586 | 6,860,518 |
| | | | | | | | | | | |
| Check | | | | | | | | | | |
| | | | | | | | | | | |
| Beginning A/C Receivable | 485,210 | 538,699 | 532,928 | 552,492 | 503,208 | 531,476 | 523,214 | 511,520 | 506,247 | 552,903 |
| Plus Sales - Net | 93,868 | 149,826 | 140,687 | 138,388 | 108,069 | 166,890 | 110,355 | 155,365 | 112,891 | 653,570 |
| Less Cash Receipts | (70,840) | (176,018) | (144,112) | (187,672) | (79,801) | (175,152) | (122,049) | (160,639) | (66,235) | (717,396) |
| Ending A/C Rec. | 508,238 | 512,507 | 529,503 | 503,208 | 531,476 | 523,214 | 511,520 | 506,247 | 552,903 | 489,077 |
| | | | | | | | | | | |
| Beginning Inventory | 699,679 | 688,333 | 696,149 | 719,776 | 721,068 | 741,661 | 730,850 | 732,960 | 760,432 | 754,254 |

EXHIBIT F
Page 2 of 3

Laura L. Hagenauer
dba Valley Rolling Corporation
Actual - Pro Forma Balance Sheets
Week Ended 10-10-15

| Description | Mo. End 1/31/2015 Actual | Mo. End 2/28/2015 Actual | Mo. End 07/31/15 Actual | Mo. End 08/31/15 Actual | Week 09/05/15 Actual | Week 09/12/15 Actual | Week 09/19/15 Actual | Week 09/26/15 Actual | Week 09/30/15 Actual | Week 10/10/15 Actual |
|---|---|---|---|---|---|---|---|---|---|---|
| Purchases | 74,041 | 119,652 | (73,966) | (95,785) | (55,760) | (135,711) | (79,543) | (81,226) | (73,421) | (456,480) |
| Material COS | (65,137) | (99,180) | 83,967 | 97,078 | 76,353 | 124,901 | 81,653 | 108,698 | 67,244 | 458,848 |
| Ending Inventory | 708,583 | 708,805 | 706,150 | 721,068 | 741,661 | 730,850 | 732,960 | 760,432 | 754,254 | 756,622 |
| | | | | | | | | | | |
| Beginning A/C Payable | 12,217 | 36,754 | 35,620 | (2,888) | 9,152 | 49,219 | 42,263 | 66,031 | 35,458 | 49,019 |
| Total Expenses (Excl COS) | 5,567 | 48,120 | 31,268 | 40,179 | 18,757 | 47,324 | 14,048 | 33,891 | 9,915 | 123,934 |
| Payments on Non-Debt Liability. | (9,746) | (76,651) | (38,412) | (28,140) | 21,311 | (54,280) | 9,721 | (64,464) | 3,647 | (166,339) |
| Ending A/C Payable | 8,038 | 8,224 | 28,475 | 9,152 | 49,219 | 42,263 | 66,031 | 35,458 | 49,019 | 6,614 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Net Income (Loss) | 13,414 | 17,151 | 5,341 | (16,494) | 12,851 | (6,442) | 13,974 | 12,772 | 15,217 | (264) |
| Petty Cash (Increase) Decrease | | | | | | | | | | |
| A/R (Increase) Decrease | (23,027) | 26,192 | 3,425 | 49,284 | (28,268) | 8,262 | 11,694 | 5,274 | (46,656) | 63,826 |
| Inventory (Increase) Decrease | (8,904) | (20,472) | (10,001) | (1,292) | (20,593) | 10,811 | (2,110) | (27,472) | 6,178 | (2,368) |
| Other Current Assets (Incr) Decr | | | | | | | | | | |
| Fixed Assets (Incr) Decr | | | | | | | | | | |
| Other Assets (Incr) Decr | | | | | | | | | | |
| Increase (Decrease) in A/P & Liab. | (3,992) | (28,343) | (7,023) | 12,450 | 40,402 | (5,833) | 23,769 | (30,540) | 13,635 | (41,804) |
| Increase (Decrease) Pre-Pet. LTD | | | 205 | | | (698) | | | | |
| Increase(Decrease) in DeLammc Pd in Cap. (Decrease) in Sub S. Distrib. | | | | | | | | | | |
| | | | | | | | | | | |
| Beginning Cash Balance | 41,522 | 19,013 | 88,449 | 47,900 | 91,847 | 96,239 | 102,339 | 149,667 | 109,701 | 98,075 |
| Ending Cash Balance | 19,013 | 13,541 | 80,395 | 91,847 | 96,239 | 102,339 | 149,667 | 109,701 | 98,075 | 117,464 |
| | | | | | | | | | | |
| Cash Incr (Decr) During Period. | (22,510) | (20,131) | (8,054) | 43,947 | 4,392 | 6,100 | 47,327 | (39,966) | (11,626) | 19,389 |

**Fill in this information to identify your case:**

Debtor 1 __Laura Lee Hagenauer__
First Name    Middle Name    Last Name

Debtor 2
(Spouse, if filing) First Name    Middle Name    Last Name

United States Bankruptcy Court for the District of Oregon

Case number __14-63530-fra11__
(if known)

Check if this is:

☐ An amended filing

☐ A supplement showing post-petition chapter 13 expenses as of the following date:

_____
MM / DD / YYYY

☐ A separate filing for Debtor 2 because Debtor 2 maintains a separate household

Official Form 6J

# Schedule J: Your Expenses

12/13

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach another sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

## Part 1: Describe Your Household

1. **Is this a joint case?**

   ☑ No. Go to line 2.
   ☐ Yes. **Does Debtor 2 live in a separate household?**

        ☐ No
        ☐ Yes. Debtor 2 must file a separate Schedule J.

2. **Do you have dependents?**

   Do not list Debtor 1 and Debtor 2.

   Do not state the dependents' names.

   ☐ No
   ☑ Yes. Fill out this information for each dependent ..........

| Dependent's relationship to Debtor 1 or Debtor 2 | Dependent's age | Does dependent live with you? |
|---|---|---|
| __Daughter__ | __18__ | ☐ No ☑ Yes |
| | | ☐ No ☐ Yes |
| | | ☐ No ☐ Yes |
| | | ☐ No ☐ Yes |
| | | ☐ No ☐ Yes |

3. **Do your expenses include expenses of people other than yourself and your dependents?**

   ☑ No
   ☐ Yes

## Part 2: Estimate Your Ongoing Monthly Expenses

Estimate your expenses as of your bankruptcy filing date unless you are using this form as a supplement in a Chapter 13 case to report expenses as of a date after the bankruptcy is filed. If this is a supplemental *Schedule J*, check the box at the top of the form and fill in the applicable date.

Include expenses paid for with non-cash government assistance if you know the value of such assistance and have included it on *Schedule I: Your Income* (Official Form 6I.)

|  |  | | Your expenses |
|---|---|---|---|
| 4. | The rental or home ownership expenses for your residence. Include first mortgage payments and any rent for the ground or lot. | 4 | $ __1,967.00__ |
| | If not included in line 4: | | |
| 4a | Real estate taxes | 4a | $ __0.00__ |
| 4b | Property, homeowner's, or renter's insurance | 4b | $ __0.00__ |
| 4c | Home maintenance, repair, and upkeep expenses | 4c | $ __225.00__ |
| 4d | Homeowner's association or condominium dues | 4d | $ __0.00__ |

Official Form 6J      Schedule J: Your Expenses      page 1

EXHIBIT __G__
Page __1__ Of __3__

Debtor 1 __Laura Lee Hagenauer__     Case number *if known* __14-63530-fra11__
First Name    Middle Name    Last Name

| | | Your expenses |
|---|---|---|
| 5 | Additional mortgage payments for your residence, such as home equity loans | 5 | $ 0.00 |
| 6 | **Utilities:** | | |
| | 6a. Electricity, heat, natural gas | 6a | $ 148.00 |
| | 6b. Water, sewer, garbage collection | 6b | $ 0.00 |
| | 6c. Telephone, cell phone, Internet, satellite, and cable services | 6c | $ 251.00 |
| | 6d. Other. Specify: _____ | 6d | $ 0.00 |
| 7 | **Food and housekeeping supplies** | 7. | $ 260.00 |
| 8 | **Childcare and children's education costs** | 8 | $ 0.00 |
| 9 | **Clothing, laundry, and dry cleaning** | 9 | $ 50.00 |
| 10 | **Personal care products and services** | 10. | $ 95.00 |
| 11 | **Medical and dental expenses** | 11 | $ 300.00 |
| 12 | **Transportation.** Include gas, maintenance, bus or train fare. Do not include car payments. | 12. | $ 500.00 |
| 13 | **Entertainment, clubs, recreation, newspapers, magazines, and books** | 13 | $ 200.00 |
| 14 | **Charitable contributions and religious donations** | 14 | $ 100.00 |
| 15 | **Insurance.** Do not include insurance deducted from your pay or included in lines 4 or 20. | | |
| | 15a. Life insurance | 15a | $ 0.00 |
| | 15b. Health insurance | 15b | $ 0.00 |
| | 15c. Vehicle insurance | 15c. | $ 300.00 |
| | 15d. Other insurance. Specify: _____ | 15d. | $ 0.00 |
| 16 | **Taxes.** Do not include taxes deducted from your pay or included in lines 4 or 20. Specify: _____ | 16. | $ 0.00 |
| 17 | **Installment or lease payments:** | | |
| | 17a. Car payments for Vehicle 1 | 17a | $ 0.00 |
| | 17b. Car payments for Vehicle 2 | 17b | $ 0.00 |
| | 17c. Other. Specify: _____ | 17c. | $ 0.00 |
| | 17d. Other. Specify: _____ | 17d. | $ 0.00 |
| 18 | **Your payments of alimony, maintenance, and support that you did not report as deducted from your pay on line 5, *Schedule I, Your Income* (Official Form 6I).** | 18 | $ 0.00 |
| 19 | **Other payments you make to support others who do not live with you.** Specify: _____ | 19 | $ 0.00 |
| 20 | **Other real property expenses not included in lines 4 or 5 of this form or on *Schedule I: Your Income.*** | | |
| | 20a. Mortgages on other property | 20a | $ 0.00 |
| | 20b. Real estate taxes | 20b. | $ 0.00 |
| | 20c. Property, homeowner's, or renter's insurance | 20c. | $ 0.00 |
| | 20d. Maintenance, repair, and upkeep expenses | 20d. | $ 0.00 |
| | 20e. Homeowner's association or condominium dues | 20e. | $ 0.00 |

Official Form 6J          Schedule J: Your Expenses

EXHIBIT G      page 2
Page 2 Of 3

Debtor 1    __Laura Lee Hagenauer_____
     First Name    Middle Name      Last Name

Case number (if known) __14-63530-fra11_____

21. **Other**. Specify. _____     21.   +$ _____0.00_____

22. **Your monthly expenses.** Add lines 4 through 21.
The result is your monthly expenses.     22.   $ ____4,396.00____

23. **Calculate your monthly net income.**

   23a.   Copy line 12 (*your combined monthly income*) from *Schedule I*.     23a.   $ ____4,745.00____

   23b.   Copy your monthly expenses from line 22 above.     23b.   − $ ____4,396.00____

   23c.   Subtract your monthly expenses from your monthly income.
The result is your *monthly net income*.     23c.   $ ____349.00____

24. **Do you expect an increase or decrease in your expenses within the year after you file this form?**

For example, do you expect to finish paying for your car loan within the year or do you expect your
mortgage payment to increase or decrease because of a modification to the terms of your mortgage?

☐ No.

☑ Yes.   **Car payment paid in full after November 2014. Payment amount for October and November is $1,135.00**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF OREGON

In Re:                     )

                             )    Case No. 14-63530-fra11

LAURA LEE HAGENAUER     )

                             )    VOTING BALLOT FOR ACCEPTING

         Debtor.        )    OR REJECTING DEBTORS' PLAN

Filed By: _____ on: _____
             Creditor                               Date

Designated Class Number: _____

      The Plan referred to in this Ballot can be confirmed by the Court and thereby made binding on you if it is accepted by the holders of two-thirds in total dollar amount and more than one-half in number of claims in each class voting on the Plan. If the requisite acceptances are not obtained, the Court may confirm the Plan if it finds that the Plan accords fair and equitable treatment to the class rejecting it. You must complete and return this Ballot for your vote to count. Only those Ballots actually received by the voting deadline will be counted as either accepting or rejecting the Plan.

      **You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. If you hold claims or equity interests in more than one class, you will receive a Ballot for each class in which you are entitled to vote.**

      The undersigned: (check one box)

        ☐ ACCEPTS THE PLAN       ☐ REJECTS THE PLAN

      The Debtor's Plan of Reorganization.

Dated: _____

Print or type name: _____

Signature: _____

Title (if corporation or partnership) _____

Address: _____

Return this Ballot on or before the date specified by the Court in the order accompanying the Plan and Disclosure Statement to:

Ted A. Troutman
Troutman Law Firm, P.C.
5075 SW Griffith Dr., Ste 220
Beaverton, OR 97005

**THIS FORM DOES NOT CONSTITUTE A PROOF OF CLAIM AND MUST NOT BE USED TO FILE A CLAIM OR TO INCREASE ANY AMOUNT LISTED IN THE DEBTOR'S SCHEDULES.**

Exhibit H

September 16, 2015

FOR VALUE RECEIVED, and in consideration of the mutual promises contained in this **SALE AGREEMENT** (the "**Agreement**"), the undersigned **LAURA LEE HAGENAUER** ("Seller") agrees to sell, and the undersigned **R & R PROPERTY HOLDINGS, INC., a Washington corporation** ("Purchaser") agrees to purchase, subject to the conditions stated in this Agreement, the following property, situated in the State of Oregon ("Title Company") to-wit: **the buildings, the cranes and other improvements on the property that are used in connection with the building, and land located at 3071 Schmidt Lane NE, Hubbard, OR 97032, as more particularly described in the attached Exhibit A** (collectively, the "**Property**"), on the following terms and conditions:

**1. PURCHASE PRICE.** The purchase price ("Purchase Price") for the Property shall be TWO MILLION SIX HUNDRED THOUSAND AND 00/100THS Dollars **($2,600,000.00 )**. The terms of such purchase shall be: **all cash at Closing**. This Agreement is not subject to (or conditioned upon) the need for Purchaser to obtain any financing on the Property.

**2. DEPOSIT AND ESCROW.** Purchaser will deposit in escrow an earnest money deposit in the amount of **TWENTY-FIVE THOUSAND DOLLARS ($25,000.00)** (the "Deposit"), within three business days after the Opening of Escrow . The escrow agent ("Escrow Agent") will be a branch office of a title company in Oregon ("Title Company") mutually acceptable to Seller and Purchaser. The earnest money deposit (the "Deposit") will be refunded to Purchaser if Purchaser terminates this Agreement during the Contingency Period described below. If this Agreement is not so terminated, the Deposit will become a forfeitable earnest money deposit and will be applied to the Purchase Price due at closing. This Agreement will constitute the parties' instructions to Escrow Agent; *provided*, that if Escrow Agent requires separate or additional instructions or information from the parties, the parties will reasonably and promptly execute such instructions and/or provide such information. The date on which Escrow Agent notifies the parties that it has received an executed copy or counterpart copy of this Agreement is the "Opening of Escrow."

**3. CONTINGENCY PERIOD AND APPROVAL BY PURCHASER.** The review and contingency period ("Contingency Period") for Purchaser to satisfy itself concerning inspections, investigations or other "due diligence" reviews of the Property will be as follows: **the Contingency Period will start on the date of this Agreement and will expire and terminate upon the date that is forty-five (45) days after the date of Opening of Escrow, within which Purchaser shall satisfy itself as to the following: (1) the physical condition of the Property including physical condition, zoning and use, (2) the environmental condition of the Property, including receipt of a "phase I" environmental assessment of the Property (as provided below), (3) all relevant business documents pertaining to the Property, including (without limitation) any existing reports or information in Seller's possession concerning the environmental condition of the Property, any surveys, any notices of violation in Seller's possession that pertain to the Property, any other studies or notices pertaining to the Property, and copies of any other written information in Seller's possession pertaining to the condition, use, operation or ownership of the Property that Purchaser may reasonably require, and (4) any other studies or matters that Purchaser chooses to review and that are pertinent to the Property.** During the Contingency Period, Purchaser may terminate the Agreement in its discretion, if Purchase determines that the contingencies are not satisfied. If it does so, any deposit made by Purchaser shall be refunded.

After mutual execution of this Agreement, the parties will order a "phase I" environmental assessment (the "Phase I Assessment") of the Property from an environmental consulting firm acceptable to Purchaser, which will be addressed jointly to Seller and Purchaser. Purchaser will pay for the cost of the Phase I Assessment at Closing (as provided below) or if the transaction fails to close solely because of Purchaser's default or refusal to close the purchase of the Property after removal of contingencies (and, otherwise, the cost of the Phase I Assessment will be paid by Seller or any overbidder who becomes the final purchaser of the Property pursuant to a Final Order, as defined and described below).

**4. TITLE REVIEW AND APPROVAL.** Upon mutual execution of this Agreement, Seller will furnish to Purchaser a preliminary title report showing the status of title to the Property, along with a legible copy of the exceptions to title shown in the title report. Purchaser will have fifteen (15) days after receipt of the title report to notify Seller as to any matter shown on the title report to which Purchaser objects. Any matter shown on the title report that Purchaser does not disapprove within such 15-day period will be deemed conclusively approved by Purchaser ("Permitted Exceptions"). Seller may, but will not be required to, elect to cure any disapproved title matter or notify Purchaser that Seller elects not to cure. If Seller elects to cure a disapproved title matter, Seller will have until Closing to cure the matter. If Seller elects not to cure or is unable to cure a disapproved title matter, Seller may so notify Purchaser, and Purchaser will have five (5) days after receipt of such notice to elect to waive any objection to the previously disapproved title matter, and if not so waived, this Agreement shall terminate. At Closing, an owner's title insurance policy will be issued to Purchaser, in form reasonably acceptable to Purchaser, insuring that Purchaser holds good and merchantable fee title to the Property, subject only to the Permitted Exceptions and any other exception specifically approved by Purchaser.

**5. BANKRUPTCY COURT APPROVAL.** The parties acknowledge that Seller is the subject of that certain bankruptcy case, Case No. 14-63530-FRAII (the "**Bankruptcy Case**"), which is pending in the United States Bankruptcy Court for the District of Oregon (the "**Bankruptcy Court**"). The parties further acknowledge that the transactions described in this Agreement are subject to the approval of the Bankruptcy Court and cannot be consummated without such approval. Seller shall file a motion with the Bankruptcy Court seeking the entry of an order (the "**Approval Order**") authorizing Seller to enter into this Agreement and consummate the transactions described herein. Purchaser shall use commercially reasonable efforts to cooperate with Seller in the filing of the motion for the Approval Order. The parties' obligations under this Agreement are conditioned upon the Approval Order becomes a Final Order. "**Final Order**" means that (i) the Approval Order has been entered in the Bankruptcy Case, and (ii) the period in which the Approval Order is subject to any rights of appeal, certiorari proceeding, or other proceeding for review or rehearing has ended, or if any appeal, certiorari proceeding or other review or rehearing occurs), has ended and the Approval Order is not subject to further rights of legal challenge.

**6. CLOSING.** The escrow shall be closed (the "Closing") on a date mutually acceptable to the parties ("Closing Date"), within fifteen (15) days after the date on which the conditions to Closing set forth above are satisfied. At Closing, the following will take place: (a) Seller will convey the Property to Purchaser pursuant to a good and sufficient, statutory warranty deed ("Deed") and bill of sale (the form of which will be approved by the parties within the Contingency Period); (b) the Title Company will commit to issue to Purchaser an owner's policy of title insurance, in the amount of the Purchase Price and subject to no liens or encumbrances, other than the Permitted Exceptions and any other exception specifically approved by Purchaser in its review of title; and (c) Purchaser will pay the Purchase Price to Seller.

Ex I

EXHIBIT I
Page 1 Of 5

Current property taxes shall be prorated as of the Closing Date (such property taxes, if not yet assessed, to be deemed equal to those for the last preceding year, subject to a post-Closing adjustment when the actual amount of property taxes becomes known). Seller and Purchaser shall equally divide the escrow fee, if the parties choose to close this transaction in escrow with the title company. The cost of the owner's policy of title insurance to be issued to Purchaser in the amount of the Purchase Price will be paid by Seller. Seller will be responsible for causing the Property to be released from the Bankruptcy Case and any liens on the Property, other than current property taxes. Purchaser will pay the recording fee for the Deed and the cost of its "due diligence" investigations. Each party will pay its own legal and consulting fees.

If any post-Closing reconciliation or adjustment is required between the parties pursuant to this Agreement (because of an adjustment or prorate that is done on an estimated basis, or otherwise), the parties will reasonably co-operate with each other to provide the information needed for such reconciliation and adjustment, and will promptly do the reconciliation and adjustment when the information is available to do so. If any other closing costs not specifically provided for herein are due at closing of this transaction, each party shall pay such closing costs as are normally and customarily the responsibility of such party. This paragraph 6 shall survive the Closing for all purposes.

**7.  UNTIL CLOSING; SELLER'S COOPERATION.** From the date of this Agreement until the Closing Date, Seller will continue to cause the Property to be maintained in substantially the same manner and condition which now exists, and will not further mortgage or further encumber its interest in the Property. Seller will cooperate in executing any documents and doing such other things as Purchaser may reasonably request in connection with Purchaser's due diligence activities; provided, that such actions will be at no out-of-pocket expense to Seller, and neither Seller nor the Property will be bound if Purchaser does not close the purchase of the Property.

**8.  CONDEMNATION.** If, prior to Closing, any part of the Property is condemned or appropriated by public authority or any party exercising the right of eminent domain, or is threatened thereby, then this Agreement shall, at the election of Purchaser, become null and void. In the event Purchaser elects not to terminate this Agreement, the purchase price shall be reduced by the amount of the Seller's award pertaining to the Property. Seller will promptly notify Purchaser as to the commencement of any such action known to Seller or any communication from a condemning authority that a condemnation or appropriation is contemplated, and will cooperate with Purchaser prior to Closing in the response to or defense of such actions in order to maximize the award.

**9.  NOTICES.** All notices given pursuant to this Agreement shall be in writing and shall either be (i) mailed by first class mail, postage prepaid, certified or registered with return receipt requested, (ii) delivered in person or by nationally recognized overnight courier, or (iii) sent by facsimile or as a PDF attachment to an email, if the party has specified a facsimile number or email address to use for notice purposes. Notices shall be effective when received (or deemed received by the party). Any notice transmitted by overnight courier service or by certified mail shall be deemed received as of the date of delivery to the address of the party, as confirmed by the overnight courier or as shown on the certified mail return receipt. Any such notice transmitted by facsimile shall be deemed received 12 hours after being telecopied and receipt has been confirmed either electronically or otherwise. Notice given to a party in any manner not specified above shall be effective only if and when received by the addressee as demonstrated by objective evidence in the possession of the sender. The address of each party to this Agreement for purposes of notice are as set forth below their signatures. A copy of any notice to either party will be sent to the party's legal counsel, as the party may designate. Each party may change its address for notice by giving not less than ten (10) days' prior notice of such change to the other party in the manner set forth above. Delivery of the copy of any notice to the places to which copies are to be sent is not a precondition to the effectiveness of the notice between the parties themselves.

For the purpose of this Agreement, the term "receipt" shall include the earlier of any of the following: (i) the date of actual receipt of the notice by the office of the person or entity pursuant to this Agreement, whether or not any named individual at such address receives the notice, or (ii) in the case of refusal to accept delivery or inability to deliver the notice because of the recipient's failure to maintain an address at which notices can be delivered, then the earlier of (A) the date of the attempted delivery or refusal to accept delivery, or (B) the date of receipt of notice of refusal or notice of non-delivery by the sending party.

**10. REPRESENTATIONS AND WARRANTIES.** Seller warrants and represents to Purchaser as follows: (1) to Seller's knowledge, the Property is not in violation of any zoning, land-use, environmental, public health, or safety laws; (2) to Seller's knowledge, the Property, buildings and improvements (including any HVAC, plumbing, life-safety and other installed building systems and cranes) are in good and working condition and free of any known defects; (3) Seller is not aware of any pending or threatened litigation affecting the Property; (4) Seller is not aware of any pending or threatened condemnation proceedings or change in zoning affecting the Property; and (5) this Agreement has been, and all the documents to be delivered by Seller to Purchaser at Closing will be, duly authorized, executed and delivered by Seller, are or will be legal, valid, and binding obligations of Seller, will be sufficient to convey title to the Property, are or will be enforceable in accordance with their respective terms, and do not and will not at Closing violate any provisions of any agreement to which Seller is a party or by which the Property is bound.

Seller represents that, to Seller's knowledge, (a) there are no known hazardous substances on, under, in or about the Property in violation of any applicable environmental laws; (b) there have been no known spills, releases, discharges or disposal of any hazardous substances that have occurred or are presently occurring on or onto the Property or off the Property as a result of any construction on or operation and use of the Property; (c) there are no known underground storage tanks located on or immediately adjacent to the Property; or (d) there is no known contamination in the ground water on, under or about the Property. The term "hazardous substances" does not include cleaning materials, landscape fertilizer and other products and materials ("Permitted Materials") typically used in the ordinary course of maintaining and operating a commercial property similar to the Property (provided such Permitted Materials are in ordinary quantities and have been used in accordance with applicable environmental laws).

As used in the Agreement, the terms "known" or "knowledge" (or similar terms) means the actual, conscious knowledge of facts by Seller (and does not include "constructive" knowledge or imply any particular duty of investigation of facts not actually known by Seller). Seller's representations and warranties are made as of the Effective Date and will be deemed to be re-made as of the Closing Date. This paragraph 10 will survive the Closing Date and be fully enforceable thereafter; provided, that Seller will not be deemed in breach of the representations or warranties in this Agreement or be liable to Purchaser for any claimed misrepresentation in this Agreement after the Closing Date on a representation made to Seller's knowledge unless Seller had actual knowledge on the Closing Date that the representation or warranty was false and failed to provide promptly the Discovery Notice (as defined and set forth

below) to disclose to Purchaser the matter, occurrence or condition that was discovered by or made known to Seller which made the representation or warranty false.

If, prior to the Closing, Seller obtains actual knowledge of a matter, occurrence or condition that would cause any representation made by Seller in this Agreement to be misleading or inaccurate, then (i) Seller will promptly notify Purchaser ("Discovery Notice") of the fact discovered by or made known to that would cause such any such representation to be misleading or inaccurate, and (ii) Purchaser will have the option to terminate this Agreement within five (5) days after receipt of such Discovery Notice if the matter, occurrence or event that was disclosed might adversely affect the value of the Property or Purchaser's ability to use the Property after the Closing Date. If Purchaser terminates this Agreement pursuant to this paragraph, the Deposit will be refunded to Purchaser, and neither party will have any further obligation to the other party under this Agreement (whether or not such events occur during or after the end of any contingency period provided in this Agreement).

## 11. REMEDIES; COSTS AND ATTORNEYS' FEES.

**11.1** <u>Seller's Default.</u> Seller shall be deemed to be in default under this Agreement if Seller fails, for any reason other than Purchaser's default under this Agreement, to meet, comply with, or perform any covenant, agreement, or obligation required on its part within the time limits and in the manner required in this Agreement, or a material breach shall have occurred of any representation or warranty made by Seller ("Seller's Default"). In the event of Seller's Default, Purchaser shall be entitled to exercise all remedies available under applicable law for breach of contract, including (without limitation) specific performance, and collection of damages and costs and attorneys' fees in connection with enforcement of this Agreement, and other sums allowed by law.

**11.2** <u>Purchaser's Default and Failure to Close.</u> If Purchaser defaults and fails to close the purchase, and neither party has exercised any right to terminate or rescind this Agreement as provided herein, the Deposit shall be retained by Seller as liquidated damages. PURCHASER AND SELLER ACKNOWLEDGE AND AGREE THAT SELLER'S DAMAGES IN THE EVENT OF BREACH BY PURCHASER WOULD BE EXTREMELY DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT THE DEPOSIT AMOUNT IS THE PARTIES' BEST ESTIMATE OF THE DAMAGES SELLER WOULD SUFFER IN THE EVENT THIS TRANSACTION FAILS TO CLOSE BY REASON OF PURCHASER'S BREACH OF THIS AGREEMENT, AND THAT SUCH ESTIMATE IS REASONABLE COMPENSATION UNDER THE CIRCUMSTANCES EXISTING ON THE EFFECTIVE DATE OF THIS AGREEMENT AND THE EXCLUSIVE REMEDY FOR PURCHASER'S DEFAULT, SINCE THE PRECISE AMOUNT OF SUCH COMPENSATION WOULD BE DIFFICULT TO DETERMINE. In addition, Purchaser will pay the cost of the Phase I Assessment, as provided in Section 3.

The foregoing is accepted and agreed to:

Initials of: _____ _____
                 Seller  Purchaser

If this transaction fails to close for any reason other than Purchaser's default, Purchaser will be entitled to a refund of the Deposit upon demand.

12. **GENERAL PROVISIONS.** (a) <u>Time of Essence.</u> TIME IS OF THE ESSENCE of each and every provision of this Agreement.
    (a) <u>Brokers.</u> Each party will defend, indemnify and hold the other party harmless from any claim, loss or liability made or imposed by any party claiming a commission or fee in connection with this transaction and arising out of its own conduct. Seller has used ALEX RHOTEN/TIFFANY JONES of COLDWELL BANKER COMMERCIAL MWRE, LLC on this transaction.
    (b) <u>Prior Agreements.</u> This document is the entire, final and complete agreement of the parties with respect to this transaction, and supersedes and replaces all written and oral agreements previously made or existing between the parties or their representatives with respect to the Option.
    (c) <u>Counterparts; PDF and Facsimile Transmissions.</u> This Agreement may be executed simultaneously or in separate counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties to this Agreement may execute the Agreement by signing counterpart signature pages. Signatures transmitted by telecopy or as emailed PDF copies shall be binding as originals, and each party hereby waive any defenses to the enforcement of the terms of this Agreement or any document sent by emailed PDF, based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").
    (d) <u>Invalidity of Provisions.</u> In the event any provision of this Agreement is declared invalid or is unenforceable for any reason, such provision shall be deleted from the Agreement and shall not invalidate any other provision contained in the Agreement.
    (e) <u>Governing Law.</u> This Agreement affects property located in the State of OREGON, and this Agreement will be interpreted and enforced in accordance with the laws of the State of Oregon.
    (f) <u>Waiver.</u> Failure of either party at any time to require performance of any provision of this Agreement shall not limit the party's right to enforce the provision. Waiver of any breach of any provision shall not be a waiver of any succeeding breach of the provision or a waiver of the provision itself or any other provision.
    (g) <u>Legal Effect.</u> THIS IS A LEGALLY BINDING CONTRACT. ALL PARTIES SHOULD SEEK ADVICE OF COUNSEL BEFORE SIGNING.
    (h) <u>Saturday, Sunday and Legal Holidays.</u> If the time for performance of any of the terms, conditions and provisions of this Agreement shall fall on a Saturday, Sunday or legal holiday, then the time of such performance shall be extended to the next business day thereafter. As used in this Agreement, the expression (i) "business day" means every day other than a nonbusiness day, and (ii) "nonbusiness day" means a Saturday, Sunday or legal holiday in the State of Oregon. In any case where a payment is due, an act is to be performed, a notice is to be delivered or a period expires under this Agreement on a non-business day, such occurrence shall be deferred until the next succeeding business day.
    (i) <u>Assignment and Succession.</u> This Agreement shall be binding upon and inure to the benefit of the parties, and their respective heirs, personal representatives, successors, and assigns, but Purchaser shall not assign or otherwise transfer any interest without the prior written consent of Seller, which may be given (or withheld) in Seller's commercially reasonable judgment. Without the need for such consent, Purchaser may assign its rights under this Agreement at any time to any person or entity that is affiliated with or under common control with Purchaser or Purchaser's principals or affiliates and may cause the title to be taken in the name of a nominee or third party at Closing, but no such action will constitute a release of Purchaser's liability under this Agreement..
    (j) <u>Oregon Statutory Notice.</u> THE PROPERTY DESCRIBED IN THIS INSTRUMENT MAY NOT BE WITHIN A FIRE PROTECTION DISTRICT PROTECTING STRUCTURES. THE PROPERTY IS SUBJECT TO LAND USE LAWS AND REGULATIONS THAT, IN FARM OR FOREST ZONES, MAY NOT AUTHORIZE CONSTRUCTION OR SITING OF A RESIDENCE AND THAT LIMIT LAWSUITS AGAINST FARMING OR FOREST PRACTICES AS DEFINED IN ORS 30.930 IN ALL ZONES. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER ORS 195.300, 195.301, AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON

LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY THAT THE UNIT OF LAND BEING TRANSFERRED IS A LAWFULLY ESTABLISHED LOT OR PARCEL, AS DEFINED IN ORS 92.010 OR 215.010, TO VERIFY THE APPROVED USES OF THE LOT OR PARCEL, TO VERIFY THE EXISTENCE OF FIRE PROTECTION FOR STRUCTURES AND THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the dates shown below.

Dated: 9 ∂9-15 , 2015

SELLER: LAURA LEE HAGENAUER

By
Name:

Address for Notices to Seller:
To be provided by Seller

Dated: Sept 16 , 2015

PURCHASER: R & R PROPERTY HOLDINGS, INC.,
a Washington corporation

By
Name: Dwaine Odinson, CA
Title: Controller

Address for Notices to Purchaser:
R & R PROPERTY HOLDINGS, INC.
Attention: Dwaine Odinson, CA
Controller
7449 River Rd.
Delta, British Columbia
CANADA V4G1B9

Telephone: (604) 946-0916
Facsimile: (604) 946-0783
Email: dwaineo@napsteel.com

FORM - Purchase and Sale Agreement (Oregon)
79982533.1 0200079-00001

EXHIBIT I
Page 4 Of 5

Case 14-63530-fra11    Doc 261    Filed 10/23/15

## EXHIBIT A

## DESCRIPTION OF PROPERTY

The Property is known also known as: 041W33DC, Tax Lot 400, Marion County, Oregon; Tax Assessor's Parcel No. R11578. The legal description of the Property is set forth below or attached to this Exhibit A (or, if not, then the parties will use the legal description as it appears in the preliminary title commitment referred to in this Agreement, and will reasonably approve and attach it as soon as available).

The Property includes, without limitation, the land, the manufacturing building and coil storage building located thereon ("Building(s)"), the cranes used in connection with the operation of the Building(s), and the chain link fence at the perimeter of the Property boundary lines, and other improvements that are located on the land and/or that are in or a part of the Building(s).

FORM - Purchase and Sale Agreement (Oregon)
79982533.1 0200079-00001

EXHIBIT I
Page 5 Of 5

Case 14-63530-fra11    Doc 261    Filed 10/23/15

*THIS INDENTURE OF LEASE, entered into this* ........................................................ *day of* ................................................ ,
*between* ....................................................................................................................................................................................
R & R PROPERTY HOLDINGS, INC., *a Washington corporation*
................................................................................................................................................................................................ ,
*hereinafter called the lessor, and* ...........................................................................................................................................
LAURA LEE HAGENAUER
................................................................................................................................................................................................ ,
......................................................................................................................................... , *hereinafter called the lessee,*

   **WITNESSETH:** *In consideration of the covenants herein, the lessor hereby leases unto the lessee those certain premises, as is, situated in the City of* ... Hubbard ................................ , *County of* ... Marion ........................ *and State of* .............................................. , *hereinafter called the premises, described as follows:*


   See attached ADDENDUM, incorporated into this Lease by this reference.


   *To Have and to Hold the premises commencing with the* ................ *day of* See attached Addendum ........ ,
*and ending at midnight on the* ............ *day of* ..........................................., ......., *for a rental of $* ...................
*for the whole term, which lessee agrees to pay, at* Landlord's address under this Lease .........................
*City of* ........................................., *State of* ......................., *at the following times and in the following amounts, to-wit:*

            SEE ATTACHED ADDENDUM


   *In consideration of the leasing of the premises and of the mutual agreements herein contained, the parties agree as follows:*

**LESSEE'S ACCEPTANCE OF LEASE**

(1) The lessee accepts ~~~ letting and agrees to pay to the order of the lessor the monthly rentals above stated for the full term of this lease, in advance, at the times and in the manner aforesaid.

**USE OF PREMISES**

(2a) The lessee shall use the premises during the term of this lease for the conduct of the following business:

See Addendum

and for no other purpose whatsoever without lessor's written consent.

(2b) The lessee will not make any unlawful, improper or offensive use of the premises; the lessee will not suffer any strip or waste thereof; the lessee will not permit any objectionable noise or odor to escape or to be emitted from the premises or do anything or permit anything to be done upon or about the premises in any way tending to create a nuisance; the lessee will not sell or permit to be sold any product, substance or service upon or about the premises, excepting such as lessee may be licensed by law to sell and as may be herein expressly permitted.

(2c) The lessee will not allow the premises at any time to fall into such a state of repair or disorder as to increase the fire hazard thereon; the lessee will not install any power machinery on the premises except under the supervision and with written consent of the lessor; the lessee will not store gasoline or other highly combustible materials on the premises at any time; the lessee will not use the premises in such a way or for such a purpose that the fire insurance rate on the improvements on the premises is thereby increased or that would prevent the lessor from taking advantage of any rulings of any agency of the state in which the premises are situated, or which would allow the lessor to obtain reduced premium rates for long term fire insurance policies.

(2d) The lessee shall comply at lessee's own expense with all laws and regulations of any municipal, county, state, federal or other public authority respecting the use of the premises. These include, without limitation, all laws, regulations and ordinances pertaining to air and water quality, Hazardous Materials as herein defined, waste disposal, air emissions, and other environmental matters. As used herein, Hazardous Material means any hazardous or toxic substance, material, or waste, including but not limited to those substances, materials, and waste listed in the U.S. Department of Transportation Hazardous Materials Table or by the U.S. Environmental Protection Agency as hazardous substances and amendments thereto, petroleum products, or such other substances, materials, and waste that are or become regulated under any applicable local, state, or federal law.

(2e) The lessee shall regularly occupy and use the premises for the conduct of lessee's business, and shall not abandon or vacate the premises for more than ten days without written approval of lessor.

(2f) Lessee shall not cause or permit any Hazardous Material to be brought upon, kept or used in or about the premises by lessee, its agents, employees, contractors, or invitees without the prior written consent of lessor, which consent will not be unreasonably withheld so long as lessee demonstrates to lessor's reasonable satisfaction that such Hazardous Material is necessary or useful to lessee's business and will be used, kept, and stored in a manner that will comply at all times with all laws regulating any such Hazardous Material so brought upon or used or kept on or about the premises.

**UTILITIES**

(3) The lessee shall pay for all heat, light, water, power, and other services or utilities used in the premises during the term of this lease.

**REPAIRS AND IMPROVEMENTS**

(4a) The lessor shall not be required to make any repairs, alterations, additions or improvements to or upon the premises during the term of this lease, except only those hereinafter specifically provided for; the lessee hereby agrees to maintain and keep the premises, including all interior and exterior walls and doors, heating, ventilating and cooling systems, interior wiring, plumbing and drain pipes to sewers or septic tank, in good order and repair during the entire term of this lease, at lessee's own cost and expense, and to replace all glass which may be broken or damaged during the term hereof in the windows and doors of the premises with glass of as good or better quality as that now in use; it is further agreed that the lessee will make no alterations, additions or improvements to or upon the premises without the written consent of the lessor first being obtained.

(4b) The lessor agrees to make all necessary structural repairs to the building, including exterior walls, foundation, roof, gutters and downspouts, and the abutting sidewalks. The lessor reserves and at any and all times shall have the right to alter, repair or improve the building of which the premises are a part, or to add thereto, and for that purpose at any time may erect scaffolding and all other necessary structures about and upon the premises and lessor and lessor's representatives, contractors and workers for that purpose may enter in or about the premises with such materials as lessor may deem necessary therefor, and lessee waives any claim to damages, including loss of business resulting therefrom.

**LESSOR'S RIGHT OF ENTRY**

(5) It shall be lawful for the lessor, the lessor's agents and representatives, at any reasonable time to enter into or upon the premises for the purpose of examining into the condition thereof, or for any other lawful purpose.

**RIGHT OF ASSIGNMENT**

(6) The lessee will not assign, transfer, pledge, hypothecate, surrender or dispose of this lease, or any interest herein, sublet, or permit any other person or persons whomsoever to occupy the premises without the written consent of the lessor being first obtained in writing; this lease is personal to lessee; lessee's interests, in whole or in part, cannot be sold, assigned, transferred, seized or taken by operation at law, or under or by virtue of any execution or legal process, attachment or proceedings instituted against the lessee, or under or by virtue of any bankruptcy or insolvency proceedings had in regard to the lessee, or in any other manner, except as above mentioned.

**LIENS**

(7) The lessee will not permit any lien of any kind, type or description to be placed or imposed upon the improvements in which the premises are situated, or any part thereof, or the land on which they stand.

**ICE, SNOW, DEBRIS**

(8) If the premises are located at street level, then at all times lessee shall keep the sidewalks in front of the premises free and clear of ice, snow, rubbish, debris and obstruction; and if the lessee occupies the entire building, the lessee will not permit rubbish, debris, ice or snow to accumulate on the roof of the building so as to stop up or obstruct gutters or downspouts or cause damage to the roof, and will save harmless and protect the lessor against any injury whether to lessor or to lessor's property or to any other person or property caused by lessee's failure in that regard.

**OVERLOADING OF FLOORS**

(9) The lessee will not overload the floors of the premises in such a way as to cause any undue or serious stress or strain upon the building in which the premises are located, or any part thereof, and the lessor shall have the right, at any time, to call upon any competent engineer or architect whom the lessor may choose, to decide whether or not the floors of the premises, or any part thereof, are being overloaded so as to cause any undue or serious stress or strain on the building, or any part thereof, and the decision of the engineer or architect shall be final and binding upon the lessee; and in the event that it is the opinion of the engineer or architect that the stress or strain is such as to endanger or injure the building, or any part thereof, then and in that event the lessee agrees immediately to relieve the stress or strain, either by reinforcing the building or by lightening the load which causes such stress or strain, in a manner satisfactory to the lessor.

**ADVERTISING SIGNS**

(10) The lessee will not use the outside walls of the premises, or allow signs or devices of any kind to be attached thereto or suspended therefrom, for advertising or displaying the name or business of the lessee or for any purpose whatsoever without the written consent of the lessor; however, the lessee may make use of the windows of the premises to display lessee's name and business when the workmanship of such signs shall be of good quality and permanent nature; provided further that the lessee may not suspend or place within said windows or paint thereon any banners, signs, sign-boards or other devices in violation of the intent and meaning of this section.

**LIABILITY INSURANCE**

(11) At all times during the term hereof, the lessee will, at the lessee's own expense, keep in effect and deliver to the lessor liability insurance policies in form, and with an insurer, satisfactory to the lessor. Such policies shall insure both the lessor and the lessee against all liability for damage to persons or property in, upon, or about the premises. The amount of such insurance shall be not less than $_____ for injury to one person, not less than $_____ for injuries to all persons arising out of any single incident, and not less than $_____ for damage to property, or a combined single limit of not less than $ 1,000,000.00 _____ It shall be the responsibility of lessor to purchase casualty insurance with extended coverage so as to insure any structure on the premises against damage caused by fire or the effects of fire (smoke, heat, means of extinguishment, etc.), or any other means of loss. It shall be the responsibility of the lessee to insure all of the lessee's belongings upon the premises, of whatsoever nature, against the same. With respect to these policies, lessee shall cause the lessor to be named as an additional insured party. Lessee agrees to and shall indemnify and hold lessor harmless against any and all claims and demands arising from the negligence of the lessee, lessee's officers, agents, invitees and/or employees, as well as those arising from lessee's failure to comply with any covenant of this lease on lessee's part to be performed, and shall at lessee's own expense defend the lessor against any and all suits or actions arising out of such negligence, actual or alleged, and all appeals therefrom and shall satisfy and discharge any judgment which may be awarded against lessor in any such suit or action.

**FIXTURES**

(12) All partitions, plumbing, electrical wiring, additions to or improvements upon the premises, whether installed by the lessor or lessee, shall be and become a part of the building in which the premises are located as soon as installed and the property of the lessor unless otherwise herein provided.

**LIGHT AND AIR**

(13) This lease does not grant any rights of access to light and air over the premises or any adjacent property.

**DAMAGE BY CASUALTY, FIRE AND DUTY TO REPAIR**

(14) In the event of the destruction of the improvements in which the premises are located by fire or other casualty, either party hereto may terminate this lease as of the date of fire or casualty, provided, however, that in the event of damage to the improvements by fire or other casualty to the extent of _____30_____ per cent or more of the sound value thereof, the lessor may or may not elect to repair the same; written notice of lessor's election shall be given lessee within fifteen days after the occurrence of the damage; if notice is not so given, lessor conclusively shall be deemed to have elected not to repair; in the event lessor elects not to repair, then and in that event this lease shall terminate with the date of the damage; but if the improvements in which the premises are located be but partially destroyed and the damage so occasioned shall not amount to the extent indicated above, or if greater than said extent and lessor elects to repair, as aforesaid, then the lessor shall repair the same with all convenient speed and shall have the right to take possession of and occupy, to the exclusion of the lessee, all or any part thereof in order to make the necessary repairs, and the lessee hereby agrees to vacate upon request, all or any part thereof which the lessor may require for the purpose of making necessary repairs, and for the period of time between the day of such damage and until such repairs have been substantially completed there shall be such an abatement of rent as the nature of the injury or damage and its interference with the occupancy of the premises by the lessee shall warrant; however, if the premises be but slightly injured and the damage so occasioned shall not cause any material interference with the occupation of the premises by lessee, then there shall be no abatement of rent and the lessor shall repair the damage with all convenient speed.

**WAIVER OF SUBROGATION RIGHTS**

(15) Neither the lessor nor the lessee shall be liable to the other for loss arising out of damage to or destruction of the premises, or the building or improvement of which the premises are a part or with which they are connected, or the contents of any thereof, when such loss is caused by any of the perils which are or could be included within or insured against by a standard form of fire insurance with extended coverage, including sprinkler leakage insurance, if any. All such claims for any and all loss, however caused, hereby are waived. Such absence of liability shall exist whether or not the damage or destruction is caused by the negligence of either lessor or lessee or by any of their respective agents, servants or employees. It is the intention and agreement of the lessor and the lessee that the rentals reserved by this lease have been fixed in contemplation that both parties shall fully provide their own insurance protection at their own expense, and that both parties shall look to their respective insurance carriers for reimbursement of any such loss, and further, that the insurance carriers involved shall not be entitled to subrogation under any circumstances against any party to this lease. Neither the lessor nor the lessee shall have any interest or claim in the other's insurance policy or policies, or the proceeds thereof, unless specifically covered therein as a joint assured.

**EMINENT DOMAIN**

(16) In case of the condemnation or purchase of all or any substantial part of the premises by any public or private corporation with the power of condemnation this lease may be terminated, effective on the date possession is taken, by either party hereto on written notice to the other and in that case the lessee shall not be liable for any rent after the termination date. Lessee shall not be entitled to and hereby expressly waives any right to any part of the condemnation award or purchase price.

**FOR SALE AND FOR RENT SIGNS**

(17) During the period of _____30_____ days prior to the date above fixed for the termination of this lease, the lessor herein may post on the premises or in the windows thereof signs of moderate size notifying the public that the premises are "for sale" or "for lease."

**DELIVERING UP PREMISES ON TERMINATION**

(18) At the expiration of the lease term or upon any sooner termination thereof, the lessee will quit and deliver up the premises and all future erections or additions to or upon the same, broom-clean, to the lessor or those having lessor's estate in the premises, peaceably, quietly, and in as good order and condition, reasonable use and wear thereof, damage by fire, unavoidable casualty and the elements alone excepted, as the same are now in or hereafter may be put in by the lessor.

**ADDITIONAL COVENANTS OR EXCEPTIONS**

(19)

SEE ATTACHED ADDENDUM

EXHIBIT _____J_____
Page _____3_____ Of _____11_____

PROVIDED, ALWAYS, and these presents are upon these conditions, that (1) if the lessee shall be in arrears in the payment of rent for a period of ten days after the same becomes due, or (2) if the lessee shall fail or neglect to perform or observe any of the covenants and agreements contained herein on lessee's part to be done, kept, performed and observed and such default shall continue for ten days or more after written notice of such failure or neglect shall be given to lessee, or (3) if the lessee shall be declared bankrupt or insolvent according to law, or (4) if any assignment of lessee's property shall be made for the benefit of creditors, or (5) if on the expiration of this lease lessee fails to surrender possession of the premises, the lessor or those having lessor's estate in the premises, may terminate this lease and, lawfully, at lessor's option immediately or at any time thereafter, without demand or notice, enter into and upon the premises and every part thereof and repossess the same, and expel lessee and those claiming by, through and under lessee and remove lessee's effects at lessee's expense, forcibly if necessary and store the same, all without being deemed guilty of trespass and without prejudice to any remedy which otherwise might be used for arrears of rent or preceding breach of covenant.

Neither the termination of this lease by forfeiture nor the taking or recovery of possession of the premises shall deprive lessor of any other action, right, or remedy against lessee for possession, rent or damages, nor shall any omission by lessor to enforce any forfeiture, right or remedy to which lessor may be entitled be deemed a waiver by lessor of the right to enforce the performance of all terms and conditions of this lease by lessee.

In the event of any re-entry by lessor, lessor may lease or relet the premises in whole or in part to any tenant or tenants who may be satisfactory to lessor, for any duration, and for the best rent, terms and conditions as lessor may reasonably obtain. Lessor shall apply the rent received from any such tenant first to the cost of retaking and reletting the premises, including remodeling required to obtain any such tenant, and then to any arrears of rent and future rent payable under this lease and any other damages to which lessor may be entitled hereunder.

Any property which lessee leaves on the premises after abandonment or expiration of the lease, or for more than ten days after any termination of the lease by landlord, shall be deemed to have been abandoned, and lessor may remove and sell the property at public or private sale as lessor sees fit, without being liable for any prosecution therefor or for damages by reason thereof, and the net proceeds of any such sale shall be applied toward the expenses of landlord and rent as aforesaid, and the balance of such amounts, if any, shall be held for and paid to the lessee.

In the event the lessee for any reason shall hold over after the expiration of this lease, such holding over shall not be deemed to operate as a renewal or extension of this lease, but shall only create a tenancy at sufferance which may be terminated at will at any time by the lessor.

In case suit or action is instituted to enforce compliance with any of the terms, covenants or conditions of this lease, or to collect the rental which may become due hereunder, or any portion thereof, the losing party agrees to pay the prevailing party's reasonable attorney fees incurred throughout such proceeding, including at trial, on appeal, and for postjudgment collection. The lessee agrees to pay and discharge all lessor's costs and expenses, including lessor's reasonable attorney's fees that shall arise from enforcing any provision or covenants of this lease even though no suit or action is instituted. Should the lessee be or become the debtor in any bankruptcy proceeding, voluntarily, involuntarily or otherwise, either during the period this lease is in effect or while there exists any outstanding obligation of the lessee created by this lease in favor of the lessor, the lessee agrees to pay the lessor's reasonable attorney fees and costs which the lessor may incur as the result of lessor's participation in such bankruptcy proceedings. It is understood and agreed by both parties that applicable federal bankruptcy law or rules of procedure may affect, alter, reduce or nullify the attorney fee and cost awards mentioned in the preceding sentence.

Any waiver by the lessor of any breach of any covenant herein contained to be kept and performed by the lessee shall not be deemed or considered as a continuing waiver, and shall not operate to bar or prevent the lessor from declaring a forfeiture for any succeeding breach, either of the same condition or covenant or otherwise.

Any notice required by the terms of this lease to be given by one party hereto to the other or desired so to be given, shall be sufficient if in writing, contained in a sealed envelope, and sent first class mail, with postage fully prepaid, and if intended for the lessor herein, then if addressed to the lessor at ................ SEE ADDENDUM

lessee at ___Tenant's address or the leased premises_____ and if intended for the lessee, then if addressed to the notice shall be deemed conclusively to have been delivered to the addressee forty-eight hours after the deposit thereof in the U.S. Mail.

All rights, remedies and liabilities herein given to or imposed upon either of the parties hereto shall extend to, inure to the benefit of and bind, as the circumstances may require, the heirs, successors, personal representatives and so far as this lease is assignable by the terms hereof, to the assigns of such parties. ....................................... Any such

In construing this lease, it is understood that the lessor or the lessee may be more than one person; that if the context so requires, the singular pronoun shall be taken to mean and include the plural, and that generally all grammatical changes shall be made, assumed and implied to make the provisions hereof apply equally to corporations and to individuals.

IN WITNESS WHEREOF, the parties have executed this lease on the day and year first hereinabove written, any corporation signature being by authority of its Board of Directors.

LANDLORD: ...........................................

TENANT: ...........................................

R & R PROPERTY HOLDINGS, INC.,

LAURA LEE HAGENAUER

a Washington corporation

Signature on attached ADDENDUM

Signature on attached ADDENDUM

The publisher strongly recommends that both the lessor and the lessee become familiar with the Americans with Disabilities Act of 1990, Public Laws 101-336. The Act may impose certain duties and responsibilities upon either or both parties to this lease. These duties and responsibilities may include but not be limited to the removal of certain architectural barriers and ensuring that disabled persons are not denied the opportunity to benefit from the same goods and services as those available to persons without disabilities. Under the Act, prohibition against discrimination applies to any person who is the owner, operator, lessor, or lessee of a place of public accommodation.

EXHIBIT 1
Page 4 Of 11

# ADDENDUM TO LEASE

DATED:     As of October ___, 2015

BETWEEN:   **R & R PROPERTY HOLDINGS, INC.,**
           **a Washington corporation**

                                               "**Lessor**" or "**Landlord**"

AND:       **LAURA LEE HAGENAUER (successor-in-interest to, and**
           **formerly doing business as, "VALLEY ROLLING LLC")**

                                               "**Lessee**" or "**Tenant**"

This Addendum to Lease ("**Addendum**") and the attached Business Lease [Stevens Ness Form No. 812] by Landlord (with this Addendum, the "**Lease**") are executed to document the terms of the lease between the parties for the following premises ("**Premises**"): approximately **27,500 square feet of space, including office space,** in the building ("**Building**") located at **3071 Schmidt Lane NE, Hubbard, Oregon 97032**, as more particularly described on the attachments to this Lease, subject to the provisions of this Addendum. The Building is located on a larger parcel of property shown on the drawing attached to this Lease as the "**Valley Rolling**" property, known as **Tax Lot 400, Marion County, Oregon** (the "**Property**").

This Addendum hereby amends, supplements and is incorporated into the Lease, as follows:

1.      **Bankruptcy Case; Closing of Purchase.** The parties acknowledge that the Property is the subject of the bankruptcy case, Case No. 14-63530-FRA11 (the "**Bankruptcy Case**"), which is pending in the United States Bankruptcy Court for the District of Oregon (the "**Bankruptcy Court**") and an executory Sale Agreement, dated as of September 16, 2015 ("**Sale Agreement**"), under which Landlord would purchase the Property and lease the Premises back to Tenant. This Lease is subject to the closing of the purchase of the Property pursuant to the Sale Agreement (the "**Closing**").

2.      **Commencement Date.** Possession will be deemed delivered to Tenant at Closing, which will be the commencement of the Lease term ("**Commencement Date**"). Rent will commence as of the Commencement Date.

3.      **Future Demising of Office Space into Two Spaces.** Initially, the Premises includes use of the entire office space within the Building, which contains approximately 4,276 square feet. However, Landlord will have the right and option to demise separately (and lease or occupy for any office-warehouse purpose) up to one-half of such office space (the "**Separate Office Space**"), so long as Landlord provides to Tenant additional warehouse space in the Building with a gross square footage equal to the area of the Separate Office Space taken from the Premises.

4.      **Year-to-Year Lease Term.** The initial Lease term (the "**Term**") will commence on the Commencement Date and continue until the last day of the calendar month in which the first anniversary of the Commencement Date occurs (the "**Renewal Date**"), at which time this Lease will be automatically renewed for an additional period of twelve (12) calendar months (a "**Renewal Term**"), and thereafter on each anniversary of the first Renewal Date will be automatically renewed for additional period(s) of twelve (12) calendar months each, <u>unless and until</u> either party notifies the other party at least ninety (90) days before a Renewal Date that the party is electing to terminate this Lease at the end of the current Term, immediately before such renewal.

5.      **Base Rent.** The regular monthly base rent amount will be <u>**$12,650.00**</u>. The monthly base rent will be due as of the fifteenth (15th) day of each month. Rent for any partial month will be prorated on the basis of a 30-day month. Rent is payable in advance. During the initial term of this Lease (ending on the first Renewal Date), the monthly base rent is included in the gross rent amount of $15,000 per month, and thereafter will be paid as part of the "triple net" Lease rental, as provided in Section 6.

6.      **Gross Lease for First Year; Triple Net Lease Thereafter.** For the initial Term of this Lease ending on the first Renewal Date, Tenant will pay a "gross" rent of $15,000 per month, including the monthly base rent amount and all other amounts to be reimbursed to Landlord for property taxes, insurance and maintenance. Thereafter,

Addendum to Lease - Stevens Ness
Business Lease Form 812
80227578.1 0052781-00013

Rider - 1

EXHIBIT ___J___
Page___5___ Of_11_

Case 14-63530-fra11    Doc 261    Filed 10/23/15

if the Lease is renewed and exten...d, this Lease is a so-called "triple net" l..e, pursuant to which Tenant will be responsible for its proportionate and allocated share of taxes, maintenance, insurance and other costs in operating the Premises during the Term. Tenant's share of such costs is referred to as **"Additional Rent."** The term **"Rent"** means the monthly base rent and all Additional Rent.

      7.     **Security Deposit; Payment.** As a condition to the commencement of the Term, Tenant will pay to Landlord (i) the monthly "gross" rent of $15,000 for the first month of the Term, and (ii) a Security Deposit of $15,000. All payments by Tenant to Landlord under the Lease will be made by wire transfer to a bank account of Landlord to be designated by written notice to Tenant.

      8.     **Property Taxes and Assessments.** Landlord is responsible for paying the property taxes and assessments ("taxes") against the Building and land area being used by Tenant, as they become due, subject to Landlord's right to collect back from Tenant during the Term Tenant's proportionate share of such amounts, as Additional Rent, commencing with the first Renewal Term. Taxes for the year in which the Lease terminates will be prorated and adjusted for any partial year. As used in this Lease, the term **"proportionate share"** of Additional Rent items that are attributable to the Building will be fixed at fifty percent (50%). The initial estimated amount payable by Tenant is: **50% of $3,833.33, equaling $1,916.67 per month** (which is included in the "gross" rent amount under this Lease for the initial Term). Tenant's proportionate share of property taxes will be due on November 1st of each year, unless Tenant is paying monthly installments as referenced below.

      Commencing with the first Renewal Term, Landlord may elect to require that Tenant shall pay to Landlord, on the fifteenth (15th) day of each month in advance, an amount equal to one twelfth (1/12) of Tenant's proportionate share of taxes to be paid for the year. The monthly payment for taxes may be adjusted by Landlord during the Term, based on Landlord's reasonable estimate of changes in the amount of annual property taxes and assessments to be paid. There will be an annual reconciliation and adjustment between the parties when the actual amount of taxes is determined. If the monthly estimated payments were less than Tenant's proportionate share of the actual taxes, Tenant will pay the deficiency to Landlord at the time Landlord submits an invoice therefor. If the monthly estimated payments were greater than the actual amount due, Landlord will credit the difference against the next monthly payments due from Tenant.

      Tenant will pay any personal property taxes on Tenant's trade fixtures and personal property.

      9.     **Maintenance and Repair.** Tenant will maintain the Premises, and Landlord will maintain the Building, parking areas, accessways, landscaping and other common area portions of the Property ("**Common Areas**"), and the parties will otherwise perform their respective obligations in **Sections 2 and 4(a)** of the Lease. If any maintenance expenses are incurred by Landlord for the Building or Common Areas, and the work performed is not specific to the correction of a maintenance problem caused by a tenant within its tenant space, such maintenance expenses will be allocated proportionately to the tenant space in the Building as a whole, and Tenant will pay its proportionate share (i.e., 50%, if it is leasing one-half of the Building) of such maintenance expenses, as Additional Rent, commencing with the first Renewal Term. Maintenance charges for the Building and Common Areas are included in the "gross" rent amount under this Lease for the initial Term.

      10.     **Property Insurance.** Landlord will maintain property casualty insurance on the Building (but not any of Tenant's own trade fixtures, inventory and personal property), as Landlord determines to be appropriate. Tenant will reimburse Landlord for Tenant's allocated and proportionate share of the cost of Landlord's property insurance, as Additional Rent, commencing with the first Renewal Term. The initial estimated amount payable by Tenant is: **$433.34 per month** (which is included in the "gross" rent amount under this Lease for the initial Term). Tenant will maintain such casualty insurance on Tenant's own trade fixtures, inventory and personal property, as Tenant determines to be appropriate.

      11.     **Liability Insurance; Indemnity** Tenant must provide Landlord with a certificate of commercial general liability insurance in the amount of at least $1,000,000 (combined single limit), as provided in **Section 11** of the Lease, naming Landlord as additional named insured and with a contractual liability endorsement covering the

EXHIBIT   J
Page   2   Of   11

indemnification obligations refere...d in this Lease. The certificate must have ...inimum 10-day written cancellation notice clause in favor of Landlord. **Failure to provide such insurance certificate may result in termination of this Lease by Landlord and/or Tenant's not being entitled to enter and continue to use the Premises.**

Tenant will defend, indemnify, and hold Landlord, and its agents and representatives, harmless from any claim, loss, or liability (including attorneys' fees incurred) arising out of or in connection with any use, entry or activity on the Premises or any injury or damage to the Premises or Building or to any person or property therein or thereon during the term of this Lease, whether or not caused or contributed by any act or omission of Landlord, its agents or representatives.

**12.    Utilities; Telephone.** Except as otherwise provided below, Tenant will pay for all utilities used by Tenant in the Premises. For utilities provided to the Building that are not separately metered, Tenant will pay 100% of such utilities until the other portion of the Building is leased, and thereafter will pay its proportionate share (50%), unless otherwise reasonably allocated by Landlord, of such utilities. Tenant will arrange for its own trash removal and arrange for its own janitorial service, if any. Water and sewer and natural gas charges will be paid by Landlord unless and until the costs are separately metered or submetered.

The telephone service for the Building will be initially in the name of Tenant and paid by Tenant. If an additional tenant is added by Landlord to the Building, the added tenant will arrange for its own telephone line.

**13.    Alterations.** Any proposed alterations by Tenant to the Premises or Building will be subject to Landlord's prior written consent, as required by this Lease.

**14.    Tenant's Use.** Under **Section 2(a)** of the Lease, Tenant's intended and permitted use of the Premises is for the following: **office and warehouse use**, and no other use without Landlord's prior written consent. Tenant keep its hours of operation posted at the Premises. Tenant will have the right to use a reasonable number of parking spaces, which will be equitably allocated by Landlord to Tenant and other tenants of the Building from time to time, but will not occupy any parking spaces designated for customers.

**15.    Tenant's Work.** There is no work required to be performed by Landlord to ready the Premises for use by Tenant. Tenant will be responsible for moving to the Premises any of Tenant's furniture, fixtures and equipment ("FF&E") that Tenant wants to use within the Premises. The Premises will be modified by Tenant to accommodate its intended use, in accordance with this Lease, but any such work must meet Code requirements.

**16.    Rent Not Paid When Due; NSF Checks.** Rent will be received by Landlord without set-off, offset, abatement or deduction of any kind. Such payments will be made in advance to Landlord's address as stated below (or as Landlord may subsequently specify by written notice to Tenant). Any rent not paid within ten (10) days after it is due will be assessed a late charge equal to **Five percent (5%) of the overdue amount**. Tenant shall pay the late charge without the need for demand by Landlord, and will reimburse Landlord for reasonable attorneys' fees incurred by Landlord in connection with any overdue payment (if Landlord consults an attorney or takes other action to collect the amounts owed). Landlord may levy and collect a late charge and/or interest in addition to all other remedies available for Tenant's default. If any check is returned by Tenant's bank for insufficient funds ("NSF"), then the bank service charges resulting from the NSF check will be promptly paid by Tenant, in addition to the late charge.

**17.    Rights of Use; Rules.** Tenant will (a) reasonably co-operate on any security measures that Landlord may take from time to time, and (b) promptly comply with reasonable rules and regulations that Landlord may adopt from time to time in order to promote safety, order, cleanliness, operation of business, and good service to the Building and its tenants, so long as they are required of all tenants at Landlord's Property. Such rules will include (without limitation) the following: (i) there is NO SMOKING allowed in the Premises, Building or restrooms; and (ii) no portion of the Premises may be used for overnight sleeping.

**18.    Transfers.** Tenant shall not assign, mortgage, lien or encumber the Premises or Tenant's leasehold estate, or sublet any portion of the Premises, or license the use of any portion of the Premises, or otherwise transfer any

Addendum to Lease - Stevens Ness
Business Lease Form 812
80227578.1 0052781-00013

Rider - 3

interest in the Premises (whether voluntary, involuntary, by operation of law or otherwise) (collectively, a **"transfer"**), without the prior written consent of Landlord pursuant to **Section 6** of the body of this Lease. Any attempted transfer without consent shall be null and void and, at the option of Landlord, will cause termination of this Lease. The giving of such consent in one instance shall not preclude the need for Tenant to obtain Landlord's consent to further transfers. If Tenant is permitted to make any transfer, Tenant shall not be relieved of its obligations, but shall remain primarily liable to Landlord for performance of all obligations.

19. **Methods for Notices**. Notices may be given by utilization of the method(s) in the Lease, or by registered mail, or by facsimile or other telecommunication device capable of transmitting or creating a written record, or personally. Notices are effective on receipt. A notice will also be deemed received if posted at or delivered to the Premises.

20. **Conduct of Business; Maintenance; Signage**. Tenant will cause its employees, customers and invitees on the Premises to conduct themselves in a good and orderly manner. Tenant will keep the interior of the Premises in good condition, repair and appearance. To identify Tenant's business, Tenant may maintain signage appropriate for the conduct of its business, subject to compliance with applicable sign codes and Landlord's prior written approval of the size, design, placement and other details of such signage.

21. **Default**. Tenant will not be in default under the Lease unless Tenant fails to pay rent or other charges within **FIVE (5) days** after receipt of written notice of nonpayment when due (which notice can be given within the 10-day grace period in the Lease and need not wait until the end of the 10-day period) or fails to perform other obligations under the Lease within **twenty (20) days** after receipt of written notice of nonperformance by Landlord, specifying in reasonable detail the nature of Tenant's default.

22. **General Provisions**. The following are added as Miscellaneous Provisions of the Lease:

(a) **Surrender of Premises**. Upon expiration of the Term or earlier termination of this Lease, Tenant shall deliver all keys to Landlord and surrender the Premises in good condition, subject to reasonable wear and tear. Tenant shall remove all of its furnishings, furniture, and trade fixtures that remain the property of Tenant (and if Tenant has made any alterations, Landlord may require that Tenant remove them. **Tenant will restore any physical damage caused by such removal (including, without limitation, resurfacing or covering holes in the walls, floors or other parts of the Premises and any necessary repainting to put the Premises in the condition required by this Lease)**. If Tenant fails to do so, such failure shall, at Landlord's option, be deemed an abandonment of the property and Landlord may retain the property and all rights of Tenant with respect to it shall cease or, by notice in writing given to Tenant within 20 days after removal was required, Landlord may elect to hold Tenant to its obligation of removal. If Landlord elects to require Tenant to remove, Landlord may effect a removal and place the property in public storage for Tenant's account. Tenant shall be liable to Landlord for the cost of removal, restoration, transportation to storage, and storage, with interest on all such expenses as provided in this Lease.

(b) **Holdover**. If Tenant does not vacate the Premises at the time required, Landlord shall have the option to treat Tenant as a tenant from month to month, subject to all of the provisions of this Lease (except that the term will be month to month and the initial base rent will be 150 percent of the base rent then being paid by Tenant), or to eject Tenant from the Building and Premises and recover damages caused by wrongful holdover. Failure of Tenant to remove property or installations which Tenant is required to remove under **paragraph 20 (b)** above shall constitute a failure to vacate to which this paragraph shall apply.

(c) **Security Deposit**. Tenant shall maintain with Landlord the security deposit as listed above. The deposit shall be held by Landlord to secure all payments and performances due from Tenant under this Lease. Landlord may commingle the deposit with its funds and will owe no interest on the deposit. Landlord may apply the deposit to the cost of performing any obligation which Tenant fails to perform within the time required by this Lease, but application by Landlord will not be the exclusive remedy for Tenant's default. If the deposit is applied by Landlord, Tenant shall pay the sum necessary to restore the deposit to its original amount on Landlord's demand. To the extent not applied by Landlord, the deposit shall be refunded to Tenant within 30 days after expiration of the Term.

(d)     **Addresse.** Tenant's addresses for notice purposes a. **Business Address: 3071 Schmidt Lane, Hubbard, OR 97032; and Personal Address: 1129 Belle Passi Rd., Woodburn, OR 97071.** Landlord's address for notice purposes and for payment of rent is: **R & R PROPERTY HOLDINGS, INC., Attention: Dwaine Odinson, CA, Controller, 7449 River Rd., Delta, British Columbia, CANADA V4G1B9.** Landlord's representative: **Dwaine Odinson.     Telephone:     (604) 946-0916, Facsimile:     (604) 946-0783.     Email: dwaineo@napsteel.com .**

(e)     **Counterparts; Fax or PDF Transmission.** This Lease (Addendum) may be executed in separate counterpart signature pages with the same effect as if both parties had signed the same document. All counterparts shall be taken together and shall constitute a single Lease. Any counterparts that are signed and transmitted by facsimile machine or as an emailed PDF copy shall be treated as an original document. Each party hereby waives any defenses to the enforcement of the terms of this document if sent by facsimile or as an emailed PDF, based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").

IN WITNESS WHEREOF, the parties have executed this instrument as of the date first above written.

Tenant:

**LAURA LEE HAGENAUER** (successor-in-interest to, and formerly doing business as "VALLEY ROLLING LLC")

By _____

Landlord:

**R & R PROPERTY HOLDINGS, INC.,**
**a Washington corporation**

By: _____
Name:  Dwaine Odinson, CA
Title:  **Controller**

Addendum to Lease - Stevens Ness
Business Lease Form 812
80227578.1 0052781-00013

Rider - 5

EXHIBIT  J
Page____4____Of_11_

DRAWING OF PREMISES
AND BUILDING



EXHIBIT I
Page 10 Of 11

Case 14-63530-fra11   Doc 261   Filed 10/23/15



DRAWING OF PROPERTY

RECORD OF
For: PBSL, LLC

VALLEY ROLLING

Scale: 1"=60"